**No. 26-2119**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

AA, et al.,
Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF STATE, et al.,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:25-cv-1819-AJT-WEF (Hon. Anthony J. Trenga)

---

# BRIEF OF THE APPELLANTS

---


BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

ANTHONY P. NICASTRO
*Director*
Office of Immigration Litigation

JESSIC R. LESNAU
*Senior Litigation Counsel*

JESSE MONTES
TIA HOCKENBERRY
JOSEPH MCCARTER
JASON ZUBATA
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Stn.
Washington, D.C. 20044

## TABLE OF CONTENTS


**INTRODUCTION** .......... **1**

**JURISDICTIONAL STATEMENT** .......... **4**

**STATEMENT OF THE ISSUES** .......... **4**

**STATEMENT OF THE CASE** .......... **5**

I. Legal Background .......... 5

A. Presidential authority over foreign affairs and national security .......... 5

B. The Immigration and Nationality Act .......... 6

C. The INA's asylum scheme .......... 8

D. The President's Executive Order and Proclamations .......... 11

II. Procedural History .......... 14

A. The Plaintiffs and their Complaint .......... 14

B. Defendants' motion to dismiss .......... 16

C. The district court's order granting Summary Judgment .......... 18

D. Defendants' motion to stay the orders .......... 19

**SUMMARY OF ARGUMENT** .......... **20**

**STANDARD OF REVIEW** .......... **24**

**ARGUMENT** .......... **25**

I. Plaintiffs' claims are neither justiciable nor reviewable because the consular nonreviewability doctrine precluded the district court from reviewing consular decisions to refuse boarding foils. .......... 25

II. Proclamations 10949 and 10998 do not except Plaintiffs. .......... 35

A. Individuals outside the United States cannot be "seeking asylum." .......... 36

B. Regardless of location, derivative Plaintiffs cannot be "seeking asylum" under the INA. .......... 41

III. Plaintiffs' due process claim fails. .......... 42

A. Plaintiffs lack a property or liberty interest in the I-730 applications. .......... 42

B. Plaintiffs do not identify any procedural deficiencies in the follow-to-join asylees adjudication process. .......... 45

IV. The Proclamations are not unconstitutionally vague as applied. .......... 47

V. At a minimum, the district court's overbroad universal remedy should be reversed as to non-parties. .......... 49

A. The APA does not authorize universal vacatur. .......... 50

B. Even if vacatur is an available remedy under the APA, it is subject to traditional equitable principles. .......... 55

**CONCLUSION .......... 61**

**CERTIFICATE OF SERVICE .......... 63**

## TABLE OF AUTHORITIES

Page(s)

CASES

*A.A v. Department of State*,
No. 25-cv-1819-AJT-WEF, 2026 WL 1498079 (E.D. Va. May 28, 2026) ........................................................................................ passim

519 U.S. 824 (1996) ........................................................................38

*American Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ........................................................................50

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ..........................................................50

*Azarmanesh v. Bondi*,
No. 23-CV-05210-LJC, 2025 WL 965955 (N.D. Cal. Mar. 31, 2025) ...38

*B&B Trucking, Inc. v. USPS*,
406 F.3d 766 (D.C. Cir. 2005) ........................................................31

*Baan Rao Thai Rest. v. Pompeo*,
985 F.3d 1020 (D.C. Cir. 2021) ......................................................30

*Baeder v. Heckler*,
768 F.2d 547 (3d Cir. 1985) ..........................................................50

*Boutilier v. INS*,
387 U.S. 118 (1967) ........................................................................48

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........................................................................52

*California v. Texas*,
593 U.S. 659 (2021) ........................................................................51

*Carolina Youth Action Project; D.S. by and through Ford v. Wilson*,
60 F.4th 770 (4th Cir. 2023) ..........................................................49

*Cela v. Garland*,
75 F.4th 355 (4th Cir. 2023) ........ 38

*Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ........ 50

*Dekoladenu v. Gonzalez*,
459 F.3d 500 (4th Cir. 2006) ........ 44

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024) ........ passim

*Doe v. Pompeo*,
451 F. Supp. 3d 100 (D.D.C. 2020) ........ 26

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) ........ 50

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ........ 54, 55

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........ 47

*Fiallo v. Bell*,
430 U.S. 787 (1977) ........ 34

*For Equal. & Reform*,
431 U.S. 816 (1977) ........ 45, 46

*French v. Assurance Co. of Am.*,
448 F.3d 693 (4th Cir. 2006) ........ 24

*Harisiades v. Shaughnessy.*,
342 U.S. ........ 28, 33

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) ........ 51

*Holly Hill Farm Corp. v. United States*,
447 F.3d 258 (4th Cir. 2006) ........ 24, 25

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)....................38

*Karimova v. Abate*,
No. 23-5178, 2024 WL 3517852 (D.C. Cir. July 24, 2024)....................33

*Kerry v. Din*,
576 U.S. 86 (2015)....................18

*Kiyemba v. Obama*,
555 F.3d 1022 (D.C. Cir. 2009)....................38

*Kiyemba v. Obama*,
559 U.S. 131 (2010)....................38

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)....................25

*LaMarche v. Mayorkas*,
2024 WL 2502929 (D. Mass. May 22, 2024)....................26

*Landon v. Plasencia*,
459 U.S. 21 (1982)....................42, 44

*United States v. Ledwith*,
No. 92-2613, 1993 WL 264576 (4th Cir. July 14, 1993)....................24

*Margoli v. Nat'l Ass'n of Immigr. Judges,*
*n v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285 (2026)....................53

*Massachusetts v. Mellon*,
262 U.S. 447 (1923)....................50

*Matushkina v. Nielsen*,
877 F.3d 289 (7th Cir. 2017)....................29

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982)....................31

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)....................50

*Mullin v. Al Otro Lado*,
146 S. Ct. 2079 (2026) ........................................................................ 36

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) .......................................................... 29, 31, 32

*National Ass'n of Diversity Officers in Higher Educ. v. Trump*,
167 F.4th 86 (4th Cir. 2026) ................................................................ 47

*Nebraska Dep't of Health & Human Servs. v. HHS*,
435 F.3d 326 (D.C. Cir. 2006) .............................................................. 50

*Negusie v. Holder*,
555 U.S. 511 (2009) .............................................................................. 39

*Niang v. Gonzales*,
492 F.3d 505 (4th Cir. 2007) ................................................................ 41

*Norton v. Southern Utah Wilderness All.*,
542 U.S. 55 (2004) ............................................................................... 50

*Olim v. Wakinekona*,
461 U.S. 238 (1983) .............................................................................. 44

*Pacito v. Trump*,
169 F.4th 895 (2026) ............................................................................ 36

*Pietersen v. U.S. Dep't of State*,
138 F.4th 552 (D.C. Cir. 2025) ...................................................... 28, 30

*Rashiah v. Ashcroft*,
388 F.3d 1126 (7th Cir. 2004) .............................................................. 36

*Saavedra Bruno v. Albright*,
197 F.3d 1135 (D.C. Cir. 1999) ............................................................ 34

*Selami v. Gonzales*,
150 F. App'x 504 (6th Cir. 2005) ......................................................... 35

*Sesay v. United States*,
984 F.3d 312 (4th Cir. 2021) ................................................................ 26

*Sessions v. Dimaya*,
584 U.S. 148 (2018)....................................................................47

*Shaughnessy v. United States ex rel. Mezei*,
345 U.S. 206 (1953)....................................................................27

*Sierra Club v. Army Corps of Engineers*,
909 F.3d 635 (4th Cir. 2018)....................................................................50

*Smith v. Ashcroft*,
295 F.3d 425 (4th Cir. 2002)....................................................................42

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024)....................................................................51

*Texas Medical Ass'n v. HHS*,
No. 23-40605, --- F.4th ----, 2026 WL 2322331 (5th Cir. Aug. 11, 2026)
....................................................................50

*Thein v. Trump*,
No. 25-cv-2369, 2025 WL 2418402 (D.D.C. Aug. 21, 2025) ....................29

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025).................................................... 3, 23, 50, 52

*Trump v. Hawaii*,
585 U.S. 667 (2018).................................................... passim

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950).................................................... passim

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936)....................................................................6

*United States v. Texas*,
599 U.S. 670 (2023)....................................................................50

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982)....................................................................51, 54

*Wildlife v. North Carolina Dep't of Transp.*,
762 F.3d 374 (4th Cir. 2014)....................................................................24

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2009) .......... 53

*Wong Wing v. United States*,
163 U.S. 228 (1896) .......... 27

*Yang v. I.N.S.*,
79 F.3d 932 (9th Cir. 1996) .......... 38

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 6

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) .......... 6, 10

STATUTES

5 U.S.C. §702(1) .......... 34, 50, 52

5 U.S.C. § 701(a)(2) .......... 34

5 U.S.C. § 702 .......... 34, 50

5 U.S.C. § 703 .......... 50

5 U.S.C. § 704 .......... 33

5 U.S.C. § 706(2) .......... 50

5 U.S.C. § 706(2)(A) .......... 24

8 U.S.C. § 1101(a)(42)(A) .......... 8

8 U.S.C. § 1101(a)(42) .......... 38

8 U.S.C. § 1157 .......... 37

8 U.S.C. § 1158(a) .......... 41, 42

8 U.S.C. § 1158(a)(1) .......... 8

8 U.S.C. § 1158(b)(1)(A) .......... 9,38

8 U.S.C. § 1158(b)(1)(B)(i) .... 8

8 U.S.C. § 1158(b)(3).... 35, 41

8 U.S.C. § 1158(b)(3)(A).... 9, 37, 41, 44

8 U.S.C. § 1158(c)(2)(D).... 37, 38, 39

8 U.S.C. § 1158(d)(5)(A)(i) .... 37, 39

8 U.S.C. § 1182(d)(5)(A).... 44

8 U.S.C. § 1182(f).... passim

8 U.S.C. § 1185(a)(1).... 7

28 U.S.C. § 1291 .... 4

Section 706 .... 50

§701(a)(1) or §702(1).... 34

RULES

Fed. R. App. P. 32(f) .... 58

Fed. R. Civ. P. 56.... 24

REGULATIONS

8 C.F.R. §208.16(c) .... 4

8 C.F.R. §208.21(d) .... 36, 37, 39

8 C.F.R. § 208.21 (2025) .... 9, 39

8 C.F.R. § 208.21(c) (2025) .... 9, 39

8 C.F.R. § 208.24(a)(2).... 38

8 C.F.R. § 223.2(e) .... 44

8 C.F.R. § 1208.16(c).... 4

21(a) .......... 35

OTHER AUTHORITIES

9 FAM 203.2 .......... 38, 48

9 FAM 203.5 .......... 10, 11, 44, 46

90 Fed. Reg. 24,497 (June 4, 2025) .......... passim

92 Cong. Rec. 2159 .......... 50

*AA*, 2026 WL 1598079 .......... 28

Executive Order 14163 .......... 36

President issued,
Executive Order No. 14,161 .......... 11

President issued,
Proclamation 10998 .......... passim

Presidential,
Proclamation 9645 .......... 36, 37, 41

Pt. C, Ch. 5 .......... 10

S. Rep. No. 79-752 .......... 50

S. Rep. No. 96-256 .......... 38

*The Path of Administrative Law Remedies*,
98 Notre Dame L. Rev. 2037 (2023) .......... 50

## INTRODUCTION

The district court issued a sweeping universal vacatur of the Government's application of the entry bars in Presidential Proclamations 10949 and 10998 to aliens abroad applying for derivative asylum status, despite the President's determination that aliens from particular countries should not be admitted. The court further ordered Defendants to issue "boarding foils" to applicants of five of the Plaintiff families, essentially forcing their admission to United States, despite the President's determination and in contravention of the consular nonreviewability doctrine. As to applications from the remaining two Plaintiff families, the court ordered Defendants to rapidly adjudicate their applications, placing the court in a supervisory role over the consular adjudication process in ways that cannot be squared with this Court's or the Supreme Court's precedent. And the district court's universal remedy not only conflicts with longstanding equitable principles; it goes beyond the relief Plaintiffs even sought. The district court's judgment must be reversed.

*First*, as discussed, the district court's order reversing consular denials and forcing admissions violated the consular nonreviewability

doctrine. And the court lacked authority to override the doctrine under the Administrative Procedure Act ("APA") because consular denials are not reviewable under it. The district court allowed Plaintiffs to evade the doctrine by accepting Plaintiffs' creative framing of their claims as a *policy* challenge even though what Plaintiffs ultimately challenged was the denials themselves.

*Second*, the court misconstrued Presidential Proclamations 10949 and 10998. The Proclamations restrict the entry into the United States of aliens from countries with deficient vetting procedures, 90 Fed. Reg. 24,497 (June 4, 2025), 59,722-27 (Dec. 16, 2025), which mirrors the proclamation at issue in *Trump v. Hawaii*, 585 U.S. 667, 679 (2018). While the Proclamations contain a provision allowing individuals to continue to "seek asylum," the district court erred in concluding that this provision excepted follow-to-join asylees from the Proclamations' entry suspension.

*Third*, the district court's procedural due process analysis was legally infirm because the U.S.-based Plaintiffs who filed derivative asylum applications lack a liberty or property interest in the beneficiaries' subsequent administrative proceedings. And regardless,

the court failed to identify any deficient process but instead took issue only with the process's outcome.

*Fourth*, the court erroneously adjudged the Proclamations unconstitutionally vague despite their language comporting neatly with agency definitions of asylum.

This Court should also reverse the district court's universal vacatur. Plaintiffs did not even request universal relief in their complaint. Yet, relying on what it considered the standard APA remedy, the district court determined that Defendants' policy of applying the Proclamations' entry bar to derivative asylum applicants must nevertheless be universally vacated. That is an extraordinary remedy that was not even requested by Plaintiffs and is not authorized by the APA, defies traditional equitable principles, and disrupts orderly judicial review. "[F]ederal courts do not exercise general oversight of the Executive Branch," *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025), and this Court should hold that the APA does not give every district judge in the country unilateral power to veto executive action nationwide or, as here, worldwide.

## JURISDICTIONAL STATEMENT

On July 29, 2026, the district court granted the Plaintiffs' Motion for Summary Judgement., JA001 (Order); JA003 (Judgment). This Court has jurisdiction to review the district court's Order granting summary judgment under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I. Whether the district court erred in concluding that: (1) the consular nonreviewability doctrine did not preclude the court's review of consular decisions on Plaintiffs' boarding foil petitions where the consular nonreviewability doctrine precludes judicial review of consular decisions and such decisions are not reviewable under the APA; and (2) that consular officers must disregard the Proclamation in adjudicating Plaintiffs claims and issuing boarding foils.

II. Whether the court erred in ruling that the provision in Proclamations 10949 and 10998 allowing aliens to continue to "seek asylum" creates an exception for derivative asylum applicant Plaintiffs from the Proclamations' entry bars where derivative

Plaintiffs are by definition not seeking asylum because they are outside the United States.

III. Whether the court erred in concluding that Defendants' policy does not comport with the Fifth Amendment's Due Process Clause where Plaintiffs fail to establish any requisite liberty or property interest and do not identify any deficient procedures.

IV. Whether the court erred in ruling that the Proclamations are unconstitutionally vague as applied to derivative Plaintiffs where the Proclamations' application to derivative asylum applicants is consistent with agency definitions on asylum.

V. Whether the court erred in universally vacating Defendants' policy where the APA does not authorize vacatur and the court's remedy violated equitable principles, especially when Plaintiffs' complaint does not request universal relief.

## STATEMENT OF THE CASE

### I. Legal Background

#### A. Presidential authority over foreign affairs and national security

The Constitution grants expansive authority to the President over foreign affairs, national security, and immigration. *See, e.g.*, *United*

*States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Although "normally Congress supplies the conditions of the privilege of entry into the United States," "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power[.]" *Knauff*, 338 U.S. at 543. Thus, where, as here, "the President acts pursuant to an express or implied authorization of Congress," that is, Sections 1182(f) and 1185(a)(1), coupled with the President's Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015).

**B. The Immigration and Nationality Act**

The Immigration and Nationality Act ("INA") provides the legal framework under which Congress has exercised and delegated its constitutional authority to determine who is permitted to enter the United States, who is permitted to remain in the United States, and for

what reasons persons may be admitted to or removed from the United States. "The exclusion of aliens is a fundamental act of sovereignty," and "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542. In this regard, Section 212(f) of the INA, 8 U.S.C. § 1182(f), provides broad authority to the President to suspend the entry of aliens into the United States:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

As the Supreme Court has stated emphatically: "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry; whose entry to suspend; for how long; and on what conditions." *Hawaii*, 585 U.S. at 684 (cleaned up).

Section 215(a)(1) of the INA, 8 U.S.C. § 1185(a)(1), further grants the President broad authority to adopt "reasonable rules, regulations, and

orders" governing the entry of aliens, and the President may make entry "subject to such limitations and exceptions as [he] may prescribe."

Over at least the past thirty years, every President has invoked these statutory authorities to suspend or impose restrictions on the entry of certain aliens or classes of aliens, and there is a consistent history for at least fifty years to implement those proclamations through visa denials to covered. *See, e.g.*, Proclamation 5377 of October 4, 1985; Proclamation 5829 of June 10, 1988.[1]

**C. The INA's asylum scheme**

The INA authorizes any alien who is physically present in, or arriving to, the United States to apply for asylum under 8 U.S.C. § 1158(a)(1), regardless of immigration status. To qualify, an applicant must satisfy the INA's definition of a "refugee" by demonstrating either past persecution or a well-founded fear of future persecution tied to race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i). In addition, the

[1] *See also, e.g.*, Presidential Proclamation 5517 (President Reagan); Exec. Order No. 12,324 (President Reagan); Exec. Order No. 12,807 (President George H.W. Bush); Presidential Proclamation 6958 (President Clinton); Presidential Proclamation 8342 (President George W. Bush); Presidential Proclamation 8693 (President Obama); Exec, Order No. 13,694 (President Obama); Exec. Order No. 13,726 (President Obama).

applicant must show that a favorable exercise of discretion is warranted—a determination entrusted expressly to the Secretary of Homeland Security or the Attorney General under 8 U.S.C. § 1158(b)(1)(A).

A spouse and/or unmarried child under 21 years of age of an individual granted asylum may receive derivative asylee status, provided no statutory bars apply and the beneficiary merits a favorable exercise of discretion. *See* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.21 (2025); *see also* Dep't of State, *Follow-to-Join Refugee and Asylees*.[2] The INA permits such "follow-to-join" benefits only in the Secretary's discretion. *See* 8 U.S.C. § 1158(b)(3)(A) ("[A] spouse or child ... of an alien who is granted asylum...*may*...be granted the same status as the alien if accompanying, or following to join, such alien." (emphasis added)); 8 C.F.R. § 208.21(c) (2025) (asylee may request accompanying or following-to-join benefits for qualifying family members by filing Form I-730).

For beneficiaries located outside the United States in jurisdictions without U.S. Citizenship and Immigration Services ("USCIS") presence,

[2] Available at https://travel.state.gov/content/travel/en/us-visas/immigrate/follow-to-join-refugees-and-asylees.html (last accessed October 6, 2026).

the beneficiary must (1) establish identity and the qualifying relationship through an approved Form I-730 and (2) be found by a consular officer not to be subject to any applicable bars or grounds of inadmissibility. *See* 9 FAM 203.5-2, *available at* https://fam.state.gov/FAM/09FAM/09FAM020305.html#M203_5_2 (last accessed October 12, 2026); *id.* 203.5-3 (permitting consular officers to perform USCIS functions where USCIS lacks overseas presence). When USCIS approves an I-730 petition but cannot conduct overseas processing, it forwards the case to the State Department's National Visa Center ("NVC"). *See* USCIS Policy Manual, Vol. 4., Pt. C, Ch. 5 § D, *available at* https://www.uscis.gov/policy-manual/ (last accessed October 6, 2026); 9 FAM 203.5-4.

After NVC transfers the case to the appropriate consular post, the post schedules an interview. *See* 9 FAM 203.5-6. The interview verifies identity and the qualifying relationship and determines whether any bars to asylum apply or whether other derogatory information warrants discretionary denial. *Id.* 203.5-7. If the consular officer finds the beneficiary eligible, the officer approves travel and issues a boarding foil and travel packet. *See id.* 203.5-15. If the officer determines the

beneficiary has not met the burden of proof, the case is returned to USCIS through the consular return process. *Id.*

**D. The President's Executive Order and Proclamations**

**1. The Executive Order**

On January 20, 2025, the President issued Executive Order No. 14,161 titled: "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. 8,451-8,453 (Jan. 30, 2025). The Executive Order stated, "It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." *Id.* § 1(a).

To accomplish this purpose, the President directed the Secretary of State and the Attorney General to, among other things, submit to the President a report "identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries" under Section 1182(f)). *Id.* § 2(b)(i).

### 2. Proclamations 10949 and 10998

After receiving the reports, the President issued Proclamation 10949, titled "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. 24,497, 24,499 (June 4, 2025).

Proclamation 10949 states that "[s]creening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing" the United States's policy of protecting "its citizens from terrorist attacks and other national security or public-safety threats" and the United States must "exercise extreme vigilance during the visa-issuance … process []" Proc., Preamble, § 1(a). To this end, the "Secretary … identified countries …. for which screening and vetting information is so deficient as to warrant a full or partial suspension of the admission of nationals from those countries." *Id.*, Preamble.

Pursuant to the President's authority in 8 U.S.C. § 1182(f), Proclamation 10949 fully suspends and limits the entry of nationals from twelve countries found to be deficient with regards to screening and vetting and determined to pose a very high risk to the United States,

including Afghanistan. *Id.* §§ 1(f), 2. The Proclamation partially suspends and limits the entry of nationals from seven countries who also pose a high level of risk to the United States. *Id.* §§ 1(g), 3.

The Proclamation includes exceptions, including lawful permanent residents; foreign nationals traveling with a valid nonimmigrant visa in certain specified categories; immediate family immigrant visas with clear and convincing evidence of identity and family relationship to U.S. citizens; adoptions; Afghan Special Immigrant Visas; immigrant visas for ethnic and religious minorities facing persecution in Iran; and individuals whose travel would serve a U.S. national interest. *Id.* § 4(b) and (d).

Within 90 days of the date of the Proclamation, and every 180 days thereafter, the Secretary, in consultation with other Executive Branch officials, must submit a report to the President "describing his assessment and recommending whether any suspensions and limitations imposed … should be continued, terminated, modified, or supplemented. *Id.*

On December 16, 2025, the President issued Proclamation 10998, titled "Restricting and Limiting the Entry of Foreign Nationals to Protect

the Security of the United States, Proclamation 10998 found that "most of the countries identified in Proclamation 10949, as well as others, continue to exhibit woeful inadequacies in screening, vetting, and provision of information." *See* 90 Fed Reg. 59,717, 59,718 (Dec. 19, 2025). Accordingly, the President decided "to continue to impose and modify the limitations" set forth in Proclamation 10949, including the entry suspension of Afghan nationals, and "to impose limitations … on the entry into the United States by certain other classes of foreign nations." *Id.* at 59,719–59,726. Relevant here, both Proclamation 10949and Proclamation 10998 explicitly state, "[t]his proclamation shall not apply to an individual who has been granted asylum by the United States … [and] [n]othing in this proclamation shall be construed to limit the ability of an individual to seek asylum." 90 Fed. Reg. at 24,504, 59,728.

## II. Procedural History

### A. The Plaintiffs and their Complaint

Plaintiffs are Afghan nationals. JA090. Plaintiffs AA, BB, CC, DD, EE, FF, and GG (collectively, "principal Plaintiffs"), were granted asylum in the United States. *Id.* ¶¶ 18, 22, 35, 44, 56, 66, 74, 81. Prior to the issuance of the Proclamations, principal Plaintiffs each filed Form I-730, Refugee/Asylee Petition, on behalf of their spouses and children under

age 21 (collectively, "derivative Plaintiffs"), and USCIS approved them. *Id.* ¶¶ 157, 161, 164, 169, 176, 180, 183. All petitions were then sent to the NVC. *Id.* Consular officers interviewed derivative Plaintiffs AA, BB, CC, DD, and EE to determine their eligibility for a boarding foil. *Id.* ¶¶ 159, 162, 166, 171, 177. The officers refused these derivative Plaintiffs' applications for boarding foils under 8 U.S.C. § 1182(f), pursuant to Proclamation 10949, and informed them they did not merit a national-interest exception to the Proclamation. *Id.* ¶¶ 160, 163, 168, 174-75, 179. The spouses and children of Plaintiffs FF and GG had not been interviewed by consular officers nor denied boarding foils. *Id.* ¶¶ 181-82, 184-85. Pursuant to the district court's July 29, 2026 order, derivative Plaintiffs in families AA, BB, CC, DD, and EE were subsequently admitted to the United States. JA278.

Plaintiffs filed suit in October 2025, alleging that Defendants' application of Proclamation 10949 to deny boarding foils to derivative Plaintiffs violates the APA and the Constitution. JA090 ¶¶ 193–226. Plaintiffs asserted four claims: (1) Defendants' denial of boarding foils is arbitrary and capricious under the APA because derivative Plaintiffs should be treated as "asylees," *id.* ¶¶ 193–210; (2) applying Proclamation

10949 to derivative Plaintiffs violates the APA and the *Accardi* doctrine, *id*. ¶¶ 211–15; (3) Plaintiffs possess an entitlement to asylum benefits, and denial of entry violates that entitlement under the Due Process Clause, *id*. ¶¶ 216–21; and (4) Proclamation 10949 is unconstitutionally vague, *id*. ¶¶ 222–26. As relief, Plaintiffs sought a declaration setting aside the State Department's policy "as used to deny boarding foils to Derivative Plaintiffs," *id*. ¶ 1, as well as additional Plaintiff-specific remedies, *id*. ¶¶ 2–7.

**B. Defendants' motion to dismiss**

On February 11, 2026, Defendants moved to dismiss. Dkt. 40. Defendants argued that: (1) the case should have been transferred to the district court for the District of Maryland as it was the appropriate venue for Plaintiffs, convenient for the parties and witnesses, and in the interest of justice (*Id*. at 8-11); (2) the District Court lacked subject matter jurisdiction over Plaintiffs' claims (*Id*. at 11-16); and (3) Plaintiffs' claims should have been dismissed for failing to state a claim upon which relief could be granted (*Id*. at 16-26);

The district court denied Defendants' motion to dismiss in its entirety. *AA. v. Department of State*, No. 25-cv-1819-AJT-WEF, 2026 WL

1498079 (E.D. Va. May 28, 2026); JA004. Specifically, it denied the Defendants' motion on jurisdictional grounds finding that both the Derivative and Principal Plaintiffs had standing, and that the State Department's policy to refuse travel documentation was reviewable under the APA, despite Defendants' arguments to the contrary. *Id.* at 10.

It also found that Plaintiffs' spouses and children were excepted to the Presidential Proclamations agreeing that Derivative Plaintiffs were "clearly "seek[ing] asylum". *Id.* at 14. Similarly, it found that the doctrine of consular nonreviewability did not apply to the State Department's independent discretion of issuing or denying boarding foils because Plaintiffs did not challenge any "discretionary decisions of the consular and embassy staff who are implementing it but instead [challenged] the defendants' blanket application of the Presidential Proclamations to Plaintiffs without any regard to their individualized circumstances." *Id.* at 15.

As to the Fifth Amendment issue, the Court distinguished this case from *Dep't of State v. Muñoz*, 602 U.S. 899, 915 (2024), finding that "Principal Plaintiffs here have their own entitlement and a 'strong expectation' under the statutory and regulatory scheme to have the

asylum claims of their family members fairly adjudicated." *Id.* at 17 (citing *See Kerry v. Din*, 576 U.S. 86, 98 (2015)). As a result, the Court concluded that their procedural due process rights were violated. *Id.*

Lastly, the district court rejected Defendants' argument that Plaintiffs' Void for Vagueness claim, with respect to Presidential Proclamation 10949, should be dismissed. The Defendants argued that the Derivative Plaintiffs did not meet the definition of an "asylee" and that Plaintiffs were given "clear notice" that their boarding foils were denied under the Presidential Proclamations and the President's authority under 8 U.S.C. § 1182(f). *Id.*

**C. The district court's order granting Summary Judgment**

The district court later granted summary judgment in Plaintiffs' favor. *AA. v. Department of State*, JA001 (Order), JA003 (Judgment), No. 25-cv-1819-AJT-WEF, 2026 WL 1498079 (E.D. Va. May 28, 2026). The court focused solely on remedy and did not revisit its earlier merits analysis from its motion-to-dismiss decision, but cited the reasoning in its May 28, 2026 memorandum opinion denying Defendants' motion to dismiss. *See* Doc. 10-4 at 4:4; JA004. The court ordered Defendants to issue boarding foils to derivative Plaintiffs AA, BB, CC, DD, and EE

within fifteen days, and to adjudicate the boarding foil applications of Plaintiffs FF and GG within thirty days. JA001. The court also universally vacated Defendants' "policy of applying Proclamations 10949 and 10998 to follow-to-join asylees as used to deny boarding foils." *Id.*

**D. Defendants' motion to stay the orders**

On August 12, 2026, Defendants filed a notice of appeal of the district court's order granting summary judgment to this Court. JA276. Defendants also moved the district court to stay the Order and Judgment pending appeal, or alternatively to stay the portion of the Order extending relief to non-parties. Dkt. 137. The district court denied the motion on August 28. JA024.

On September 9, 2026, Defendants filed an emergency motion for a temporary administrative stay and a stay pending appeal with this Court. Doc. 14. The Court denied the motion October 1, 2026. Doc. 20. Judge Quattlebaum dissented as to the universal applicability of the district court's remedy. Judge Quattlebaum would have granted the stay "to the extent it vacates the government's policy of applying the Proclamations to deny boarding foils to potential follow-to-join

beneficiaries under the APA" because in his view, the Court should limit the relief to the parties in this case." *Id.* at 9 (citation omitted).

## SUMMARY OF ARGUMENT

The district court erred when it universally vacated the State Department's policy of applying the entry bars in Proclamations 10949 and 10998 to follow-to-join asylees and ordered Defendants to (i) issue boarding foils to derivative Plaintiffs AA, BB, CC, DD, and EE and (ii) adjudicate the boarding foil applications of Plaintiffs FF and GG without regard to Proclamations 10949 and 10998.

**1.** The doctrine of consular nonreviewability bars the district court's actions here. The doctrine forbids judicial review of consular decisions admitting or excluding aliens, yet the district court reversed consular decisions denying boarding foils to derivative Plaintiffs, effectively forcing their entry into the United States. The court allowed Plaintiffs to evade the doctrine under the theory that Plaintiffs were seeking *prospective* relief via a policy challenge, but the relief Plaintiffs requested—and the court ordered—was plainly *retrospective.*

This intervention cannot be squared with the separation of powers or the Supreme Court's longstanding precedent, which emphasizes that

"no limits can be put by the courts upon that power" to "forbid aliens or classes of aliens from coming within [our] borders." *Dep't of State v. Muñoz*, 602 U.S. 899, 915 (2024) (citation and internal quotations omitted). The district court sought to evade that clear limit by treating the boarding foil refusals as non-final and subject to court supervision. This was error.

The district court ruled as such even though APA claims are still subject to the consular nonreviewability doctrine's restrictions. The court further erred in conducting APA review because aliens seeking boarding foils (like Plaintiffs) do not have a cause of action thereunder as they are not aggrieved under the INA due to their having no entitlement to admission and, nevertheless, consular decisions on boarding foils are committed to agency discretion.

**2.** The district court then misconstrued the Proclamations' provision allowing aliens to continue to "seek asylum" as to except derivative asylum applicants from the Proclamations' entry bar. Plaintiffs are not covered by that provision. Aliens outside the United States—like all derivative Plaintiffs were when they sued—by definition cannot be seeking asylum, as caselaw, the INA, and its regulations

confirm. And regardless of derivative Plaintiffs' location, they are not themselves seeking asylum under the INA; they are only following-to-join individuals in the United States with asylum status.

**3.** The court's procedural due process analysis was also legally infirm because, under *Muñoz*, the U.S.-based principal Plaintiffs who started the process by filing follow-to-join petitions lack a liberty or property interest in derivative Plaintiffs' administrative proceedings. 602 U.S. 899 at 911 (finding no cognizable due process interest in someone else's proceedings). The court distinguished *Muñoz* on the basis that principal Plaintiffs had a property interest in the proceedings because they had filed the petitions, but that theory does not overcome *Muñoz*, which also involved a U.S.-based petitioner who filed an immigration petition and then sought to assert procedural due process rights in the beneficiary's proceedings. The Supreme Court rejected the alleged property interest in *Muñoz*, and there is no distinguishable basis to find a property interest here.

Even assuming, *arguendo*, the existence of a liberty or property interest, the district court also failed to identify what procedures were deficient during the adjudication of Plaintiffs' boarding-foil petitions. The

court only took issue with the outcome of the consular decisions, but that is a *substantive*, not procedural, due process issue.

**4.** The district court then adjudged the Proclamations unconstitutionally vague despite (i) the Proclamations proscribing no conduct for which Plaintiffs must receive fair notice, and (ii) the Proclamations' language comporting neatly with agency definitions of asylum, thus negating any risk of arbitrary agency enforcement. Moreover, the void-for-vagueness doctrine is unavailable to Plaintiffs because it is a component of due process and Plaintiffs fail to establish a requisite protected liberty or property interest.

**5.** The district court separately erred in reflexively granting universal relief. The court's understanding of universal vacatur as the "default" remedy for an APA violation defies traditional equitable principles and has no footing in the APA. The APA does not authorize vacatur and, even if it did, that remedy would still be subject to traditional equitable considerations, including the principle of party-specific relief. *See Trump v. CASA*, *Inc.*, 606 U.S. 831, 852 (2025). This Court should at minimum reverse the district court's Order to the extent it applies to non-parties.

## STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment de novo. *French v. Assurance Co. of Am.*, 448 F.3d 693, 700 (4th Cir. 2006). In doing so, the Court applies the same Rule 56 standard as the district court. *See United States v. Ledwith*, No. 92-2613, 1993 WL 264576, at *6 (4th Cir. July 14, 1993); Fed. R. Civ. P. 56. Summary judgment is appropriate "when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*

**The APA.** Defendants maintain that the consular nonreviewability doctrine encompasses limitations on APA review. However, should the Court determine that APA review is permitted, then the Court may only set aside the agency action if it is determined to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see Defs. of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014). The court's role is limited to determining "whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment." *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 264 (4th Cir. 2006). The

Court "is not empowered to substitute its judgment for that of the agency." *Id.* (cleaned up).

## ARGUMENT

### I. Plaintiffs' claims are neither justiciable nor reviewable because the consular nonreviewability doctrine precluded the district court from reviewing consular decisions to refuse boarding foils.

The district court erred in reviewing consular decisions here and ordering (i) issuance of Plaintiffs AA, BB, CC, DD, and EE's boarding foils, (ii) rapid adjudication of Plaintiffs FF and GG's I-730 applications, and (ii) non-application of the Proclamations' entry bars to the I-730 applications of numerous non-parties. The doctrine does not permit reversal of consular denials, including whether or not to issue boarding foils, and the APA does not provide an end-run around the doctrine.

1. Federal courts have long recognized the doctrine of consular nonreviewability—the rule that, in the absence of affirmative congressional authorization, an alien cannot assert any right to judicial review of a visa determination. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). As the Supreme Court has explained, "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a

given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). "[F]oreign nationals seeking admission have no constitutional right to entry." *Trump v. Hawaii*, 585 U.S. 667, 703 (2018). And the "admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Id.* at 670 (quotation omitted).

The consular nonreviewability doctrine therefore provides that "the action of an executive officer to admit or exclude a noncitizen is final and conclusive" and "federal courts cannot review those decisions." *Department of State v. Muñoz*, 602 U.S. 899, 907-08 (2024); *see Sesay v. United States*, 984 F.3d 312, 315 (4th Cir. 2021). Other courts concluded that the doctrine bars review of a denial or issuance of a boarding foil. *See LaMarche v. Mayorkas*, 2024 WL 2502929, at *5 (D. Mass. May 22, 2024); *cf. Doe v. Pompeo*, 451 F. Supp. 3d 100, 117 (D.D.C. 2020) (explaining a boarding foil is a "travel document" akin to a visa). After all, such review would require "[p]robing" the Executive's determination that certain foreign nationals are ineligible to enter the United States—far more than the limited judicial review the doctrine permits. *See Sesay*, 984 F.3d at 316.

Accordingly, the Supreme Court has long held that "[t]he power of Congress to … prescribe the terms and conditions upon which [aliens] may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled"—including in instances in which there is some question about whether the applicant falls within "a class forbidden to enter the United States." *Wong Wing v. United States*, 163 U.S. 228, 233 (1896) (citation omitted); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (reaffirming that this area is "largely immune from judicial control").

Most recently, the Supreme Court reaffirmed this doctrine, and its scope, in *Muñoz*, 602 U.S. at 899, a case involving a husband denied a visa to reside in the United States with his spouse. There, the Court recognized "the longstanding principle 'that the United States can, as a matter of public policy … forbid aliens or classes of aliens from coming within their borders,' and '[n]o limits can be put by the courts upon' that power." *Id.* at 915 (quoting *Wong Wing*, 163 U.S. at 237). Further, "Congress may delegate to executive officials the discretionary authority to admit noncitizens" which is "immune from judicial inquiry or

interference." *Id.* at 907-08 (citing *Harisiades*, 342 U.S. at 588-91). And upon exercising this authority, the consular officer's decision "'to admit or to exclude [an alien]' 'is final and conclusive.'" *Id.* (quoting *Knauff*, 338 U.S. at 543).

The district court concluded that the consular nonreviewability doctrine inapplicable because Plaintiffs purportedly challenged the lawfulness of Defendants' *policy* of applying the Proclamations to I-730 beneficiaries, not consular decisions themselves. *AA*, 2026 WL 1598079, at *7 (citing *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025)). The court erred because (i) the relief the court ordered and Plaintiffs sought contravened the doctrine of consular nonreviewability, (ii) this case is distinguishable from *Pietersen* because Plaintiffs here did not seek prospective relief, and (iii) this Court should not follow *Pietersen* because it conflicts with recent Supreme Court precedent.

2. Plaintiffs clearly sought reversal of consular *decisions* on five Plaintiff families' I-730 petitions. *E.g.*, JA090 ¶¶ 160, 163, 168, 175, 179. Thus, it was improper for the district court to consider review of a purported policy challenge because the extent of the court's review and its ultimate decision were squarely precluded by consular

nonreviewability. *See Matushkina v. Nielsen*, 877 F.3d 289, 295 (7th Cir. 2017) (rejecting even an "indirect attack on [a] visa denial"); *cf. Mullin v. Doe*, 146 S. Ct. 2121, 2136 (2026) ("[C]hallengers cannot avoid a judicial-review bar by creative pleading or clever lawyering.").

Here, the district court's decision flatly contravenes the principles of consular nonreviewability. Under the court's order, it required bi-weekly status reports to supervise the Department's progress in adjudicating Plaintiffs' boarding foils and thereby imposed substantive standards on officers carrying out their duties. JA248. Rather than simply vacate the Department's policy, the court's order clearly *overturned* prior refusals by requiring the Department to re-adjudicate boarding foil applications that had been refused and mandated the issuance of boarding foils to several other Plaintiffs. *See* Id. That kind of court interference cannot be permissible under any reasonable understanding of the consular nonreviewability doctrine. The district court's orders contradict the very essence of consular non-reviewability: "review of completed consular decisions is precisely what the doctrine forbids." *Thein v. Trump*, No. 25-cv-2369, 2025 WL 2418402, at *7

(D.D.C. Aug. 21, 2025) (citing *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021)).

If district courts can suddenly command consular officials to take actions that are undeniably consular in nature, consular nonreviewability becomes illusory. The court's Order and Judgment do not (and cannot) square that circle.

3. The district court's reliance on the D.C. Circuit's decision in *Pietersen* was incorrect. There, the D.C. Circuit held that the consular nonreviewability doctrine did not foreclose an alien's (and her U.S. citizen fiancé) forward-looking APA challenge to the Department's Foreign Affairs Manual guidance. 138 F.4th at 555. However, in *Pietersen*, the appellants notably challenged only the *prospective* application of a State Department policy. Although the appellants there challenged the application of the policy to their prior visa denials in district court, on appeal they did not dispute that their "challenges to ... prior visa denials [were] unreviewable under the consular nonreviewability doctrine." *Pietersen*, 138 F.4th at 555.

*Pietersen*'s focus on prospective relief makes it distinguishable from this case, which involves retrospective relief. *Pietersen* says nothing

about the application of the consular nonreviewability doctrine where a decision had already been made denying Plaintiffs' boarding foils. The district court's reversal of the consular officers' denials, and its order that the officers issue different decisions, were clearly not forms of *prospective* relief such that *Pietersen* could be at all instructive. JA248.

If this Court were to apply *Pietersen*'s reasoning regarding prospective policy challenges here despite the retrospective relief Plaintiffs sought, it would (1) invite the kind of impermissible "creative pleading or clever lawyering" Plaintiffs have attempted, *cf. Mullin*, 146 S. Ct. at 2136, *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) (rejecting creative attempt to disguise a Tucker Act claim as an APA claim), and (2) permit Plaintiffs' "title or characterization of [their] claims" to be controlling, which they are not, *see B&B Trucking, Inc. v. USPS*, 406 F.3d 766, 768 (D.C. Cir. 2005).

Moreover, even assuming, *arguendo*, that Plaintiffs are seeking prospective relief through their policy challenge, *Pietersen* cannot be reconciled with the Supreme Court's recent decision in *Mullin v. Doe*. In *Mullin*, the plaintiffs argued that a judicial review bar on the Secretary of Homeland Security's ultimate decision regarding whether to cancel a

Temporary Protected Status designation did not extend to the Secretary's subsidiary determinations underlying the Secretary's ultimate decision. 146 S. Ct. at 2136. The Court observed that the argument "contradicts general administrative-law principles" because in "APA cases, an agency's subsidiary decisions merge into the final agency action, which is then subject to review." *Id.* "If the final agency action is unreviewable, then so too are subsidiary determinations." *Id.* The Court added that "[t]his important principle ensures that challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering." *Id.*

*Pietersen*'s holding conflicts with these general APA principles. *Pietersen* prohibits judicial review of a consular officer's ultimate decision on a visa application, yet it nevertheless allows denied applicants to challenge a consular officer's subsidiary determination that the applicant is inadmissible due to a given policy. That in turn invites denied applicants to circumvent the consular nonreviewability doctrine through "clever pleading" and "creative lawyering" as Plaintiffs do here. *See id.*

At bottom, regardless of Plaintiffs' characterizations, the district court engaged in impermissible judicial review of consular decisions

denying Plaintiffs' boarding foils and interfered in that insulated decision by ordering relief contrary to the consular officers' findings.

4. Moreover, consistent with the consular nonreviewability doctrine, the APA does not authorize review of consular decisions. That is because consular decisions are "not standard administrative fare," but arise in a field "intricately interwoven with ... foreign relations" where the norm is that such decisions are *not* subject to review. *Karimova v. Abate*, No. 23-5178, 2024 WL 3517852, at *5 (D.C. Cir. July 24, 2024) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952)). If the APA supplied a cause of action, there would be no consular nonreviewability doctrine—a visa denial is, after all, a "final agency action ... for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Yet, the *Muñoz* Court reaffirmed consular nonreviewability in precisely that circumstance, underscoring that "federal courts cannot review" a "consular officer's denial of a visa." 602 U.S. at 907-09 (further concluding an executive officer's decision "to admit or to exclude an alien" is "final and conclusive" and not subject to judicial review in federal court). Thus, issues relating to consular decisions—including the effort to

review boarding-foil denials here—are not APA reviewable for multiple reasons.

*First*, the APA does not "affect other limitations on judicial review," including the well-established principle of consular nonreviewability, 5 U.S.C. §702(1), *see Saavedra Bruno v. Albright*, 197 F.3d 1135, 1158 (D.C. Cir. 1999) (finding no APA review under §701(a)(1) or §702(1) due to consular nonreviewability).

*Second*, Plaintiffs are not "aggrieved ... within the meaning of the relevant statute [the INA]," 5 U.S.C. § 702, because they have no entitlement to enter the United States. *See Hawaii*, 585 U.S. at 703; *see also Saavedra Bruno*, 197 F.3d at 165 (finding U.S. citizen sponsors lacked standing to challenge the denial of an alien's adverse consular decision because the sponsors "have not been aggrieved 'within the meaning of the relevant statute' and have no right of review under the APA even if APA review were available" (citing 5 U.S.C. § 702)).

*Third*, the grant of a boarding foil is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has repeatedly recognized that determinations regarding the admission and exclusion of aliens are classic discretionary judgments "largely immune

from judicial control." *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Congress may delegate this discretionary authority to executive officials, and when it does, that discretion is not subject to judicial second-guessing. *Muñoz*, 602 U.S. at 907-08. The consular officers' decisions to deny Plaintiffs' boarding foils fall within this core discretionary category.

Without a permissible basis for APA review, the district court's order must be reversed.

## II. Proclamations 10949 and 10998 do not except Plaintiffs.

The Proclamations' provision permitting aliens to "seek asylum" does not except Plaintiffs from the Proclamations' entry suspension. *See* 90 Fed. Reg. 24,504, 59,728. Because Derivative Plaintiffs were outside the United States at the time they sought entry pursuant to their approved I-730 petitions, they were not "seeking asylum" under the INA. Rather, it is the alien who files the asylum form, *i.e.*, the "principal" asylum applicant, who "may confer asylum status on a spouse and child, who join the alien's claim," *i.e.*, the "derivative" or follow-to-join asylum applicant. *See Selami v. Gonzales*, 150 F. App'x 504, 506 (6th Cir. 2005) (citing 8 U.S.C. § 1158(b)(3); 8 C.F.R. § 1208.21(a)). "[A]s the name

implies, the derivative applicants do not file asylum claims of their own but instead rely on the principal applicant's claim for relief." *Id.* (citing *Rashiah v. Ashcroft*, 388 F.3d 1126, 1128 n.2 (7th Cir. 2004)). In plain terms, it is the principal asylum applicant who is "seeking asylum," not the derivate applicant.

**A. Individuals outside the United States cannot be "seeking asylum."**

Derivative Plaintiffs could not have been "seeking asylum" because they were *outside* the United States when their I-730 petitions were approved and when the complaint was filed. *See* 8 C.F.R. §208.21(d). The Supreme Court recently confirmed that asylum is available only to aliens *within* the United States. *See Mullin v. Al Otro Lado*, 146 S. Ct. 2079, 2090 (2026). The Proclamations' asylum exception thus had no effect on aliens like derivative Plaintiffs who, at the time the complaint was filed, were outside the country.[3]The Government's interpretation is confirmed by Presidential Proclamation 9645, a similar §1182(f) entry suspension issued in 2017. Proclamation 9645 included identical language saying it

---

[3] Follow-to-join *refugees* are additionally barred by Executive Order 14163, *Realigning the United States Refugee Admissions Program*, 90 Fed. Reg. 8459 (Jan. 30, 2025). The Ninth Circuit upheld the Executive Order's suspension of follow-to-join-refugee admissions and case processing. *Pacito v. Trump*, 169 F.4th 895, 923 (2026).

"shall not be construed to limit the ability of an individual to seek asylum." Procl. 9645 §6(e), 82 Fed. Reg. 45,161 (Sept. 24, 2017). It is clear this language does not allow entry by follow-to-join asylees because Proclamation 9645 also included a special exception for that group, which Proclamation 10998 does not include. *See id.* § 3(b)(iii) (exempting "any foreign national who has a document other than a visa, such as a transportation letter, an appropriate boarding foil, or an advance parole document, valid on the applicable effective date under section 7 of this proclamation or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission").

The INA, its regulations, and agency practice all confirm that aliens abroad cannot be "seeking asylum" while outside the United States. Although the INA provides that derivative beneficiaries receive "the same status as the [principal] alien," 8 U.S.C. § 1158(b)(3)(A), asylum status only attaches when the beneficiary is physically present in the United States. *See* 8 U.S.C. §§ 1157, 1158(c)(2)(D) and (d)(5)(A)(i); 8 C.F.R. § 208.21(d). USCIS and the State Department define "asylee" as an alien in the United States or at a port of entry who cannot return to

their home country due to persecution. *See* USCIS Glossary, "Asylee"[4]; 9 FAM 203.2-2. Congress likewise contemplated that asylum procedures apply only to aliens physically present in the United States. *See* S. Rep. No. 96-256, at 9 (1980). Courts have also long recognized physical presence as a prerequisite for asylum status. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987); *Cela v. Garland*, 75 F.4th 355, 361 (4th Cir. 2023); *Kiyemba v. Obama*, 555 F.3d 1022, 1030 (D.C. Cir. 2009), *vacated on other grounds*, *Kiyemba v. Obama*, 559 U.S. 131 (2010) (per curiam); *Yang v. I.N.S.*, 79 F.3d 932, 938 (9th Cir. 1996), *cert. denied*, 519 U.S. 824 (1996); *Azarmanesh v. Bondi*, No. 23-CV-05210-LJC, 2025 WL 965955, at *11 (N.D. Cal. Mar. 31, 2025) (citing 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A)).

Other INA provisions reinforce that asylum status cannot attach abroad. For example, asylum status may be terminated if an asylee "voluntarily avails" themself of their home country's protection. 8 U.S.C. § 1158(c)(2)(D); *see also* 8 C.F.R. § 208.24(a)(2); *Cela*, 75 F.4th at 361 ("asylum status can be terminated ... [if] the alien has availed himself of

[4] Available at https://www.uscis.gov/glossary-term/50691 (last accessed October 6, 2026).

his own country of nationality by returning there[.]); *Negusie v. Holder*, 555 U.S. 511, 544 (2009) (Thomas, J., dissenting) ("Congress ... has provided for the termination of asylum when an alien has voluntarily availed himself or herself of another country's protections") (citing 8 U.S.C. § 1158(c)(2)(D)) (internal quotations omitted). If derivative Plaintiffs were considered asylees while still in Afghanistan—the country of alleged persecution—USCIS could terminate their status immediately. That result only underscores the fact that asylum status cannot attach extraterritorially.

The INA also requires identity and admissibility checks before asylum may be granted. 8 U.S.C. § 1158(d)(5)(A)(i) ("[A]sylum cannot be granted until ... grounds on which an alien may be inadmissible [are checked.]"). Because inadmissibility grounds—including those invoked under § 1182(f)—apply until admission, derivative asylum status cannot attach before physical entry. *See* 8 U.S.C. § 1182(f). And 8 C.F.R. § 208.21 specifically distinguishes derivative petitioners *inside* the United States, § 208.21(c), from those abroad, § 208.21(d), making clear that the I-730 confers immigration benefits only when used for admission. *Id*.

There is nothing preventing derivative Plaintiffs from seeking asylum if they present themselves at a port-of-entry. *See* 90 Fed. Reg. 24,504 ("Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum."), 59,728 (same). But Plaintiffs are covered by the Proclamations while they are outside the United States, and thus the boarding foils were properly refused. *See* 8 U.S.C. § 1182(f).

The district court also erroneously found that derivative Plaintiffs *were* seeking asylum and thus were excepted from the Proclamations' entry ban. *AA*, 2026 WL 1498079, at *6. But the court misconstrued the Proclamations' "seek asylum" provision. That narrow exception allowing aliens to seek asylum is designed to ensure that the Proclamations do not impact removal protections for aliens *in the United States*—that is why the provision also refers to withholding of removal and the Convention Against Torture, which are common protections sought in removal proceedings but unavailable for aliens abroad. Presidential Proclamation No. 10998, ¶ (d); 8 C.F.R. §§ 208.16(c) and 1208.16(c). Applying the "seek asylum" exception here would undermine the Proclamations' very purpose—to ensure that no aliens are admitted from the identified

countries given serious concerns about inadequate vetting in those countries.[5]

### B. Regardless of location, derivative Plaintiffs cannot be "seeking asylum" under the INA.

The INA distinguishes between applications for asylum under 8 U.S.C. § 1158(a) and derivative asylum under 8 U.S.C. § 1158(b)(3). Plaintiffs could obtain such derivative status even if they were "not otherwise eligible for asylum," 8 U.S.C. § 1158(b)(3)(A)—in other words, they are only eligible for asylum as derivatives under § 1158(b)(3)(A) and not as standalone applicants under § 1158(a). *See Niang v. Gonzales*, 492 F.3d 505, 512 n.11 (4th Cir. 2007). It follows that "seek asylum" and "follow to join" are not interchangeable concepts. Derivative asylees

[5] The narrower meaning is confirmed by Presidential Proclamation 9645, a similar §1182(f) entry suspension issued in 2017. Proclamation 9645 included identical language saying it "shall not be construed to limit the ability of an individual to seek asylum." Procl. 9645 §6(e), 82 Fed. Reg. 45,161 (Sept. 24, 2017). It is clear this language does not allow entry by follow-to-join asylees because Proclamation 9645 also included a special exception for that group, which Proclamation 10998 does not include. *See id*. § 3(b)(iii) (exempting "any foreign national who has a document other than a visa, such as a transportation letter, an appropriate boarding foil, or an advance parole document, valid on the applicable effective date under section 7 of this proclamation or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission").

obtain their derivative status by virtue of another alien's prior grant of asylum and are not themselves "seek[ing] asylum." In fact, under § 1158(a), they *cannot* seek asylum. Thus, regardless of where derivative Plaintiffs are physically located, they cannot be "seeking asylum" under the INA and their boarding foils were properly refused.

Accordingly, the "seek asylum" exceptions in the Proclamations are inapplicable to Plaintiffs.

## III. Plaintiffs' due process claim fails.

### A. Plaintiffs lack a property or liberty interest in the I-730 applications.

To establish a due process violation, Plaintiffs "must first establish that [they] ha[ve] a property or liberty interest at stake." *Smith v. Ashcroft*, 295 F.3d 425, 429 (4th Cir. 2002) (citations omitted). They have not nor could they do so here; the principal Plaintiffs who already received asylum in the United States lack a property or liberty interest in the follow-to-join applications of derivative Plaintiffs.

Aliens seeking admission, like derivative Plaintiffs, "ha[ve] no constitutional rights regarding [their] application[s]" and therefore cannot bring a valid due process claim. *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). And principal Plaintiffs may not assert "a procedural due

process right in *someone else's* legal proceeding." *Muñoz*, 602 U.S. at 916. Nor can principal Plaintiffs claim that the Government has burdened a fundamental liberty interest in denying derivative Plaintiffs' boarding foils; *Muñoz* held that there is no liberty interest in residing with one's spouse in the United States. 602 U.S. at 911. *Muñoz* is thus dispositive of Plaintiffs' constitutional claims here.

The district court distinguished *Muñoz*, reasoning that principal Plaintiffs were not asserting a procedural due process right in derivative Plaintiffs' consular proceedings and boarding foil applications; rather, they were asserting a procedural due process right in *their own* proceedings because they had filed the I-730 petitions. *See AA*, 2026 WL 1498079, at *8. As explained above, Plaintiff's filing of I-730 petitions is not a proper basis upon which to distinguish *Muñoz*, which likewise involved a U.S.-based filer of a standalone immigration application asserting constitutional rights in the beneficiary's consular proceedings to no avail. The same is true here.

Moreover, even if principal Plaintiffs *were* asserting their own procedural due process rights, which they do not, the district court still erred. An alien or U.S. citizen cannot have a property or liberty interest

in a discretionary benefit. *Dekoladenu v. Gonzalez*, 459 F.3d 500, 508 (4th Cir. 2006). And a boarding foil *is* a discretionary benefit. *See* 9 FAM 203.5-3. So too is derivative asylee status, *see* 8 U.S.C. § 1158(b)(3)(A), as well as other similar travel documents sought overseas, *e.g.*, 8 U.S.C. § 1182(d)(5)(A) (advance parole); 8 C.F.R. § 223.2(e) (refugee travel documents and reentry permits).

To be sure, Plaintiffs cannot simply choose to frame their challenge as sounding only in procedural due process rather than a claim to a substantive constitutional right to entry because it is more convenient for their argument. *See* Doc. 16 at 16 (Plaintiffs' opposition to stay motion) (framing their due process claim as such). The Supreme Court has clarified that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). "[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." *Id.* n.12; *see Knauff*, 338 U.S. at 544 ("[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."); *Landon*, 459 U.S. at 32 (noting the Supreme Court's

longstanding view that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application") (citing cases). Yet, the district court jumped straight to procedural adequacy without first identifying any substantive entitlement. *See AA*, 2026 WL 1498079, at *8. Such deficiencies in the district court's due process analysis warrant reversal.

### B. Plaintiffs do not identify any procedural deficiencies in the follow-to-join asylees adjudication process.

The district court further erred by failing to identify what *procedures* are deficient in the follow-to-join asylees adjudication process. "Where procedural due process must be afforded…, there must be determined 'what process is due' in the particular context." *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 847 (1977). The district court did not do that; instead, the court relied solely on the outcome of the consular determinations to conclude that due process was violated. *See AA*, 2026 WL 1498079, at *8. That would mean the Plaintiffs' claim sounds in *substantive* due process claim, not procedural due process, and thus the district court did not attempt to justify its holding under the applicable legal standards.

While the district court and Plaintiffs disagreed with the outcome of the consular determinations, they neither identified nor alleged any procedural deficiency. Indeed, Plaintiffs received every procedural step available to overseas derivative beneficiaries: (1) USCIS approved the I-730 petitions based on the derivatives' identities and their qualifying relationships with the petitioners; and (2) for Plaintiffs AA, BB, CC, DD, and EE, consular officers conducted interviews to verify eligibility and whether any admissibility bars or derogatory information warranted denial. *See* 9 FAM 203.5-2; 203.5-3, 203.5-4, 203.5-6, 203.5-7, 203.5-15; USCIS Policy Manual, Vol. 4, ch. 5, Pt. D. (Feb. 3, 2026), JA090 ¶¶ 8, 10. While the consular officers denied boarding foils because an eligibility bar applied under Proclamation 10949, the district court identified no procedural defect in the process—it simply disagreed with the result. Disagreement with the consular officers' determination is an insufficient basis to overrule the consular officer's determination and order issuance of the boarding foils. *See Smith*, 431 U.S. at 847. Without having specified a procedural deficiency, both Plaintiffs and the district court failed to identify a due process violation, and the district court erred in holding otherwise.

## IV. The Proclamations are not unconstitutionally vague as applied.

The district court held that Proclamations 10949 and 10998 are unconstitutionally vague as applied to derivative Plaintiffs. *See AA*, 2026 WL 1498079*,* at *8. Not so.

"[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *National Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 101 (4th Cir. 2026) (citation omitted). The void-for-vagueness doctrine addresses two concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Defendants' application of the Proclamations' entry bar to derivative Plaintiffs comports with both prongs.

The first prong is not implicated because the Proclamations do not proscribe any conduct for which Plaintiffs must have fair notice. *See Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018); *see also FCC v. Fox Television Stations, Inc*, 567 U.S. 239, 254-56 ("[R]egulated parties should know what is required of them."). Even assuming *arguendo* that

the Proclamations do proscribe conduct, the void-for-vagueness doctrine cannot be extended to aliens abroad who have no constitutional entitlement to clear standards by which their entry into the country will be permitted. *See Boutilier v. INS*, 387 U.S. 118, 123 (1967). And in any event, consular officers provided Plaintiffs with adequate notice of the State Department's policy when the officers notified Plaintiffs of the boarding foil refusal under § 1182(f). JA090, ¶¶ 160, 163, 168, 174-75, 170.

As for the second prong, the Proclamations give clear guidance to the agencies implementing them because only aliens *within* the United States may seek asylum. *See supra* pp.15-16. As used in the Proclamations, USCIS and the State Department have long defined "asylee" uniformly and to cover only aliens within the United States. *See* USCIS Glossary, "Asylee"; 9 FAM 203.2-2. The district court's reasoning that the Proclamations do not provide guidance regarding "follow-to-join asylees ... in the process of 'seeking asylum,'" *AA*, 2026 WL 1498079, at *8, hinges on its erroneous reading of the "seek asylum" provision. *See supra* pp.16-18 (explaining that derivative applicants do not file asylum claims of their own but instead rely on the principal applicant's claim for

relief and thus are not separately "seeking asylum" for purposes of the Proclamations).

Moreover, the void-for-vagueness doctrine is a "component of due process" and thus requires Plaintiffs to first establish deprivation of a protected interest, which they have not. *See Carolina Youth Action Project; D.S. by and through Ford v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023). Because Plaintiffs fail to do so, *see supra* p.10, the void-for-vagueness doctrine is not an available basis to challenge the Proclamations. But even assuming Plaintiffs had properly asserted a protected due-process interest, which they have not, the State Department's established policy that the district court purported to vacate, and the individualized notices Plaintiffs received, supplied adequate notice of the policy. *See supra* pp. 47. Disagreement over the interpretation of the Proclamations is not a constitutional vagueness problem.

## V. At a minimum, the district court's overbroad universal remedy should be reversed as to non-parties.

The district court far exceeded its authority by issuing universal vacatur. Such relief is unsupported by the APA and conflicts with ordinary equitable principles by going beyond affording complete relief to

the parties. The court's vacatur should thus be reversed as to non-parties who were not before the district court.

**A. The APA does not authorize universal vacatur.**

In APA challenges, as in any other case involving non-monetary relief, federal courts are authorized to award traditional party-centered remedies such as declaratory judgments and, where necessary, appropriately tailored injunctions. But the APA does not authorize courts to radically depart from those traditional remedies, let alone to do so by default. *See United States v. Texas*, 599 U.S. 670, 693-703 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment); *Texas Medical Ass'n v. HHS*, No. 23-40605, --- F.4th ----, 2026 WL 2322331, at *8-9 (5th Cir. Aug. 11, 2026) (Ho, J., concurring); *but cf. Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826-43 (2024) (Kavanaugh, J., concurring) (expressing a contrary view).

Under Section 702 of the APA, judicial review is available only to "person[s]" who have "suffer[ed] legal wrong because of agency action or [been] adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Aggrieved persons may seek remedies as set forth in the succeeding section, 5 U.S.C. § 703. Section 703 specifies that where, as here, there

is no “special statutory review proceeding” applicable to the matter, the plaintiff may bring “any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus.” *Id.* § 703; *see also, e.g.*, *Administrative Procedure Act*, S. Doc. No. 79-248, at 36-37 (1946) (referring to Section 703 as governing remedies); 92 Cong. Rec. 2159 (1946) (similar).

“Conspicuously missing from [that list of remedies] is vacatur.” *Texas*, 599 U.S. at 698 (Gorsuch, J., concurring). Instead, Section 703’s formulation of remedies makes clear that, rather than itself creating new remedies, the APA looks to pre-existing remedies available in the “form[s] of legal action” known at the time of the APA’s enactment. As described in the Attorney General’s Manual on the APA— “a document whose reasoning [the Supreme Court has] often found persuasive,” *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63 (2004)—the APA “constitute[s] a general restatement of the principles of judicial review embodied in many statutes and judicial decisions.” U.S. Dep’t of Justice, *Attorney General’s Manual on the Administrative Procedure Act* 93 (1947); *see also* S. Rep. No. 79-752, at 44 (1945); Aditya Bamzai, *The Path of Administrative Law Remedies*, 98 Notre Dame L. Rev. 2037

(2023). And in the absence of a special review statute, the ordinary method of review before the APA was a suit in equity against a federal official, typically seeking a prohibitory injunction. *See, e.g., American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *see also* U.S. Dep't of Justice, *Final Report of the Attorney General's Committee on Administrative Procedure* 81 (1941) (noting that "the injunction is the remedy normally used" in nonstatutory suits "for the protection of the individual against illegal official action" but that courts also employed remedies such as "habeas corpus, certiorari, mandamus, [and] prohibition" and could issue "declaratory judgments").

Here, in ordering vacatur, the district court invoked § 706(2) of the APA. JA001. Many other courts, particularly in the D.C. Circuit, have long done the same. *See Texas*, 599 U.S. at 701 (Gorsuch, J., concurring). But those precedents are not probative of § 706(2)'s meaning since venue rules may give the D.C. Circuit's administrative-law precedents nationwide effect in many contexts. Regardless, those cases do not meaningfully grapple with § 706(2)'s text, which states that, in certain circumstances, a reviewing court "shall ... hold unlawful and set aside agency action." 5 U.S.C. § 706(2). As discussed above, *supra*, remedies

under the APA are governed by Section 703. Section 706 (titled "Scope of Review"), by contrast, addresses "the court's decisional process" leading up to its judgment, not "the remedies the court may authorize after reaching its judgment on the merits." *Texas*, 599 U.S. at 696 (Gorsuch, J., concurring); *but see Sierra Club v. Army Corps of Engineers*, 909 F.3d 635, 655 (4th Cir. 2018) (relying on § 706 to vacate agency action without discussing § 703 or its impact).

In the § 706 context, the APA's directive to a reviewing court to "set aside" unlawful agency action means to disregard that unlawful action in resolving the case before the court, in the same way a court would set aside and disregard an unconstitutional statute. *See Tx. Medical Ass'n*, 2026 WL 2322331, at *9 (Ho., J., concurring) (citing John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. Reg. Bull. 37, 37 (2020)). That does not mean courts have the authority to vacate the action or statute. It is well settled that courts "have no power per se to review and *annul* acts of Congress on the ground that they are unconstitutional." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also CASA*, 606 U.S. at 844 (emphasis added) (explaining that a court

considering declaratory or injunctive relief from the operation of a statute lacks the authority to "'directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs'") (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)). Instead, judicial review "amounts to little more than the negative power to disregard an unconstitutional enactment." *Mellon*, 262 U.S. at 488. Judicial review of agency rules under § 706 should function the same way. *See Texas*, 599 U.S. at 695-99 (Gorsuch, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring).

This usage also makes sense of the phrase "set aside" in all settings where § 706(2) applies. The APA expressly permits, for example, challenges to agency action to be raised in "actions for declaratory judgment []" or "habeas corpus" actions, 5 U.S.C. § 703, but "no one thinks a court adjudicating a declaratory action or a habeas petition 'vacates' agency action along the way," *Texas*, 599 U.S. at 699 (Gorsuch, J., concurring). The same principle applies in judicial review of agency adjudications, which are party-specific actions that may rely on an agency rule, but that would not provide any occasion for a reviewing court to vacate the underlying rule. *See Nebraska Dep't of Health & Human*

*Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006); *Baeder v. Heckler*, 768 F.2d 547, 553 (3d Cir. 1985). And the same is true for the APA's instruction that a court should disregard unfounded agency "findings" or "conclusions"; it makes little sense to say that a court "vacates" those findings or conclusions as opposed to simply disregarding them for purposes of resolving the case before it. *Texas*, 599 U.S. at 697-98 (Gorsuch, J., concurring).

**B. Even if vacatur is an available remedy under the APA, it is subject to traditional equitable principles.**

Even if vacatur were a permissible remedy under the APA, and it is not, it is an equitable remedy subject to ordinary equitable principles. Nothing about the term "set aside" suggests that Congress intended to "overthrow the 'bedrock practice of case-by-case judgments with respect to the parties in each case'" and authorize sweeping relief to nonparties as a matter of course. *See Texas*, 599 U.S. at 695, 702 (Gorsuch, J., concurring) (quoting *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring)). To the contrary, the APA expressly states that "[n]othing" in the statute "affects ... the power or duty of the court to ... deny relief on any ... equitable ground." 5 U.S.C. § 702(1). Courts should accordingly consider whether declaratory or injunctive relief in lieu of vacatur is appropriate

and, if not, whether any vacatur remedy should be tailored rather than universal. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) (explaining that a less drastic remedies such as partial vacatur are available); *see also Texas*, 599 U.S. at 702 (Gorsuch, J., concurring) ("Even if [the APA authorized universal vacatur], a district court should think twice—and perhaps twice again—before granting such sweeping relief." (citation omitted)).

Courts "do not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and ordinarily courts expect that Congress will make "an unequivocal statement of its purpose" if it intends to make "a drastic departure from the traditions of equity practice," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *accord Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). Nothing in the APA authorizes courts to depart from traditional equitable principles and grant universal relief as a matter of course.

Three ordinary equitable principles are particularly relevant in considering the appropriate relief here.

*First*, remedies “ordinarily operate with respect to specific parties,” rather than “on legal rules in the abstract,” *California v. Texas*, 593 U.S. 659, 672 (2021) (quotations omitted). Equitable remedies are no exception. As *CASA* confirmed, equitable relief should “‘be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*.’” 606 U.S. 831, 852 (2025) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The APA does not compel any different result. As noted above, the APA expressly preserves a court’s “power or duty” to “deny relief” on any equitable ground. 5 U.S.C. § 702(1). And even if “set[ting] aside agency action” under § 706(2) of the APA meant vacating it, “agency action” is in turn defined to include “the whole *or a part* of an agency rule,” *id.* § 551(13) (emphasis added), which readily encompasses relief directed to only certain applications of the rule at issue, including those applications that affect the plaintiffs to the lawsuit.

Here, narrower party-specific relief such as setting aside Defendants’ application of the Proclamations’ entry bar to derivative Plaintiffs’ cases would have fully remedied Plaintiffs’ alleged injuries and would better comport with the plain meaning of “setting aside” an agency action. Indeed, the district court’s issuance of universal vacatur was

especially glaring here because Plaintiffs, in their complaint, only requested that Defendants' policy be "set aside" "*as used*" to deny boarding foils to Derivative Plaintiffs…" JA090 ¶ 1 (emphasis added). Plaintiffs' own requested remedy was thus limited to their own boarding foils and the district court had no basis to go beyond the complaint and universally vacate Defendants' policy.

The district court simply reasoned that vacatur was the APA's "default remedy" without even considering that Plaintiffs sought more limited relief—an as-applied vacatur. This reasoning supposedly in support of nationwide vacatur, in fact, contravenes a fundamental principle of judicial decision making: "that points not argued will not be considered" which, as implemented, requires courts to rely on the parties to "frame the issues for decision" and decide "only the questions presented." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (reversing a decision where the Fourth Circuit had decided a case different from the one the respondent advanced). The district court defied this principle, and this Court cannot let it stand.

*Second*, in fashioning equitable relief, courts ordinarily weigh equitable considerations that may make any particular relief

inappropriate. This includes the power to withhold relief altogether even after success on the merits has been conclusively shown. *See, e.g.*, *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2009) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *Romero-Barcelo*, 456 U.S. at 313 ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). There is thus no obligation to resort to the remedy of vacatur where other remedies (such as a declaratory judgment or a tailored, party-specific injunction) would provide adequate relief to the plaintiff, assuming the plaintiff establishes its entitlement to such relief. Here, tailored relief would have adequately addressed Plaintiffs' alleged injuries. *Supra* p.58.

*Third*, the party seeking equitable relief bears the burden of demonstrating that several factors are satisfied, which Plaintiffs here would not be able to satisfy. Under "well-established principles of equity," a party seeking an injunction must affirmatively demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved" by the relief requested. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Like injunctive relief, vacatur should be treated as an extraordinary remedy that should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements. *Id.*

Plaintiffs did not do so below. The balance of the equities weighed in Defendants' favor, particularly because universal vacatur obstructs the Executive's constitutional and statutory duty to administer the immigration system and to protect national security by addressing countries with recognized vetting deficiencies. *See Hawaii*, 585 U.S. at 704 ("[W]hen it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the part of the courts is marked." (citation omitted)); *id.* ("Any rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution, and our inquiry into matters of entry and national security is highly constrained." (citation omitted)); *see also* Doc. 14 at 22-24 (Defendants' stay motion). For these reasons, even if the district court can issue an

order styled as a "vacatur," that order should conform with traditional equitable principles and be sufficiently narrowed to achieve a party-specific injunction tailored to address Plaintiffs' injuries only.

## CONCLUSION

This Court should reverse the district court's Order and Judgment in its entirety. At minimum, this Court should reverse the district court's vacatur as to non-parties.

Dated: October 15, 2026

Respectfully Submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

ANTHONY P. NICASTRO
*Director*
Office of Immigration Litigation

JESSICA R. LESNAU
*Senior Litigation Counsel*

*s/ Jesse Montes*
JESSE MONTES
TIA HOCKENBERRY
JOSEPH MCCARTER
JASON ZUBATA
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Stn.
Washington, D.C. 20044
(202) 598-3962
Jesse.A.Montes@usdoj.gov

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 11,657 words and does not exceed 13,000 words. This brief complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Century Schoolbook in font size 14.

*s/Jesse Montes*
JESSE MONTES
Trial Attorney
Office of Immigration Litigation

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system on October 15, 2026. Participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*s/Jesse Montes*
JESSE MONTES
Trial Attorney
Office of Immigration Litigation