**No. 26-2119**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

AA, et al.,
Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF STATE, et al.,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:25-cv-1819-AJT-WEF (Hon. Anthony J. Trenga)

---

# JOINT APPENDIX

---


BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

ANTHONY P. NICASTRO
*Director*
Office of Immigration Litigation

JESSIC R. LESNAU
*Senior Litigation Counsel*

JESSE MONTES
TIA HOCKENBERRY
JOSEPH MCCARTER
JASON ZUBATA
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin
Station
Washington, D.C. 20044

*Attorneys for Defendants-Appellants*

Ryan T. Scarborough
William P. Ashworth (pro hac vice)
Adam D. Harber (pro hac vice)
Danielle J. Barondess (pro hac vice)
Julian Yigal Kritz (pro hac vice)
Lindsay P. Hannibal
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
rscarborough@wc.com
washworth@wc.com
aharber@wc.com
dbarondess@wc.com
jkritz@wc.com
lhannibal@wc.com

Ghita Schwarz (pro hac vice)
Guadalupe Aguirre (pro hac vice)
Pedro Sepulveda (pro hac vice)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, NY 10004
Telephone: (516) 838-1655
gschwarz@refugeerights.org
laguirre@refugeerights.org
psepulveda@refugeerights.org

*Attorneys for Plaintiffs-Appellees*

TABLE OF CONTENTS

Order Granting Plaintiffs' Motion for Summary Judgement and Denying Defendants' Motion for Summary Judgement……………JA001

District Court Judgement……………………………………………….JA003

Memorandum Opinion Denying Defendants' Motion to Dismiss….JA004

Order Denying Motion to Stay Pending Appeal……………………..JA024

E.D.V.A. Docket Report…………………………………………….....JA029

Complaint……………………………………………………………….JA090

Transcript of Hearing held on 5/1/2026……………………………….JA160

Transcript of Motion to Dismiss……………………………………….JA189

Transcript of Motions Hearing held on 5/15/2026…………..…………JA216

Transcript of Motion to Compel hearing held on 6/3/2026…………JA245

Transcript of Proceedings held on 7/26/2026………………………....JA256

Defendants' Notice of Appeal (Dist. Ct.)………………………………JA276

Joint Status Report 9/9/2026…………………………………………JA278

Joint Status Report 9/23/2026………………………………………..JA282

Administrative Record with documents provided from the U.S. Department of State & U.S. Department of Homeland Security….JA284

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| AA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>Defendants. | ) | Civil Action No. 1:25-cv-01819 (AJT/WEF) |

**ORDER**

Before the Court are the parties' cross motions for summary judgment, [Doc. Nos. 110, 120] ("the Motions"). The Court held a hearing on the Motions on July 29, 2026. For the reasons stated from bench and in its May 28, 2026 Memorandum Opinion and Order denying Defendants' Motion to Dismiss, [Doc. No 103], it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment, [Doc. No. 110], be and the same hereby is, **GRANTED**, and judgment be entered in favor of Plaintiffs pursuant to Fed. R. Civ. P. 58; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment, [Doc. No. 120], be and the same hereby is, **DENIED**; and it is further

**ORDERED** that the State Department's policy applying Presidential Proclamations 10949 and 10998 to follow-to-join asylees as used to deny boarding foils, be and the same hereby is, **VACATED** as unlawful under 5 U.S.C. § 706(2)(A); and it is further

**ORDERED** that Defendants issue the boarding foils for Derivative Plaintiffs AA, BB, CC, DD, EE within 15 days of the Court's Order, without prejudice to Defendants' ability to impose

additional compliance measures, as required by law, on these Derivative Plaintiffs following their arrival to the United States; and it is further

**ORDERED** that Defendants adjudicate the boarding foil applications of Plaintiffs FF and GG individually and without regard to Presidential Proclamations 10949 and 10998, within 30 days of the date of this Order; and it is further

**ORDERED** that the Court retains jurisdiction over this action until all Derivative Plaintiffs have received individualized travel eligibility and border admissibility determinations and arrive in the United States, and, while the Court retains jurisdiction, the parties file a joint status report to the Court every 14 days.

The Clerk is directed to forward a copy of this Order to all counsel of the record; and to enter judgment in favor of Plaintiffs pursuant to Fed. R. Civ. P. 58.

July 29, 2026
Alexandria, Virginia

/s/
Anthony J. Trenga
Senior United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| AA, ET AL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-1384 |
| | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| STATE, ET AL | ) | |
| | ) | |
| Defendant. | ) | |

**JUDGMENT**

Pursuant to the order of this Court entered on July 29, 2026 and in accordance with Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the Plaintiffs, AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse, and against the Defendants, Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State.

LAURA GRIFFIN, CLERK OF COURT

By:__________/s/__________
Dani Zirk
Deputy Clerk

Dated: 7/29/2026
Alexandria, Virginia

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| AA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:25-cv-01819 (AJT/WEF) |

**MEMORANDUM OPINION & ORDER**

On October 21, 2025, seven families (collectively, Plaintiffs"), all native citizens of Afghanistan, and each with one person granted asylum status in the United States, filed this action claiming that the Presidential Proclamation 10949, which forbids the entry of Afghan nationals into the United States, violates the Fifth Amendment and Administrative Procedure Act ("APA") when applied to prevent the completion of the application process of their spouses' and children's already approved asylum applications. Before the Court is Defendants' Motion to Dismiss for Lack of Jurisdiction pursuant to Rule 12(b)(1) and for Failure to State a Claim pursuant to Rule 12(b)(6), or in the alternative, Motion to Transfer to the United States District Court for the District of Maryland. [Doc. No. 39]. The Court held a hearing on the Motion on May 6, 2026, following which it took the Motion under advisement. Upon consideration of the Motion, the memoranda in support thereof, [Doc. Nos. 40, 56] and in opposition thereto, [Doc. No. 51], the arguments of counsel at the hearing, and for the reasons stated below, the Motion is DENIED.

# I. FACTUAL BACKGROUND

A. Presidential Proclamations 10949, 10998

On January 20, 2025, the President issued Executive Order ("EO") 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," in which he directed the Secretary of State and Attorney General to submit a report identifying countries "for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f))." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025). After receiving such reports, the President issued Proclamation 10949, in which he invoked his authority under section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f), to suspend the entry of noncitizens into the United States from nineteen countries, including Afghanistan. Proclamation No. 10949, 90 Fed. Reg. 24497, 24499 (June 4, 2025).

On December 16, 2025, the President issued Proclamation 10998, which continued the suspension of the entry of noncitizens into the United States from Afghanistan and further suspended the entry of noncitizens into the United States from twenty additional countries as well as noncitizens applying using travel documents issued by the Palestine Authority. Proclamation No. 10998, 90 Fed. Reg. 59717, 59722–27 (Dec. 16, 2025). Centrally relevant here is that both proclamations state that they "shall not apply to an individual who has been granted asylum by the United States . . . [and] [n]othing in this proclamation shall be construed to limit the ability of an individual to seek asylum[.]" *See* Proclamation Nos. 10949, 10998, 90 Fed. Reg. at 24504, 59728.

B. Plaintiffs' Relevant Immigration History

As alleged in the Complaint, Plaintiffs AA, BB, CC, DD, EE, FF, and GG (collectively "Principal Plaintiffs"), proceeding under pseudonyms, are natives and citizens of Afghanistan and

were granted asylum in the United States following the U.S. withdrawal from Afghanistan in 2021. [Doc. No. 1] ¶¶ 2–5, 18, 22, 35, 44, 56, 66, 74, 81. Since arriving in the United States, these individuals have found employment, productively integrated into United States society, applied for and, in some cases, obtained green cards, and begun rebuilding their lives with the expectation that their wives and children would soon join them through the follow-to-join pathway. *Id.* ¶ 6. The Principal Plaintiffs each filed the Form I-730, Refugee/Asylee Petition, on behalf of their children under the age of 21 and their spouses (collectively, "Derivative Plaintiffs"). *Id.* ¶¶ 157, 161, 164, 169, 176, 180, 183. USCIS approved all of the I-730 petitions at issue, following which it sent them to the National Visa Center for consular processing.[1] *Id.* ¶¶ 33, 42, 52, 64, 72, 79, 88

Derivative Plaintiffs AA, BB, CC, DD, and EE were each interviewed by a consular officer to determine their eligibility for a "boarding foil," a document that allows an individual to travel to the United States, FAM 203.5-6(a)(5), 203.5-15, following which they were informed that "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." [Doc. No. 1] ¶¶ 159–60 (AA), 162–63 (BB), 166–68 (CC), 174–75 (DD), 177–79 (EE).[2] Derivative Plaintiffs FF and GG have neither been interviewed by a consular officer nor been denied a boarding foil. *Id.* ¶¶ 181–82, 184–85.

---

[1] When USCIS approves an I-730 petition but does not conduct overseas processing where the would-be beneficiary is located, it forwards the petition to the Department of State's National Visa Center ("NVC"). *See* USCIS, Policy Manual Vol. 4, Part C, Ch. 5, https://www.uscis.gov/policy-manual/volume-4-part-c-chapter-5 [https://perma.cc/5J5K-KRRX]; 9 FAM 203.5-4.

[2] In some cases, the Derivative Plaintiffs were informed before their interview took place that their boarding foil had been denied, [Doc. No. 1] ¶ 167, or were handed a pre-typed form on State Department letterhead, immediately following their interview, stating that their visas had been refused and their case placed into "administrative processing." *Id.* ¶ 178.

C. The Claims

Plaintiffs filed this action on October 21, 2025, alleging that Defendants' application of Presidential Proclamation 10949 denying the Derivative Plaintiffs' travel authorization violates the United States Constitution and APA. [Doc. No. 1]. Plaintiffs bring four claims for relief: (1) that the denial of Derivative Plaintiffs' boarding foils is arbitrary and capricious under the APA because Derivative Plaintiffs are "asylees" (Claim One); (2) that application of Presidential Proclamation 10949 to Derivative Plaintiffs violates the *Accardi* doctrine and APA (Claim Two); (3) that Plaintiffs are entitled to benefits under the derivative asylum process, including the admission of eligible and admissible family members to the United States who have already been approved as derivative asylees by USCIS, and the deprivation of those benefits absent an individualized determination violates their procedural due process rights (Claim III); and (4) that Presidential Proclamation 10949 is unconstitutionally vague. *Id.* ¶¶ 193–226 (Claim Four).

## II. STANDARD OF REVIEW

A. Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) challenges a court's jurisdiction over the subject matter of the suit. The motion may attack the court's subject matter jurisdiction either as a facial challenge by arguing that the "complaint simply fails to allege facts upon which subject matter jurisdiction can be based," or as a factual challenge by arguing "that the jurisdictional allegations of the complaint are not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Under the latter approach, this Court "may consider evidence outside the pleadings" to determine whether subject matter jurisdiction exists. *In re KBR, Inc.*, 744 F.3d 326, 333 (4th Cir. 2014) (citation omitted). The party asserting federal jurisdiction bears the burden of

establishing subject matter jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

B. Federal Rule of Civil Procedure 12(b)(6)

"[T]he purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint." *Randall v. U.S.*, 30 F.3d 518, 522 (4th Cir. 1994). To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it contains factual allegations that permit a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id*. Although a court must accept all factual allegations as true, the court need not "accept as true a legal conclusion couched as a factual allegation." *Id*. (quoting *Twombly*, 550 U.S. at 555).

C. Motion to Transfer Under 28 U.S.C. § 1404(a)

A district court may "[f]or the convenience of parties and witnesses, in the interest of justice . . . transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). In exercising its discretion under the statute, the Court considers the following factors: "(1) the weight accorded the plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties, and (4) the interest of justice." *Trs. of the Plumbers and Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015). The movant bears the burden of showing the propriety of transfer and must demonstrate that the "deference due plaintiffs' choice of venue is clearly outweighed by other factors." *Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1254, 1256 (E.D. Va. 1988) ("*Baylor*").

## III. DISCUSSION

Defendants move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and pursuant to pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Alternatively, Defendants move to transfer this action to the United States District Court for the District of Maryland. [Doc. No. 39].

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants argue that the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because (1) Plaintiffs lack Article III standing; and (2) the decision to issue or deny a boarding foil is within the discretion of the consular officer and therefore "committed to agency discretion by law" and unreviewable under the APA. [Doc. No. 40] at 11–16.

#### 1. Standing

Defendants argue that neither set of Plaintiffs can establish a cognizable injury-in-fact. Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies,'" which requires the plaintiff in a case to demonstrate a "personal stake" in the case, or in other words "standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish Article III standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

As to the first element, the injury in fact must be sufficiently "concrete"—meaning it must be "real, and not abstract." *TransUnion*, 594 U.S. at 424. Concrete injuries include "traditional tangible harms, such as physical harms and monetary harms," and "[v]arious intangible harms,"

including, not only those harms "specified by the Constitution itself," *id.* at 425, but other harms such as "a person's interest in being united with his relatives," can also constitute an injury for standing purposes. *Trump v. Hawaii*, 585 U.S. 667, 698 (2018). On a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct" suffice because courts "presume that general allegations embrace those specific facts that are necessary to support" a given claim. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)

As to the Derivative Plaintiffs, Defendants contend that because they are foreign nationals with no independent right to enter the U.S. or be issued a boarding foil, they have not suffered a cognizable "injury in fact." [Doc. No. 40] at 12. But Defendants put "the merits cart before the standing horse" by conflating the jurisdictional question of standing with a merits determination. *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013). Indeed, a determination on whether the Derivative Plaintiffs have any entitlement to be issued a boarding foil involves a finding on the merits that "has nothing to do with Article III standing." *Li v. Heller*, No. 23-CV-3025 (DLF), 2024 WL 3400111, at *3 (D.D.C. July 12, 2024); *Pourabdollah v. Blinken*, 2024 WL 474523, at *4 (D.D.C. Feb. 7, 2024) (holding that a visa applicant's "lack of a constitutional right to entry does not preclude Article III standing"). If anything, the Supreme Court's decision in *Department of State v. Muñoz*, 602 U.S. 899 (2024), which Defendants rely on extensively, "undermines the government's standing argument" because in reaching the merits of the case to conclude that a non-asylee spouse of a U.S. resident could not obtain a visa under the circumstances of that case, the Court implicitly rejected Defendants' argument that the case should be dismissed on jurisdictional grounds. *See Berenjian v. Blinken*, 2024 WL 3732451, at *2 (E.D. Va. Aug. 8, 2024) ("If Muñoz (or the Plaintiff here) lacked an injury, the Court would have been required to dismiss the case on jurisdictional grounds.").

Here, the Complaint alleges that the Derivative Plaintiffs have suffered various tangible and intangible harms, including the risk of "torture, degrading and inhumane treatment, or even death"; the "time, costs, and risks to attend an entirely futile interview"; harm to their "Fifth Amendment rights to due process"; and the denial of "family reunification," *See, e.g.*, [Doc. No.] ¶¶ 40, 187–92, 220. Such harms are "sufficient for standing under Article III." *See Hawaii*, 585 U.S. at 698 (recognizing "that a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact"); *Li*, 2024 WL 3400111, at *3 (finding plaintiff's separation from U.S. citizen fiance, which also caused financial hardship, as sufficient to establish injury in fact); *Pourabdollah*, 2024 WL 474523, at *4 (financial hardship qualifies as concrete harm for stnading).

Likewise, the Principal Plaintiffs in the United States have alleged their own injuries arising out of their separation from their immediate family members that remain in Afghanistan, as well as third-party standing given their "close relationship" with the Derivative Plaintiffs, their spouses or children, that face a "hindrance" in protecting their own interests due to their inability in travelling to the U.S. *See Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (recognizing that an individual has standing to bring an action on behalf of others when the individual (1) "has a close relationship" with someone else (2) facing "a hindrance" in protecting his or her own interests); *Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007) (recognizing third party standing with parental relationship between parties and "some hindrance to the third party's ability to protect his or her own interest").

Defendants do not contest the causation and redressability prongs of the standing inquiry, and those too are easily met. No one disputes that but for the Presidential Proclamations, which the consular officers relied on in denying the boarding foil or declining to schedule a consular

interview, the Plaintiffs would have had their asylum applications fully processed. And a court order requiring the processing of the asylum applications is likely to redress Plaintiffs' injuries. Plaintiffs thus have established Article III standing to bring their claims.

2. Agency Discretion

Next, Defendants argue that the Court lacks jurisdiction to review Plaintiff's claims because they are "committed to agency discretion by law." [Doc. No. 40] at 13 (citing 5 U.S.C. § 701(a)(2)).

The APA "embodies a 'basic presumption of judicial review'" and "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 771 (2019) (quoting U.S.C. § 706(2)(A)). The APA does not permit judicial review "'to the extent that' a relevant statute precludes it . . . or the agency action is 'committed to agency discretion by law.'" *Id.* (quoting 5 U.S.C. §§ 701(a)(1), (2)). "Agency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'" *Pharm. Coal. For Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985)). To determine whether the exception to the "basic presumption of judicial review" applies, courts ask (1) whether the kind of agency action at issue has "traditionally been committed to agency discretion," taking into account whether the action is "coercive" or more akin to an exercise of prosecutorial discretion; and (2) whether the relevant statutory provisions "intentionally limit[] the agency's discretion by setting guidelines or providing a limit." *See Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 290 (4th Cir. 2022) (citing *Chaney*, 470 U.S. at 832).

Defendants argue that the decision to deny boarding foils is "committed to agency discretion by law" and thus judicially unreviewable under the *Holbrook* test. In that regard, Defendants contend that such a decision "involves an interest-balancing of factors that are within the agency's expertise" because the admission and exclusion of foreign nationals is largely an executive function and that there are no intentional statutory limits on the agency's decision. [Doc. No. 40] at 14–15. Plaintiffs, in opposition, argue that the *Holbrook* analysis weighs in favor of judicial reviewability because, in denying a boarding foils (and in some of the Plaintiffs' cases, withholding a decision), the consular officers, whose actions are intentionally limited by Congress, applied a "blanket ban to every Afghan derivative asylee without regard to individual circumstances or other considerations that would be a matter of discretion." [Doc. No. 51] at 10–13.

The State Department's blanket adoption of a policy to refuse travel documentation to all individuals affected by the Presidential Proclamations is reviewable under the APA. Although the Executive branch's authority on immigration matters necessarily allows consular officers to make certain discretionary decisions concerning immigration, *Hawaii*, 585 U.S. at 702, the Complaint alleges facts that make plausible Plaintiffs' claim that no individualized determination was ever made concerning the denial of the Derivative Plaintiffs' boarding foils. Instead, the Derivative Plaintiffs were denied boarding foils "pursuant to Presidential Proclamation [10949]," in some cases even before the interview with the consular officer took place. *See* [Doc. No. 1] ¶ 167. The denial of the Derivative Plaintiffs' boarding foils is therefore akin to "an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation," which is not "committed to agency discretion by law" under § 701(a)(2). *CASA de Maryland v. Dep't of Homeland Sec.*, 924 F.3d 684, 699–701 (4th Cir. 2019) (concluding that Acting Secretary of

Homeland Security's decision to rescind the Deferred Action for Childhood Arrivals ("DACA") policy was judicially reviewable because "DACA's rescission involves a broad enforcement policy, not an individual decision").

Defendants contend that unlike the agency conduct in *CASA de Maryland*, the consular officers here engaged in discretionary decision making when they decided to deny or withhold a decision on the Derivative Plaintiffs' boarding foils in compliance with what they thought was required under a Presidential Proclamation; and in any event, the consular officers refusal to act was not "coercive" and therefore unreviewable under *Heckler v. Cheney* given that Plaintiffs do not have a constitutional liberty interest in the conferral of discretionary benefits. Neither contention is sufficient to eliminate the Court's jurisdiction to review the agency action at issue under the APA. In that regard, the APA "incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). Here, the Court's judicial function clearly extends to reviewing an agency's interpretation of the Presidential Proclamations. *Casa de Maryland*, 924 F.3d at 701 n.13 ("An otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion.") (quoting *NAACP v. Trump*, 298 F.Supp.3d 209, 231 (D.D.C. 2018)). Nor is there a lack of a "coercive" effect stemming from the Defendants' decision to prevent family unification after the approval of asylum applications simply because Plaintiffs do not have an independent constitutional right to family reunification.

As to the second *Holbrook* inquiry of whether "the statute intentionally limits the agency's discretion by setting guidelines or providing a limit," the State Department's guidelines for "V92 following-to-join asylees" provide that USCIS "has primary responsibility for Form I-730 petition

adjudications of following-to-join asylees," 9 FAM 203.5-3(a)(2), and "[c]onsular officers perform services on behalf of DHS/USCIS to facilitate V92 case processing abroad and to verify the eligibility of the approved beneficiaries, but not for adjudication of the Form I-730 petition." *Id.* 203.5-3(5). Indeed, the circumscribed purpose of the V92 interview is to (1) "[v]erify the beneficiary's identity"; (2) "[c]onfirm the qualifying relationship between the petitioner and beneficiary"; and (3) [d]etermine whether any bars to asylum exist, and if a bar does not apply, assess whether other derogatory information exists that would warrant a discretionary denial." *Id.* 203.5-7(a). And the guidelines provide a list of factors for the consular officer to consider when "requesting a discretionary denial," which the guidelines provide is "extremely rare" and is only "applicable when derogatory information in a case is egregious." *Id.* 203.5-9(12). If the consular officer finds that a V92 beneficiary is either subject to a bar to asylum, or warrants discretionary denial, they are required to send the case back to USCIS for additional processing. *Id.* 203.5-10. In sum, the State Department's own guidelines acknowledge the limited discretion consular officers have in approving boarding foils and provide meaningful standards for judicial review. For these reasons, Plaintiffs have "identified specific statutory standards against which to judge the Government's action underlying [their] claim, and [their] challenge is to a broad agency enforcement policy rather than to an individual decision." *See Doe v. Jaddou*, No. CV TDC-24-0650, 2024 WL 2057144 (D. Md. May 8, 2024). Therefore, Plaintiffs' claims are not "committed to agency discretion by law" and are judicially reviewable.

For the reasons discussed above, the Court DENIES Defendants' Motion to Dismiss on jurisdictional grounds pursuant FRCP 12(b)(1).

B. Motion to Dismiss for Failure to State a Claim.

Next, Defendants argue that the Complaint should be dismissed under Rule 12(b)(6) because it fails to state a claim upon which relief can be granted. Specifically, Defendants contend that (1) the Derivative Plaintiffs do not meet the asylum exception in the Presidential Proclamations; (2) the doctrine of consular non-reviewability precludes this Court from granting relief; (3) Plaintiffs have no cognizable liberty interest under the Constitution; and (4) the Presidential Proclamations 10949 and 10998 are not void for vagueness. [Doc. No. 40] at 16–26.

1. Asylum Exception

At the heart of this lawsuit is whether Plaintiffs' spouses and children fall under the exception to the Presidential Proclamations, which under their express terms, "shall not apply to an individual who has been granted asylum by the United States" or "limit the ability of an individual to seek asylum." *See* Proclamation Nos. 10949, 10998, 90 Fed. Reg. at 24504, 59728. Although neither the INA nor its implementing regulations define "asylee," Defendants point to the USCIS and State Department definitions of an "asylee," which defines asylees as noncitizens in the United States,[3] to argue that because the Derivative Plaintiffs are outside the country, they do not meet the asylee exception in Presidential Proclamations 10949 and 10998.[4] Plaintiffs, in opposition, argue that the Derivative Plaintiffs, who are outside the United States, have been

[3] USCIS defines "asylee" as:

> An alien in the United States or at a port of entry who is unable or unwilling to return to their country of nationality, or to seek the protection of that country because of persecution or a well-founded fear of persecution.

*See* USCIS, *Glossary Terms*, Asylee, https://www.uscis.gov/glossary-term/50691 [https://perma.cc/9ZDM-HD2Y]. The State Department defines an "asylee" as:

> [A] noncitizen in the United States who is found to be unable or unwilling to return to their country of nationality, or to seek the protection of that country because of persecution or a well-founded fear of persecution.

9 FAM 203.2-2.

[4] Defendants also rely on 8 U.S.C. § 1158(d)(5)(A)(i) and 8 C.F.R. §§ 208.21(c) as further support for their argument that the Derivative Plaintiffs are not "asylees" excepted from the Presidential Proclamations. [Doc. No. 40] at 18–13.

"granted asylum" or at a minimum are "seek[ing] asylum" and are therefore exempt from the Presidential Proclamations. [Doc. No. 51] at 23.

As discussed above, Derivative Plaintiffs have had their I-730 Refugee/Asylee Relative Petition approved by USCIS and are awaiting their eligibility determination of whether they can "travel to the U.S. as a family member of an individual granted asylee status." 9 FAM 203.5-2(a). Irrespective of whether Derivative Plaintiffs have been "granted asylum," which the Court need not decide for the purposes of its decision here, the Derivative Plaintiffs are clearly "seek[ing] asylum" such that they are excepted from the reach of the Presidential Proclamations.

2. Consular Non-reviewability

Next, Defendants argue that Plaintiffs cannot state a claim upon which relief can be granted because federal courts are barred from reviewing a denial of a boarding foil under the doctrine of consular non-reviewability. [Doc. No. 40] at 19–21. In opposition, Plaintiffs argue the doctrine of consular non-reviewability does not apply to the facts of this case because, unlike the cases Defendants cite, Plaintiffs are not challenging any discretionary and individualized decisions made by consular officials, but rather are opposing their application of the Proclamations' categorical ban. [Doc. No. 51] at 15. For the reasons discussed below, the doctrine of consular non-reviewability does not bar Plaintiffs' claims.

The doctrine of consular nonreviewability "instructs that ordinarily 'it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien.'" *Sesay v. United States*, 984 F.3d 312, 315 (4th Cir. 2021) (quoting *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950)). It is "well settled," however, that "challenges to the lawfulness of regulations or policies governing consular decisions"—as opposed to "particular" determinations by consular officers—are

reviewable. *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025); *see also Sunny v. Biden*, 573 F. Supp. 3d 759, 771 (E.D.N.Y. 2021) (holding that plaintiffs' challenge was not bared by doctrine of consular non-reviewability because it did "not seek to expedite individual cases or litigate a specific deferral [and instead] aims at enjoining a State Department policy that plaintiffs believe violates the INA and the Administrative Procedures Act").

Here, as discussed above with respect to whether Plaintiffs' claims are committed to agency discretion under the APA, Plaintiffs do not challenge any "discretionary decisions of the consular and embassy staff who are implementing it," but instead Defendants' blanket application of the Presidential Proclamations to Plaintiffs without any regard to their individualized circumstances. *Sunny*, 573 F. Supp. 3d at 771. Where, as here, no consular officer has made any discretionary decision, the doctrine of consular nonreviewability does not apply. *See Ameen v. U.S. Dep't of State*, 2024 WL 3416264, at *3 (E.D. Va. July 15, 2024) ("[T]he doctrine of consular non-reviewability applies only *once a consular officer has made a decision*." (emphasis added)).

3. <u>Fifth Amendment Claim</u>

Next, Defendants argue that Plaintiffs have failed to establish that Defendants violated any Fifth Amendment rights because they have not identified a cognizable liberty or property interest at stake. [Doc. No. 40] at 22–24.

The Fifth Amendment prohibits the government from depriving individuals of their "life, liberty, or property, without due process of law." U.S. CONST. amend. V. "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). Plaintiffs are entitled to procedural due process rights when nonconstitutional law, such as a statute

or regulation, creates "an expectation" that they would not be deprived of that kind of liberty without fair procedures. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

Defendants contend that the Supreme Court's decision in *Dep't of State v. Muñoz* prevents Plaintiffs from asserting a Fifth Amendment claim because they do not have a cognizable liberty interest. In *Muñoz*, a U.S. citizen brought a Fifth Amendment due process claim after her husband's visa application was denied under § 1182(a)(3)(A)(ii), which allows a consular officer to determine an individual is inadmissible if they have reason to believe that they have engaged in "unlawful activity." *Muñoz*, 602 U.S. at 902. The plaintiff argued that "even though visa denials are ordinarily unreviewable by courts" under the doctrine of consular nonreviewability, "the right to live with her noncitizen spouse in the United States is implicit in the 'liberty' protected by the Fifth Amendment" and the denial of her husband's visa without any explanation deprived her of her due process right. *Id.* at 903. Ruling against the plaintiff, the Supreme Court held that "a citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country," stressing that the Constitution does not require prioritizing "the unity of the immigrant family." *Id.* at 910 (reasoning that "while Congress may show special solicitude to noncitizen spouses, such solicitude is 'a matter of legislative grace rather than fundamental right'").

The plaintiff in *Muñoz* claimed "an unenumerated constitutional right" in the "right to bring her noncitizen spouse to the United States" and the Supreme Court in *Muñoz* squarely focused on whether an individual has a "procedural due process right in *someone else's* legal proceeding" to provide an exception to the doctrine of consular nonreviewability. *Id.* at 916 (emphasis in original). In contrast, here, Plaintiffs claim a procedural due process right to have followed the detailed procedures of the asylum statute and its regulatory scheme, which allows for persons with asylum status, such as the Principal Plaintiffs, to seek asylum for their spouses and children. 8 U.S.C. §

1158(b)(3); 8 CFR § 208.21 (regulations for admission of the asylee's spouse and children); 9 FAM 203.5 (procedures for following-to-join asylees). Although Plaintiffs do not have a constitutional right to asylum, they "do have a due process interest in the procedures by which their asylum claims are adjudicated." *Black v. Almodovar*, 156 F.4th 171, 200 (2d Cir. 2025) (denying petition for rehearing en banc) (collecting cases); *Cham v. Att'y Gen. of U.S.*, 445 F.3d 683 (3d Cir. 2006) ("Although [petitioner] has no constitutional right to asylum, he was entitled, as a matter of due process, to a full and fair hearing on his application."). And unlike the plaintiff in *Muñoz*, who was asserting a liberty interest on behalf of her spouse, the Principal Plaintiffs here have their own entitlement and a "strong expectation" under the statutory and regulatory scheme to have the asylum claims of their family members fairly adjudicated. *See Kerry v. Din*, 576 U.S. 86, 98 (2015). Therefore, Plaintiffs have plausibly alleged a violation of their procedural due process rights.

4. <u>Void for Vagueness Claim</u>

Finally, Defendants argue that Plaintiffs' Void for Vagueness claim with respect to Presidential Proclamation 10949 should be dismissed because under the USCIS and State Department definitions of "asylee,'" *see supra* n.3, the Derivative Plaintiffs do not meet the definition of an "asylee"; and the Plaintiffs were given "clear notice" that their boarding foils were denied under the Presidential Proclamations and the President's authority under 8 U.S.C. § 1182(f); and as a result, the USCIS is not arbitrarily enforcing section 212(f) of the UNA, 8 U.S.C. § 1182(f). [Doc. No. 40] at 25–26.

The "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment" and requires the "invalidation" of regulations that are "impermissibly vague" as applied to a given context. *FCC v. Fox Television Stations, Inc.*, 567

U.S. 239, 253, 258 (2012) ("[T]he Commission's standards as applied to these broadcasts were vague, and the Commission's orders must be set aside."). The "void for vagueness doctrine" addresses two interconnected due process concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* A party raising a facial challenge to a regulation on void-for-vagueness grounds need not show that the law is vague in all its applications. *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 781–82 (4th Cir. 2023). Courts regularly apply the void-for-vagueness doctrine to executive orders. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 174–77 (D.D.C. 2025); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534–36 (N.D. Cal. 2017).

Notwithstanding the definitions of "asylee," relied upon by Defendants, Presidential Proclamation 10949 does not provide any guidance with respect to its application to following-to-join asylees such as the Derivative Plaintiffs who have had their I-730 petitions approved and are in the process of "seeking asylum." Indeed, as alleged in the Complaint, Defendants took the position in 2017 that identical language in Proclamation 9645 (the 2017 travel ban) did not apply to following-to-join asylees. [Doc. No. 1] ¶¶ 133–35 & n.9.[5] For all these reasons, dismissal of Plaintiffs' void-for-vagueness claim is not warranted.

C. Motion to Transfer

As an alternative to their Motion to Dismiss, Defendants request that the case be transferred to the U.S. District Court for the District of Maryland. Defendants argue that Plaintiffs' choice of

[5] Defendants' contention that "Plaintiffs were provided clear notice that their requests for boarding foils were denied pursuant to 8 U.S.C. § 1182(f)" is also inconsistent with the Complaint's allegations. *See* [Doc. No. 1]. ¶ 167 (refusal letters stated that they were "ineligible for an immigrant visa"), and in any case is not a relevant inquiry on a void-for-vagueness claim, which looks at whether the proclamations themselves were vague, and not the denial letters provided to Plaintiffs.

venue, Virginia, should be afforded little weight given that only Principal Plaintiffs AA, EE, and FF currently reside in Virginia, while the others reside in Missouri (BB), Illinois (CC), Maryland (DD), and Michigan (GG). *See* [Doc. No. 1] ¶¶ 22, 35, 44, 56, 66, 74, 81. Defendants further argue that because Defendant USCIS's principal place of business is in Camp Springs, Maryland, transferring the case to Maryland would "serve the interests of justice and would permit the parties to litigate this case in a district with a more obvious connection to the underlying facts, claims, and issues in the case." [Doc. No. 40] at 9.

None of the factors under 28 U.S.C. § 1404(a) supports the transfer of this case to Maryland. First, that three of the seven Principal Plaintiffs live in this judicial district weighs in favor of keeping the case in their home forum of the Eastern District of Virginia. *See Baylor*, 702 F. Supp at 1257 (the "plaintiff's choice of venue is entitled to substantial weight in determining whether transfer is appropriate," particularly where they have selected their home forum over a foreign forum).

Witness convenience, which "is not a significant factor" in cases seeking the review of agency action, *see Chenari v. U.S. Citizenship & Immigr. Servs.*, 2024 WL 895111, at *2 (D. Md. Mar. 1, 2024), similarly weighs against transfer. Although "the location of the administrative record carries some weight," which Defendants contend resides in Maryland, the State Department personnel that know most about the status of Plaintiffs' applications are clearly located outside the country and "not at USCIS headquarters in Maryland." *See Chakrabarti v. United States Citizenship & Immigr. Servs.*, No. CV 21-1945 PJM, 2021 WL 4458899, at *4 (D. Md. Sept. 29, 2021).

As to party convenience, three of the four institutional defendants, the State Department, the Department of Homeland Security, and USCIS are geographically closer to the Eastern District

of Virginia's Alexandria Division courthouse than they are to the District of Maryland's Greenbelt Division courthouse.[6] And, regardless, because the two divisions are less than 30 miles apart, "none of the parties can claim any significant inconvenience" from a case tried at any particular federal courthouse in the greater DC metropolitan area. *U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*, 357 F. Supp. 2d 924, 937 (E.D. Va. 2005). Therefore, this factor also weighs against transfer. Finally, Defendants do not point to any other consideration, and the Court cannot identify any, under which the "interest of justice" would be served by transferring the case.

For these reasons, Defendants have failed to establish that transfer is appropriate.

## IV. CONCLUSION

For the above reasons, it is hereby

**ORDERED** that the Motion be, and the same hereby is, DENIED.

May 28, 2026
Alexandria, Virginia

Anthony J. Trenga
United States District Judge

[6] The State Department is headquartered at 2201 C Street NW, Washington, D.C., and the Department of Homeland Security is headquartered at 245 Murray Lane SW, Washington, D.C. USCIS is headquartered at 5900 Capital Gateway Drive, Camp Springs, MD.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| AA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:25-cv-01819 (AJT/WEF) |

**ORDER**

Before the Court is Defendants' Motion to Stay Pending Appeal this Court's July 29, 2026 Order and Judgment granting summary judgment for Plaintiffs, [Doc. Nos. 128–29], or in the alternative, stay pending appeal the aspects of the Order that impose universal vacatur under the APA. [Doc. No. 137] (the "Motion"). Plaintiffs oppose the Motion. [Doc. No. 146]. For the reasons stated below, the Motion is **DENIED**.

A stay pending appeal requires the movant to demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm absent a stay; (3) that the balance of equities tips in the movant's favor; and (4) that the stay serves the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Defendants bear the burden of demonstrating a "strong showing" of likelihood of success on appeal. *Id.* A stay is an "extraordinary relief," and the movant bears a "heavy burden." *Winston-Salem/Forsyth Cnty. Bd. of Ed. v. Scott*, 404 U.S. 1221, 1231 (1971). Defendants have not met their burden to warrant the requested stay.

The factual background of this case has been previously summarized by this Court. *See* [Doc. No. 103]. Relevant to this Motion, Plaintiffs are Afghan asylees residing in the United States

("Principal Plaintiffs") and their spouses and children in Afghanistan who hold approved petitions for derivative asylum status ("Derivative Plaintiffs"). [Doc. No. 111] ¶ 14. The Principal Plaintiffs filed I-730 petitions seeking asylum for the Derivative Plaintiffs through the "follow to join" process, which affords the same status to the family members of asylees. *Id.* ¶ 15. After substantial vetting, USCIS approved Derivative Plaintiffs' I-730 petitions, leaving only a travel-eligibility determination before Derivative Plaintiffs could travel to the United States for reunification. *Id.*

In June 2025, before the Derivative Plaintiffs were interviewed and admitted, President Trump issued Proclamation 10949, suspending entry of nationals of nineteen countries, including Afghanistan. In December 2025, the President issued Proclamation 10998, continuing this travel ban. Both Proclamations contain an asylum exception providing that they "shall not apply to an individual who has been granted asylum" and shall not "be construed to limit the ability of an individual to seek asylum." Proclamation No. 10949, 90 Fed. Reg. 24,497, 24,504 (June 4, 2025); Proclamation No. 10998, 90 Fed. Reg. 59,717, 59,728 (Dec. 16, 2025). Notwithstanding that exception, the State Department adopted a blanket policy applying the Proclamations to categorically deny boarding foils to follow-to-join asylees from countries subject to the travel ban. [Doc. No. 111] ¶¶ 10–11, 13.

In October 2025, Plaintiffs filed this action challenging the Defendants' application of the presidential proclamations to Plaintiffs' boarding foil applications. [Doc. No. 2]. On May 28, 2026, this Court issued a memorandum opinion and order denying Defendants' motion to dismiss, holding that Plaintiffs had standing, that Defendants' policy was reviewable under the APA, and that the challenge to Defendants' policy was not barred by the consular nonreviewability doctrine.

[Doc. No. 103]. The Court also held that Derivative Plaintiffs are clearly "seek[ing] asylum" and therefore fall within the Proclamations' asylum exception. *Id.* at 13–14.

On July 29, 2026, after the parties filed cross-motions for summary judgment, in which the parties agreed that there were no disputed facts to necessitate a trial, the Court granted judgment in Plaintiffs' favor on their APA claims and applied "the standard APA remedy" by vacating Defendants' unlawful policy under Section 706(2)(A) of the Administrative Procedure Act. [Doc. No. 128]; [Doc. No. 135], Hr'g Tr. at 18 (July 29, 2026).[1] The Court ordered Defendants to issue boarding foils to the five interviewed families within fifteen days and to complete individualized adjudication, including interviews and medical exams, of the remaining two families within thirty days. *Id.* That process remains underway. *See* [Doc. Nos. 139, 145].

In support of their Motion arguing for a stay pending appeal, Defendants repeat the same arguments the Court twice rejected, namely that (1) this Court's decision violates the consular non-reviewability doctrine; (2) that Plaintiffs do not qualify for any asylum exception under the presidential proclamations; (3) that Plaintiffs' procedural due process claim is legally infirm; (4) that Plaintiffs lack standing; (5) that Plaintiffs' APA claims are not reviewable; and (6) that the Court granted overbroad relief by ordering universal vacatur of Defendants' application of the Proclamation to derivative asylee applicants. [Doc. No. 137]. As noted above, the Court has already rejected most of these arguments at earlier stages in this case. *See* [Doc. Nos. 103, 128].

[1] The Court's Motion to Dismiss Order contains the bulk of its analysis and rationale in deciding the various legal issues Defendants raised at the pleading stage. [Doc. No. 103]. Defendants move[d] for summary judgment "[f]or the reasons set forth in Defendants' motion to dismiss," [Doc. No. 121] at 2–3, which this Court rejected for the same "reasons stated from the bench and in [the Court's] May 28, 2026 Memorandum Opinion and Order denying Defendants Motion to Dismiss." [Doc. No. 128].

For these same reasons, the Court concludes that Defendants have not demonstrated a likelihood of success on the merits of their arguments in support of their requested stay.

Defendants' argument that this Court's vacatur "conflicts with *Trump v. CASA* and is unsupported by the APA," [Doc. No. 137] at 13, is similarly unavailing. The Supreme Court made clear in *CASA* that "[n]othing" about its decision "resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Trump v. CASA*, 606 U.S. 831, 847 n.10 (2025). Indeed, *CASA* decided only whether "a federal court's equitable authority under the Judiciary Act" permits universal injunctions—nothing more. *Id.* at 847. And the circuits that have addressed this issue unanimously agree that complete relief through vacatur, the APA's default remedy, remains appropriate after *CASA*. *See, e.g.*, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119–20 (D.C. Cir. 2026) ("Vacatur under Section 706 functions quite differently from an injunction."); *Nat'l TPS All. v. Noem*, 166 F.4th 739, 760 (9th Cir. 2026) ("Textually, it would be difficult to square the plain meaning of a 'set aside'—to 'cancel, annul, or revoke'— with the plain meaning of an injunction—a judicial order that 'tells someone what to do or not to do.'"); *Tex. Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, 2026 WL 2322331, at *8–9 (5th Cir. Aug. 11, 2026).

Defendants have, therefore, failed to make the required "strong showing" that they are likely to succeed on any of their arguments in the Fourth Circuit. *Nken*, 556 U.S. at 434. Defendants have similarly failed to show irreparable injury or that the balance of equities and public interest considerations tip in their favor.

For the above reasons, it is hereby

**ORDERED** that the Motion be, and the same hereby is, **DENIED**.

The Clerk is directed to forward a copy of this Order to all counsel of the record.

August 28, 2026
Alexandria, Virginia

/s/
Anthony J. Trenga
Senior United States District Judge

APPEAL,CLOSED

# U.S. District Court
# Eastern District of Virginia - (Alexandria)
# CIVIL DOCKET FOR CASE #: 1:25-cv-01819-AJT-WEF

AA, et al. v. United States Department of State, et al.
Assigned to: District Judge Anthony J Trenga
Referred to: Magistrate Judge William E. Fitzpatrick
Case in other court: 4CCA, Case Manager R. Phillips,, 26-02119
Cause: 05:0706 Judicial Review of Agency Action

Date Filed: 10/21/2025
Date Terminated: 07/29/2026
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**AA** represented by

**Adam Daniel Harber**
Williams & Connolly LLP (DC-NA)
680 Maine Ave SW
Washington, DC 20024
*** NA ***
202-434-5000
Fax: 202-434-5029
Email: aharber@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
Williams & Connolly LLP (DC-NA)
680 Maine Ave SW
Washington, DC 20024
*** NA ***
202-434-5000
Fax: 202-434-5049
Email: dbarondess@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
Williams & Connolly
680 Maine Avenue, SW
Washington, DC 20024
202-434-5083
Fax: 202-434-5029
Email: ebennett@wc.com
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
International Refugee Assistance Project
(NY/NA)
One Battery Park Plaza
33rd Floor
New York, NY 10004

**NA**
646-939-9169
Fax: 516-324-2267
Email: gschwarz@refugeerights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
International Refugee Assistance Project (NY/NA)
One Battery Park Plaza
33rd Floor
New York, NY 10004
**NA**
929-246-0154
Fax: 516-324-2267
Email: laguirre@refugeerights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
Williams & Connolly LLP (DC-NA)
680 Maine Ave SW
Washington, DC 20024
NA
202-434-5000
Fax: 202-434-5029
Email: jkritz@wc.com
*TERMINATED: 09/09/2026*
*PRO HAC VICE*

**Lindsay Pearlman Hannibal**
Williams & Connolly LLP
680 Maine Avenue, SW
Washington, DC 20024
202-434-5000
Email: lhannibal@wc.com
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
Williams & Connolly LLP (DC-NA)
680 Maine Ave SW
Washington, DC 20024
*** NA ***
202-434-5000
Fax: 202-434-5029
Email: linterlicchio@wc.com
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
International Refugee Assistance Project (NY/NA)

One Battery Park Plaza
33rd Floor
New York, NY 10004
**NA**
Fax: 516-324-2667
Email: psepulveda@refugeerights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
Williams & Connolly LLP (DC-NA)
680 Maine Ave SW
Washington, DC 20024
*** NA ***
202-434-5000
Fax: 202-434-5029
Email: washworth@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
Williams & Connolly
680 Maine Avenue SW
Washington, DC 20024
202-434-5173
Fax: 202-434-5029
Email: rscarborough@wc.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AA Spouse** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
Williams & Connolly LLP (DC-NA)
680 Maine Ave SW
Washington, DC 20024
*** NA ***
202-434-5000
Fax: 202-434-5029
Email: jkritz@wc.com
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**AA Child 1** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AA Child 2** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BB** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BB Spouse** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BB Child 1** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BB Child 2** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BB Child 3** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BB Child 4** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BB Child 5** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BB Child 6** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**CC** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CC Spouse** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CC Child 1** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CC Child 2** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CC Child 3** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**DD** represented by **Adam Daniel Harber**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **DD Spouse** | represented by | **Adam Daniel Harber**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Danielle Jean Barondess**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Edward John Bennett**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Ghita Schwarz**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Guadalupe Victoria Aguirre**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Julian Y. Kritz**<br>(See above for address)<br>*TERMINATED: 09/09/2026*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Lindsay Pearlman Hannibal**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Lori Jo Interlicchio**<br>(See above for address)<br>*TERMINATED: 07/09/2026*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Pedro Sepulveda , Jr.**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**William P. Ashworth**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Ryan Thomas Scarborough**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **DD Child 1** | represented by | **Adam Daniel Harber**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Danielle Jean Barondess**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Edward John Bennett**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Ghita Schwarz**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Guadalupe Victoria Aguirre**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Julian Y. Kritz**<br>(See above for address)<br>*TERMINATED: 09/09/2026*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Lindsay Pearlman Hannibal**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Lori Jo Interlicchio**<br>(See above for address)<br>*TERMINATED: 07/09/2026*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Pedro Sepulveda , Jr.**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**William P. Ashworth**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Ryan Thomas Scarborough**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

**DD Child 2** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DD Child 3** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EE** represented by

**Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EE Spouse** represented by

**Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EE Child 1** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EE Child 2** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FF** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FF Spouse** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FF Child 1** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FF Child 2** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FF Child 3** represented by

**Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FF Child 4** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FF Child 5** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GG** represented by

**Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GG Spouse** represented by **Adam Daniel Harber**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Jean Barondess**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ghita Schwarz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Guadalupe Victoria Aguirre**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julian Y. Kritz**
(See above for address)
*TERMINATED: 09/09/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Pearlman Hannibal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lori Jo Interlicchio**
(See above for address)
*TERMINATED: 07/09/2026*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pedro Sepulveda , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William P. Ashworth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of State** represented by

**Christian James Cooper**
DOJ-USAO
2100 Jamieson Avenue
Alexandria, VA 22314
703-397-7489
Email: christian.cooper@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Spavins**
United States Attorney's Office (Alexandria)
2100 Jamieson Ave
Alexandria, VA 22314
703-299-3785
Email: lizzie.spavins@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirstin O'Connor**
DOJ-USAO
2100 Jamieson Ave.
Alexandria, VA 22314
703-299-3799
Email: kirstin.o'connor@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marco Rubio**
*his official capacity as Secretary of the United States Department of State*
represented by

**Christian James Cooper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Spavins**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **United States Department of Homeland Security** | represented by | **Christian James Cooper**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Elizabeth Anne Spavins**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirstin O'Connor**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Kristi Noem**<br>*her official capacity as Secretary of the United States Department of Homeland Security* | represented by | **Christian James Cooper**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Elizabeth Anne Spavins**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **United States Citizenship and Immigration Services** | represented by | **Christian James Cooper**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Elizabeth Anne Spavins**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirstin O'Connor**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Joseph B. Edlow**<br>*his official capacity as Director of the United States Citizenship and Immigration Services* | represented by | **Christian James Cooper**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Elizabeth Anne Spavins**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **The United States of America** | represented by | **Christian James Cooper**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Elizabeth Anne Spavins**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirstin O'Connor**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 10/21/2025 | 1 | Complaint *for Declaratory and Injunctive Relief* (Filing Fee $405, receipt number AVAEDC-10535784), filed by FF Child 5, FF Child 4, DD Child 2, BB Child 1, EE Child 2, AA Spouse, CC Child 3, A. A., D. D., FF Child 2, CC Child 2, F. F., EE Child 1, FF Spouse, CC Spouse, DD Child 1, EE Spouse, BB Child 4, FF Child 3, GG Spouse, BB Child 5, DD Child 3, C. C., E. E., FF Child 1, BB Spouse, AA Child 1, BB Child 3, BB Child 6, CC Child 1, BB Child 2, AA Child 2, G. G., DD Spouse, B. B. (Attachments: # 1 Civil Cover Sheet)(Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 2 | COMPLAINT *for Declaratory and Injunctive Relief with* EXHIBITS by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Scarborough, Ryan) (Main Document 2 replaced with version without headers on 10/22/2025) (triv). (Entered: 10/21/2025) |
| 10/21/2025 | 3 | Proposed Summons *to Department of State* by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Attachments: # 1 Exhibit Proposed Summons DHS, # 2 Exhibit Proposed Summons DOJ, # 3 Exhibit Proposed Summons Edlow, # 4 Exhibit Proposed Summons Noem, # 5 Exhibit Proposed Summons Rubio, # 6 Exhibit Proposed Summons Bondi, # 7 Exhibit Proposed Summons USA, # 8 Exhibit Proposed Summons USCIS)(Scarborough, Ryan) (Attachment 2 replaced with non-fillable format on 10/22/2025) (triv). (Entered: 10/21/2025) |
| 10/21/2025 | 4 | NOTICE of Appearance by Ryan Thomas Scarborough on behalf of A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 5 | MOTION to appear Pro Hac Vice by William Pruitt Ashworth and Certification of Local Counsel Ryan T. Scarborough. Filing Fee $75, receipt number AVAEDC-10536369 by A. |

| | | |
|---|---|---|
| | | A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 6 | MOTION to appear Pro Hac Vice by Danielle Jean Barondess and Certification of Local Counsel Ryan T. Scarborough. Filing Fee $75, receipt number AVAEDC-10536375 by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 7 | MOTION to appear Pro Hac Vice by Michael Richmond Kershow and Certification of Local Counsel Ryan T. Scarborough. Filing Fee $75, receipt number AVAEDC-10536402 by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 8 | MOTION to appear Pro Hac Vice by Julian Yigal Kritz and Certification of Local Counsel Ryan T. Scarborough. Filing Fee $75, receipt number AVAEDC-10536426 by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 9 | MOTION to appear Pro Hac Vice by Ghita Schwarz and Certification of Local Counsel Ryan T. Scarborough. Filing Fee $75, receipt number AVAEDC-10536440 by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 10 | MOTION to appear Pro Hac Vice by Pedro Sepulveda, Jr. and Certification of Local Counsel Ryan T. Scarborough. Filing Fee $75, receipt number AVAEDC-10536449 by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 11 | MOTION to appear Pro Hac Vice by Guadalupe Victoria Aguirre and Certification of Local Counsel Ryan T. Scarborough. Filing Fee $75, receipt number AVAEDC-10536456 by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 12 | MOTION for Leave to Proceed Under Pseudonyms by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, |

| | | |
|---|---|---|
| | | FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 13 | Memorandum in Support in re 12 MOTION for Leave to Proceed Under Pseudonyms filed by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Exhibit 1 (Redacted), # 2 Exhibit 2 (Redacted), # 3 Exhibit 3 (Redacted), # 4 Exhibit 4 (Redacted), # 5 Exhibit 5 (Redacted), # 6 Exhibit 6 (Redacted), # 7 Exhibit 7 (Redacted), # 8 Exhibit 8 (Withheld))(Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 14 | Notice of Motion to Seal by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 15 | MOTION to Seal *Identifying Documents* by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/21/2025 | 16 | Memorandum in Support in re 15 MOTION to Seal *Identifying Documents* filed by A. A., B. B., C. C., AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, D. D., E. E., F. F., G. G., AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Proposed Order Proposed Order) (Scarborough, Ryan) (Entered: 10/21/2025) |
| 10/22/2025 | | Notice of Correction in re 3 Proposed Summons. The Proposed Summons (attachment 2) was an incorrectly saved PDF fillable form; the Clerk's Office staff has corrected this error. Additionally, the Proposed Summons for Kristi Noem was not filed; please file the Proposed Summons for Kristi Noem. (triv) (Entered: 10/22/2025) |
| 10/22/2025 | | Initial Case Assignment to District Judge Anthony J. Trenga and Magistrate Judge William E. Fitzpatrick. (triv) (Entered: 10/22/2025) |
| 10/22/2025 | | Notice of Correction re 7 Motion to appear Pro Hac Vice by Michael Richmond Kershow and Certification of Local Counsel Ryan T. Scarborough, 6 Motion to appear Pro Hac Vice by Danielle Jean Barondess and Certification of Local Counsel Ryan T. Scarborough. The filing user is notified that the applications are incomplete. Please re-file applications referencing other federal courts in which admitted. (swil) (Entered: 10/22/2025) |
| 10/22/2025 | 17 | Proposed Summons *for Kristi Noem* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Scarborough, Ryan) (Entered: 10/22/2025) |

| | | |
|---|---|---|
| 10/22/2025 | 18 | ORDER granting 5 Motion for Pro hac vice. Appointed William P. Ashworth for Plaintiffs. Signed by District Judge Anthony J Trenga on 10/22/2025. (kgall) (Entered: 10/22/2025) |
| 10/22/2025 | 19 | ORDER granting 8 Motion for Pro hac vice Appointed Julian Y. Kritz for Plaintiffs. Signed by District Judge Anthony J Trenga on 10/22/2025. (kgall) (Entered: 10/22/2025) |
| 10/22/2025 | 20 | ORDER granting 9 Motion for Pro hac vice. Appointed Ghita Schwarz for Plaintiffs. Signed by District Judge Anthony J Trenga on 10/22/2025. (kgall) (Entered: 10/22/2025) |
| 10/22/2025 | 21 | ORDER granting 10 Motion for Pro hac vice. Appointed Pedro Sepulveda, Jr for Plaintiffs. Signed by District Judge Anthony J Trenga on 10/22/2025. (kgall) (Entered: 10/22/2025) |
| 10/22/2025 | 22 | ORDER granting 11 Motion for Pro hac vice. Appointed Guadalupe Victoria Aguirre for Plaintiffs. Signed by District Judge Anthony J Trenga on 10/22/2025. (kgall) (Entered: 10/22/2025) |
| 10/22/2025 | 23 | Sealed Attachment/Exhibit(s) re 2 Exhibit,,. (Attachments: # 1 Exhibit C (Sealed), # 2 Exhibit D (Sealed), # 3 Exhibit E (Sealed), # 4 Exhibit F (Sealed), # 5 Exhibit G (Sealed), # 6 Exhibit H (Sealed), # 7 Exhibit I (Sealed))(Scarborough, Ryan) (Entered: 10/22/2025) |
| 10/22/2025 | 24 | Summons Issued as to Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State, U.S. Attorney and U.S. Attorney General. NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed as to USA or Summons Returned Unexecuted as to USA. (Attachments: # 1 Notice to Attorney) (triv) (Entered: 10/22/2025) |
| 10/22/2025 | 25 | Sealed Attachment/Exhibit(s) re 13 Memorandum in Support,,,. (Attachments: # 1 Exhibit 2 (Sealed), # 2 Exhibit 3 (Sealed), # 3 Exhibit 4 (Sealed), # 4 Exhibit 5 (Sealed), # 5 Exhibit 6 (Sealed), # 6 Exhibit 7 (Sealed), # 7 Exhibit 8 (Sealed))(Scarborough, Ryan) (Entered: 10/22/2025) |
| 10/24/2025 | 26 | Motion to appear Pro Hac Vice by Lindsay Pearlman Hannibal and Certification of Local Counsel Ryan T. Scarborough Filing fee $ 75, receipt number AVAEDC-10544946. by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 10/24/2025) |
| 10/24/2025 | 27 | ORDER granting 26 Motion for Pro hac vice Appointed Lindsay Pearlman Hannibal for Plaintiffs. Signed by District Judge Anthony J. Trenga on 10/24/2025. (jlan) (Entered: 10/24/2025) |
| 10/29/2025 | 28 | AFFIDAVIT *of Service of Summons and Complaint* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Exhibit 1)(Scarborough, Ryan) (Entered: 10/29/2025) |

| | | |
|---|---|---|
| 10/29/2025 | 29 | ORDERED that Plaintiffs' Motion (Dkt. 12) is GRANTED; and it is further ORDERED that Plaintiffs may proceed in this lawsuit pseudonymously via genericinitials. Signed by Magistrate Judge William E. Fitzpatrick on 10/29/2025. (swil) (Entered: 11/04/2025) |
| 11/17/2025 | 30 | Motion to appear Pro Hac Vice by Danielle Jean Barondess and Certification of Local Counsel Ryan T. Scarborough Filing fee $ 75, receipt number AVAEDC-10589913. by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 11/17/2025) |
| 11/17/2025 | 31 | ORDER granting 30 Motion for Pro hac vice Appointed Danielle Jean Barondess for AA,Danielle Jean Barondess for BB,Danielle Jean Barondess for CC,Danielle Jean Barondess for AA Child 1,Danielle Jean Barondess for BB Child 1,Danielle Jean Barondess for CC Child 1,Danielle Jean Barondess for DD Child 1,Danielle Jean Barondess for EE Child 1,Danielle Jean Barondess for FF Child 1,Danielle Jean Barondess for AA Child 2,Danielle Jean Barondess for BB Child 2,Danielle Jean Barondess for CC Child 2,Danielle Jean Barondess for DD Child 2,Danielle Jean Barondess for EE Child 2,Danielle Jean Barondess for FF Child 2,Danielle Jean Barondess for BB Child 3,Danielle Jean Barondess for CC Child 3,Danielle Jean Barondess for DD Child 3,Danielle Jean Barondess for FF Child 3,Danielle Jean Barondess for BB Child 4,Danielle Jean Barondess for FF Child 4,Danielle Jean Barondess for BB Child 5,Danielle Jean Barondess for FF Child 5,Danielle Jean Barondess for BB Child 6,Danielle Jean Barondess for DD,Danielle Jean Barondess for EE,Danielle Jean Barondess for FF,Danielle Jean Barondess for GG,Danielle Jean Barondess for AA Spouse,Danielle Jean Barondess for BB Spouse,Danielle Jean Barondess for CC Spouse,Danielle Jean Barondess for DD Spouse,Danielle Jean Barondess for EE Spouse,Danielle Jean Barondess for FF Spouse,Danielle Jean Barondess for GG Spouse. Signed by District Judge Anthony J Trenga on 11/17/2025. (swil) (Entered: 11/17/2025) |
| 11/25/2025 | 32 | NOTICE of Appearance by Lindsay Pearlman Hannibal on behalf of AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Hannibal, Lindsay) (Entered: 11/25/2025) |
| 12/22/2025 | 33 | NOTICE of Appearance by Elizabeth Anne Spavins on behalf of Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State (Spavins, Elizabeth) (Entered: 12/22/2025) |
| 12/22/2025 | 34 | Consent MOTION for Extension *of Time to file Answer and/or Responsive Pleading* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(Spavins, Elizabeth) (Entered: 12/22/2025) |
| 12/22/2025 | 35 | ORDER granting 34 Consent Motion for Extension of Time. ORDERED that the deadline for Defendants to file their Answer or other responsive pleading to the instant Complaint shall be extended until January 21, 2026. Signed by Magistrate Judge William E. Fitzpatrick on 12/22/2025. (kgall) (Entered: 12/23/2025) |

| | | |
|---|---|---|
| 01/20/2026 | 36 | Consent MOTION for Extension *of Time (Second)* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(Spavins, Elizabeth) (Entered: 01/20/2026) |
| 01/22/2026 | 37 | ORDERED that the deadline for Defendants to file their Answer or other responsive pleading to the instant Complaint shall be extended until February 11, 2026. Signed by Magistrate Judge William E. Fitzpatrick on 01/22/2026. (dvanm) (Entered: 01/23/2026) |
| 02/11/2026 | 38 | NOTICE of Appearance by Christian James Cooper on behalf of Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State (Cooper, Christian) (Entered: 02/11/2026) |
| 02/11/2026 | 39 | MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss for Failure to State a Claim , MOTION to Transfer Case by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Cooper, Christian) (Entered: 02/11/2026) |
| 02/11/2026 | 40 | Memorandum in Support re 39 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim MOTION to Transfer Case filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Cooper, Christian) (Entered: 02/11/2026) |
| 02/11/2026 | 41 | Notice of Hearing Date set for April 15, 2026 re 39 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim MOTION to Transfer Case (Cooper, Christian) (Entered: 02/11/2026) |
| 02/12/2026 | 42 | Joint MOTION for Extension of Time to File Response/Reply as to 39 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim MOTION to Transfer Case by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Proposed Order)(Hannibal, Lindsay) (Entered: 02/12/2026) |
| 02/12/2026 | 43 | ORDERED that:<br>1. the Joint Motion to Modify Briefing Schedule for Defendants Motion to Dismissis GRANTED; and<br>2. Plaintiffs' responsive brief SHALL be due on March 13, 2026, and Defendants' reply brief SHALL be due on March 27, 2026 in re 42 Joint MOTION for Extension of Time to File Response/Reply. Signed by District Judge Anthony J Trenga on 2/12/2026. (Dest) (Entered: 02/12/2026) |
| 02/13/2026 | 44 | SCHEDULING ORDER: Initial Pretrial Conference set for 3/11/2026 at 11:00 AM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. Final Pretrial Conference set for 6/18/2026 at 10:00 AM in Alexandria Telephonically before District Judge Anthony J. Trenga. Discovery due by 6/12/2026. Signed by District Judge Anthony J. Trenga on 2/12/2026. (Attachments: # 1 Magistrate Consent, # 2 Pretrial Notice)(dzir) (Entered: 02/13/2026) |
| 02/13/2026 | | Motion Hearing set for 4/15/2026 at 10:00 AM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga as to 39 MOTION to Dismiss for Lack of Jurisdiction, |

| | | |
|---|---|---|
| | | MOTION to Dismiss for Failure to State a Claim, and MOTION to Transfer Case. (dzir) (Entered: 02/13/2026) |
| 02/13/2026 | 45 | Motion to appear Pro Hac Vice by Lori Interlicchio and Certification of Local Counsel Lindsay Hannibal Filing fee $ 75, receipt number AVAEDC-10784316. by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 02/13/2026) |
| 02/17/2026 | 46 | ORDER granting 45 Motion for Pro hac vice Appointed Lori Jo Interlicchio for AA,Lori Jo Interlicchio for BB,Lori Jo Interlicchio for CC,Lori Jo Interlicchio for AA Child 1,Lori Jo Interlicchio for BB Child 1,Lori Jo Interlicchio for CC Child 1,Lori Jo Interlicchio for DD Child 1,Lori Jo Interlicchio for EE Child 1,Lori Jo Interlicchio for FF Child 1,Lori Jo Interlicchio for AA Child 2,Lori Jo Interlicchio for BB Child 2,Lori Jo Interlicchio for CC Child 2,Lori Jo Interlicchio for DD Child 2,Lori Jo Interlicchio for EE Child 2,Lori Jo Interlicchio for FF Child 2,Lori Jo Interlicchio for BB Child 3,Lori Jo Interlicchio for CC Child 3,Lori Jo Interlicchio for DD Child 3,Lori Jo Interlicchio for FF Child 3,Lori Jo Interlicchio for BB Child 4,Lori Jo Interlicchio for FF Child 4,Lori Jo Interlicchio for BB Child 5,Lori Jo Interlicchio for FF Child 5,Lori Jo Interlicchio for BB Child 6,Lori Jo Interlicchio for DD,Lori Jo Interlicchio for EE,Lori Jo Interlicchio for FF,Lori Jo Interlicchio for GG,Lori Jo Interlicchio for AA Spouse,Lori Jo Interlicchio for BB Spouse,Lori Jo Interlicchio for CC Spouse,Lori Jo Interlicchio for DD Spouse,Lori Jo Interlicchio for EE Spouse,Lori Jo Interlicchio for FF Spouse,Lori Jo Interlicchio for GG Spouse. Signed by District Judge Anthony J Trenga on 2/17/2026. (swil) (Entered: 02/17/2026) |
| 03/04/2026 | 47 | Joint MOTION to Continue *Fed. R. Civ. P. 16(B) Pretrial Conference* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(Spavins, Elizabeth) (Entered: 03/04/2026) |
| 03/04/2026 | 48 | ORDER granting 47 Motion to Continue. ORDERED that the Initial Pretrial Conference is rescheduled to Wednesday, March 25, 2026 at 11:00 a.m.; and it is further ORDERED that the Initial Pretrial Conference shall be held remotely. Signed by Magistrate Judge William E. Fitzpatrick on 03/04/2026. (wgar, ) (Entered: 03/05/2026) |
| 03/04/2026 | | Initial Pretrial Conference reset for 3/25/2026 at 11:00 AM in Alexandria Telephonically before Magistrate Judge William E. Fitzpatrick. (wgar, ) (Entered: 03/05/2026) |
| 03/11/2026 | 49 | MOTION re 44 Scheduling Order, *to Vacate* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(Spavins, Elizabeth) (Entered: 03/11/2026) |
| 03/12/2026 | | Notice of Correction re 49 MOTION re 44 Scheduling Order, *to Vacate*. The filing user is notified to file a Notice of Hearing or Notice of Waiver of Oral Argument (swil) (Entered: 03/12/2026) |
| 03/13/2026 | 50 | NOTICE of Waiver *of Hearing* re 49 MOTION re 44 Scheduling Order, *to Vacate* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State (Spavins, Elizabeth) (Entered: 03/13/2026) |
| 03/13/2026 | 51 | Memorandum in Opposition re 39 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim MOTION to Transfer Case filed by AA, |

| | | |
|---|---|---|
| | | BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 03/13/2026) |
| 03/17/2026 | 52 | RESPONSE in Opposition re 49 MOTION i to Vacate re 44 Scheduling Order, filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 03/17/2026) |
| 03/18/2026 | 53 | *Joint Proposed* Discovery Plan by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse.(Scarborough, Ryan) (Entered: 03/18/2026) |
| 03/23/2026 | 54 | ORDER that Defts' 49 Motion to Vacate the Scheduling Order is **DENIED** (see Order for details). Signed by Magistrate Judge William E. Fitzpatrick on 03/23/26. (pmil, ) (Entered: 03/24/2026) |
| 03/25/2026 | | Set Deadlines/Hearings: Initial Pretrial Conference set for 3/27/2026 at 10:00 AM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. (per WEF chambers) (tfitz, ) (Entered: 03/25/2026) |
| 03/25/2026 | 55 | ORDERED that the Initial Pretrial Conference is rescheduled for March 27, 2026 at 10:00 a.m. in Courtroom 500. Signed by Magistrate Judge William E. Fitzpatrick on 3/25/26. (tfitz, ) (Entered: 03/26/2026) |
| 03/27/2026 | 56 | REPLY to Response to Motion re 39 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim MOTION to Transfer Case filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Cooper, Christian) (Entered: 03/27/2026) |
| 03/27/2026 | 57 | Minute Entry for proceedings held before Magistrate Judge William E. Fitzpatrick: Initial Pretrial Conference held on 3/27/2026. Counsel appeared for Plaintiffs and Defendants. The Court did not adopt the parties' Joint Proposed Discovery Plan. Order to follow. (Court Reporter FTR)(dzir) (Entered: 03/30/2026) |
| 03/30/2026 | 58 | Rule 16(b) Scheduling Order - Pursuant to the Rule 16(b) Conference it is ordered that: 1. All discovery shall be concluded by June 12, 2026. 2. Defendants shall produce the Certified Administrative Record to Plaintiffs on or before April 15, 2026. 3. Expert disclosures required by Fed. R. Civ. P. 26(a)(2) shall be made in accordance with this Order. Specifically, opening expert reports are due by May 22, 2026. Any rebuttal expert disclosures are due by June 5, 2026. To the extent the parties wish to modify expert deadlines, they must seek leave of court (see Order for further details). Signed by Magistrate Judge William E. Fitzpatrick on 3/30/2026. (dzir) (Entered: 03/30/2026) |

| | | |
|---|---|---|
| 03/31/2026 | 59 | ORDERED that the hearing on Defendant's Motion to Dismiss for Lack of Jurisdiction, Motion to Dismiss for Failure to State a Claim, and Motion to Transfer Case, [Doc. No. 39], is hereby CONTINUED to May 6, 2026 at 10:00 a.m. Signed by District Judge Anthony J. Trenga on 3/31/2026. Motion Hearing reset for 5/6/2026 at 10:00 AM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga.(dzir) (Entered: 03/31/2026) |
| 04/14/2026 | 60 | TRANSCRIPT of pretrial hearing held on 3/27/26, before Judge William E. Fitzpatrick, Court Reporter/Transcriber Stephanie Austin, Telephone number 607-743-1894. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/14/2026. Redacted Transcript Deadline set for 6/15/2026. Release of Transcript Restriction set for 7/13/2026. (Austin, Stephanie) (Entered: 04/14/2026)** |
| 04/15/2026 | 61 | Joint MOTION for Protective Order by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Exhibit A)(Hannibal, Lindsay) (Entered: 04/15/2026) |
| 04/15/2026 | 62 | Stipulated Protective Order. Signed by Magistrate Judge William E. Fitzpatrick on 4/15/2026. (dvanm) (Entered: 04/15/2026) |
| 04/15/2026 | 63 | Consent MOTION for Leave to File *Notice of Supplemental Authority* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Order)(Hannibal, Lindsay) (Entered: 04/15/2026) |
| 04/17/2026 | 64 | MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 04/17/2026) |
| 04/17/2026 | 65 | Memorandum in Support re 64 MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD (REDACTED)* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Affidavit of Lindsay P. Hannibal, # 2 Exhibit A, # 3 Exhibit B (REDACTED), # 4 Exhibit C, # 5 Exhibit D)(Hannibal, Lindsay) (Entered: 04/17/2026) |

| | | |
|---|---|---|
| 04/17/2026 | 66 | Notice of Filing Sealing Motion LCvR5(C) by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Hannibal, Lindsay) (Entered: 04/17/2026) |
| 04/17/2026 | 67 | MOTION to Seal *Documents* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Unredacted Memorandum in Support of Motion to Compel Completion of the Administrative Record, # 2 Exhibit B)(Hannibal, Lindsay) Modified on 8/6/2026 (Dcrow, ). (Entered: 04/17/2026) |
| 04/17/2026 | 68 | Notice of Hearing Date set for April 24, 2026 re 64 MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD* (Hannibal, Lindsay) (Entered: 04/17/2026) |
| 04/20/2026 | | Set/Reset Deadlines as to 64 MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD*. Motion Hearing reset for 5/1/2026 at 10:00 AM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. (per WEF chambers) (tfitz, ) (Entered: 04/20/2026) |
| 04/22/2026 | 69 | RESPONSE in Opposition re 64 MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD* filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Cooper, Christian) (Entered: 04/22/2026) |
| 04/23/2026 | 70 | REPLY to Response to Motion re 64 MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 04/23/2026) |
| 04/27/2026 | 71 | NOTICE of Appearance by Edward John Bennett on behalf of AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Bennett, Edward) (Entered: 04/27/2026) |
| 04/29/2026 | 72 | Motion to appear Pro Hac Vice by Adam Harber and Certification of Local Counsel Lindsay Pearlman Hannibal Filing fee $ 75, receipt number AVAEDC-10955799. by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 04/29/2026) |
| 04/29/2026 | 73 | ORDER granting 72 Motion for Pro hac vice Appointed Adam Daniel Harber for AA,Adam Daniel Harber for BB,Adam Daniel Harber for CC,Adam Daniel Harber for AA Child 1,Adam Daniel Harber for BB Child 1,Adam Daniel Harber for CC Child |

| | | |
|---|---|---|
| | | 1,Adam Daniel Harber for DD Child 1,Adam Daniel Harber for EE Child 1,Adam Daniel Harber for FF Child 1,Adam Daniel Harber for AA Child 2,Adam Daniel Harber for BB Child 2,Adam Daniel Harber for CC Child 2,Adam Daniel Harber for DD Child 2,Adam Daniel Harber for EE Child 2,Adam Daniel Harber for FF Child 2,Adam Daniel Harber for BB Child 3,Adam Daniel Harber for CC Child 3,Adam Daniel Harber for DD Child 3,Adam Daniel Harber for FF Child 3,Adam Daniel Harber for BB Child 4,Adam Daniel Harber for FF Child 4,Adam Daniel Harber for BB Child 5,Adam Daniel Harber for FF Child 5,Adam Daniel Harber for BB Child 6,Adam Daniel Harber for DD,Adam Daniel Harber for EE,Adam Daniel Harber for FF,Adam Daniel Harber for GG,Adam Daniel Harber for AA Spouse,Adam Daniel Harber for BB Spouse,Adam Daniel Harber for CC Spouse,Adam Daniel Harber for DD Spouse,Adam Daniel Harber for EE Spouse,Adam Daniel Harber for FF Spouse,Adam Daniel Harber for GG Spouse. Signed by District Judge Anthony J Trenga on 4/29/2026. (swil) (Entered: 04/29/2026) |
| 05/01/2026 | 74 | Minute Entry for proceedings held before Magistrate Judge William E. Fitzpatrick:Motion Hearing held on 5/1/2026 re 64 MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD* filed by FF Child 3, BB Child 1, BB Child 4, EE, EE Child 1, FF, DD, BB Spouse, EE Child 2, FF Child 4, DD Child 1, AA Child 1, BB Child 5, CC, AA Child 2, FF Child 1, FF Spouse, CC Child 3, CC Spouse, FF Child 5, DD Child 3, CC Child 1, GG Spouse, BB Child 3, AA Spouse, DD Spouse, BB Child 2, CC Child 2, FF Child 2, BB Child 6, AA, EE Spouse, BB, GG, DD Child 2. Appearance of counsel. The Motion is CONTINUED to 5/15/26 @ 10:00 a.m.; Order to follow. (Tape #FTR.)(tfitz, ) (Entered: 05/04/2026) |
| 05/01/2026 | 75 | For the reasons stated on the record in open court, it is hereby ORDERED that Plaintiffs Motion to Compel Completion of the Certifipd Administrative Record (Dkt. 64) is CONTINUED to May 15, 2026, at 10:00 a.m. in Courtroom 500; and it is further ORDERED that, on or before May 5, 2026, Defendants shall file on the docket and serve on Plaintiffs: (1) a statement setting forth Defendants position as to the proper scope of the Certified Administrative Record in this matter; and (2) a detailed description of the specific steps taken by Defendants and all relevant government agencies to search for, identify, review, retain, and produce materials responsive to that definition; and it is further ORDERED that, on or before May 5, 2026, Defendants shall serve on Plaintiffs a complete privilege log identifying any documents withheld on the basis of privilege; (see Order for complete details). Signed by Magistrate Judge William E. Fitzpatrick on 5/1/26. (tfitz, ) (Entered: 05/04/2026) |
| 05/01/2026 | | Set/Reset Deadlines as to 64 MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD*. Motion Hearing continued to 5/15/2026 at 10:00 AM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. (tfitz, ) (Entered: 05/04/2026) |
| 05/05/2026 | 76 | NOTICE by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State re 75 Order,,, (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Spavins, Elizabeth) (Entered: 05/05/2026) |
| 05/06/2026 | 77 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Motion Hearing held on 5/7/2026 re 39 MOTION to Dismiss for Lack of Jurisdiction, MOTION to Dismiss for Failure to State a Claim, and MOTION to Transfer Case filed by Kristi Noem, Joseph B. Edlow, The United States of America, United States Citizenship and Immigration Services, United States Department of State, Marco Rubio, United States Department of Homeland Security. Counsel appeared for Plaintiff and Defendant. Motion argued and taken under advisement. Order to follow. (Court Reporter R. Montgomery) (dzir) (Entered: 05/07/2026) |

| | | |
|---|---|---|
| 05/08/2026 | 78 | TRANSCRIPT of hearing held on 5/1/26, before Judge William E. Fitzpatrick, Court Reporter/Transcriber Stephanie Austin, Telephone number 607-743-1894. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/8/2026. Redacted Transcript Deadline set for 7/8/2026. Release of Transcript Restriction set for 8/6/2026.(Austin, Stephanie) (Main Document 78 replaced on 5/19/2026) (dzir). (Entered: 05/08/2026)** |
| 05/11/2026 | 79 | ORDERED that the Final Pretrial Conference, currently scheduled for June 18, 2026 be, and the same hereby is, CONTINUED to Thursday, June 25, 2026 at 10:00 a.m. Signed by District Judge Anthony J. Trenga on 5/11/2026. Final Pretrial Conference reset for 6/25/2026 at 10:00 AM in Alexandria Telephonically before District Judge Anthony J. Trenga. (dzir) (Entered: 05/11/2026) |
| 05/12/2026 | 80 | MOTION for Extension of Time and to Continue Hearing by The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(O'Connor, Kirstin) (Entered: 05/12/2026) |
| 05/12/2026 | 81 | Waiver of re 80 MOTION for Extension of Time and to Continue Hearing *Waiver of Hearing* by The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State (O'Connor, Kirstin) (Entered: 05/12/2026) |
| 05/12/2026 | 82 | TRANSCRIPT of proceedings held on 5/6/26 ( 39 Motion to Dismiss), before Judge Anthony J. Trenga. Court Reporter Rhonda Montgomery, Telephone No. 571-358-9539. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after ninety (90) calendar days. The policy is located on our website at www.vaed.uscourts.gov . Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. Redaction Request due 6/11/2026. Redacted Transcript Deadline set for 7/13/2026. Release of Transcript Restriction set for 8/10/2026.(Montgomery, Rhonda) (Main Document 82 replaced on 5/21/2026) (jlan, ). (Entered: 05/12/2026)** |
| 05/12/2026 | 83 | Response to 76 NOTICE, *Pursuant to May 1, 2026 Order* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Affidavit of Lori Interlicchio, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Scarborough, Ryan) (Entered: 05/12/2026) |
| 05/12/2026 | 84 | Notice of Filing Sealing Motion LCvR5(C) by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, |

| | | |
|---|---|---|
| | | BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Scarborough, Ryan) (Entered: 05/12/2026) |
| 05/12/2026 | 85 | MOTION to Seal *Documents* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Proposed Order Proposed Order)(Scarborough, Ryan) Modified on 8/6/2026 (Dcrow, ). (Entered: 05/12/2026) |
| 05/12/2026 | 86 | Memorandum in Support re 85 MOTION to Seal *Documents* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 05/12/2026) |
| 05/12/2026 | 87 | Sealed Response/Reply/Opposition re 85 MOTION to Seal *Documents*, 86 Memorandum in Support,. (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit F)(Scarborough, Ryan) (Entered: 05/12/2026) |
| 05/13/2026 | 88 | ORDERED that the Motion (Dkt. 80) is DENIED. Signed by Magistrate Judge William E. Fitzpatrick on 5/13/2026. (swil) (Entered: 05/13/2026) |
| 05/13/2026 | 89 | Response to 83 Response,, filed by The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Thoman Declaration (Redacted)) (O'Connor, Kirstin) (Entered: 05/13/2026) |
| 05/13/2026 | 90 | MOTION to Seal *Portions of Declaration of Michael Thoman* by The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(O'Connor, Kirstin) Modified on 8/6/2026 (Dcrow, ). (Entered: 05/13/2026) |
| 05/13/2026 | 91 | Notice of Filing Sealing Motion LCvR5(C) by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State re 90 MOTION to Seal *Portions of Declaration of Michael Thoman* (O'Connor, Kirstin) (Entered: 05/13/2026) |
| 05/13/2026 | 92 | Memorandum in Support re 90 MOTION to Seal *Portions of Declaration of Michael Thoman* filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (O'Connor, Kirstin) (Entered: 05/13/2026) |
| 05/13/2026 | 93 | Waiver of re 90 MOTION to Seal *Portions of Declaration of Michael Thoman Waiver of Hearing* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State (O'Connor, Kirstin) (Entered: 05/13/2026) |
| 05/13/2026 | 94 | Unredacted Doument re 90 MOTION to Seal *Portions of Declaration of Michael Thoman* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (O'Connor, Kirstin) (Entered: 05/13/2026) |

| | | |
|---|---|---|
| 05/14/2026 | 95 | NOTICE by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State re 89 Response, *Notice of Filing Declaration of Brendan McCommas* (Attachments: # 1 McCommas Declaration) (O'Connor, Kirstin) (Entered: 05/14/2026) |
| 05/14/2026 | 96 | NOTICE by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State *(Notice of Filing of Supplemental Declaration of Kevin Grigsby)* (Attachments: # 1 Exhibit Supplemental Declaration of Kevin Grigsby)(Cooper, Christian) (Entered: 05/14/2026) |
| 05/14/2026 | 97 | Reply to 83 Response,, *Submission Pursuant to May 1, 2026 Order* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 05/14/2026) |
| 05/15/2026 | 98 | Minute Entry for proceedings held before Magistrate Judge William E. Fitzpatrick: Motion Hearing held on 5/15/2026 re 64 MOTION to Compel *COMPLETION OF THE CERTIFIED ADMINISTRATIVE RECORD* filed by FF Child 3, BB Child 1, BB Child 4, EE, EE Child 1, FF, DD, BB Spouse, EE Child 2, FF Child 4, DD Child 1, AA Child 1, BB Child 5, CC, AA Child 2, FF Child 1, FF Spouse, CC Child 3, CC Spouse, FF Child 5, DD Child 3, CC Child 1, GG Spouse, BB Child 3, AA Spouse, DD Spouse, BB Child 2, CC Child 2, FF Child 2, BB Child 6, AA, EE Spouse, BB, GG, DD Child 2. Appearance of counsel. Motion argued and Granted In Part (Order to follow). (Tape #FTR.)(tfitz, ) (Entered: 05/19/2026) |
| 05/15/2026 | 99 | This matter comes before the Court on Plaintiffs Motion to Compel 64 . For the reasons stated in open court on the record, it is hereby ORDERED that the Motion to Compel is GRANTED IN PART; and it is further ORDERED that, on or before May 18, 2026, Plaintiffs shall provide the Government with proposed search terms to identify materials that should potentially be included in the Certified Administrative Record; and it is further ORDERED that, on or before May 22, 2026, the parties shall meet and confer to finalize an agreed-upon set of search terms; and it is further ORDERED that, on or before May 22, 2026, the Government shall provide Plaintiffs with an updated and detailed privilege log, including all information necessary for Plaintiffs to challenge the Government s asserted privilege claims; and it is further ORDERED that the Parties shall notice a status conference with the undersigned within one week of the District Judges ruling on the pending Motion to Dismiss. Signed by Magistrate Judge William E. Fitzpatrick on 5/15/26. (tfitz, ) (Entered: 05/19/2026) |
| 05/19/2026 | 100 | TRANSCRIPT of motions hearing held on 5/15/26, before Judge William E. Fitzpatrick, Court Reporter/Transcriber Stephanie Austin, Telephone number 607-743-1894. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/18/2026. Redacted Transcript Deadline set for 7/20/2026. Release of Transcript Restriction set for 8/17/2026. (Austin, Stephanie) (Entered: 05/19/2026)** |

| | | |
|---|---|---|
| 05/20/2026 | 101 | RESPONSE in Support re 90 MOTION to Seal *Portions of Declaration of Michael Thoman* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 05/20/2026) |
| 05/22/2026 | 102 | Letter *Regarding Ongoing Discovery Discussions*. (Hannibal, Lindsay) (Entered: 05/22/2026) |
| 05/28/2026 | 103 | MEMORANDUM OPINION AND ORDER that the Motion be, and the same hereby is, DENIED re 39 MOTION to Dismiss for Lack of Jurisdiction, MOTION to Dismiss for Failure to State a Claim, MOTION to Transfer Case. See Order for further details. Signed by District Judge Anthony J Trenga on 5/26/2026. (Dest) (Entered: 05/28/2026) |
| 06/01/2026 | 104 | This matter is before the Court on the parties request to schedule a status conference pursuant to the Courts May 15, 2026 Order. It is hereby, ORDERED that a status conference shall be held on June 3, 2026 at 1:30 p.m. in Courtroom 500. Signed by Magistrate Judge William E. Fitzpatrick on 6/1/26. (tfitz, ) Modified to edit date on 6/2/2026 (tfitz, ). (Entered: 06/02/2026) |
| 06/01/2026 | | Set/Reset Hearings: Status Conference set for 6/3/2026 at 01:30 PM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. (tfitz, ) (Entered: 06/02/2026) |
| 06/03/2026 | 105 | Minute Entry for proceedings held before Magistrate Judge William E. Fitzpatrick: Status Conference held on 6/3/2026. Appearance of counsel. Parties provided updates to the court. Matter set for Status Conference on 6/16/26. (Order to follow) (Tape #FTR.)(tfitz, ) (Entered: 06/04/2026) |
| 06/03/2026 | 106 | This matter comes before the Court to schedule a status conference. It is hereby, ORDERED that a status conference shall be held on June 16, 2026 at 10:00 a.m. in Courtroom 500. Signed by Magistrate Judge William E. Fitzpatrick on 6/3/26. (tfitz, ) (Entered: 06/04/2026) |
| 06/05/2026 | 107 | This matter is before the Court on Plaintiffs' Motion to Compel Completion of the Certified Administrative Record 64 . For the reasons stated on the record in open court, it is hereby ORDERED that the Motion 64 is DENIED as moot. Signed by Magistrate Judge William E. Fitzpatrick on 6/5/26. (tfitz, ) (Entered: 06/08/2026) |
| 06/11/2026 | 108 | TRANSCRIPT of motion to compel hearing held on 6/3/26, before Judge William E. Fitzpatrick, Court Reporter/Transcriber Stephanie Austin, Telephone number 607-743-1894. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/13/2026. Redacted Transcript Deadline set for 8/11/2026. Release of Transcript Restriction set for 9/9/2026.(Austin, Stephanie) (Entered: 06/11/2026)** |
| 06/17/2026 | 109 | MOTION to Expedite *Briefing and Hearing Schedule* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF |

| | | |
|---|---|---|
| | | Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Proposed Order Proposed Order)(Scarborough, Ryan) (Entered: 06/17/2026) |
| 06/17/2026 | 110 | MOTION for Summary Judgment by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 06/17/2026) |
| 06/17/2026 | 111 | Memorandum in Support re 110 MOTION for Summary Judgment filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E (Withheld), # 6 Exhibit F (Redacted), # 7 Exhibit G (Redacted), # 8 Exhibit H)(Scarborough, Ryan) (Entered: 06/17/2026) |
| 06/17/2026 | 112 | Notice of Hearing Date *July 8, 2026* re 110 MOTION for Summary Judgment (Scarborough, Ryan) (Entered: 06/17/2026) |
| 06/17/2026 | 113 | Notice of Filing Sealing Motion LCvR5(C) by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Scarborough, Ryan) (Entered: 06/17/2026) |
| 06/17/2026 | 114 | MOTION to Seal *Documents* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Proposed Order Proposed Order)(Scarborough, Ryan) Modified on 8/6/2026 (Dcrow, ). (Entered: 06/17/2026) |
| 06/17/2026 | 115 | Memorandum in Support re 114 MOTION to Seal *Documents* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Scarborough, Ryan) (Entered: 06/17/2026) |
| 06/17/2026 | 116 | Sealed Attachment/Exhibit(s) re 115 Memorandum in Support,. (Attachments: # 1 Exhibit F, # 2 Exhibit G)(Scarborough, Ryan) (Entered: 06/17/2026) |
| 06/18/2026 | | Motion Hearing set for 7/8/2026 at 10:00 AM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga as to 110 MOTION for Summary Judgment. (dzir) (Entered: 06/18/2026) |
| 06/23/2026 | | Final Pretrial Conference reset for 6/25/2026 at 10:10 AM in Alexandria Telephonically before District Judge Anthony J. Trenga. (dzir) (Entered: 06/23/2026) |
| 06/24/2026 | 117 | ORDERED that Defendants shall file any response to Plaintiffs' Motion for Summary Judgment, or Cross Motion for Summary Judgment by July 2, 2026, and any opposition |

| | | |
|---|---|---|
| | | and reply briefs shall be governed by the Courts Local Rules; and it is further ORDERED that the Court will hold a hearing on the summary judgment motions on July 29, 2026 at 10:00 a.m.; and it is further ORDERED that Plaintiff's Motion to Modify Briefing and Hearing Schedule, [Doc. No. 109], is otherwise DENIED. Signed by District Judge Anthony J. Trenga on 6/24/2026. Summary Judgment Hearing set for 7/29/2026 at 10:00 AM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga. (dzir) (Entered: 06/24/2026) |
| 06/24/2026 | 118 | Joint MOTION for Relief from Pretrial Requirements and Status Report by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(Spavins, Elizabeth) (Entered: 06/24/2026) |
| 06/24/2026 | 119 | ORDERED that the Final Pretrial Conference, currently scheduled to take place on June 25, 2026, is CONTINUED, to be reset by the Court as necessary; and it is further ORDERED that the parties Joint Motion for Relief from Pretrial Requirements, [Doc. No. 118], be and the same hereby is GRANTED and the parties are relieved of any obligation to file witness lists, exhibit lists, or stipulation of facts, and any obligation to exchange trial exhibits. Signed by District Judge Anthony J. Trenga on 6/24/2026. (dzir) (Entered: 06/24/2026) |
| 07/02/2026 | 120 | MOTION for Summary Judgment by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Cooper, Christian) (Entered: 07/02/2026) |
| 07/02/2026 | 121 | Memorandum in Support re 120 MOTION for Summary Judgment *(and Opposition to Plaintiff's Motion for Summary Judgment)* filed by The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Cooper, Christian) (Entered: 07/02/2026) |
| 07/02/2026 | 122 | Waiver of re 120 MOTION for Summary Judgment *(Waiver of Hearing)* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State (Cooper, Christian) (Entered: 07/02/2026) |
| 07/07/2026 | | Motion Hearing reset for 7/29/2026 at 10:00 AM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga as to 110 MOTION for Summary Judgment (per Order 117 entered on 6/24/2026). (dzir) (Entered: 07/07/2026) |
| 07/07/2026 | 123 | MOTION to Withdraw as Attorney *Lori Jo Interlicchio* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 07/07/2026) |
| 07/09/2026 | 124 | ORDER: This matter comes before the Court on Plaintiffs' Motion for Leave to Withdraw Counsel. Dkt. 123. Plaintiffs seek leave to withdraw Lori Jo Interlicchio as counsel and represent that Plaintiffs will continue to be represented despite this withdrawal. Upon consideration of the Motion, and for good cause shown, it is hereby ORDERED the Motion (Dkt. 123) is GRANTED. Signed by Magistrate Judge William E. Fitzpatrick on 07/08/26. (yguy) (Entered: 07/09/2026) |
| 07/16/2026 | 125 | RESPONSE in Opposition re 120 MOTION for Summary Judgment *and Reply in Support re 110 Plaintiffs' Motion for Summary Judgment* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, |

| | | |
|---|---|---|
| | | CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 07/16/2026) |
| 07/22/2026 | 126 | REPLY to Response to Motion re 120 MOTION for Summary Judgment filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Spavins, Elizabeth) (Entered: 07/22/2026) |
| 07/29/2026 | 127 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Motion Hearing held on 7/29/2026 re 110 MOTION for Summary Judgment filed by FF Child 3, et al and 120 MOTION for Summary Judgment filed by Kristi Noem, et al. Counsel appeared for Plaintiffs and Defendants. Motions argued and Plaintiff's Motion for Summary Judgment 110 is granted. Defendant's Motion for Summary Judgment 120 is denied. Order to follow. (Court Reporter R. Montgomery)(dzir) (Entered: 07/29/2026) |
| 07/29/2026 | 128 | ORDERED that Plaintiffs' Motion for Summary Judgment, [Doc. No. 110], be and the same hereby is, GRANTED, and judgment be entered in favor of Plaintiffs pursuant to Fed. R. Civ. P. 58; and it is further ORDERED that Defendants Motion for Summary Judgment, [Doc. No. 120], be and the same hereby is, DENIED; and it is further ORDERED that the State Department's policy applying Presidential Proclamations 10949 and 10998 to follow-to-join asylees as used to deny boarding foils, be and the same hereby is, VACATED as unlawful under 5 U.S.C. § 706(2)(A) (see Order for further details). Signed by District Judge Anthony J. Trenga on 7/29/2026. (dzir) (Entered: 07/29/2026) |
| 07/29/2026 | 129 | Rule 58 Judgment is hereby entered in favor of the Plaintiffs and against the Defendants. Signed by Deputy Clerk on 7/29/2026. (dzir) (Entered: 07/29/2026) |
| 08/05/2026 | 130 | ORDER - Accordingly, it is hereby<br>ORDERED that Plaintiffs' 15 Motion to Seal is GRANTED.<br>The Clerk's Office is directed to maintain the following documents under seal until further Order of this Court:<br>1. unredactcd Exhibits A, C, D, E, F, G, and H to the Complaint;<br>2. unredacted declarations of Plaintiffs AA, BB, CC, DD, EE, FF, and GG filed in support of Plaintiffs' Motion for Leave to Proceed Under Pseudonyms (Exhibits 1 through 7);and<br>3. Exhibit 8 to the Motion for Leave to Proceed Under Pseudonyms. Signed by Magistrate Judge William E. Fitzpatrick on 8/5/2026. (Dcrow, ) (Entered: 08/06/2026) |
| 08/05/2026 | 131 | ORDER - Accordingly, it is hereby<br>ORDERED Plaintiffs' 67 Motion to Seal is DENIED; and it is further<br>ORDERED Defendants shall have fourteen (14) days from entry of this Order to file an accompanying memorandum to the Motion to Seal if they still seek the relief sought. Signed by Magistrate Judge William E. Fitzpatrick on 8/5/2026. (Dcrow, ) (Entered: 08/06/2026) |
| 08/05/2026 | 133 | ORDER - Accordingly, it is hereby<br>ORDERED Defendants' 90 Motion to Seal is GRANTED; and it is further<br>ORDERED the unredacted version of the Thoman Declaration (Dkt. 94) shall remain under seal until further Order from this Court. Signed by Magistrate Judge William E. Fitzpatrick on 8/5/2026. (Dcrow, ) (Entered: 08/06/2026) |
| 08/05/2026 | 134 | ORDER - Accordingly, it is hereby<br>ORDERED Plaintiffs' 114 Motion to Seal is GRANTED; and it is further<br>ORDERED the unredacted versions of Exhibit E, Exhibit F, and Exhibit G (Dkt. Nos. |

| | | |
|---|---|---|
| | | 116, 116-1, & 116-2) shall remain under seal until further Order of this Court. Signed by Magistrate Judge William E. Fitzpatrick on 8/5/2026. (Dcrow, ) (Entered: 08/06/2026) |
| 08/06/2026 | 132 | ORDER - Accordingly, it is hereby<br>ORDERED Plaintiffs' 85 Motion to Seal is GRANTED IN PART as to Exhibit B; it is further<br>ORDERED Plaintiffs' 85 Motion to Seal is DENIED IN PART as to Exhibits C, F, and Submission Pursuant to the Court's Order dated May l, 2026; it is further<br>ORDERED Defendants shall have fourteen (14) days from entry of this Order to file an accompanying memorandum to the Motion to Seal if they still seek the relief sought; and it is further<br>ORDERED if no response is received from Defendants within fourteen ( 14) days of this Order, the Clerk's Office is directed to unseal Exhibit C, Exhibit F, and the Submission Pursuant to the Court's Order dated May I, 2026 (0kt. Nos. 87, 87-2, & 87-3). Signed by Magistrate Judge William E. Fitzpatrick on 8/5/2026. (Dcrow, ) (Entered: 08/06/2026) |
| 08/11/2026 | 135 | TRANSCRIPT of proceedings held on 7/29/26 ( 110 120 Cross-Motions for Summary Judgment), before Judge Anthony J. Trenga. Court Reporter Rhonda Montgomery, Telephone No. 571-358-9539. **NOTICE RE REDACTION OF TRANSCRIPTS: he parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after ninety (90) calendar days. The policy is located on our website at www.vaed.uscourts.gov . Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. Redaction Request due 9/10/2026. Redacted Transcript Deadline set for 10/13/2026. Release of Transcript Restriction set for 11/9/2026.(Montgomery, Rhonda) (Entered: 08/11/2026)** |
| 08/12/2026 | 136 | NOTICE OF APPEAL as to 129 Clerk's Judgment, 128 Order on Motion for Summary Judgment,,,,, by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Cooper, Christian) (Entered: 08/12/2026) |
| 08/12/2026 | 137 | Emergency MOTION to Stay re 129 Clerk's Judgment, 128 Order on Motion for Summary Judgment,,,,, *and for an Administrative Stay* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Exhibit Declaration of Stuart R. Wilson, Deputy Assistant Secretary of State for Visa Services, Bureau of Consular Affairs, # 2 Exhibit Declaration of Nicolas Bartell, Associate Director of the Fraud and National Security Directorate, United States Citizenship and Immigration Services, # 3 Proposed Order)(Cooper, Christian) (Entered: 08/12/2026) |
| 08/12/2026 | 138 | Waiver of re 137 Emergency MOTION to Stay re 129 Clerk's Judgment, 128 Order on Motion for Summary Judgment,,,,, *and for an Administrative Stay (Waiver of Hearing)* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State (Cooper, Christian) (Entered: 08/12/2026) |
| 08/12/2026 | 139 | STATUS REPORT *(filed Jointly)* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Spavins, Elizabeth) (Entered: 08/12/2026) |

| | | |
|---|---|---|
| 08/13/2026 | 140 | Transmission of Notice of Appeal to US Court of Appeals re 136 Notice of Appeal, (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm) (Entered: 08/13/2026) |
| 08/13/2026 | 141 | Letter *Opposing Defendants' Request for Emergency Administrative Stay*. (Hannibal, Lindsay) (Entered: 08/13/2026) |
| 08/13/2026 | 142 | Consent MOTION for Extension *of Time* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(Spavins, Elizabeth) (Entered: 08/13/2026) |
| 08/17/2026 | 143 | USCA Case Number 26-2119; 4CCA, Case Manager R. Phillips, for 136 Notice of Appeal, filed by Kristi Noem, Joseph B. Edlow, The United States of America, United States Citizenship and Immigration Services, United States Department of State, Marco Rubio, United States Department of Homeland Security. (dzir) (Entered: 08/17/2026) |
| 08/18/2026 | 144 | ORDER granting 142 Consent Motion for Extension of Time. ORDERED that Defendants' deadline to comply with this Courts Order (Doc. No. 139) as to derivative Plaintiffs of families AA, BB, CC, DD, and EE, is extended to the latter of 48 hours after receipt of the passports at the U.S. embassy in Islamabad or Dushanbe, or Wednesday, August 19, 2026. Signed by District Judge Anthony J Trenga on 8/18/2026. (kgall) (Entered: 08/18/2026) |
| 08/26/2026 | 145 | STATUS REPORT *(filed jointly)* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 08/26/2026) |
| 08/26/2026 | 146 | Memorandum in Opposition re 137 Emergency MOTION to Stay re 129 Clerk's Judgment, 128 Order on Motion for Summary Judgment,,,,, *and for an Administrative Stay* filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 08/26/2026) |
| 08/26/2026 | 147 | Notice of Filing Sealing Motion LCvR5(C) by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse (Hannibal, Lindsay) (Entered: 08/26/2026) |
| 08/26/2026 | 148 | MOTION to Seal by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Attachments: # 1 Proposed Order) (Hannibal, Lindsay) (Entered: 08/26/2026) |
| 08/26/2026 | 149 | Memorandum in Support re 148 MOTION to Seal filed by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, |

| | | |
|---|---|---|
| | | AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 08/26/2026) |
| 08/26/2026 | 150 | Sealed Response in Opposition to 137 Emergency MOTION to Stay re 129 Clerk's Judgment, 128 Order on Motion for Summary Judgment,,,,, *and for an Administrative Stay*. (Hannibal, Lindsay) (Entered: 08/26/2026) |
| 08/26/2026 | 151 | Sealed unredacted 145 Status Report (filed jointly). (Hannibal, Lindsay) (Entered: 08/26/2026) |
| 08/28/2026 | 152 | ORDERED that the Motion be, and the same hereby is, DENIED. Signed by District Judge Anthony J. Trenga on 8/28/2026. (dzir) (Entered: 08/28/2026) |
| 08/28/2026 | 153 | Consent MOTION for Extension *of Time* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(Spavins, Elizabeth) (Entered: 08/28/2026) |
| 08/31/2026 | 154 | ORDERED that the Motion, (Doc. No. 153), is GRANTED, and it is hereby ORDERED that Defendants' deadline to comply with this Court's Order (Doc. No. 128) as to Plaintiffs FF and GG is extended to September 18, 2026. Signed by District Judge Anthony J. Trenga on 8/31/2026. (dzir) (Entered: 08/31/2026) |
| 09/09/2026 | 155 | MOTION to Withdraw as Attorney *Julian Yigal Kritz* by AA, BB, CC, AA Child 1, BB Child 1, CC Child 1, DD Child 1, EE Child 1, FF Child 1, AA Child 2, BB Child 2, CC Child 2, DD Child 2, EE Child 2, FF Child 2, BB Child 3, CC Child 3, DD Child 3, FF Child 3, BB Child 4, FF Child 4, BB Child 5, FF Child 5, BB Child 6, DD, EE, FF, GG, AA Spouse, BB Spouse, CC Spouse, DD Spouse, EE Spouse, FF Spouse, GG Spouse. (Hannibal, Lindsay) (Entered: 09/09/2026) |
| 09/09/2026 | 156 | STATUS REPORT *(filed Jointly)* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Spavins, Elizabeth) (Entered: 09/09/2026) |
| 09/09/2026 | 157 | This matter comes before the Court on Plaintiffs' motion to withdraw the pro hac vice admission of Julian Yigal Kritz of Williams & Connolly LLP as counsel for Plaintiffs. Dkt. 155 . The law firm of Williams & Connolly LLP will continue to represent Plaintiffs in this action. Upon consideration of the Motion, and for good cause shown, it is hereby ORDERED that the Motion is GRANTED. The Clerk's Office is directed to remove Julian Yigal Kritz as counsel of record in this matter. Signed by Magistrate Judge William E. Fitzpatrick on 9/9/26. (tfitz, ) (Entered: 09/10/2026) |
| 09/10/2026 | 158 | ORDERED that the parties file a supplemental status report on or before September 16, 2026, at 5:00 PM providing more details on Defendants' implementation of the Court's Order dated July 29, 2026. Signed by District Judge Anthony J. Trenga on 9/10/2026. (dzir) (Entered: 09/10/2026) |
| 09/16/2026 | 159 | STATUS REPORT by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Spavins, Elizabeth) (Entered: 09/16/2026) |
| 09/17/2026 | 160 | Consent MOTION for Extension *of Time* by Joseph B. Edlow, Kristi Noem, Marco Rubio, The United States of America, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Department of State. (Attachments: # 1 Proposed Order)(Spavins, Elizabeth) (Entered: 09/17/2026) |

| | | |
|---|---|---|
| 09/18/2026 | 161 | ORDER granting 160 Consent Motion for Extension of Time. ORDERED that Defendants' deadline to comply with this Court's Order (Doc. No. 128) as to Plaintiffs FF and GG is extended to September 25, 2026. Signed by District Judge Anthony J Trenga on 9/18/2026. (kgall) (Entered: 09/18/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 09/22/2026 18:22:49 | | | |
| **PACER Login:** | rmysoldr | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-01819-AJT-WEF |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA,**

**ALEXANDRIA DIVISION**

AA, AA SPOUSE, AA CHILD 1, AA CHILD 2,BB, BB SPOUSE, BB CHILD 1, BB CHILD 2, BB CHILD 3, BB CHILD 4, BB CHILD 5, BB CHILD 6, CC, CC SPOUSE, CC CHILD 1, CC CHILD 2, CC CHILD 3, DD, DD SPOUSE, DD CHILD 1, DD CHILD 2, DD CHILD 3, EE, EE SPOUSE, EE CHILD 1, EE CHILD 2, FF, FF SPOUSE, FF CHILD 1, FF CHILD 2, FF CHILD 3, FF CHILD 4, FF CHILD 5, GG, AND GG SPOUSE,

Plaintiffs,

– *versus* –

UNITED STATES DEPARTMENT OF STATE,

MARCO RUBIO, in his official capacity as Secretary of the United States Department of State,

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security,

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

JOSEPH B. EDLOW, in his official capacity as Director of the United States Citizenship and Immigration Services,

and

THE UNITED STATES OF AMERICA,

Defendants.

**Case No. 1:25-cv-1819**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. This action challenges Defendants' unlawful application of Presidential Proclamation 10949—which bars entry into the United States of foreign nationals from certain countries—to "follow-to-join" spouses and children of Afghan allies who sought refuge and were granted asylum in the United States after they took unimaginable risks to aid the United States' military campaign in Afghanistan following the September 11 attacks.

2. United States law provides for the right to seek asylum and refuge from persecution; torture; and cruel, inhumane, and degrading treatment, including death. Enshrined within the law is the right for individuals, once granted asylum, to seek reunification with family members they left behind—spouses and children who often face similar risk of persecution, harm, or death abroad—through a formal "follow-to-join" process.

3. Plaintiffs in this action are Afghans who were paroled into the United States following the United States' withdrawal from Afghanistan in 2021 and then granted asylum ("Asylee Plaintiffs"), as well as their family members who already have been approved for derivative asylum through the "follow-to-join" pathway ("Derivative Plaintiffs").

4. Asylee Plaintiffs spent years risking their lives and the lives of their families to support the United States' efforts to topple the Taliban and establish a U.S.-aligned, democratic government in Afghanistan. They worked for and with the U.S.-allied government, including as pilots, soldiers, and bodyguards.

5. Following the chaotic fall of the U.S.-backed government in Afghanistan and the violent Taliban takeover, Asylee Plaintiffs were forced to flee Afghanistan, leave their families behind, and seek refuge in the United States. In the course of their escape, many of these

individuals put themselves at further risk to ensure that U.S.-provided military equipment did not end up in Taliban hands, including by flying military aircraft out of Afghanistan.

6. After urgently evacuating and then entering the United States through a special humanitarian parole program known as Operation Allies Refuge and later as Operation Allies Welcome, Asylee Plaintiffs sought and were granted asylum. Since then, they have found employment, productively integrated into United States society, applied for and, in some cases, obtained green cards, and begun rebuilding their lives with the expectation that their wives and children would soon join them through the follow-to-join pathway.

7. Derivative Plaintiffs similarly made great sacrifices and faced dire consequences due to their family members' support of the United States. Left behind in Afghanistan, Derivative Plaintiffs have taken great efforts to avoid detection by the Taliban. They have faced life-threatening danger—from arrest and interrogation, to physical beatings, to being shot. The follow-to-join process is their only way out of immediate harm and to reunite with their husbands or fathers in the United States.

8. Asylee Plaintiffs applied for their families (Derivative Plaintiffs) to join them in the United States by submitting Form I-730 Refugee/Asylee Petitions. U.S. Citizenship and Immigration Services ("USCIS") granted the Form I-730 Petitions well before the effective date of Proclamation 10949.

9. Proclamation 10949 specifically states that it does not apply to individuals who have been granted asylum and that it should not be construed to limit the ability of any individual to seek asylum. Defendants have nonetheless unlawfully applied the Proclamation to prevent Asylee Plaintiffs from reuniting with their families in the United States. By misconstruing Proclamation 10949's text and contravening federal statutory law and the U.S. Constitution,

Defendants have impermissibly shut down the statutory follow-to-join path for Derivative Plaintiffs.

10. To make matters worse, although Defendants have adopted a mandatory, non-discretionary policy and practice to refuse travel documents to derivative asylees based on Proclamation 10949, the State Department is still conducting consular interviews of families with follow-to-join petitions already approved by USCIS. Thus, certain Derivative Plaintiffs received interview notices from the State Department and, because there is no U.S. embassy in Afghanistan, embarked on dangerous, difficult, and expensive journeys to third countries attend their consular interviews. They did so even though the State Department's denial of travel documents evidently was preordained. The denials given to Derivative Plaintiffs came in the form of boilerplate letters—including one dated days *before* the family's interview took place and another with no date, no addressee, no case number, and no signature from the consular officer.

11. In the wake of these preordained, unlawful denials, the wives and children of Afghan allies who have been granted asylum in the United States either are stuck in third countries like Pakistan where they have no independent resources or support and are subject to persecution, violence, and risk of deportation, or have returned to Afghanistan to face potential persecution based on their familial connection to individuals who assisted the United States and where their attempt to flee makes them even more of a target.[1] The increasing violence and recent border

[1] *See* Hope Hodge Seck, *Despite Taliban amnesty declaration, killings of US allies persist*, Military Times (Oct. 15, 2025), https://www.militarytimes.com/news/your-military/2025/10/15/despite-taliban-amnesty-declaration-killings-of-us-allies-persist/ (reporting that former U.S.-allied soldiers and security forces continue to be systematically hunted by the Taliban).

closures between Afghanistan and Pakistan only exacerbate an already dangerous situation for Plaintiffs.[2]

12. Unless the unlawful application of Proclamation 10949 to derivative asylees is discontinued, Asylee Plaintiffs face two choices: stay in the United States and abandon their families, or abandon their asylum (and, for some, green cards) and leave the United States to rejoin their family in the country where they were (and would continue to be) persecuted. Both choices are inhumane and inconsistent with the asylum statute.

13. For these reasons and those that follow, Plaintiffs request that the Court declare Defendants' policy and practice applying Proclamation 10949 to follow-to-join asylees as used to deny boarding foils to Derivative Plaintiffs unlawful and vacate the policy, void the denials of travel authorization to Derivative Plaintiffs based on the wrongful policy and practice, and enjoin Defendants from denying travel authorization to Derivative Plaintiffs who have not yet attended interviews on the basis of Proclamation 10949.

14. Without intervention from this Court, Plaintiffs will remain separated from their immediate relatives—women and children in Afghanistan and Pakistan who rely on Asylee Plaintiffs for safety and support, and whose access to the follow-to-join process could be the difference between life and death.

**JURISDICTION AND VENUE**

15. This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*; and the Due Process Clause of the United States Constitution. This Court has subject matter jurisdiction pursuant to

[2] *See* Saeed Shah, Mohammad Yunus Yawar, & Mushtaq Ali, *Dozens killed in Pakistan-Afghanistan clashes, Border Closed*, Reuters (Oct. 12, 2025), https://www.reuters.com/world/asia-pacific/afghanistan-claims-58-pakistani-soldiers-killed-clashes-border-closed-2025-10-12/.

28 U.S.C. § 1331 (federal question). The Court has additional remedial authority under 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act).

16. Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(e)(1) because Plaintiffs AA, EE, and FF are residents of the District. Defendants are agencies of the United States and the heads of those agencies. No real property is involved in this action.

17. Venue is proper in the Alexandria Division under Local Civil Rule 3(B)–(C) because Plaintiff AA is domiciled in Fairfax County, Virginia, and Plaintiff FF is domiciled in Arlington County, Virginia.

## PARTIES

### I. Plaintiffs

18. Asylee Plaintiffs are Afghan asylees who were brought to the United States via Operation Allies Refuge, later known as Operation Allies Welcome, a multi-agency operation in which the United States evacuated thousands of at-risk Afghans following the United States' withdrawal from Afghanistan. After extensive vetting at U.S. military bases in Europe and the Middle East, Asylee Plaintiffs were granted humanitarian parole and brought into the United States so that they could avail themselves of our comprehensive asylum framework, including the process for bringing families to the United States as derivative asylees.

19. Asylee Plaintiffs supported the United States' mission in Afghanistan. They trained with Americans, and they used American equipment to defend the American-aligned democratic government of Afghanistan. They fought the Taliban in partnership with and on behalf of the United States, including, for example, by protecting officials of the Afghan government and facilitating the detention of Al-Qaeda and Taliban militants. Their military missions in

coordination with the United States helped advance the goal of defeating the Taliban and promoting freedom and democracy in Afghanistan.

20. Asylee Plaintiffs were not in a position to bring their spouses and children with them when they fled Afghanistan in the midst of the Taliban's capture of Kabul. After being granted asylum in the United States, Asylee Plaintiffs—as was their right—petitioned for derivative asylum for their wives and children to join them in the United States pursuant to 8 U.S.C. § 1158(b)(3), which USCIS granted. Asylee Plaintiffs now hold approved petitions for their spouses and children, Derivative Plaintiffs. But the State Department is unlawfully preventing Derivative Plaintiffs from traveling to the United States based on an erroneous application of Proclamation 10949.

21. Each Asylee Plaintiff is discussed below, along with the associated Derivative Plaintiffs.

**A. Plaintiffs AA and Family**

22. Asylee Plaintiff AA is an Afghan asylee living in Virginia.

23. AA served in the Afghan Air Force from 2014 to 2021. He spent fifteen months in training funded by the U.S. government to fly three types of helicopters. He was one of the ten students selected from a group of 25 to join the 777th Special Mission Wing ("Unit 777"), Afghanistan's most elite helicopter unit. AA was then trained by U.S. Special Operations forces to fly the Mi-17 and UH-60 Blackhawk helicopters. AA holds thirteen certifications from the U.S. military.

24. During his time with Unit 777, AA flew combat missions in coordination with the U.S. military. For example, in April 2019, AA flew a mission to recover the bodies of Afghan

special forces officers who had been killed by the Taliban. As AA attempted to land, his helicopter was hit by a Taliban-fired mortar, nearly killing him.

25. Many of his fellow soldiers were even less fortunate. During a November 2020 mission in Helmand Province, AA watched as the Taliban shot down two of his team's helicopters. Eight of his friends died in front of his eyes.

26. During a different mission, another four of AA's colleagues lost their lives when the Taliban downed their aircraft with an anti-tank guided missile.

27. Four months later, while flying a mission to evacuate a group of Afghan Army special forces commandos surrounded by the Taliban in Maidan Wordak, AA landed his helicopter next to his teammates' aircraft that had just crashed while attempting the rescue. AA and his crew were shot at from multiple directions by the Taliban, and three of his crew members died.

28. During a mission in June 2021, AA was flying a Blackhawk helicopter during a combat mission when one of his team's aircraft was shot down by the Taliban. AA landed his helicopter next to the downed aircraft to attempt to rescue its crew. AA and his team worked for more than twenty minutes under heavy fire from Taliban machine guns, rocket-propelled grenade launchers, and anti-tank guided missiles to try to save the aircraft's occupants, unfortunately unsuccessfully.

29. As the Taliban offensive gained steam and the American withdrawal approached, AA and his colleagues were increasingly targeted by the Taliban and other terrorist groups. At least two of AA's pilot colleagues were assassinated while they were off duty.

30. On August 14, 2021, the night before the Taliban took Kabul, AA was flying a mission to evacuate Afghan commandos from Taliban-controlled territory. He returned to his base at 7:00 a.m. on August 15, 2021, and went to sleep before the next evening's mission. He was

awoken by screaming that Kabul had fallen to the Taliban. On orders from superiors and U.S. advisors, AA and his colleagues flew their aircrafts into Uzbekistan to keep them out of the Taliban's hands, even though this meant leaving their families behind. AA's wife was three months pregnant at the time.

31. AA was in Uzbekistan when he learned that the Taliban had gone to his home in an effort to find his family. Fortunately, AA's family had anticipated the danger and already moved to another location. AA's wife burned AA's belongings to avoid detection.

32. AA was paroled into the United States in October 2021 as part of Operation Allies Welcome and granted asylum in the United States in October 2023.

33. In August 2024, USCIS approved AA's Form I-730 Refugee/Asylee Relative Petitions for his wife and two children—Derivative Plaintiffs AA Spouse, AA Child 1, and AA Child 2—to join him in the United States as derivative asylees. But after securing a visa at great expense and traveling to Islamabad, Pakistan, for their interview on June 25, 2025, they were categorically denied entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. A.[3]

34. AA's family continues to reside in Pakistan. They live in constant fear of deportation to Afghanistan, where they would face dangers from the Taliban regime. Their situation is especially dire given that Pakistan has launched a campaign to remove Afghans from the country (in the midst of the current hostilities between Pakistan and Afghanistan).[4]

---

[3] A redacted version of Exhibit A has been filed in the public record. The unredacted version of Exhibit A has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

[4] *See, e.g.*, *Afghan migrants report surge in forced deportations from Pakistan*, ANI (Sept. 5, 2025), https://www.aninews.in/news/world/asia/afghan-migrants-report-surge-in-forced-deportations-from-pakistan20250905130555/; Rick Noack, *Afghans awaited U.S. resettlement. Pakistan sent them back to the Taliban*, Wash. Post (Oct. 5, 2025), https://www.washingtonpost.com/world/2025/10/05/pakistan-deports-afghan-refugees-taliban-resettlement/; Shah, Yawar, & Ali, *supra* note 2.

**B. Plaintiffs BB and Family**

35. Asylee Plaintiff BB is an Afghan asylee living in Missouri.

36. BB joined the Afghanistan Defense Ministry in 2006 as a soldier. Until the Taliban captured Kabul in 2021, BB worked as a mechanic with Afghan military convoys transporting weapons and injured or dead soldiers between various U.S. and Afghan bases. These convoys were frequently ambushed, and BB was responsible for fixing any vehicles disabled by the Taliban using rockets or mines. BB repaired the vehicles, often under heavy gunfire.

37. During one such encounter, BB was shot in the hand and the foot and had to be medically evacuated for treatment.

38. In another instance, BB was riding in a convoy vehicle with three of his colleagues that exploded from a mine placed in the road by the Taliban. He sustained serious damage to his wrist and face.

39. During his time as an Afghan military mechanic, BB witnessed the deaths of many of his colleagues, some of whom died in his arms.

40. When the Taliban seized Kabul, BB boarded a U.S. military flight to Dubai to escape because he knew the Taliban would kill him for working with the United States. Days after BB left Afghanistan, the Taliban went to his family home looking for him and any weapons. After finding nothing, they returned the next day to conduct a second search. When they did not find BB or any of his weapons, they began firing at his family. BB's son—Derivative Plaintiff BB Child 1—was hit and wounded by gunfire. BB's family fled their house and have not returned since.

41. BB was paroled into the United States in October 2021 as part of Operation Allies Welcome and granted asylum in April 2024.

42. In December 2024, USCIS approved BB's Form I-730 Refugee/Asylee Relative Petitions for his wife and six unmarried children—Derivative Plaintiffs BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, and BB Child 6—to join him in the United States as derivative asylees. To pay for their visas to travel to Dushanbe, Tajikistan for their interview, BB's family sold most of their belongings and rented out a level in their home. On August 7, 2025, BB's family attended an interview at the U.S. Embassy in Dushanbe, Tajikistan. They thought the interview went well because it lasted multiple hours and the consular officer processed updated photos of them for their visas. But at the end of the interview, the family was handed a boilerplate notice denying them entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. B.

43. BB's family has been forced to return to Afghanistan and repurchase personal and home items to replace those they sold. The family of seven, which previously occupied two floors of their house, are now confined to the one floor of their house. They live in fear that the Taliban will discover they attempted to flee and will retaliate against them.

**C. Plaintiffs CC and Family**

44. Asylee Plaintiff CC is an Afghan asylee and lawful permanent resident living in Illinois.

45. CC served in multiple positions in the Afghan National Security Forces from 2013 to 2021. He received his training from NATO advisors, which included several Americans. After completing training, CC was stationed for five years with the Afghan National Army at a joint NATO military base that also housed American special forces. In this role, CC performed combat missions while shoulder-to-shoulder with American soldiers.

46. CC witnessed the deaths of many of his Afghan colleagues by gunfire or IED explosions. For example, in 2013, one of CC's close friends was killed along with four others from CC's unit when their Humvee was blown up by the Taliban. The bodies were burned beyond recognition.

47. After five years, CC transferred to the Afghan Air Force where he worked as an intelligence and security officer at the Kabul International Airport. In this role, he supported military helicopter units by providing intelligence regarding the Taliban's location and capabilities. He also checked documents and packages of individuals coming in and out of the airport to protect against attempts to smuggle bombs inside.

48. CC was working at the airport when the Taliban seized Kabul on August 15, 2021. Though many fled the airport to escape the Taliban, CC and his unit remained. They had only a single aircraft left, which they boarded and flew to Uzbekistan to keep it out of the Taliban's hands. In so doing, he was forced to leave his family behind, including his pregnant wife and two young children. To this day, CC has never met his youngest child.

49. Several of CC's colleagues who were not able to leave Afghanistan in time were arrested by the Taliban and CC has not heard from them since.

50. After CC fled Afghanistan, the Taliban searched his family's home looking for weapons and for documents proving that CC worked with the United States. Although they did not find any there, the Taliban now has control of government records that show CC worked in the Army and Air Force with the Americans. His family lives in fear that the Taliban will return to arrest or kill them.

51. CC was paroled into the United States in October 2021 as part of Operation Allies Welcome and was granted asylum in October 2023.

52. In May 2024, USCIS approved CC's Form I-730 Refugee/Asylee Relative Petitions for his wife and three children—Derivative Plaintiffs CC Spouse, CC Child 1, CC Child 2, and CC Child 3—to join him in the United States as derivative asylees. Because Derivative Plaintiff CC Child 3, age three, was suffering from a congenital heart condition requiring specialized treatment and surgery, CC and his family requested and were granted an expedited interview to obtain their travel documentation before entering the United States.

53. But after securing a Pakistani visa at great expense, traveling to Islamabad, Pakistan, and attending an interview with a U.S. consular officer on July 28, 2025, they were handed boilerplate letters dated 3 days ***prior***, denying them entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. C.[5]

54. The family has since returned to Afghanistan despite the dangers associated with having a family member who, like CC, served in the Afghan government. CC's family takes great care to keep a low profile and avoid the attention of the Taliban.

55. CC Child 3 continues to suffer from a serious heart condition that will require surgery—a surgery he has not been able to get in Afghanistan.

### D. Plaintiffs DD and Family

56. Asylee Plaintiff DD is an Afghan asylee living in Maryland.

57. DD served in the Afghan Air Force from 2017 to 2021 as an MD-530F attack helicopter pilot, logging more than 2,500 combat flight hours in support of U.S. and Afghan troops.

58. Numerous times during his years of service, the Taliban attacked aircraft DD was flying. As one example, in late 2020 or early 2021, DD was shot in the upper leg when the Taliban attacked the helicopter he was co-piloting. The bullet penetrated the floor and passed through his

[5] A redacted version of Exhibit C has been filed in the public record. The unredacted version of Exhibit C has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

upper thigh, before continuing upward and almost hitting him below the chin. The damage to the helicopter forced an emergency landing at a nearby base. Not wanting his co-pilot to lose morale, DD kept the fact that he had been shot to himself until they landed the helicopter, at which point his shoes were filled with blood. DD was hospitalized for three days after this incident.

59. One day before the fall of Kabul, DD flew a mission in northern Afghanistan to try to stop the Taliban from seizing the city of Mazar-i-Sharif and again came under fire from the Taliban. Upon landing at the city's airport, he and his teammates were told that the Taliban was about to capture Kabul and that it would no longer be safe to fly their helicopters back to their usual base.

60. Determined to return to protect their families back in Kabul, DD and a group of his colleagues decided to fly a small plane back to Kabul. Nineteen people crowded into an eight-person Cessna.

61. Upon takeoff, however, the Taliban shot at and hit the plane at least nine times, severely damaging the aircraft. Multiple passengers were injured. As they continued to attempt to fly the damaged plane, the pilots realized that they would not make it to Kabul in their current state. They made an emergency landing just over the border in Termez, Uzbekistan. That heartbreaking decision meant leaving their families in Kabul, at the mercy of the Taliban.

62. Since DD fled Afghanistan, his family's home has been searched at least three times by the Taliban, who were looking for DD and weapons. During one of these searches, Taliban soldiers physically attacked DD's elderly father in an attempt to learn DD's whereabouts. His extended family ultimately was forced to relocate as a result of these ongoing threats to their safety.

63. DD was paroled into the United States in October 2021 as part of Operation Allies Welcome and was granted asylum in November 2023.

64. In September 2024, USCIS approved DD's Form I-730 Refugee/Asylee Relative Petitions for his wife and three children—Derivative Plaintiffs DD Spouse, DD Child 1, DD Child 2, and DD Child 3—to join him in the United States as derivative asylees. But after securing a visa at great expense and traveling to Islamabad, Pakistan, accompanied by DD's father (as is required under Taliban law), they were interviewed by a consular officer on July 7, 2025, after which they were denied entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. D.[6]

65. Out of fear of returning to Afghanistan, DD's family continues to reside in Pakistan to this day. DD Spouse and her father-in-law cannot work under the visa they have, nor can the children attend school. Pakistan's recent effort to remove Afghans from the country (and the ongoing hostilities between the two countries) only add to the family's fears.

**E. Plaintiffs EE and Family**

66. Asylee Plaintiff EE is an Afghan asylee living in Virginia.

67. EE served in the Afghan Air Force from 2013 to 2021. He was trained for fifteen months in the Czech Republic by the U.S. military to fly a variety of aircraft, and in 2016 he began piloting American-provided military transport aircraft.

68. EE flew soldiers to and from the front lines, often in dangerous situations and to or from areas controlled by the Taliban. He would transport dead and injured individuals from Taliban combat areas back to American-controlled air bases. The smell of dead bodies in his plane was sickening and is ingrained in his memory to this day, as is the memory of the injured men who died in his plane on the way to try to find medical treatment.

[6] A redacted version of Exhibit D has been filed in the public record. The unredacted version of Exhibit D has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

69. When Kabul fell to the Taliban on August 15, 2021, EE was on duty at the Kabul International Airport. The Taliban had the facility surrounded and the American military was trying to hold the perimeter. He and his colleagues made the decision to fly their U.S.-supplied aircraft to Tajikistan to keep it away from the Taliban. EE was forced to leave behind his child and his wife, who was pregnant at the time. To this day, EE has never met his youngest child.

70. After EE fled Afghanistan, the Taliban searched his family's home.

71. EE was paroled into the United States in March 2022 as part of Operation Allies Welcome and was granted asylum in August 2023.

72. In July 2024, USCIS approved EE's Form I-730 Refugee/Asylee Relative Petitions for his wife and two children—Derivative Plaintiffs EE Spouse, EE Child 1, and EE Child 2—to join him in the United States as derivative asylees. Eager to escape Afghanistan and get to the United States, the family secured six-month visas at great expense and traveled to Islamabad, Pakistan in November 2024 to await their interview. The interview was initially scheduled for February 25, 2025, but then postponed to June 13, 2025. EE's family was categorically denied entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. E.[7]

73. EE's family continues to reside in Pakistan under the threat of deportation to Afghanistan, where the Taliban will target them for their association with EE and for attempting to flee.

[7] A redacted version of Exhibit E has been filed in the public record. The unredacted version of Exhibit E has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

**F. Plaintiffs FF and Family**

74. Asylee Plaintiff FF is an Afghan asylee and lawful permanent resident living in Virginia.

75. FF worked from 2003 to 2021 as a special agent in the protective details of former Presidents of Afghanistan Hamid Karzai and Ashraf Ghani. He was part of the first class of protective agents trained by the United States. Over the years, FF traveled with the Presidents of Afghanistan to over thirty countries, including twice to the United States to meet with U.S. government officials, and successfully protected Presidents Karzai and Ghani from multiple assassination threats.

76. In August 2021, the Taliban reached the outskirts of the city of Kabul, where FF and his family lived. Because FF was known to the Taliban for having worked with the United States and the democratic government of Afghanistan, he faced mortal danger if he were to remain in Kabul when the Taliban captured it. For that reason, FF boarded a U.S. military plane destined for an American base in Qatar. Unfortunately, FF had to leave his wife and five children behind, and they remain in Afghanistan to this day.

77. After FF fled the country, the Taliban raided his family's home and arrested and interrogated his eldest son.

78. FF was paroled into the United States in October 2021 as part of Operation Allies Welcome and was granted asylum in November 2023.

79. In June 2024, USCIS approved FF's Form I-730 Refugee/Asylee Relative Petitions for his wife and five children—Derivative Plaintiffs FF Spouse, FF Child 1, FF Child 2, FF Child 3, FF Child 4, and FF Child 5—to join him in the United States as derivative asylees. They now await an interview, at which point they will have to secure Pakistani visas at great expense and

travel to Islamabad, Pakistan, for an interview, knowing they will be summarily denied entry into the United States based on the unlawful application of Presidential Proclamation 10949.

80. FF's family continues to face grave danger as a result of his service to the United States and the democratic government of Afghanistan. FF's children rarely leave the house for fear that the Taliban will arrest them, as they did FF's eldest son. As a result of these ongoing risks and continued separation from her husband, FF's wife has experienced depression and suicidal thoughts.

**G. Plaintiffs GG and Family**

81. Asylee Plaintiff GG is an Afghan national and a lawful permanent resident living in Michigan.

82. GG first worked in the Bagram Airfield Division Military Police section of Bagram Airbase at a power plant powering Parwan Detention Facility, which was Afghanistan's main military prison, housing members of the Taliban and Al Qaeda, including senior leaders of those groups. During his employment there, GG narrowly escaped death after his vehicle was targeted in a terrorist attack, killing one of GG's colleagues.

83. Shortly thereafter, a former colleague who had been laid off began to harass and threaten GG. The colleague implied that, if GG did not help him get his job back, the Taliban would harm him.

84. In December 2020, GG left his job at Parwan and began working as an aircraft mechanic at Kabul International Airport.

85. On August 15, 2021, Kabul and Bagram Air Base fell to the Taliban. One of the first things the Taliban did was release thousands of prisoners from Parwan, many of whom knew about GG's work there.

86. Fearing for his life when the Taliban took power, GG made the agonizing decision to board a plane without his wife, evacuating Afghanistan on August 16, 2021.

87. GG was paroled into the United States in October 2021 as part of Operation Allies Welcome and was granted asylum in March 2024.

88. In May 2025, USCIS approved GG's Form I-730 Refugee/Asylee Relative Petition for his wife, Derivative Plaintiff GG Spouse, to join him in the United States as a derivative asylee. She now awaits an interview, at which point she will have to secure a Pakistani visa at great expense, find a male family member to accompany her, and travel to Islamabad, Pakistan, from Afghanistan in the middle of armed conflict between the countries for an interview, knowing she will be denied entry into the United States based on the unlawful application of Presidential Proclamation 10949.

## II. <u>Defendants</u>

89. Defendant U.S. Department of State is the executive agency of the United States that facilitates the processing of approved derivative asylees on behalf of USCIS when USCIS does not have an overseas office located in a given country. The State Department determines whether a derivative asylee is eligible to travel to the United States but does not adjudicate follow-to-join Form I-730 Refugee/Asylee Relative Petitions, which are under the purview of USCIS.

90. Defendant Marco Rubio is the Secretary of State and is responsible for overseeing the State Department's management of final processing for approved derivative asylees. He is also responsible for overseeing the enforcement and implementation of executive orders and presidential proclamations by all State Department staff. He is sued in his official capacity.

91. Defendant U.S. Department of Homeland Security ("DHS") is the executive agency of the United States with authority to adjudicate and process affirmative asylum applications, including follow-to-join petitions.

92. Defendant Kristi Noem is the Secretary of Homeland Security and is responsible for overseeing DHS's management of the derivative asylee process. She is also responsible for overseeing enforcement and implementation of relevant executive orders and proclamations by all DHS staff. She is sued in her official capacity.

93. Defendant USCIS is the agency within DHS that adjudicates Form I-730 Refugee/Asylee Relative Petitions.

94. Defendant Joseph B. Edlow is the Director of USCIS and is responsible for overseeing USCIS's management of the derivative asylee process. He is also responsible for overseeing enforcement and implementation of relevant executive orders and proclamations by all USCIS staff. He is sued in his official capacity.

95. Defendant United States of America is responsible for the exercise of executive action by the other named Defendants.

## FACTUAL BACKGROUND

### I. <u>The Immigration and Nationality Act</u>

96. Under Article I of the U.S. Constitution, the power to make immigration laws "is entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954); *see also* U.S. Const. art. I, § 8, cl. 4.

97. Pursuant to this authority, Congress enacted the INA, 8 U.S.C. § 1101 *et seq.*, a comprehensive statutory scheme to regulate immigration. The INA empowers specific federal agencies to enforce and administer immigration laws.

98. Section 208 of the INA provides: "The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A).

99. Section 208 of the INA also entitles asylees to seek asylum for their spouses and children based on their derivative relationship: "A spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien." 8 U.S.C. § 1158(b)(3).

100. Thus, by law, an asylee's spouse and children are eligible for the same status as the principal asylee through the "derivative" or "follow-to-join" asylum process. *See id.*; 8 C.F.R. § 208.21. The mechanism for doing so is to file a Form I-730 Refugee/Asylee Relative Petition.

## II. <u>The Derivative Asylum Process</u>

101. The derivative asylum process is governed by the INA, implementing regulations, USCIS's Policy Manual, and the State Department's Foreign Affairs Manual ("FAM").

102. USCIS's Policy Manual is the agency's centralized online repository for USCIS's immigration policies. The Policy Manual contains the "official policies of USCIS" and "is to be followed by all USCIS officers in the performance of their duties." USCIS, Policy Manual, https://www.uscis.gov/policy-manual (last visited Oct. 18, 2025).

103. The FAM is "a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the

State Department, the Foreign Service and, when applicable, other federal agencies." U.S. Dep't of State, FAM/FAH Search, https://fam.state.gov/ (last visited Oct. 18, 2025). Volume 9 of the FAM provides extensive guidance for processing visa and non-visa travel to the United States, and Section 203 in particular provides guidance on processing petitions for derivative asylees.

### A. USCIS's Adjudication of Form I-730 Refugee/Asylee Relative Petitions

104. As a matter of law, authority to adjudicate and process affirmative asylum applications, including petitions for derivative asylees, rests exclusively with DHS. 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.21(d); 9 FAM 203.3-4(a)(1), 203.5-3(a)(1).

105. The component of DHS designated to administer the derivative asylum process is USCIS. 8 C.F.R. § 208.21(d); 9 FAM 203.5-3(a)(2).

106. After an individual is granted asylum in the United States, he or she may petition for their spouse and children to receive asylee status by filing Form I-730 Refugee/Asylee Relative Petitions for each beneficiary with USCIS. 9 FAM 203.5-1(c)(2); 9 FAM 203.5-4(a); *see also* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.21(d).

107. USCIS adjudicates the Form I-730 petition based on criteria set out in INA Section 208 and USCIS's own regulations.

108. The spouse or child of a principal asylee with an approved Form I-730 Refugee/Asylee Relative Petition is referred to as a "follow[]-to-join asylee" or a "Visas 92" or "V92" beneficiary. 9 FAM 203.5-1(c)(1).

109. Upon approval of the petition, USCIS informs the petitioner (the principal asylee) via written notice that it has "approved" the petition "in accordance with Section 208 of the Immigration and Nationality Act" and has forwarded it to the Department of State National Visa Center. The notice further states that "USCIS action" on the petition is "complete."

**B. State Department's Travel Eligibility Determination**

110. The State Department performs certain services on behalf of DHS and USCIS "to facilitate [follow-to-join asylum] case processing abroad and to verify the eligibility of the approved beneficiaries, but not for adjudication of the Form I-730 petition." 9 FAM 203.5-3(a)(5).

111. It is USCIS's policy that, for a beneficiary overseas in a country without a USCIS international field office presence such as Afghanistan, USCIS first approves the Form I-730 Petition, then forwards it to the State Department for the travel eligibility determination. *See* USCIS Policy Manual, Vol. 4, Part C. Ch. 5.

112. The State Department receives the approved Form I-730 Petition at the State Department's National Visa Center, which manually creates a record of the case in the Immigrant Visa Information System, using the YY category for Visas 92. 9 FAM 203.5-4(f). The "Visas 92" or "V92" category is distinct from the categories for immigrant and non-immigrant visas.

113. The National Visa Center forwards the hard copy of the V92 file, including the approved Form I-730 Petition, "to the U.S. Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located." 8 C.F.R. § 208.21(d); *see also* USCIS Policy Manual, Vol. 4, Part C. Ch. 5.

114. Because the United States closed its embassy in Afghanistan following the Taliban takeover, interviews of Afghan follow-to-join beneficiaries are conducted at U.S. embassies in third countries.[8]

---

[8] As of November 1, 2025, Afghan nationals will generally only be interviewed at the U.S. Embassy in Islamabad, Pakistan. *See* Adjudicating Immigrant Visa (IV) Applicants in Their Country of Residence, U.S. State Dep't, https://travel.state.gov/content/travel/en/News/visas-news/adjudicating-iv-applicants-in-their-country-of-residence.html (last updated Oct. 10, 2025).

115. Upon receiving the approved Form I-730 Petition, the receiving embassy or consulate will then contact the beneficiary to schedule an interview.

116. Before the interview, a consular officer annotates the beneficiary's V92 file with the language: "Not a visa. Foil prepared at DHS request." 9 FAM 203.5-6(a)(4)–(5). The consular officer then "interviews and completes processing of the beneficiary on USCIS' behalf and determines the beneficiary's eligibility to travel to the United States." USCIS Policy Manual, Vol. 4, Part C, Ch. 5.

117. Although State Department consular officers conduct the interview, they are not permitted to re-adjudicate a Form I-730 Petition already approved by USCIS. *See* 9 FAM 203.5-3(a)(1)–(2). Instead, their involvement is limited to conducting an individualized determination of a derivative asylee's eligibility to travel based on their identity, their qualifying relationship with the principal asylee, and any statutory bars or grounds of inadmissibility. *See* 9 FAM 203.5-7.

118. Specifically, it is the State Department's policy that a derivative asylee is "eligible" to travel to the United States if they (1) can "establish their identity and a qualifying relationship with the asylee" and (2) are not "subject to any bars, or inadmissibilities, or reasons for denial of their case, unless such issues have been satisfactorily resolved." 9 FAM 203.5-2(a); *see id.* 203.5-7(a)(1).

119. The grounds of inadmissibility applicable to immigrants and nonimmigrants specified in INA Section 212(a) expressly "do not apply to" follow-to-join beneficiaries. 9 FAM 203.5-9(b)(1). Follow-to-join beneficiaries instead are only subject to the specific bars to asylum found in INA Section 208(b)(2)(A)(i)–(v). *Id.*

120. The bars and grounds of inadmissibility applicable to derivative asylees are listed at 8 U.S.C. § 1158(b)(2)(A)(i)–(vi):

i. the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

ii. the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

iii. there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

iv. there are reasonable grounds for regarding the alien as a danger to the security of the United States;

v. the alien [engaged in certain terrorist activity]; and

vi. the alien was firmly resettled in another country prior to arriving in the United States.

121. If no bars or grounds of inadmissibility apply, the State Department also assesses whether there is "derogatory information" about the specific derivative asylee that is "egregious" and outweighs other "positive factors," such that a discretionary denial might be warranted. 9 FAM 203.5-9(b)(12); *see id.* 203.5-7(a). Justifications for requesting a discretionary denial from USCIS include things like "communicable disease of public health significance"; "physical or mental disorder" that poses a threat to the safety of the individual or others; "[c]riminal convictions"; "[v]iolation of any law or regulation relating to a controlled substance"; "[e]vidence of moral depravity"; "[i]nstances of immigration fraud"; and the "presence of other evidence indicative of the individual's bad character." 9 FAM 203.5-9(b)(12). Such discretionary denials are "extremely rare," 9 FAM 203.5-9(12)(c), and require "specific, verifiable, and concrete information or evidence" about the individual, *id.* 203.5-17(e).

122. If a consular officer determines that a bar or ground of inadmissibility applies to a derivative asylee, or that a discretionary denial may be appropriate, the officer must refuse to issue travel documentation under INA § 221(g) and return the case to USCIS for further action with an

explanation of why the officer believes a discretionary denial is warranted. 9 FAM 203.5-9(10), 203.5-10(1)–(2).

123. Similarly, if consular officers uncover information during case processing that suggests USCIS should not have approved a Form I-730 Petition, the FAM instructs consular officers to return the case via the National Visa Center to the appropriate USCIS office for further action. 9 FAM 203.5-3(a)(5).

124. Consular officers, and the State Department more generally, lack authority or discretion to make any decisions on derivative asylum status.

125. If a bar, ground of inadmissibility, or discretionary reason for denial does not apply to a derivative asylee, the FAM directs that the asylee is, at that point, "approved to travel." 9 FAM 203.5-15(a).

126. The State Department does not have authority or discretion to deny travel documentation to a derivative asylee who is not subject to a bar, inadmissibility, or discretionary reason for denial, and who is, therefore, eligible and "approved to travel."

127. If a beneficiary is found to be eligible to travel to the United States, they receive a "boarding foil" in a passport or other travel document authorizing them to board a flight and enter the United States. 9 FAM 203.5-15(c)–(d).

128. Upon entry into the United States, beneficiaries obtain all the benefits afforded to asylees, including employment authorization, and are eligible to apply for lawful permanent residency after one year.

## III. <u>Relevant Executive Actions</u>

129. Over the course of President Trump's first term and the first nine months of his second term, he has issued several presidential proclamations and executive orders restricting the

admission and entry of certain groups of foreign nationals pursuant to 8 U.S.C. § 1182(f). A timeline of the relevant proclamations and executive orders is outlined below.

### A. Executive Order 13780 (2017)

130. On March 6, 2017, President Trump issued Executive Order 13780, "Protecting the Nation From Foreign Terrorist Entry Into the United States." EO 13780 suspended the entry of nationals from six countries for ninety days. 82 Fed. Reg. 13209, 13213 (Mar. 6, 2017).

131. EO 13780 stated that it "shall not apply to an individual who has been granted asylum" and that it "shall [not] be construed to limit the ability of an individual to seek asylum." *Id.* at 13218.

132. On June 28, 2017, the State Department adopted a policy that EO 13780 did not apply to derivative asylees. Quinta Jurecic, *State Department Cable on Implementing Travel Ban Executive Order*, Lawfare (June 29, 2017), https://www.lawfaremedia.org/article/state-department-cable-implementing-travel-ban-executive-order (last visited Oct. 18, 2025).

### B. Presidential Proclamation 9645 (2017)

133. On September 24, 2017, President Trump issued Proclamation 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats." Proclamation 9645 suspended and limited "the immigrant and nonimmigrant entry into the United States" of nationals of eight countries. 82 Fed. Reg. 45161, 45165–67 (Sept. 24, 2017).

134. Proclamation 9645 contained identical language to EO 13780 that it "shall not apply to an individual who has been granted asylum," and that it "shall [not] be construed to limit the ability of an individual to seek asylum." *Id.* at 45171.

135. The State Department adopted a policy that Proclamation 9645 did not apply to derivative asylees and affirmed this policy multiple times, including on or around December 4, 2017, April 10, 2018, and June 26, 2018.[9]

### C. Presidential Proclamation 10949 (2025)

136. Four and a half months into his second term in office, on June 4, 2025, President Trump issued Proclamation 10949 titled "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. 24497 (June 4, 2025).

137. Proclamation 10949 "fully restrict[s] and limit[s] the entry of nationals" of twelve countries, including Afghanistan. *Id.* at 24499.

138. The stated policies and purposes of the travel restrictions announced in Proclamation 10949 are to "protect [U.S.] citizens from terrorist attacks" by preventing "exploitation of our visa system." *Id.* at 24497–98.

139. With certain exceptions, Proclamation 10949 suspends entry of Afghan nationals into the United States because:

> The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exist Overstay Report ("Overstay Report"), Afghanistan had a business/tourist (B-1/B-2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

---

[9] "New Court Order on Presidential Proclamation" (Dec. 4, 2017), https://web.archive.org/web/20171208120811/https://travel.state.gov/content/travel/en/traveladvisories/ea/new-court-orders-on-presidential-proclamation.html (last visited Oct. 18, 2025); "Revisions to Presidential Proclamation 9645" (Apr. 10, 2018), https://web.archive.org/web/20180413101610/https://travel.state.gov/content/travel/en/traveladvisories/ea/revisions-to-presidential-proclamation-9645.html (last visited Oct. 18, 2025); "June 26 Supreme Court Decision on Presidential Proclamation 9645," https://web.archive.org/web/20180718121421/https://travel.state.gov/content/travel/en/News/visas-news/june_26_supreme_court_decision_on_presidential_proclamation9645.html (last visited Oct. 18, 2025).

*Id.* at 24499.

140. Like President Trump's prior executive actions, Proclamation 10949 states that it "shall not apply to an individual who has been granted asylum" and that it "shall [not] be construed to limit the ability of an individual to seek asylum." *Id.* at 24504.

141. Proclamation 10949 also states that "[e]xceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest." This is known as a National Interest Exception or "NIE." *Id.* at 24503.

142. On June 6, 2025, the State Department sent a cable to all diplomatic and consular posts worldwide, instructing officials how to implement Proclamation 10949. *See Thein v. Trump*, 2025 WL 2418402, at *3 (D.D.C. Aug. 21, 2025). The State Department has not shared the contents of these instructions publicly.

143. On June 7, 2025, the State Department announced a new policy that it would be "fully suspending visa issuance to nationals of Afghanistan . . . for all nonimmigrant and immigrant visa categories" pursuant to Proclamation 10949.[10]

144. The State Department further stated that "[v]isa applicants who are subject to th[e] Presidential Proclamation may still submit visa applications and schedule interviews, but they may be ineligible for visa issuance or admission to the United States."[11]

---

[10] Suspension of Visa Issuance to Foreign Nationals to Protect the United States from Foreign Terrorists and other National Security and Public Safety Threats, U.S. State Dep't, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-visa-issuance-to-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats.html (last updated June 7, 2025) (emphasis omitted).

[11] *Id*. (emphasis omitted).

145. The State Department's announcement of this new policy did not address derivative asylees or boarding foils.

146. On June 9, 2025, at 12:01 a.m. EDT, Proclamation 10949 took effect. 90 Fed. Reg. at 24504.

147. On information and belief, after Proclamation 10949 took effect, and continuing to the present, the State Department adopted a final policy to categorically deny boarding foils to derivative asylees from the countries listed in Proclamation 10949.

148. The State Department has neither explained the reason for this policy and practice nor publicly announced it, even though it is a reversal from all prior practice, including under the prior presidential orders restricting entry to the United States.

149. The State Department's Consular Affairs Visa Office confirmed its position in response to a congressional inquiry in August 2025, explaining that it is applying Proclamation 10949 to "Following-to-Join Asylee V92/YY beneficiaries from suspended countries."

150. More recently, however, the State Department has refused to acknowledge any responsibility for this decision, stating in response to a congressional inquiry in late September 2025 that questions about boarding foil refusals for I-730 beneficiaries are better addressed to DHS.

151. What's more, on or around August 22, 2025, the State Department issued letters en masse categorically denying travel documents to family members of Afghan asylees with approved Form I-730 Petitions who had already interviewed with consular officers. These letters were seemingly sent irrespective of whether a prior denial letter had already been issued in a specific family's case. *See, e.g.*, Exs. A, D, F, H.

152. Even though Proclamation 10949—like EO 13780 and Proclamation 9645 before it—expressly exempts asylees and expressly is not to be construed to limit individuals' ability to seek asylum, the State Department's policy bars entry of asylum-holders' follow-to-join family members whose Form I-730 Petitions already have been approved, meaning these family members are already derivative asylees or, at the very least, are seeking asylum.

153. The State Department has executed this policy by interviewing approved derivative asylees at embassies, then denying travel eligibility after the interview via a generic notice with this or substantially similar text:

> Dear Applicant:
>
> This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.
>
> Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

154. On certain occasions, the letter is dated before the interview ever took place.

155. On other occasions, the letter contains no date, no addressee, no case number, and no signature from a consular officer.

156. In sum, embassies are conducting interviews knowing that they will categorically, and as a matter of State Department policy, deny entry without regard to the families' qualifications and their USCIS-approved petitions for derivative asylum.

## IV. State Department's Refusal to Issue Boarding Foils to Approved I-730 Beneficiaries

### A. Plaintiffs AA and Family

157. In December 2023, AA submitted Form I-730 Petitions to USCIS for his wife and two children to become derivative asylees and join him in the United States. USCIS approved the petitions in August 2024—ten months before Proclamation 10949 took effect—and forwarded them to the U.S. Embassy in Islamabad.

158. AA's family—AA Spouse, AA Child 1, and AA Child 2—was scheduled for an interview on June 9, 2025, but the U.S. Embassy in Islamabad postponed the interview until June 25, 2025, because of the Eid holiday.

159. AA's family secured a Pakistani business visa at considerable expense, traveled to Islamabad in late May 2025, received their required medical examinations, and attended their scheduled interview on June 25, 2025. They were accompanied by AA's uncle because the Taliban does not allow women to travel without an adult male family member.

160. At the end of the interview, AA's family members were handed paperwork saying their case was in administrative processing, which is an additional, temporary review of an application. Ex. F.[12] They later received a letter on State Department letterhead, dated August 22, 2025, stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. A.

[12] A redacted version of Exhibit F has been filed in the public record. The unredacted version of Exhibit F has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

**B. Plaintiffs BB and Family**

161. In June 2024, BB submitted Form I-730 Petitions to USCIS for his wife and six unmarried children to become derivative asylees and join him in the United States. USCIS approved the petitions in December 2024 and forwarded them to the U.S. embassy in Dushanbe, Tajikistan. On May 28, 2025—a week before Proclamation 10949 was even announced—the embassy informed the family that their interview would take place on August 7, 2025.

162. BB's family—BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, and BB Child 6—secured visas at considerable expense, traveled to the U.S. Embassy in Dushanbe, received their required medical examinations, and attended their interview with the State Department on August 7, 2025.

163. After a four-hour interview, which left BB's family under the impression that they would be given boarding foils to travel to the United States, they were handed a letter stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. B. The letter that BB's family received was so pro forma that it contained no date, no addressee, no case number, and no signature from a consular officer.

**C. Plaintiffs CC and Family**

164. In January 2024, CC submitted Form I-730 Petitions to USCIS for his wife and three children to become derivative asylees and join him in the United States. USCIS approved the petitions in May 2024—thirteen months before Proclamation 10949 took effect—and forwarded them to the U.S. Embassy in Islamabad, Pakistan.

165. CC's three-year-old child—Plaintiff CC Child 3—was later diagnosed with a congenital heart condition, which requires specialized treatment and surgery.

166. CC's family—CC Spouse, CC Child 1, CC Child 2, and CC Child 3—secured a Pakistani visa at considerable expense, traveled to the U.S. Embassy in Islamabad, received their required medical examinations, and attended their scheduled interview on July 28, 2025.

167. At the end of the interview, CC's family was handed letters on State Department letterhead, dated three days ***before*** the interview, which stated: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. C.

168. Later, CC's family received a second letter on State Department letterhead dated August 22, 2025, stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. G.[13]

### D. Plaintiffs DD and Family

169. In December 2023, DD submitted Form I-730 Petitions to USCIS for his wife and three children to become derivative asylees and join him in the United States. USCIS approved the petitions in September 2024—nine months before Proclamation 10949 took effect—and forwarded them to the U.S. Embassy in Islamabad. On May 28, 2025—a week before Proclamation 10949 was announced—the embassy informed the family that their interview would take place on July 7, 2025.

[13] A redacted version of Exhibit G has been filed in the public record. The unredacted version of Exhibit G has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

170. After Presidential Proclamation 10949 was issued, DD's counsel emailed the U.S. Embassy in Islamabad to confirm that the family's interview would still go forward. The embassy informed counsel that the interview would proceed.

171. Based on that assurance, DD's family—DD Spouse, DD Child 1, DD Child 2, and DD Child 3—secured Pakistani business visas at considerable expense, traveled to Islamabad in late June 2025, received their required medical examinations, and attended their interview with the State Department on July 7, 2025. They were also accompanied by DD's father because the Taliban does not allow women to travel without an adult male family member.

172. A week before the interview, DD's counsel emailed the embassy to request a National Interest Exception permitting the family to travel to the United States.

173. At the end of the interview, the consular officer said nothing to DD Spouse or the rest of the family about Proclamation 10949.

174. After the interview, the embassy emailed DD's counsel a letter on State Department letterhead stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]." Ex. H.[14] The letter also advised: "The State Department is reviewing your case to determine whether to grant a National Interest Exception (NIE) under the Proclamation . . . . [U]nless the State Department determines your travel would serve a U.S. national interest and grants an NIE, your visa application will remain refused under Section 212(f)." *Id.*

175. In anticipation of receiving a National Interest Exception, DD's family remained in Pakistan following the July 7 interview. But in a letter dated August 22, 2025, the embassy informed DD and his family that "[t]aking into account the provisions of the Proclamation, a

[14] A redacted version of Exhibit H has been filed in the public record. The unredacted version of Exhibit H has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

National Interest Exception (NIE) will not be granted in your case." Ex. D. The family remains in Pakistan, afraid to return to Afghanistan.

### E. Plaintiffs EE and Family

176. In September 2023, EE submitted Form I-730 Petitions to USCIS for his wife and two children to become derivative asylees and join him in the United States. USCIS approved the petitions in July 2024—twelve months before Proclamation 10949 took effect—and forwarded them to the U.S. Embassy in Islamabad. The interview was originally scheduled for February 13, 2025—four months before Proclamation 10949 was even announced. But on February 5, 2025, EE received a notice from the U.S. Embassy in Islamabad that their interview had been postponed. On May 22, 2025—two weeks before Proclamation 10949 was even announced—EE's family finally received a notice that their interview had been rescheduled for June 13, 2025—mere days after Proclamation 10949 went into effect.

177. EE's family—EE Spouse, EE Child 1, and EE Child 2—secured a Pakistani business visa at considerable expense, crossed into Pakistan with a male chaperone, traveled to the U.S. Embassy in Islamabad, received their required medical examinations, and attended their scheduled interview on June 13, 2025.

178. Immediately at the end of the interview, EE's family was handed a pre-typed form on State Department letterhead stating that their visas had been refused and their case placed into "administrative processing." Ex. I.[15] Unlike Derivative Plaintiffs, who received outright denials of their boarding foils, upon information and belief, EE's family was placed into administrative

[15] A redacted version of Exhibit I has been filed in the public record. The unredacted version of Exhibit I has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

processing, presumably because their interview occurred only four days after Proclamation 10949 took effect and the State Department was still finalizing its unlawful policy.

179. On September 3, 2025, EE's family received a second letter on State Department letterhead dated August 22, 2025, stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. E.

**F. Plaintiffs FF and Family**

180. In December 2023, FF submitted Form I-730 Petitions for his wife and five children to become derivative asylees and join him in the United States. USCIS approved the petitions in June 2024—thirteen months before Proclamation 10949 took effect—and forwarded them to the National Visa Center.

181. As of the filing of this Complaint, FF's family—FF Spouse, FF Child 1, FF Child 2, FF Child 3, FF Child 4, and FF Child 5—is still waiting in Afghanistan to receive an interview notice from the U.S. Embassy in Islamabad.

182. Once their interview is scheduled, FF's family will incur significant time, costs, and risk to obtain proper visas and travel to Islamabad to attend their interview, after which it is a foregone conclusion that FF's family will be refused boarding foils on the basis of the State Department's unlawful policy and practice implementing Presidential Proclamation 10949 to bar entry to Afghan derivative asylees.

### G. Plaintiffs GG and Family

183. In July 2024, Plaintiff GG submitted a Form I-730 Petition for his wife to become a derivative asylee and join him in the United States. USCIS approved the petition in May 2025 and forwarded it to the National Visa Center.

184. As of the filing of this Complaint, GG's wife—GG Spouse—is still waiting in Afghanistan to receive an interview notice from the U.S. Embassy in Islamabad.

185. Once her interview is scheduled, GG Spouse will incur significant time, costs, and risk to obtain proper visas and travel to Islamabad to attend her interview. She will have to find a male guardian to accompany her on the trip. And after GG Spouse is interviewed, it is a foregone conclusion that she will be refused a boarding foil on the basis of the State Department's unlawful policy and practice implementing Presidential Proclamation 10949 to bar entry to Afghan derivative asylees.

186. After that, GG Spouse will eventually have to return to a country where the inmates previously detained at the facility at which her husband used to work are now free and, in some cases, even hold positions in the new Taliban government.

## V. Imminent and Ongoing Harm to Plaintiffs

187. The State Department's application of Proclamation 10949 to derivative asylees upends the statutory benefits of asylum, including by foreclosing the pathway to derivative status for asylees' family members imposed by Congress; denies Plaintiffs the benefit of family reunification that they have already been granted; forces Plaintiffs to incur significant time, costs, and risks to attend an entirely futile interview; and puts Derivative Plaintiffs in significant danger of further persecution, torture, degrading and inhumane treatment, or even death.

188. Plaintiffs have been injured, or face an impending injury or a non-speculative substantial risk of future injury, as a result of the State Department's erroneous and unlawful application of Proclamation 10949 to derivative asylees.

189. The State Department's unlawful policy and practice has already been applied to refuse boarding foils to Derivative Plaintiffs AA Spouse, AA Child 1, AA Child 2, BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, BB Child 6, CC Spouse, CC Child 1, CC Child 2, CC Child 3, DD Spouse, DD Child 1, DD Child 2, DD Child 3, EE Spouse, EE Child 1, and EE Child 2 (not to mention other derivative asylees who have been interviewed and denied since June 9, 2025). These Derivative Plaintiffs made long, expensive, and dangerous journeys to attend their interviews, and the families of AA, DD, and EE must now choose between two evils: remaining in Pakistan, where they will face discrimination, abuse, violence, and possibly deportation because of their nationality, or else voluntarily return to Afghanistan, where they will have a target on their backs and be at risk of violent retaliation by the Taliban government. The families of BB and CC have already returned to Afghanistan and live in constant fear of detection by the Taliban.

190. Although FF Spouse, FF Child 1, FF Child 2, FF Child 3, FF Child 4, FF Child 5, and GG Spouse have not yet been interviewed, it is a foregone conclusion that the State Department will apply the same policy and practice to similarly deny them boarding foils. They will have to undergo the same timely, costly, and otherwise difficult journey that other Plaintiffs engaged in, knowing that the only outcome of their interviews will be certain denial, at which point they too will have to decide between staying in limbo in Pakistan or returning to live under mortal threat in Afghanistan.

191. To avoid the consequences of appearing for a futile interview that all agree would end in denial, FF's and GG's families have only one other option upon receiving their interview notice: choose not to appear for the interview. Doing so could eventually lead to administrative closure of their cases. *See* 9 FAM 203.5-6(b). And the failure to appear would amount to a concession that their families will not be reunited in the United States.

192. The State Department's actions have forced Asylee Plaintiffs to choose between three devastating options: (1) risk the safety of their family and attend the interviews at great time and expense, after which they inevitably will be denied entry under the State Department's unlawful policy and practice; (2) remain in the United States and accept that they may never be reunited with their family; or (3) return to Afghanistan to be reunited with their families, but face the same mortal danger that led them to flee Afghanistan and obtain asylum in the United States in the first place.

## CLAIMS FOR RELIEF

### CLAIM ONE
### Administrative Procedure Act

193. The foregoing allegations are repeated and re-alleged as though fully set forth herein.

194. The APA requires courts to hold unlawful and set aside any agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or made without observance of procedure required by law. 5 U.S.C. § 706(2)(A)–(D).

195. DHS has sole authority to determine whether derivative asylum status should be granted to an applicant. 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.21(d); 9 FAM 203.3-4(a)(1), 203.5-3(a)(1).

196. USCIS is the DHS administering agency with primary responsibility for adjudicating I-730 Refugee/Asylee Relative Petitions for derivative asylum status. 8 C.F.R. § 208.21(d); 9 FAM 203.3-4(a)(2), 203.5-3(a)(2).

197. When USCIS approved Asylee Plaintiffs' respective Form I-730 Refugee/Asylee Relative Petitions, Derivative Plaintiffs were given the same status and thus became derivative asylees. At a minimum, Derivative Plaintiffs are seeking asylum.

198. Now that USCIS has granted Asylee Plaintiffs' Form I-730 Petitions for each of the Derivative Plaintiffs, the State Department's only role is to determine whether Derivative Plaintiffs are eligible to travel to the United States based on specified factors, and to grant or deny boarding foils based on those factors.

199. By Proclamation 10949's plain language, the travel restrictions enacted therein do not apply to Plaintiffs because the Proclamation states that it: (i) "shall not apply to an individual who has been granted asylum by the United States;" and (ii) "shall [not] be construed to limit the ability of an individual to seek asylum."

200. Further, none of the policy reasons set out in Proclamation 10949 for barring the entry of Afghan nationals apply to Plaintiffs. Plaintiffs have demonstrated their commitment to the United States' democratic mission, and their family members have applied for boarding foils, which the State Department does not consider to be visas. *See* 9 FAM 203.5-6. Moreover, concerns that "Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures," 90 Fed. Reg. at

24499, are inapplicable to Derivative Plaintiffs given Asylee Plaintiffs' opposition on the battlefield to the current Taliban government, and because Derivative Plaintiffs have undergone substantively the same heightened vetting as the family members of Afghan SIV holders, who are exempt from Proclamation 10949's restrictions.

201. EO 13780 and Proclamation 9645 both stated that they "shall not apply to an individual who has been granted asylum by the United States," and that they "shall [not] be construed to limit the ability of an individual to seek asylum." Proclamation 10949 contains that same language.

202. In implementing EO 13780 and Proclamation 9645, the State Department adopted a policy that follow-to-join beneficiaries with an approved Form I-730 Refugee/Asylee Relative Petition were exempt from the travel restrictions enacted in those executive actions.

203. Without reason, the current State Department has adopted the opposite policy and practice: that Proclamation 10949 renders I-730 beneficiaries ineligible to receive boarding foils to travel to the United States.

204. The State Department has departed from its prior policy *sub silentio*, in violation of the principles articulated in *F.C.C. v. Fox Television Stations, Inc.*, 566 U.S. 502 (2009).

205. Based on its unlawful policy and practice, the State Department has wrongfully denied boarding foils to the Derivative Plaintiff family members of Plaintiffs AA, BB, CC, DD, and EE.

206. It is also a forgone conclusion that, absent a reversal of this unlawful policy, the State Department will wrongfully deny boarding foils to the family members of Plaintiffs FF and GG after their interviews are conducted.

207. Derivative Plaintiffs are otherwise eligible to travel to the United States.

208. The State Department's policy of refusing to issue boarding foils to derivative asylees who are otherwise eligible to travel to the United States also constitutes a legislative rule issued without observance of the notice and comment procedure required by 5 U.S.C. § 553.

209. For these reasons, the State Department's policy that Proclamation 10949 applies to derivative asylees is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and made without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(A)–(D).

210. The State Department's application of Proclamation 10949 to derivative asylees must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

**CLAIM TWO**
***Accardi* Doctrine & Administrative Procedure Act**

211. The foregoing allegations are repeated and re-alleged as though fully set forth herein.

212. The State Department's application of Proclamation 10949 to derivative asylees violates agency rules, regulations, policies, and procedures, including those in 8 C.F.R. § 208.21(d); USCIS Policy Manual Volume 4, Chapter 5; and 9 FAM 203.5.

213. The State Department's application of Proclamation 10949 to derivative asylees should therefore be set aside under the principles articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

214. The failure of the State Department's implementation of Proclamation 10949 to comply with applicable rules, regulations, policies, and procedures renders the State Department's actions arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right; and made without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(A)–(D).

215. The State Department's application of Proclamation 10949 to derivative asylees must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

**CLAIM THREE**
**Violation of the Fifth Amendment Due Process Clause**

216. The foregoing allegations are repeated and incorporated as though fully set forth herein.

217. Plaintiffs have an entitlement to benefits under the derivative asylum process, including the admission of eligible and admissible family members to the United States who have already been approved as derivative asylees by USCIS, subject only to an individualized determination of their travel eligibility by the State Department.

218. The benefits afforded to asylum holders and their approved beneficiaries confer on Plaintiffs a right that can be deprived only pursuant to procedural due process.

219. The State Department's blanket denial of approved Afghan derivative asylees' admission to the United States violates the procedural due process guarantees protected by the Fifth Amendment to the U.S. Constitution.

220. As a result of Defendants' actions, Plaintiffs' Fifth Amendment rights to due process have been violated.

221. Defendants' violation of due process has caused Plaintiffs to suffer ongoing and irreparable harm.

**COUNT FOUR**
**Unconstitutional Deprivation of Due Process (Vagueness)**

222. The foregoing allegations are repeated and re-alleged as though fully set forth herein.

223. Federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015).

224. In the alternative to the claims above, Proclamation 10949, as applied to derivative asylees, is unconstitutionally vague because it enables Defendants to engage in its arbitrary and discriminatory application in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

225. As a result of Defendants' actions, Plaintiffs' Fifth Amendment rights to due process have been violated.

226. Defendants' violation of due process has caused Plaintiffs to suffer ongoing and irreparable harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1) Declare unlawful and set aside the State Department's policy applying Proclamation 10949 to follow-to-join asylees as used to deny boarding foils to Derivative Plaintiffs as arbitrary and capricious, an abuse of discretion; not in accordance with law; contrary to constitutional right, power, privilege, or

immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and made without observance of procedure required by law;

2) Declare the State Department's policy used to deny boarding foils to Derivative Plaintiffs unconstitutional and violative of the Due Process Clause of the Fifth Amendment, or alternatively declare Proclamation 10949, as applied to Derivative Plaintiffs, unconstitutionally vague as violative of the Fifth Amendment to the Constitution;

3) Vacate and set aside the State Department's denial of boarding foils to Derivative Plaintiffs AA Spouse, AA Child 1, AA Child 2, BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, BB Child 6, CC Spouse, CC Child 1, CC Child 2, CC Child 3, DD Spouse, DD Child 1, DD Child 2, DD Child 3, EE Spouse, EE Child 1, EE Child 2;

4) Order the State Department to show cause, within seven days of the Court's resolution of this case, why Derivative Plaintiffs AA Spouse, AA Child 1, AA Child 2, BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, BB Child 6, CC Spouse, CC Child 1, CC Child 2, CC Child 3, DD Spouse, DD Child 1, DD Child 2, DD Child 3, EE Spouse, EE Child 1, and EE Child 2 should not be deemed eligible to travel pursuant to the State Department's criteria and provided with boarding foils;

5) Issue a permanent injunction enjoining the State Department, including its officials, agents, employees, assigns, and all persons acting in concert or participating with them, from denying boarding foils to Derivative Plaintiffs on the basis of Proclamation 10949;

6) Award Plaintiffs attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

7) Award such other and further relief that the Court deems just and proper.

Dated: October 21, 2025

Respectfully submitted,

*/s/ Ryan Scarborough*
Ryan T. Scarborough (VSB No. 43170)
William P. Ashworth
(*pro hac vice* forthcoming)
Danielle J. Barondess
(*pro hac vice* forthcoming)
Julian Yigal Kritz
(*pro hac vice* forthcoming)
Lindsay P. Hannibal (VSB No. 97008)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
rscarborough@wc.com
washworth@wc.com
dbarondess@wc.com
jkritz@wc.com
lhannibal@wc.com

Ghita Schwarz (*pro hac vice* forthcoming)
Guadalupe Aguirre
(*pro hac vice* forthcoming)
Pedro Sepulveda (*pro hac vice* forthcoming)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, NY 10004
Telephone: (516) 838-1655
Fax: (516) 324-2267
gschwarz@refugeerights.org
laguirre@refugeerights.org
psepulveda@refugeerights.org

Michael Kershow
(*pro hac vice* forthcoming)
KELER & KERSHOW, PLLC
800 Connecticut Avenue NW
Suite 300

Washington, DC 20006
Telephone: (301) 367-2019
mkershow@kelerkershow.com

*Counsel for Plaintiffs*

# EXHIBIT A

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

| | |
|---|---|
| Date: | August 22, 2025 |
| Case Number: | [redacted] |
| Name: | AA SPOUSE , AA CHILD 1, AA CHILD 2 |

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Sincerely yours,

U.S. Consular Officer

# EXHIBIT B

Dear Applicant,

This is to inform you that a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Immigrant Visa Unit, Consular Section

U.S. Embassy in Dushanbe

متقاضی گرامی،

به اطلاع شما می‌رساند که افسر کنسولی شما را طبق بند ۲۱۲ (اِف) قانون مهاجرت و تابعیت ایالات متحده، مطابق با فرمان ریاست جمهوری تحت عنوان «محدود کردن ورود اتباع خارجی برای حفاظت از ایالات متحده در برابر تروریست‌های خارجی و سایر تهدیدهای امنیت ملی و ایمنی عمومی» فاقد صلاحیت برای دریافت ویزای مهاجرتی تشخیص داده است. تصمیم امروز قابل تجدید نظر نمی‌باشد.

با در نظر گرفتن مفاد این فرمان، استثنای منافع ملی (NIE) در پرونده شما اعطا نخواهد شد.

سفارت ایالات متحده در دوشنبه

بخش ویزاهای اقامتی کنسولگری

# EXHIBIT C

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

Date: 25-JUL-2025

Case Number: [redacted]

Name: CC SPOUSE

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Sincerely yours,

U.S. Consular Officer

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

Date: 25-JUL-2025

Case Number: [redacted]

Name: CC CHILD 3

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Sincerely yours,

U.S. Consular Officer

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

Date: 25-JUL-2025

Case Number: [redacted]

Name: CC CHILD 2

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Sincerely yours,

U.S. Consular Officer

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

Date: 25-JUL-2025

Case Number: [redacted]

Name: CC CHILD 1

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Sincerely yours,

U.S. Consular Officer

# EXHIBIT D

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

Date: 22-AUG-2025

Case Number: [redacted]

Name: DD SPOUSE ; DD CHILD 3
DD CHILD 2 ; DD CHILD 1

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation “Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats”. Today’s decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Sincerely yours,

U.S. Consular Officer

# EXHIBIT E

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

Date: August 22, 2025

Case Number: [redacted]

Name: EE SPOUSE , EE CHILD 1 , EE CHILD 2

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation “Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats”. Today’s decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Sincerely yours,

U.S. Consular Officer

# EXHIBIT F

[redacted] [redacted]

**Immigrant Visa Unit**
**U.S. Embassy**
**Islamabad, Pakistan**

Case ID(s): [redacted]

Date: 25 JUN 2025

**Dear Visa Applicant:**

Your visa has been refused under the Immigration & Nationality Act (INA), Section 221(g). To overcome this refusal, please submit the items ticked below. Follow the instructions on the back to submit documents online or via courier.

☑ **Administrative processing** *(you will be notified if further action is needed)*
☐ **Passport** *(submit via courier)*
☐ **Medical examination** *(through panel physician)*
☐ Original **NADRA Family Registration Certificate** *(submit via courier)*
☐ Original **NADRA Birth Cert.** *(submit via courier)* ☐ Petitioner ☐ Beneficiary
☐ Original **NADRA Marriage Certificate** *(submit via courier)*
☐ Original **Nikah Nama** *(submit via courier)*
☐ Original **NADRA Divorce Cert.** *(submit via courier)* ☐ Petitioner ☐ Beneficiary
☐ Original **U.S. Divorce Decree** or certified copy *(submit via courier)*
☐ Original **Death Certificate** *(submit via courier) for* ______________
☐ Original **Police Certificate** *(submit via courier) for country:* ______________
☐ **English translation** *(submit via courier) of document:* ______________
☐ **I-864 Affidavit of Support** *(submit via ☐ courier / ☐ online)*
  ☐ Petitioner ☐ Joint Sponsor
  ☐ *I-864A* ☐ *I-134* ☐ *I-864W* ☐ *1040* ☐ *W-2* ☐ *IRS tax transcript*
  ☐ *Proof of U.S. citizenship or LPR status* ☐ *Domicile*
☐ **DNA test** recommended for: ______________
☐ **Other:** ______________

If you fail to take action within one year, your petition will be permanently terminated under INA Section 203(g). Additional information about required documents can be found in the Reciprocity Schedule at travel.state.gov. Update any changes to your address, phone number, or email address at https://pk.usembassy.gov/courier-services/. You can check the status of your visa online at https://ceac.state.gov/CEAC/.

[redacted]

# EXHIBIT G

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

| | |
|---|---|
| Date: | August 22, 2025 |
| Case Number: | [redacted] |
| Name: | CC SPOUSE , CC CHILD 3 , CC CHILD 2 , CC CHILD 1 |

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation “Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats”. Today’s decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

Sincerely yours,

U.S. Consular Officer

# EXHIBIT H

**Embassy of the United States of America**
**Islamabad, Pakistan**
**Immigrant Visa Unit**

Date: July 7, 2025

Case Number - Name

[redacted] – DD SPOUSE

[redacted] – DD CHILD 3

[redacted] – DD CHILD 2

[redacted] – DD CHILD 1

Dear Applicant:

This is to inform you that a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.

The State Department is reviewing your case to determine whether to grant a National Interest Exception (NIE) under the Proclamation. This can be a lengthy process, and unless the State Department determines your travel would serve a U.S. national interest and grants an NIE, your visa application will remain refused under Section 212(f). You will be contacted if your case is granted an exception as soon as practicable.

Sincerely,

Immigrant Visa Unit
Consular Section,
U.S. Embassy Islamabad, Pakistan

# EXHIBIT I

Immigrant Visa Unit
U.S. Embassy
Islamabad, Pakistan

SCAN TO CONTACT US

## Submitting documents ONLINE:

For Modernized Immigrant Visa (MIV) cases, you may submit certain documents online. Scan and upload the documents to your CEAC account, where you completed the DS-260 visa application. Instructions and more information can be found at https://ceac.state.gov/CEAC/.

## Submitting documents by COURIER:

Submit original documents using one of our approved courier services. Visit https://pk.usembassy.gov/visas/immigrant-visas/courier-services/ to select a service, then create a profile free of charge at **www.USvisascheduling.com** within 24 hours of your visa interview (if you have not already). Follow these steps:

(1) Click "create account" on the right menu.

(2) Click "new application / schedule appointment" on the left menu.

(3) Select "IV address registration" to provide the following information:

- Your visa class and passport details
- Info for dependents and family members applying with you
- Select your passport pick-up location
- Or opt for delivery to your home (premium service)

(4) Print the confirmation page and save it for your records.

GSS Profile Hotline Contact Information

From Karachi, call +92-21111234111

From Islamabad, call +92-51111234111

From the United States, call +1 (703) 988-3426

Or contact us by email at support-pakistan@ustraveldocs.com

**Immigrant Visa Unit**
**U.S. Embassy**
**Islamabad, Pakistan**

*Case ID(s):* [redacted]

*Date:* 6/13/2025

**Dear Visa Applicant:**

Your visa has been refused under the Immigration & Nationality Act (INA), Section 221(g). To overcome this refusal, please submit the items ticked below. Follow the instructions on the back to submit documents online or via courier.

- ☒ **Administrative processing** *(you will be notified if further action is needed)*
- ☐ **Passport** *(submit via courier)*
- ☐ **Medical examination** *(through panel physician)*
- ☐ Original **NADRA Family Registration Certificate** *(submit via courier)*
- ☐ Original **NADRA Birth Cert.** *(submit via courier)* ☐ Petitioner ☐ Beneficiary
- ☐ Original **NADRA Marriage Certificate** *(submit via courier)*
- ☐ Original **Nikah Nama** *(submit via courier)*
- ☐ Original **NADRA Divorce Cert.** *(submit via courier)* ☐ Petitioner ☐ Beneficiary
- ☐ Original **U.S. Divorce Decree** or certified copy *(submit via courier)*
- ☐ Original **Death Certificate** *(submit via courier) for:* ____________________
- ☐ Original **Police Certificate** *(submit via courier) for country:* ____________________
- ☐ **English translation** *(submit via courier) of document:* ____________________
- ☐ **I-864 Affidavit of Support** *(submit via ☐ courier / ☐ online)*
  - ☐ Petitioner ☐ Joint Sponsor
  - ☐ *I-864A* ☐ *I-134* ☐ *I-864W* ☐ *1040* ☐ *W-2* ☐ *IRS tax transcript*
  - ☐ *Proof of U.S. citizenship or LPR status* ☐ *Domicile*
- ☐ **DNA test** recommended for: ____________________
- ☐ **Other:** ____________________

If you fail to take action within one year, your petition will be permanently terminated under INA Section 203(g). Additional information about required documents can be found in the Reciprocity Schedule at travel.state.gov. Update any changes to your address, phone number, or email address at https://pk.usembassy.gov/visas/immigrant-visas-inquiries/. You can check the status of your visa online at https://ceac.state.gov/CEAC/.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| AA, et al., Plaintiffs, versus UNITED STATES DEPARTMENT OF STATE, et al., Defendants. | Civil Action No.: 1:25-cv-1819<br>Friday, May 1, 2026<br>Alexandria, Virginia<br>Pages 1-29 |

The above-entitled motions hearing was heard before the Honorable William E. Fitzpatrick, United States Magistrate Judge.

A P P E A R A N C E S:

FOR THE PLAINTIFFS: EDWARD BENNETT, ESQUIRE
LORI INTERLICCHIO, ESQUIRE
ADAM HARBER, ESQUIRE
DANIELLE BARONDESS, ESQUIRE
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, D.C. 20024
(202) 434-5029

FOR THE DEFENDANTS: CHRISTIAN COOPER, ESQUIRE
ELIZABETH SPAVINS, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

TRANSCRIBER: STEPHANIE M. AUSTIN, RPR, CRR
Transcriber
United States District Court
401 Courthouse Square
Alexandria, Virginia 22314
S.AustinReporting@gmail.com

(TRANSCRIPT PROCEEDINGS RECORDED BY THE FTR SYSTEM)

P R O C E E D I N G S

THE DEPUTY CLERK: AA, et al. v. United States Department of State, et al., Case 1:25-cv-1819.

Counsel, please note your appearances for the record.

MR. BENNETT: Good morning, Your Honor. Ted Bennett from Williams & Connolly on behalf of the plaintiffs. With me, Ms. Interlicchio, who will argue; my partner, Mr. Harber; and Ms. Barondess.

THE COURT: Okay. Good morning.

MR. COOPER: Good morning, Your Honor. Christian Cooper, Special Assistant United States Attorney. With me at counsel's table is assistant United States Attorney Elizabeth Spavins behalf of the government, and I will be handling the argument today.

THE COURT: All right. And, I'm sorry, who's going to argue for Williams & Connolly?

MS. INTERLICCHIO: That would be me, Your Honor, Lori Interlicchio.

THE COURT: I've read the submissions. Actually, I know it's your burden, I know you want to argue, but maybe it makes sense, let me hear from the government first.

Well, I'm sorry. Let me go back to you. I'm sorry. You make whatever argument you want to make.

MS. INTERLICCHIO: Thank you, Your Honor.

The last time the parties were before the Court,

defendants were ordered to produce an administrative record by April 15th over the government's objections regarding burden and resource constraints. Discovery in this matter ends in six weeks, and defendants' administrative record is manifestly deficient.

The parties have discussed the categories of documents that we understand to be missing from the administrative record over the past several weeks. Namely, they've not produced a single document providing reason for the challenged policy. If they're not going to do so, they should not be permitted to come back later in the litigation and present a reason to the Court because they cannot rely on a rationale later that they haven't produced in the administrative record.

Missing from the productions include any documents from DHS reflecting the decision to apply the proclamations to derivative asylees, including any stated reason, any documents communicating that policy to the State Department, several documents referred to and relied on by a produced State Department cable, although two of those documents were produced yesterday, two weeks after the deadline, and other relevant cables that defendants have produced elsewhere that expressly discussed the application of the ban to derivative asylees. It's also unclear whether DHS has produced -- or -- I apologize. It's also unclear whether DHS has any documents

beyond USCIS that relate to the policy that have not been produced in this action.

The government's position is that its April 15th production represents the entire administrative record regarding the challenged policy, but that's contradicted by the documents themselves which referred to but were missing key material.

The case boils down to a determination that the presidential proclamation should be applied to derivative asylees, but that determination itself is missing from the administrative record. The only two documents that were produced that are not publicly available include one cable from the State Department and one email from the Department of Homeland Security.

The email from the Department of Homeland Security states that there is a lack of guidance at that time on how the proclamation should be applied. The cable from the State Department, issued six weeks later, states that DHS has made a determination but does not include that determination, does not include any communication from the State Department -- or from the Department of Homeland Security of that determination or any reason for that determination. It's also titled "updated guidance," and there was no prior guidance published with that document.

The certified administrative record that was produced

consists primarily of publicly available documents taken from the federal register. Four of the eight documents produced are proclamations and the executive order. Two more documents are publicly available policy memorandum issued months after the proclamation and the policy was implemented, and then the remaining two documents we've discussed were the cable and the email.

Yesterday's production of three documents relevant to this case makes evident that the administrative record produced on April 15th was and still is incomplete. It's still missing any documents stating the reasons for the determination, and the Court should not rely on written and oral representations in the litigation for what the reasons for the policy were when those reasons are absent from the administrative record.

The government further hides the ball with inadequate privilege logs that include one email with no information that allows plaintiffs to evaluate the privilege claim. The government -- we met and conferred about this yesterday, we've been discussing the privilege logs, and we're hoping that we can reach a resolution regarding that matter, but we also ask that the Court require any deliberative process, documents that the government has to be logged on a privilege log.

THE COURT: All right. Thank you very much.

MS. INTERLICCHIO: Thank you.

MR. COOPER: Thank you, Your Honor.

To start, I just -- because counsel brought it up with the issue regarding the privilege logs, those are not what is before the Court right now. We will be --

THE COURT: They're going to be, and we're going to deal with it today.

MR. COOPER: Understood, Your Honor.

And do you want to discuss that now? I can go ahead and --

THE COURT: No. You make whatever argument you want. But we're not -- if there's an issue, we're going to deal with it, right, and you're going to figure it out as we go.

You are six -- I mean, you are months and months into this, and if you don't have a complete privilege log now, that's a problem.

MR. COOPER: Understood.

THE COURT: So let's make whatever argument you want with respect to their motion now.

MR. COOPER: Understood, Your Honor.

In regards to the motion, I think it's important that -- to discuss the difference between the CAR that was requested and the other bits of information in discovery that has been provided that we just provided yesterday.

So the certified administrative record was based on the policy, the policy to apply -- to apply the presidential proclamations to those who have approved asylee petitions.

We have -- the government has provided -- in this instance, that this has been complied with. I will say just last week, however, that counsel and I were made opposed [sic] of two additional emails that we believe have some relevance that we will be also asserting privileges on, but we are still waiting back from DHS and -- to prepare the government for what privileges to assert specifically. And we understand that that is after the -- what, the April 15th deadline, I believe it was. But like I said, this is -- the first we have heard about it was last week, and that's why we are bringing this to the Court's attention now.

And for the certified administrative record specifically, we see it as there's three different types of documents that the plaintiffs want. One is the certified administrative record on the policy. We believe including --

THE COURT: You said what the plaintiffs want. That's not really how the standard is supposed to go. They don't know what you have. Right. I mean, this isn't -- they don't know what the government has. This is -- this is predicated -- all of these types of cases are predicated on a good-faith effort by the government to go through their records, their documents and create a certified record. Right. They don't know what to ask for. They're picking at this from the perimeter based on other litigation, based on public sources.

Your clients know what they have. Your clients -- you can read the complaint. It's your obligation to put forward a complete thorough record for judicial review. So don't switch the burden. Don't shuffle the burden over to them so that they have to just -- we have to only reply what they ask for or give us what they ask for. They don't know what you have. Let's be clear, the burden to put together the record is yours.

MR. COOPER: Yes. Understood, Your Honor. And the government believes that it has put forth, although in its --

THE COURT: Let's talk about that.

MR. COOPER: Of course.

THE COURT: So we're talking about records and documents from who, USCIS?

MR. COOPER: USCIS, DHS --

THE COURT: And the State.

MR. COOPER: -- and State Department.

THE COURT: Okay. I want to know, what was the process those agencies took to put together this CAR? What did they do?

MR. COOPER: From my understanding is that the -- or the local counsel -- the counsels for the agency had reached out to their agencies, their agencies --

THE COURT: How? I want to know where they looked. I want to know what they did. I want to know what search terms

they used. I want to be how many hours were spent. I want to know what they did after six months to come up with eight documents.

MR. COOPER: Understood, Your Honor.

I don't have the specific --

THE COURT: Get it.

MR. COOPER: -- answers.

Okay. Is there a certain time frame that you would like the --

THE COURT: Monday.

MR. COOPER: Okay. Understood, Your Honor.

THE COURT: What else?

MR. COOPER: Just going back to what I want to explain about how we received the case with the -- outside the scope of the administrative record.

So outside the scope of the administrative record, which we believe are those specific individual determinations to apply the proclamation, which we have provided the State Department cables on that, and we are planning --

THE COURT: I'm not even sure I understand what you mean by that.

MR. COOPER: So the certified administrative record was to the policy itself; it wasn't to the application of the policy on the derivative plaintiffs. Those are -- was not ordered to produce. But we are in good faith working on

producing those beneficiaries' A-Files and also an exemplar of a person that one of the principal plaintiffs who was granted asylee for the other side to view. And so those we see are more as outside the scope because it's not directly on the policy itself but was on the determination -- on the determination to those specific individuals.

THE COURT: What's your position about the scope of the complaint, about the scope of your cause of action?

MS. INTERLICCHIO: Our position is that while we are not positive the mechanisms by which our clients -- some of our clients were issued refusals, that information related to how that happened, the process between the Department of Homeland Security and the Department of State, scheduling those interviews and issuing those refusals is part of the administrative record because it goes to the determination on those individual clients.

Previously, we have agreed that our priority was to get the policy documents. That was probably early or mid March where we discussed that in the first instance, but at this point in the litigation with six weeks left, we think all of the documents relevant to the individual determinations, as well --

THE COURT: Yeah. I mean, the scope and the breadth of the claim is pretty broad. I mean, I cannot sit here and figure out -- I mean, having looked at it, I just cannot figure

out how the government can stand here with any sort of straight face and say this is what we're relying on. I just cannot figure it out.

MR. COOPER: I understand.

THE COURT: And I'll tell you what it does. The length of time you've taken, the information that has been provided in other litigation, which I don't -- it doesn't sound like you contest that was not provided here, the internal documents that were -- you know, that were referenced but still not provided just as a -- just as a starting point, the amount of time that you've taken to do nothing, for all intents and purposes, and you compare that to, again, the scope, the breadth, the depth of the claims, I just cannot figure out how you can stand here in good faith and look at this Court and say that you, as the lawyer, as the lawyers who signed the certifications, that a reasonable inquiry has been completed can even suggest that a reasonable inquiry has been done.

On the one hand, I suppose if this is your CAR, if this is all there is, I suppose it supports at least an argument that the decision was arbitrary. If this is all the record is, there's nothing more, how do you expect the district judge to rule on this based on this CAR?

MR. COOPER: To answer that, Your Honor, it is the government's position that the whole basis of this case relies on a legal distinction and a legal argument of whether or not,

one, these people were considered asylees; and two, that whether this is precluding them from seeking asylum at the border -- seeking asylum in general. And I think the government's position is that there's just no -- while -- there's just not a lot of documentation for this.

THE COURT: Did you file that motion?

MR. COOPER: Yes. It's pending, and we have a hearing in front of Judge Trenga on Wednesday.

THE COURT: All right. What else?

MR. COOPER: That's all, Your Honor. If you have anything else or any other questions.

THE COURT: So what are you -- I'm sorry. Go ahead. Take your time.

MS. INTERLICCHIO: Sorry, Your Honor. I think you were going to ask a question.

THE COURT: So what are you specifically asking me to do today? What order do you want entered today?

MS. INTERLICCHIO: We would like an order for the full administrative record without delay and a clear process for providing that with a time frame. I think that we have some of that from Your Honor already. We believe that the administrative record includes both stated reasons for the agency's decision and all documents, memoranda and other evidence that was considered directly or indirectly by the agency, even if the agency did not rely on that information in

its final decision.

THE COURT: I understand you have -- there are documents you may assert a privilege over; right? Do you disagree with that definition with respect to the scope? And your position is that definition covers eight documents?

MR. COOPER: There are additional. There's other additional privileges that apply as well other than that.

THE COURT: Okay. Privileges aside, right, there could be 1,000 documents, and you could say we're asserting a privilege over 994 of them, that's great, we'll figure out the privilege issues, I'll decide the privilege issues; right?

MR. COOPER: Right.

THE COURT: But the scope, it doesn't mean that that's -- that, you know, the scope of the record is six documents or eight documents.

MR. COOPER: Correct. So there's two additional emails that --

THE COURT: So what is the universe of -- so given the definition that she gave, what is the universe of documents that's responsive to that definition? Do you have them pulled? Do you know?

MS. SPAVINS: Yes, Your Honor. The agency's position, the government's position is that the certified administrative records with regard to the policies were produced on April 15th per the joint proposed discovery plan.

The defendants --

THE COURT: That's not my question. My question is she gave a definition of what she thinks constitutes the full administrative record.

MS. SPAVINS: Right. Yes. And it's been produced.

THE COURT: It's been produced?

MS. SPAVINS: That's right. And I --

THE COURT: Why don't I have a -- why don't I have an agency official here from USCIS, from State, from Homeland Security, and they can testify under oath about what processes they used, what they did to gather this record? I just can't believe that's the case. I can't believe that given the nature of this claim, that the full administrative record is eight documents.

MS. SPAVINS: I understand Your Honor's position. I would return to the point that this was a legal conclusion by the agency. And so as Your Honor noted, the agency will have to live with whatever the record is. Right. The agency -- the point of the administrative record is not to go back in time and recreate or --

THE COURT: I'm not asking to recreate anything; I'm asking them to identify what they have.

MS. SPAVINS: And they have, Your Honor.

THE COURT: And they can -- and that's it.

MS. SPAVINS: That's right.

THE COURT: How long is your privilege log?

MS. SPAVINS: It's going to be three emails. There's one already. We only learned about the other two last week after the production was complete, and we flagged that.

THE COURT: So there are a total of 11 documents?

MS. SPAVINS: Yes, Your Honor.

THE COURT: I don't believe that can be the case. I just -- I have a hard time. You have a presumption of regularity; you've lost that presumption.

MS. SPAVINS: Okay.

THE COURT: I don't -- I simply don't believe -- the presumption can be rebutted, and I think given the nature of this claim, I think given the nature of this issue, the idea that the United States government in three different branches of the -- or three different departments of the United States government -- or two, I guess, have come up with 11 documents, three of which they claim are privileged is hard to fathom.

MS. SPAVINS: Your Honor, respectfully, I want to respond to make sure Your Honor understands what the scope of the legal question here that is before Judge Trenga that has been fully briefed for months.

This is an issue of the interpretation of the presidential proclamation --

THE COURT: I understand that.

MS. SPAVINS: Right. So the presidential

proclamation is the governing document here that is -- from which the agencies have to follow. And so that -- it's not -- when you say 11 documents, it's very important that one of those is the presidential proclamation that governs this that the agency is tasked with following.

THE COURT: So there's no further -- there's no further interpretation, there's no further discussion, there's no further how is this proclamation applied to this plaintiff, to this plaintiff, to this plaintiff?

MS. SPAVINS: They're all the same, Your Honor. They're all individuals outside the country. Right. So they're not different in that way; they're actually all follow-to-join asylees.

THE COURT: So there are no documents -- they're outside the country, so there are no documents that deal with them individually?

MS. SPAVINS: So their individual files, the individual applications for follow-to-join asylum, they were approved, which is not contested. That's in the complaint. We're in the process of producing those. We talked to the plaintiffs after our last meet-and-confer about producing those by May 1st. We are on track to do so.

THE COURT: Okay. I decide when you produce things.

MS. SPAVINS: Respectfully, Your Honor, we had agreed on the certified administrative record by April 15th. There

isn't any other date by which --

THE COURT: That's not part of the -- that's not part of the record?

MS. SPAVINS: That's right. That's not part of the policy record.

THE COURT: Why not?

MS. SPAVINS: Because those are applications that were not considered by the agency in the policy. The policy is a general policy. These are individual applications for follow-to-join asylum.

THE COURT: What about documents that were provided in other similar litigation?

MS. SPAVINS: Right. So the cables that were flagged were not considered by the agency in making this determination. Those are cables on other subjects.

As you can -- I'm sure you're well aware, the proclamation is sprawling. It covers a whole lot of individuals seeking various immigration and travel benefits. Those cables, they were not forgotten about, they were not part of the determination. The sole cable that reflected DOS implementing the DHS decision was produced. There's no dispute about that.

That cable referenced two other cables. Those were not part of the decision. It was more like think about a situation where like the Court has periodic orders, and they'll

say the Court is incorporating, you know, the orders on this and this date, but here's the new current order that governs everything. But we went ahead and produced those "ref cables," we produced them yesterday. But the agency isn't relying on those as a part of its administrative record.

I understand the Court may feel there is an asymmetry between the scope of the claims and the volume of the administrative record. But I can say, having been in this job for nearly eight years, that is what happens sometimes, that a far-reaching government decision doesn't have what you might hope would be a voluminous amount of paper documenting the decision. Rather, sometimes it is a legal analysis of a governing document. That's why there's privilege issues here, because we have three documents governed by the attorney/client privilege, two of which we belatedly discovered, which we do apologize for that. We didn't not ask for them, it was just we weren't able to get our hands on them. But that's all that is here.

And I really do apologize that the Court feels frustrated with the government's candor here. That was never our intention. We have really been trying to convey to the Court and to the plaintiffs that the agency's position here was a legal determination. That's why we moved to dismiss on the basis of those legal arguments.

Now, it is the case that discovery has begun, we've

produced the administrative record. You know, we're not fighting any of that. But that can't change the underlying decision here, which it was a legal conclusion. Right. No amount of litigation can change the manner in which the agency made its decision, even if it ends up being what some might see as a "thin" record. And it's actually come up in our meet-and-confers as well. But the proclamation is the governing document here. That's why -- I mean, you know, that's what's running this show, so-to-speak.

THE COURT: So here's what I want. I want by -- I want by Tuesday a submission from the government that says what they understand the scope of the administrative record to cover and the process used by USCIS, State, Homeland Security to find records, documents, anything else with that -- understanding that definition. There shouldn't be anything privileged there, it's a process issue. There shouldn't be anything that the government is concerned about the plaintiff seeing, so I want it served on the plaintiffs on Wednesday as -- what did I say, Tuesday? On Tuesday as well. I want the plaintiffs to respond by Thursday, and I'll make a decision on Friday.

MS. SPAVINS: Okay. Your Honor, so just to clarify, filed on the docket on Tuesday or no?

THE COURT: Uh-huh.

MS. SPAVINS: Okay.

THE COURT: If there's anything in there that you

think needs to be sealed --

MS. SPAVINS: Right.

THE COURT: -- you can, you know, move under Rule 5.

MS. SPAVINS: Okay.

THE COURT: You can file it under seal pending a decision under Rule 5.

MS. SPAVINS: Okay.

THE COURT: But I don't think there's anything -- if there's anything that you think for whatever reason -- you know, I'm thinking about this in terms of process as opposed to anything that would cover a privileged communication.

MS. SPAVINS: I think I understand Your Honor, and so I will convey to the agency that that's the instruction with regard that this submission should be prepared.

THE COURT: Your privilege log contains three documents, that's it?

MS. SPAVINS: Uh-huh.

THE COURT: Okay. And you've received their privilege log?

MS. INTERLICCHIO: We received a version of the privilege log that has one document. The government's informed us that they were evaluating the -- whether or not there was a privilege claim as to two additional documents.

THE COURT: All right. So you'll give them the full privilege log by Wednesday -- by Tuesday?

MS. SPAVINS: Sure.

THE COURT: We can do this quickly. If there is a challenge to any of those three documents, file a motion by the following Tuesday, the 12th. Any reply, the 14th. And I'll hear any challenge to the privilege issues, there are three documents, on the 15th.

MS. INTERLICCHIO: Your Honor, may I ask a clarifying question?

THE COURT: Uh-huh.

MS. INTERLICCHIO: One issue that's already come up in our meet-and-confers is whether or not a privilege log must contain sender and recipient information, as well as -- in the email subject and thread -- email threading/attachment information.

The government has taken the position that it's reluctant to include sender/recipient and subject matter information in a privilege log, and so our privilege log that exists right now is pretty much a date and a -- and the fact that it's an email for the one document. Before we go another two weeks to --

THE COURT: How is that -- how is that privileged? How is who speaks privileged?

MS. SPAVINS: Thank you, Your Honor. So we met-and-conferred about this just yesterday with plaintiffs, and we had discussed -- I'm still in negotiations with the

agency, so I do think the subject matter --

THE COURT: I can make those negotiations easier. I understand it's always difficult for lawyers and clients sometimes, and you're the one sitting here bearing the brunt of other people's decisions and other people's actions. That doesn't go unnoticed or unappreciated. But I'm not -- I just cannot see how there is a recognized privilege attached to who the individuals are in communication. In fact, that seems to be essential to know whether or not the document really is privileged. If they need to make a threshold decision, you know, are we conceding that this is a privileged document? Are we going to challenge that this is a privileged document? On what basis are we going to challenge it? They need to have certain foundational information; don't they?

MS. SPAVINS: I completely understand, Your Honor, and this is what we talked about at the meet-and-confer yesterday. The agencies have concerns about individual privacy, because in the world we live in, unfortunately, individually federal employees, their names have been released, it's been very challenging.

THE COURT: Well, if that's your concern, why don't we do it as an attorneys'-eyes-only at this point, and you can file that -- you know, you can file a -- if anything has to be filed on the record, you can redact that. But the parties will have enough so that the plaintiffs can make an informed

decision about how they want to proceed, and if I have to rule on something, I'll know enough so hopefully I can rule, if not properly, close to it.

MS. SPAVINS: Understood, Your Honor.

And, yes, the parties are on the same page about the plaintiffs needing enough information to determine if the assertion of the privilege is valid. So it's merely an issue of trying to figure out a way to balance these privacy interests, and/or if we can't bring our clients, you know, to bear, so-to-speak, submitting the documents *ex parte* so that the Court can look at them with whatever information the Court needs. But we're aware, and we are working on it.

THE COURT: Okay. So you'll file a privilege log by next Tuesday?

MS. SPAVINS: Yes.

THE COURT: If there's a challenge to the privilege log, you can raise that. We'll have that resolved by the 15th.

MS. SPAVINS: And just to clarify, Your Honor, we're going to serve the privilege log, but we're not going to file it on the docket.

THE COURT: No. No. Yeah.

MS. SPAVINS: Right.

THE COURT: It may not be an issue. If you give them at privilege log and they say, hey, you know, okay, just based that description, we agree.

MS. SPAVINS: Okay.

THE COURT: Then, you know, it's the end of the story.

MS. SPAVINS: Understood. Thank you, Your Honor.

THE COURT: I'm not sure it makes sense to specifically rule on your motion today until I wait and see sort of what the process is. Right. If their position is what you're asking for is really beyond the policy decision, and you agree with that, then that's fine. If you don't, then I think you'll have an opportunity to see what they submit on Tuesday, and then if nothing else, maybe that refines your argument, maybe it expands, maybe it contracts a little bit of what you're asking me to do.

MS. INTERLICCHIO: Thank you, Your Honor.

THE COURT: Does that make sense? I felt like that was clunky coming out. Does that statement make sense?

MS. INTERLICCHIO: I'm not 100 percent sure I followed.

THE COURT: So I think rather than rule specifically on your motion right now, I think it makes sense to let -- I want to see what process they used in developing two things. Right.

First I want to know exactly how they defined the administrative record. I want to know what they told their people to look for, and then what process they used to look for

it. Right. I think once you understand that and once I understand that, then I think we'll both be in a little bit of a better position to decide whether or not the administrative record is complete, or, if not, where it needs to be supplemented.

MS. INTERLICCHIO: Thank you, Your Honor.

THE COURT: So what I would say is, let's wait to hear from them on -- wait to see their submission on Tuesday, you can decide whether that changes your position in any meaningful way. If it doesn't, that's fine. We'll resolve everything back here on the 15th; okay?

MS. INTERLICCHIO: Thank you, Your Honor.

THE COURT: Does that make sense, Ms. Spavins?

MS. SPAVINS: Yes, Your Honor.

Just to understand the timing. So the idea is that all -- because today is the 1st, right, so all of the issues would end up being briefed and heard together, to the extent there are. I really -- we are trying, and we will try to keep as many issues resolved between us. Everything will come together by the 15th.

THE COURT: Uh-huh.

MS. SPAVINS: That's fine.

MS. INTERLICCHIO: Your Honor, would it be possible to also get a ruling on one specific category of documents that I don't think the government has necessarily responded to in

their argument, which would be the -- if, in fact, this was a legal determination, it seems from the State Department cable that there was a communication of a policy from the Department of Homeland Security to the Department of State, and that is not included in the record. And regardless of the basis for the policy at issue and what counsel are informing the Court was the basis for the policy at issue, that document would not be privileged and would be part of the administrative record in any event and is not included here. Would we be able to get an order as to that document, to the extent it exists, communicating the policy?

THE COURT: About that document? Are you familiar to which document she's referring to?

MS. SPAVINS: Yes, Your Honor. This is -- this request has come up a couple of times, and we have brought it to the agency a couple -- both -- all of the agencies a couple of times. I think this is another situation where maybe what the private sector expects communications among government agencies look like doesn't match what the actual communications look like.

I don't think this document exists. I think perhaps the closest we get to it is the documents that are on the privilege log. We can -- you know, the parties might disagree about whether it's privileged, but we've asserted it. So to the extent this document exists, I have asked repeatedly, it's

these documents that are on the log.

THE COURT: But we understand that there are two different categories. Right. Just because a document is privileged, doesn't mean it's not disclosed, doesn't mean it's not collected --

MS. SPAVINS: Of course.

THE COURT: -- doesn't mean it's not set aside.

MS. SPAVINS: No, of course. But my colleague just said that of course such a document would not be privileged, and what -- I was responding that --

THE COURT: Got it. I'm not -- I just want to know is there a document? You're saying that there is no such document that she's referring to?

MS. SPAVINS: I think what the plaintiffs are imagining -- no, I don't believe it exists. What does exist with regard to the decision about the policy and the communication of that policy has been produced and/or logged.

THE COURT: Okay. So specifically can you describe the -- what you think the document exists with as much specificity as you can?

MS. INTERLICCHIO: Yes, Your Honor.

In the State Department cable produced, the State Department is informing posts that "DHS determined that following to join asylee (FTJ-A) V92 YY beneficiaries from suspended countries are subject to PP 10949." That cable is

dated July 24th, six weeks after the Department of Homeland Security email stating that there's not guidance. There are also other State Department documents that reflect confusion or a lack of policy.

At some point in June or July of 2025, the State Department learned of a DHS policy and communicated it to its posts. The State Department had to learn of that policy in some way, and there's nothing in the record that reflects a communication from the Department of Homeland Security to the Department of State. Plaintiffs needs to know how that document -- how that policy was communicated in order to properly understand how the decision was made.

THE COURT: All right. So I think that will be part -- we'll add that to the requirement for Tuesday. Right.

Is there a document that was transmitted from Homeland Security to the Department of State regarding the implementation of the policy? And, you know, it's a specific request, what State and Homeland Security did to look for that specific document. And if the answer is it doesn't exist, it would be nice if there was at least some follow-up from them saying it was communicated by phone, it was communicated orally, it was communicated in a meeting, whatever. If it was communicated in a face-to-face meeting or any other meeting, obviously any notes would be important to be preserved, collected, reviewed and determined whether or not they're part

and parcel of -- or should be part and parcel of the record.

I have no idea -- I said this last time, I'm going to say this again. I have no idea if plaintiffs' claims are meritorious or not. You know, that will play itself out as the litigation matures. My job is to make sure that there is a record that is clear, that is sufficient, that is legally appropriate. That's it. But we need to do that. Okay.

Does that -- is that acceptable to you?

MS. INTERLICCHIO: Yes, that's acceptable. Thank you, Your Honor.

THE COURT: Okay. All right. You say your hearing before Judge Trenga is Wednesday?

MS. INTERLICCHIO: Yes, Your Honor.

THE COURT: Okay. Anything else?

MS. INTERLICCHIO: Not from plaintiffs, Your Honor.

MR. COOPER: No, Your Honor.

THE COURT: All right. Thank you, all.

(Proceedings adjourned.)

----------------------------------

I certify that the foregoing is a true and accurate, to the best of my ability, transcription of proceedings recorded by electronic sound recording (FTR system).

Stephanie Austin

Stephanie M. Austin, RPR, CRR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| A.A., *et al.*, | ) | Case 1:25-cv-1819 |
| Plaintiffs, | ) | |
| v. | ) | Alexandria, Virginia |
| | ) | May 6, 2026 |
| UNITED STATES OF AMERICA, *et al.*, | ) | 10:06 a.m. |
| Defendants. | ) | |
| | ) | Pages 1 - 27 |

TRANSCRIPT OF MOTION TO DISMISS

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

APPEARANCES:

FOR THE PLAINTIFFS:

LORI JO INTERLICCHIO, ESQUIRE, *PRO HAC VICE*
JULIAN Y. KRITZ, ESQUIRE, *PRO HAC VICE*
DANIELLE J. BARONDESS, ESQUIRE, *PRO HAC VICE*
WILLIAM P. ASHWORTH, ESQUIRE, *PRO HAC VICE*
ADAM D. HARBER, ESQUIRE, *PRO HAC VICE*
RYAN T. SCARBOROUGH, ESQUIRE
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
(202) 434-5000

PEDRO SEPULVEDA, JR., ESQUIRE, *PRO HAC VICE*
GUADALUPE V. AGUIRRE, ESQUIRE, *PRO HAC VICE*
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, NY 10004
(929) 246-0154

FOR THE DEFENDANTS:

CHRISTIAN J. COOPER, ESQUIRE
ELIZABETH A. SPAVINS, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

P R O C E E D I N G S

THE COURTROOM DEPUTY: Civil Action No. 1:25-cv-1819, *A.A., et al. v. Department of State, et al.*

Counsel, will you please note your appearances for the record.

MR. SCARBOROUGH: Good morning, Your Honor. Ryan Scarborough on behalf of the plaintiffs in the case. I'm from Williams & Connolly, and I wanted to introduce my colleagues, who will be handling the argument, as well as the other representatives here today. Lori Interlicchio will be handling the application of the travel proclamation to this case, and then Julian Kritz will be handling the reviewability and jurisdiction questions.

THE COURT: All right. Very well. Welcome.

MR. SCARBOROUGH: And also with me I have other counsel who have entered appearances.

THE COURT: Great.

MR. SCARBOROUGH: Danielle Barondess, Will Ashworth, and Adam Harber from Williams & Connolly, and then we have with the International Refugee Assistance Project, Pedro Sepulveda and Guadalupe Aguirre.

THE COURT: Welcome to everyone.

MR. SCARBOROUGH: And we're also joined --

I'm sorry. One last thing, Your Honor.

THE COURT: All right.

MR. SCARBOROUGH: We're also joined by several of the primary asylee plaintiffs in the case.

THE COURT: All right. Very good. Thank you.

MR. COOPER: Good morning, Your Honor. Christian Cooper, Special Assistant United States Attorney. With me at counsel's table is Assistant United States Attorney Elizabeth Spavins on behalf of the defendants.

THE COURT: Welcome. You seem outnumbered this morning.

MR. COOPER: You do what you've got to do.

THE COURT: All right. We're here on the defendants' motion to dismiss, which I've reviewed. I'd be pleased to hear further from counsel.

MR. COOPER: Thank you, Your Honor, and may it please the Court.

This case does not involve the legality of Presidential Proclamations 10949 and 10998. Rather, this case involves the legal application of such proclamations to aliens with approved asylee relative petitions.

Plaintiffs' claim that granting of such

petitions granted them asylum or, at the very least, show that they are seeking asylum and thus are not subject to the proclamation's prohibitions on entry into the United States.

But the Immigration and Nationality Act, its legislative history, its own regulations, and Supreme Court case law make clear that aliens outside the United States cannot obtain asylum status when they are outside the United States. An alien can only be granted asylum inside the United States.

THE COURT: How would you characterize what the derivative plaintiffs are doing if not seeking asylum?

MR. COOPER: I believe, Your Honor, to answer that question, the plaintiffs did not affirmatively seek asylum. And to answer that question more specifically, they are not the ones that filed the petitions in general. It was the family members who are already here that have asylum.

THE COURT: Right, on their behalf.

MR. COOPER: On their behalf, correct, Your Honor.

The problem is that is similar to -- in the context of an ILEC for an I-130 in that it's just one step in the process in order to have entry into the

United States and to gain asylum in the United States.

Further, the plaintiffs outside --

THE COURT: What's the effect of the approval of the I-702?

MR. COOPER: The effect of the petition allows the alien to go to a consular officer and then seek what is called a boarding foil.

THE COURT: But there's an approval of something. What are they approving?

MR. COOPER: They are approving the I-730 petition, which allows the alien to go to a consular officer, receive an interview, and determine the inadmissibility of that applicant.

THE COURT: Right. But they have to meet certain qualifications before they -- there was a judgment made as to certain aspects of their status or eligibility that allowed the petition to be approved, correct?

MR. COOPER: Respectfully, Your Honor, the part of the I-730 and the purpose of an I-730 is to show the family relationship of the plaintiffs and not just that they are not asylum specifically.

THE COURT: All right.

MR. COOPER: And the plaintiffs outside the United States cannot use their petitions to claim that

they are seeking asylum because they did not actually file those petitions. It was plaintiffs who did.

In short, this case has one main legal issue, whether plaintiffs who are outside the United States have been granted asylum. In their briefing, the defendants clearly show that they are not, meaning they are subject to the proclamations and, therefore, forbidden from entry.

THE COURT: Could they have filed that petition themselves?

MR. COOPER: No, Your Honor, they could not.

THE COURT: Right.

MR. COOPER: For example, the petition that you file if you're seeking asylum is the Form I-589, which they have not filed and which you cannot file outside the United States. You have to be inside the United States.

THE COURT: Right. So the only way they could have sought asylum was through the I-730 filed by their relative?

MR. COOPER: No, that is not the only other way they can seek asylum, Your Honor.

Right now I think that's what the Supreme Court is currently addressing in *Noem v. Al Orto* -- I forget the name exactly, but that specific case is

addressing the when and where you can seek asylum, and in the oral argument that was recently conducted -- we have not gotten a decision on this case from the Supreme Court yet. But the Supreme Court across all the justices seemed to recognize that in order to seek asylum, you have to either be in the United States or at a port of entry.

The dispute of that case is where in that port of entry line you have to be, but I think that just shows the overall conclusion that the justices do have, is that to seek asylum, you have to be in the United States or at a port of entry. That has not happened here.

THE COURT: All right.

MR. COOPER: In any sense, the decisions forbidding the entry of these aliens are final and conclusive. As the Supreme Court has stated multiple times in the doctrine of consular non-reviewability applies to this case, as recently affirmed in *Munoz v. Department of State.*

THE COURT: Well, they made no affirmative decision on this other than to refuse to process it based on the presidential proclamation, correct?

MR. COOPER: They refused to issue a boarding foil.

THE COURT: Based on the presidential proclamation.

MR. COOPER: Based on the interpretation of the presidential proclamation.

THE COURT: Right, but not on the specific merits of the request for a boarding foil?

MR. COOPER: Respectfully, Your Honor, I believe it was part of the merits in the boarding foil because part of the grounds that apply when you are seeking a boarding foil is the grounds at 1182, 8 U.S.C. § 1182, and 1182(f) specifically allows this refusal pursuant to the presidential proclamation.

THE COURT: Right, but it was pursuant to the presidential proclamation that they either deny the boarding foil or refuse to process it, correct?

MR. COOPER: Correct, and it specifically cited that it was refused pursuant to 1182(f).

THE COURT: Right. So where are we if 1182(f) doesn't apply? If they were deemed to be seeking approval such that 1182(f) doesn't apply, where does that leave us?

MR. COOPER: For example, you would say the Court did say that they were seeking asylum. Is that what you are asking specifically?

THE COURT: Yes.

MR. COOPER: If they were seeking asylum, the government still stands on its doctrine of consular non-reviewability argument because a decision was made that was final and conclusive and that has no -- this Court not review such decision.

THE COURT: All right.

MR. COOPER: Because of these reasons and the reasons stated in their briefs, the defendants respectfully request this Court grant their motion to dismiss and dismiss plaintiffs' complaint in its entirety.

If the Court has no further questions, I reserve my remaining time for rebuttal.

THE COURT: All right. Thank you.

MR. COOPER: Thank you, Your Honor.

THE COURT: Counsel.

MS. INTERLICCHIO: May it please the Court. Lori Interlicchio for plaintiffs.

Your Honor, I'd like to address two arguments that the government made. The first is their argument that the plaintiffs are not seeking asylum under the proclamation. The government does not rely on any authority for that determination. That's contrary to the proclamation itself, which says that the proclamation shall not been construed to limit the

ability of any individual to seek asylum consistent with the laws of the United States.

The derivative asylees are seeking asylum consistent with the laws of the United States by filing a form that was approved by USCIS in this case. The idea that this process is the same as the I-130 process is contradicted by the agency's guidance, their manuals. Their policies lay out what this process entails and specifically describe the state in the process that the derivative plaintiffs are currently at.

So the USCIS Policy Manual at Volume 4, Part C, Chapter 5 describes the process for I-730 in three different pathways. The first is if the beneficiary is in the United States. The second is if the beneficiary is in a country where USCIS has a presence, and the third is for this case. So where the beneficiary is in a country where USCIS has no presence, and the interview would be conducted by the Department of State.

The Policy Manual makes clear that in that situation, the I-730 is adjudicated prior to sending the application to the Department of State to conduct the travel eligibility interview. Footnote 1 to that chapter of the Policy Manual makes a couple of

important points. The first is that it says as a matter of law, the authority to adjudicate affirmative asylum applications, including Form I-730. Form I-730 rests exclusively with the Department of Homeland Security.

It then goes on to say that if during the travel eligibility interview the Department of State takes issue with the granting of the application, at most, the Department of State can return the application to USCIS to, quote, reconsider the grant.

That's evidence that USCIS has taken the position that with respect to the class of derivative asylees, their applications are affirmative asylum applications and the Department of State only has the ability to ask USCIS to reconsider a grant. It cannot deny these applications on the basis that they're asylum applications.

USCIS calls this a grant. So these individuals are asylees, and at minimum, if they're not asylees, they are seeking asylum. These applications have already been approved. It's difficult to imagine how the application could be approved if they were not seeking the status.

The government is conflating "applying for" and "seeking" and is particularly doing so by arguing

that *Al Otro Lado* will govern this case. *Al Otro Lado* has nothing to do with this case. That case in front of the Supreme Court is about the ability to apply for asylum.

Now, plaintiffs recognize there's a distinction between applying for asylum as a principal under Section 1158 and being granted asylum as a derivative under 1158(b)(3).

1158(b)(3) makes clear that the derivative asylees need not meet all of the same criteria that would apply to the principal applicant. It expressly says that.

These individuals are not seeking to -- or rather, these individuals are not applying for asylum, and throughout 1158, the term "applied for applicant" is used consistently when referring to principal asylees. Whereas "seeking" is only actually used when describing a derivative.

THE COURT: In your view, what was the legal effect of the approval of the I-730 petitions?

MS. INTERLICCHIO: The legal effect was that the derivative asylees have been granted the same status as the principals.

THE COURT: They were approved as qualified to receive asylum; is that what you're saying?

MS. INTERLICCHIO: Yes, Your Honor.

THE COURT: All right.

MS. INTERLICCHIO: The I-730 was adjudicated. This is not like the I-130 process where an individual is applying for a visa for a family member because these are not visas. The visa process is different and has different steps, and the Department of State has a different level of authority at this step of the process -- or the parallel step of the process. At the I-730 -- in the I-730 process, the Department of State's ability to take any actions on these petitions is very limited.

THE COURT: And in your view, what was left for the consular review process?

MS. INTERLICCHIO: Your Honor, what was left for the consular review process was to verify the identity of the beneficiary, to verify the relationship of the beneficiary, and to verify that the beneficiary does not meet any bars to asylum or other derogatory information that USCIS would not have considered previously.

Now, even if any of those issues were raised, the proper process would be to follow the consular review process. And the approval notices, which state that USCIS has completed all action on this

application, does reserve the right to verify the information in the application through, for example, an interview.

That's not inconsistent with how principal asylum works Because principal asylum is not a permanent status that cannot be terminated. There are ways to terminate principal asylum status if the conditions are no longer met, for example, or if there is an issue with an individual's identity, for example. So it's akin to having an approved asylum petition for a principal. It's the same thing where the Department of State is really doing an identity check and a check that there are no bars.

THE COURT: The third category that you mentioned, that there are no bars, is that part of the I-730 review, or is that not?

MS. INTERLICCHIO: Is that part of the USCIS I-730?

THE COURT: Yes.

MS. INTERLICCHIO: My understanding is that it is. We don't have full insight into everything USCIS does, but my understanding is that checks are done on the beneficiary prior to approving the I-730 beneficiary request.

THE COURT: All right. So what relief are

you asking for at this point?

MS. INTERLICCHIO: Your Honor, we're asking that the Court today deny the motion to dismiss.

Are you asking in the litigation generally?

THE COURT: Yeah. Let's assume we get past the motion to dismiss. What's the ultimate relief you're asking for?

MS. INTERLICCHIO: We're asking that the Court enjoin the application of the proclamation to the derivative asylees in this case.

THE COURT: And then what would happen? There would be a consular review on an individualized basis?

MS. INTERLICCHIO: For the individuals who have not yet had a travel eligibility interview, they would be entitled to the travel eligibility interview. The refusals that were issued based solely on the application of the travel ban to these applicants should be rescinded. And for the individuals who have already had a travel eligibility interview and it was determined that there are no issues with the beneficiary aside from the government's application of the proclamation, those individuals should be issued boarding foils.

THE COURT: All right. Thank you.

MS. INTERLICCHIO: Thank you.

MR. KRITZ: May it please the Court. Julian Kritz for plaintiffs.

And I'll just briefly address reviewability. I want to focus in on consular non-reviewability. The doctrine that we heard from the government.

All the cases in which this doctrine applies have a discretionary determination that was made by a consular official. Here we do not have that. We don't have that for many reasons, and I'll begin with two.

First, all the consular officers did in this case, as explained in our complaint, is hand a pre-written boilerplate formulaic denial letter based on the wrongful belief that the travel ban applied to these follow-to-join Afghan asylees.

Those letters were pre-written. In some cases, they were dated before the interview themselves. In other cases, they didn't have any identifying information about who it was being handed to, no case numbers, no names of the derivative asylees. In some instances, not even a signature by a consular officer.

There was no determination that was made that these denial letters should be handed based on any individualized factor of the person in front of the consular officer.

THE COURT: That gets back to my question about what ultimate relief you're seeking. If you were to get past the motion to dismiss and past the application of the presidential proclamation, what are you looking for? An order from the Court ordering *de novo* consular review of the board foil application? Do I have that right?

MR. KRITZ: Yes, Your Honor.

To build off of what we heard from my colleague, Ms. Interlicchio, in our complaint, I believe we asked for an order from the Court for a seven-day period for the government to show cause about why all the derivative asylee plaintiffs should not be given boarding foils.

As to the five --

THE COURT: Would that be appropriate, or would it just be for them to process the boarding foil applications without regard to the presidential proclamation?

MR. KRITZ: Yes, Your Honor. So there's seven families. Five of the families have already had interviews.

THE COURT: Right.

MR. KRITZ: We don't know exactly what questions and assessments were made in the consular

officers bringing in their written papers. We are actively going through the discovery process right now.

But as alleged in our complaint, many of the family members that have already had interviews -- for example, the family that interviewed in Tajikistan as opposed to Islamabad -- we allege -- because having a four-hour interview where that they seemingly asked all sorts of normal questions only to then be handed -- and this is after by the way --

THE COURT: Well, you don't know the basis for the refusal?

MR. KRITZ: So the letter itself says it was just denied based on the travel ban, but there is an indication that actual questions were asked that would get to the normal process. And the denial letter itself does not cite any other basis that may have been elicited during that interview for a denial. It just says the travel ban itself.

So our understanding based off the allegations in the complaint is that the questions for an individualized assessment for these five families were already asked and elicited and there was no barred derogatory information at all. The denial is purely based on this legal determination.

And so if you remove the application of the

presidential proclamation and the travel ban, there's no reason these families shouldn't get their boarding foils and be able to come to join their family members in the United States.

Now, we're asking for seven days. Otherwise, we are actively in discovery in this case. But just to be clear, especially as to the five families that have already interviewed, that has uprooted their lives and gone to different countries to do these interviews pursuant to notices given by the government, that is the relief we're seeking.

And I just wanted to say, you know, briefly, we're learning more about this every day. But even as we explain the regulatory regime in the complaint, the State Department only is involved in this process because the derivative asylee plaintiffs are in a part of the world where there is no USCIS field office. And so we're actively in discovery right now. But as we understand it, the consular officers are maintaining that they're essentially just applying the policy perhaps from the Department of Homeland Security.

So the consular of non-reviewability doctrine is specific to the State Department, and here, the policy that the State Department is applying, it's not even a decision made by the consular officers or even,

as we're learning in discovery, the State Department itself. And so the consular non-reviewability doctrine is just far afield from these alligations here. It's application would be inappropriate.

I can briefly address, Your Honor, to the degree you have questions, the standing issue that came up in the briefing, as well as the committed to agency discretion under the APA issue that came up in the briefing. These are other reviewability issues but only to the extent Your Honor has questions.

THE COURT: All right. Why don't you address the discretionary review issue briefly.

MR. KRITZ: Yes. So this in some ways is similar reasoning. For anything to be committed to agency discretion, discretion has to be exercised in the first place. The Fourth Circuit decision in *Ortez* -- this just came out in March, and we filed it as a supplemental authority. It said, quote -- this is the Fourth Circuit -- the decision from USCIS was not an exercise of discretion because there was no consideration of the primary asylee and her husband's unique circumstances, nor the application of the Section 1158(b)(3)(A) -- that is the follow-to-join provision in the INA -- the application of the Section 1158(b)(3)(A) guidelines and standards.

So because there was not a determination of the unique circumstances -- it was also a derivative asylum case, *Ortez* -- there was no exercised discretion entitling the government to shield from judicial review, you know, challenged conduct.

This is not just unique to the Fourth Circuit decision. This is, you know, all through the case law. I will point Your Honor to another case. This is from the District of Maryland, a recent decision, the *Doe* case. And the claim there wasn't that the state had erred in a decision to bar. This was an Iraqi national who was trying to get a refuge travel document to come to the United States. But the challenge there was that the refuge travel document policy from the government ran contrary to applicable statutory authority and, therefore, was not permitted and not subject to agency discretion.

So this is a whole line of cases that essentially -- when there was not a particular determination in the application of discretion to an actual individual, something cannot be committed to agency discretion because no discretion was exercised in the first place.

So in some ways, the reasoning here tracks the reasoning that I talked before on the consular of

non-reviewability doctrine.

THE COURT: All right.

MR. KRITZ: Your Honor, if you have no further questions, I'll yield.

Thank you.

THE COURT: Mr. Cooper, I'll give you the last word on this.

Let me ask you this, the question I asked counsel: What in your view was the legal effect? What was legally being decided when the I-730 application was approved?

And secondly, if there is USCIS presence in a country where the derivative plaintiffs are located, am I correct that consideration of the I-730 petition would be sent to the consular office there for review?

MR. COOPER: To your second question, I believe so, Your Honor, but I'm not 100 percent sure.

THE COURT: And would they consider that separate and apart from whether to issue a boarding foil, or would the two considerations be merged?

MR. COOPER: So I believe, Your Honor, the two considerations would be merged because USCIS does not have -- DHS does not have authority to issue the boarding foil. It's within the consular officer's discretion even if --

THE COURT: That's what I'm getting at. If it were sent to the consular office and the I-730 was approved, is the issuance of the boarding foil anything other than a ministerial act that needs to be done?

MR. COOPER: No, Your Honor, because you're still presented to a consular officer. You still have to go through certain bars that apply.

THE COURT: I guess that's what I'm asking. Would it be the case that they would go ahead and approve the 730 application and then turn around and deny the boarding foil, or would they simply deny the 730 application since the grounds for denial of the boarding foil would essentially be the same grounds for denying the I-730 application?

MR. COOPER: To start and just to make clear, these I-730s were approved prior to the proclamation.

THE COURT: I understand that.

MR. COOPER: So that -- and also --

THE COURT: I'm talking about without regard to the proclamation, what the process would be.

MR. COOPER: Okay. So if they were approved then, like you said, that's when they are sent to the NVC if there is no USCIS field office there. And that's where the consular officer will receive the petition, and then they will discuss plaintiffs'

eligibility based on certain grounds, which include the inadmissibility grounds at 1182, which includes 1182(f).

THE COURT: Well, I was just wondering about what the process would be where there is USCIS presence. The process is basically collapsed. Would that be a fair characterization?

MR. COOPER: I believe it would be a fair characterization, yes, Your Honor.

THE COURT: So in your view, what was legally being decided by the approval of the I-730 application?

MR. COOPER: Is that the legal effect of the approved I-730 --

THE COURT: Yes.

MR. COOPER: -- was that the plaintiffs were able to receive a consular officer interview and determine whether -- to allow them to be determined whether they should be allowed entry into the United States.

THE COURT: All right. What are the grounds for approving or not approving the I-730 application?

MR. COOPER: An I-730. I believe part of it is the admissible -- not the inadmissibility grounds, Your Honor. I think it's the showing of determination. I don't know off the top of my head the exact

requirements that you have to go through. I believe the I-730 note, the instructions -- which we may have not included in our brief -- also has that information on what needs to be done.

But one thing, I think, that's clear is that I do not believe the admissibility -- you do not have to be inadmissible. The inadmissibility grounds are not reviewed at the I-730 stage specifically.

THE COURT: All right.

MR. COOPER: Going off traditional arguments that my colleagues raised, first, we talked about the USCIS Policy Manual. There's nothing in the sections that my colleague cited that talks about specifically the granting of asylum, and I think that's important to know because the granting asylum -- the other regulations, the INA, Supreme Court case law, the legislative history of The Refuge Act of 1980 show that such grant can only occur in the United States.

And I think it's also important to emphasize that these petitions, they weren't filed by the derivative plaintiffs. They were filed by the principal plaintiffs.

And if Your Honor has no other questions --

THE COURT: I don't. Thank you.

MR. COOPER: All right. Thank you.

THE COURT: All right. The Court is going to take it under advisement. I will get you a decision just as soon as I can. All right.

MR. SCARBOROUGH: Thank you, Your Honor.

THE COURT: All right.

----------------------------------
Time: 10:37 a.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/
Rhonda F. Montgomery, CCR, RPR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| AA, et al., Plaintiffs, | Civil Action No.: 1:25-cv-1819 |
| versus | Friday, May 15, 2026 Alexandria, Virginia |
| UNITED STATES DEPARTMENT OF STATE, et al., Defendants. | Pages 1-29 |

The above-entitled motions hearing was heard before the Honorable William E. Fitzpatrick, United States Magistrate Judge.

A P P E A R A N C E S:

FOR THE PLAINTIFFS: RYAN SCARBOROUGH, ESQUIRE
LORI INTERLICCHIO, ESQUIRE
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, D.C. 20024
(202) 434-5029

FOR THE DEFENDANTS: CHRISTIAN COOPER, ESQUIRE
KIRSTIN O'CONNOR, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

TRANSCRIBER: STEPHANIE M. AUSTIN, RPR, CRR
Transcriber
United States District Court
401 Courthouse Square
Alexandria, Virginia 22314
S.AustinReporting@gmail.com

(TRANSCRIPT PROCEEDINGS RECORDED BY THE FTR SYSTEM)

P R O C E E D I N G S

THE DEPUTY CLERK: AA, et al. v. United States Department of State, et al., Case 1:25-cv-1819.

Counsel, please note your appearance for the record.

MR. SCARBOROUGH: Good morning, Your Honor. Ryan Scarborough on behalf of the plaintiffs. And addressing the Court today will be my colleague, Lori Interlicchio.

THE COURT: Good morning.

MR. SCARBOROUGH: Good morning.

MS. O'CONNOR: Good morning, Your Honor. Kirstin O'Connor, Assistant U.S. Attorney. And with me at counsel table is Christian Cooper, Special Assistant United States attorney for the government.

THE COURT: All right. Good morning.

Ms. O'Connor, you're up first.

MS. O'CONNOR: I'm up first?

THE COURT: Uh-huh.

MS. O'CONNOR: Okay. Your Honor, do you have specific questions for me or should --

THE COURT: A lot.

MS. O'CONNOR: Okay.

THE COURT: I'm happy to hear what you have to say.

MS. O'CONNOR: Yes, Your Honor.

So of course we understand in this case that the government and plaintiffs have different views of the scope of

the claims and the appropriate certified administrative record here, and so we have been working diligently with plaintiffs and also internally with our agency partners to --

THE COURT: What's the evidence that you've been working diligently? It took six months -- seven months to come up with eight documents.

MS. O'CONNOR: Yes, Your Honor. So I'd like to focus a little bit about what's happened since the last hearing in this case.

So of course, as you know --

THE COURT: Nothing happened until I got mad. Let's just start right there.

MS. O'CONNOR: Understood, Your Honor.

So as you know, we provided the original certified administrative record on April 15th, we had the hearing here on May 1st, and we produced, as this Court ordered, certain materials by May 5th. And then when we received --

THE COURT: Do you think the May 5th submission at all resembled what I ordered?

MS. O'CONNOR: With respect to the privilege log? Which part of --

THE COURT: No. With respect to the process -- you know, that order was really designed to help the government, whether you think it was or whether you don't. It really was. The purpose of that order, right, if you wanted to defend,

right, the fact that the administrative record constituted eight documents, six of which were public, and maybe it does, I have no idea, but that order was designed to allow the government to establish why, to come out and say here's what we did to put forward this CAR, here's the process that we took. Nothing privileged. Nothing -- you know, no internal communications, just this is the process we used so the Court can have some comfort that this CAR is thorough, it's complete, and it's now properly positioned for judicial review. That's it. And all you had to do was come in and say here are the people who searched, here are the search terms that they used, what they did was reasonable --

MS. O'CONNOR: Yes, Your Honor.

THE COURT: -- and you didn't do it.

MS. O'CONNOR: Yes, Your Honor. I certainly understand your point about the original Grigsby declaration that we provided on May 5th, which is why we went back and asked for additional details, and we submitted the revised declaration last night. And I certainly appreciate that that was later than it should have been, and we take full responsibility for that, but we have been trying to sort of supplement with additional information so that plaintiffs and the Court can know what our process is. And part of that, as we noted in our submission to the Court on May 5th, was that we learned, after the Court had ordered a privilege log to be

produced, that there were additional privileged documents that came.

THE COURT: But isn't the government's position that -- so strike -- tell me if I catch this wrong, right --

MS. O'CONNOR: Uh-huh.

THE COURT: -- please.

At the end of the day, isn't the government's position basically this, we have two presidential proclamations, right. The -- and the central issue here is whether or not those two proclamations apply to derivative asylees; correct?

MS. O'CONNOR: That is correct.

THE COURT: Okay. So whether or not those -- those two proclamations apply to derivative asylees is essentially a purely -- a legal issue. So everything that we have is basically one lawyer talking to another lawyer about whether or not these proclamations are, in fact -- apply to this universe of folks. That's essentially it; right?

MS. O'CONNOR: That is absolutely correct, yes.

THE COURT: All right. So basically your position is anything that involved the deliberative process is going to be privileged?

MS. O'CONNOR: Correct. And also subject to attorney/client and possibly work product, yes.

THE COURT: And you threw in there deliberative

privilege as well?

MS. O'CONNOR: That's correct.

THE COURT: Does that seem a little circular, that if the whole underlying process is what was the deliberative process used by, you know, the decision makers, but we're going to argue that, well, the deliberative process is now privileged, so we can't turn over any documents that discuss the deliberative process?

MS. O'CONNOR: Yes, Your Honor. The deliberative process is -- I agree it's tricky in that way, and I think here, fortunately -- or unfortunately, I guess, depending on your point of view, the attorney/client aspect I think is really the key. Because as Your Honor noted, this really is a legal interpretation. And so as you saw from our privilege log that we did update to show the offices that each of the senders and recipients were a part of, these were all lawyers talking to each other and then talking to their clients about this issue.

THE COURT: Have you ever seen a privilege log that looked like that before? It was that thin before?

MS. O'CONNOR: Are you referring to the original one we produced on May 5th?

THE COURT: Or even the second one. How does your privilege log allow the plaintiffs or the Court, ultimately, to -- and I know we're jumping around on issues.

How does that allow the plaintiffs to make any sort of reasoned determination that, okay, this really is privileged, right, this really is an attorney/client communication, and so you know what, we're not going to challenge this. Do you think your privilege log puts them in a position where they can do that at all?

MS. O'CONNOR: With the updates, yes, I do. Because the updated privilege log shows that these are communications between attorneys within the agencies and between the agencies on this exact issue that's at issue in this case, which is the legal interpretation of the proclamation.

THE COURT: Maybe I missed it, but in the updated ones, did you include the subject matter in the -- you know, in the header of the email? I thought all of those were still redacted.

MS. O'CONNOR: The subject of the email specifically, yes, but we provided a more robust explanation for the contents of the email itself. So we think that that does give sufficient information to plaintiffs and to the Court.

And of course as we noted -- I appreciate that this is a unique situation where, as you indicated, the agency's decision-making process is all among lawyers, and it makes it very difficult, and I fully understand the plaintiffs' frustration on that. So --

THE COURT: I'm a little bit less worried about that.

MS. O'CONNOR: Okay.

THE COURT: Because I think at the end of the day, I'm going to have to make a determination about what's privileged and what isn't. I think that's kind of where this is heading. And I'm perfectly happy to do that.

MS. O'CONNOR: Yes, Your Honor.

THE COURT: All right. But I think that's like Step 3. We're still at Step 1. Right.

Tell me where I'm missing something here. If, you know, the first job, our first responsibility is to make sure that we have our hands around the universe of responsive documents, right, within that universe, there will be some documents that the government's going to say, you know what, these are not privileged, this is, you know, part of the CAR. There are going to be some -- there's going to be another universe of documents where the government's going to say, you know what, these are privileged. We get it. We'll resolve the privilege issue next.

Right now, we are still at that threshold question of do we know, do we have any reasonable degree of confidence that there has been a thorough review so that we have our hands around the universe of documents that are potentially proper to be included in the CAR?

MS. O'CONNOR: Yes, Your Honor. So I think there are -- there are a couple of answers to that.

With respect to the Grigsby declarations, we understand that the original one we submitted was not sufficiently thorough, which is why we supplemented yesterday. And after we received plaintiffs' objections, we went back to make sure to essentially -- our continuing obligation to make sure that we have the documents we need. They reran the searches as articulated in the updated declaration with the search terms. And so if plaintiffs have additional search terms that they would like us to run, we would be happy to do that.

So it was the -- the -- Mr. Grigsby, and also the person who was in charge of the policy office ran the searches yesterday as well.

THE COURT: Why does this -- on -- I know we're jumping around.

Why did -- this case should be done by now for all intents and purposes. Right. This is not -- you know, your position -- if your position is correct, this is simple, this is linear, this is straightforward, and this should have been done four months ago. Why are we sitting here today having these discussions?

MS. O'CONNOR: Yes, Your Honor. I -- I certainly appreciate that. I genuinely apologize for the delay on this, and I think what we're trying to do now is make sure that what we have now is comprehensive. And so as I indicated, we have

the updated searches. Again, if plaintiffs have additional terms they would like us to search, we're happy to do that.

And I think with respect to the specific documents the plaintiffs have been asking for about how the State Department found out about DHS's determination and whatnot, those will be coming in the privilege log that we will be serving shortly, that is what's collected from documents from the Department of Homeland Security OGC, their general counsel's office.

Now, those were not initially --

THE COURT: How could that be -- how -- you know -- I mean, look, there are certain things that are clearly privileged. There are certain things --

MS. O'CONNOR: Yes.

THE COURT: How can just the manner in which one agency informed another agency be privileged?

MS. O'CONNOR: Yes, Your Honor. So, again, because these are -- these are all communications among lawyers where, you know, one agency --

THE COURT: It doesn't make it necessarily privileged.

MS. O'CONNOR: Yes, I -- certainly. I understand that. But I think these are agencies communicating about what are we going to do, what are your thoughts on this, this is maybe what we think, have you asked this person. So it really

is -- I think when Your Honor -- you know, if Your Honor decides to look at these in camera, I think you will see that these are really core attorney/client communications between attorneys.

THE COURT: All of them? You've reviewed all of these? So we're now up to maybe 200.

MS. O'CONNOR: So my client [sic], Mr. Cooper, is in the process of continuing to review those. I have reviewed some of them. But, to be honest with you, part of the reason that we haven't produced them yet is because we want to make sure 100 percent that this is the last thing and that the privilege log is as comprehensive as it can be. And so --

THE COURT: I mean, what I'm telling you and your client, right, is there had better be a careful, good-faith review. Right.

MS. O'CONNOR: I completely --

THE COURT: And it is not uncommon, right, for there to be a communication and have part of that communication be clearly privileged, just like you said. Right. This is our advice, this is our counsel, here's what we're doing, here's why we're doing it.

And then also to have, within that same email, in that same communication, things that are not privileged. Right. There are certain things that the plaintiffs have raised which on their face I don't know how could they -- how

it could be privileged. Right.

So I will tell you, if I look at 200 emails and there is just a blanket, you know, assertion over every line, over every word and it does not appear that there was any sort of good-faith effort to really identify what is a privileged communication, right, then we'll deal with that when we get there.

MS. O'CONNOR: I certainly understand, Your Honor. And I will take that back to the client, and we will incorporate that, of course, in our own review. And again, you know, our goal here is to make -- to give plaintiffs as much as we can while of course maintaining the privileges that we think we're entitled to. So that -- the point is well taken, and we will certainly -- we will certainly do that.

THE COURT: Let's assume for the sake of argument you lose your motion to dismiss and your motion to transfer.

MS. O'CONNOR: Yes.

THE COURT: All right. How does that change this status? How does that change your position?

MS. O'CONNOR: So my understanding is if the Court determines as a legal matter that these follow-to-join asylees would not be covered by the presidential proclamation, that would essentially end the case because the plaintiffs would then be eligible for consideration for the boarding foils that they seek.

So our view is that --

THE COURT: But that's not before Judge Trenga right now; is it?

MS. O'CONNOR: The motion to dismiss?

THE COURT: Well, the motion to dismiss is, but does he have to reach that specific issue?

MS. O'CONNOR: So that came up at the motion to dismiss hearing, what the remedy would be, and the plaintiffs may wish to discuss that further, but that is my -- that is my understanding.

THE COURT: Okay.

MS. O'CONNOR: Because all of these -- I'm sorry. I didn't mean to interrupt you.

THE COURT: No. No. Go ahead.

MS. O'CONNOR: I was just going to say, all of these plaintiffs were -- their boarding foils were rejected because it was the government's view that they were covered by the proclamation, so once that bar is lifted, they would be eligible for consideration again. That's not to say that they would necessarily get the boarding foil. I can't speak to that at this moment. But the reason that they were barred would be lifted for reconsideration.

THE COURT: So you think -- I don't want to -- and this is unfair to hit you with at this point, but is it your position, or do you think it's the government's position that

whatever Judge Trenga decides essentially resolves this issue on the merits?

MS. O'CONNOR: That is my understanding, yes.

THE COURT: You think so?

MS. O'CONNOR: Yes.

THE COURT: So you think if he doesn't grant your motion, all of this is moot?

MS. O'CONNOR: Yes.

THE COURT: Do you agree?

MS. INTERLICCHIO: I think that if he does not grant their motion, that's probably true, all of this is moot. I think that if there's a -- if the case otherwise continues, even if there's some determination different than what we've argued about, the -- these individuals being asylees or seeking asylum, there's still a path that this case would continue.

We do raise other claims.

THE COURT: Tell me about that. What do you mean?

MS. INTERLICCHIO: Sure. So we raise other claims about how the proclamation was applied, that the proclamation was applied contradicting the agency regulations, and that the proclamation was applied in such a way where there are facts that --

THE COURT: Let me -- what you want out of this at the end of the day is you want a finding that the presidential proclamations do not apply to the derivative asylees; correct?

MS. INTERLICCHIO: Yes. Correct.

THE COURT: And then you want the derivative asylees to have their asylum applications adjudicated on their merits individually, one at a time on the merits; correct?

MS. INTERLICCHIO: Their travel determinations, yes.

THE COURT: Yeah. That's your goal in this?

MS. INTERLICCHIO: Yes.

THE COURT: If -- so if Judge Trenga does not agree with the government's position on the motion to dismiss, I'm not sure I understand what is left.

MS. INTERLICCHIO: Right. If Judge Trenga does not agree with the government on the motion to dismiss, then I agree that those -- the proclamation would not apply.

THE COURT: Did you all -- and I'm not sure whether Ms. Spavins argued it or you did, Ms. O'Connor, but was that issue specifically framed for Judge Trenga? Was it framed that way for Judge Trenga?

MS. INTERLICCHIO: Judge Trenga did ask about the relief we were seeking. I'm not sure that that was necessarily in the context of the motion to dismiss alone, but perhaps I could be misreading that. I certainly would hope that if he denies the motion to dismiss, that, yes, we would be entitled to relief, and that that would end this case in our favor.

THE COURT: Okay. Okay. All right. Thank you.

Ms. Spavins [sic], anything else?

MS. O'CONNOR: No, Your Honor.

THE COURT: So basically you want to slow walk this -- that's a bad phrase.

You want to hold this until he rules, and then you think once he rules, this is all done?

MS. O'CONNOR: We agree that once he rules, this is all done, that is why we set to vacate the scheduling order initially to -- honestly, to save the resources of the parties and the Court. But we are not --

THE COURT: But there's a reason -- you know, there's a -- there's a reason district judges do what district judges --

MS. O'CONNOR: I understand. Certainly, yes.

THE COURT: You know, they don't -- you know, when a district judge says I'm not vacating a scheduling order, they do it for a reason. Right. They don't -- you know, they don't -- you know, they want everything to be efficient, right. But one thing that they don't want is they don't want to -- you know, and Judge Trenga particularly, right. I mean, it is -- when there is a pending motion to dismiss, it's Judge Trenga's practice that we push forward, right --

MS. O'CONNOR: Yes.

THE COURT: -- we push forward on discovery, we push forward on everything.

MS. O'CONNOR: Yep.

THE COURT: But again, Judge Trenga always has a reason for what he does.

MS. O'CONNOR: I totally appreciate that. I only say that to suggest that we -- we are not trying to slow walk this waiting for Judge Trenga's decision. Of course we don't know when he will rule, so --

THE COURT: That is a bad choice of words. I didn't mean to -- you know --

MS. O'CONNOR: No, I understand. I just want to be clear that we take our obligations seriously here, and I appreciate that there have been mistakes along the way. So I just want to be clear with the Court that we sincerely apologize for those, and we're trying to make them right now with the hope that we can resolve these discovery and record-related disputes while the motion is pending. But then when the motion is resolved one way or the other, we do think that these discovery disputes will be mooted eventually.

So I did just want to add, Your Honor, as you, I think, were suggesting earlier, we are very happy to provide you with all of these documents for in-camera review. If you would like to see -- we can get you the current ones today if you would like them if you want them all together.

THE COURT: Well, I don't want to do it if it's not needed.

MS. O'CONNOR: I understand.

THE COURT: I mean, if I need to do it, we'll do it.

MS. O'CONNOR: Yep. I only say that -- I say that just as sort of a good-faith offer to just suggest that we're really not trying to hide the ball here, and so whatever path you think would be the most effective way to resolve these privilege issues, we're happy to do that.

THE COURT: I still feel like the first issue is we have to make sure that the CAR is thorough --

MS. O'CONNOR: I understand.

THE COURT: -- is complete. Right.

This whole process got started when the plaintiffs, understandably so, stood up and said it is just unfathomable that with claims like this on an issue like this, the entire administrative record consists of eight documents, six of which are public. Right. Three of which -- and three more that are potentially privileged. Right. There is just no way that -- you know, that the decision makers relied on that thin of a record. Right.

MS. O'CONNOR: I understand your point, Your Honor, and I know that my colleague, Ms. Spavins, noted at the previous hearing, you know, the agency has to stand behind the record that it has, ultimately, in terms of defending its decision. And so, you know, to the extent there's an asymmetry here between the nature of the claims and what the record is, you know, that is something that the Court will have to decide

on the merits, potentially, if it gets to that point.

THE COURT: Well, I thought -- I thought you were just -- are you backtracking a little bit? Because I thought what you just said was you don't think we're going to have to get there.

MS. O'CONNOR: I took --

THE COURT: Look, if we don't have to get there, I don't want to get there.

MS. O'CONNOR: I was -- sorry. I was using imprecise words.

I only mean that if the Court, for whatever reason, decides it needs to review the record, as it would under a normal APA challenge, the agency has to live with the record that it has.

Now, we do think in this case the motion to dismiss will be dispositive. It doesn't -- the record doesn't matter because it's a legal question, as you indicated, whether the proclamation applies to these follow-to-join beneficiaries. But if we were looking at it in a pure APA review context where you'd have a motion for summary judgment based on the administrative record, if the administrative record is what the Court deems to be too thin or not sufficient, then that is -- the agency has to live with that.

So I think in terms of your question to make sure that we have the full universe of records -- of documents that

would be included in this record, we are happy to go back to the agency and triple and quadruple check. We will do whatever plaintiffs and the Court think is necessary to assure you that we have everything.

THE COURT: I have a sneaking suspicion that you're going to get an answer on the motion to dismiss in the not-too-distant future.

MS. O'CONNOR: Okay.

THE COURT: But we still have a deadline.

MS. O'CONNOR: I understand.

THE COURT: And it's my job to make sure that we meet this deadline. Right. We're behind the curve on a final CAR already. Discovery is supposed to close, if there is any additional discovery, in early June.

Given the posture of things now, let me ask you this, what are you asking me to do? Why is it necessary to fight this fight right now?

MS. INTERLICCHIO: Sure, Your Honor.

Since discovery closes in one month -- and I should clarify that I agree. If the judge -- if Judge Trenga rules against the defendants on a motion to dismiss, we will win the case. It doesn't sound like there's any need for anything further.

If the -- if Judge Trenga rules on the motion to dismiss in such a way where some claims remain because we have

other claims, we don't want to find ourselves in a situation where the discovery period has ended and we have not --

THE COURT: Well, would the CAR -- if Judge Trenga allows it to go through on a more narrow theory, would the CAR -- would the certified administrative record be materially different?

MS. INTERLICCHIO: Than what it currently is?

THE COURT: Uh-huh.

MS. INTERLICCHIO: I'm not sure that it would. I think in the first instance it definitely makes sense to ensure that we have the full CAR, because I do think in any event it would be relevant.

THE COURT: What additional -- after looking at the certification that the government filed last night, what additional search terms would you want them to run?

MS. INTERLICCHIO: Sure. Right now there's nothing about FTJs, FTJAs, FTJ asylees, derivative asylees. I'm not positive whether the terms that were included in that declaration were searched in quotations or not. Maybe that's just a search term syntax question.

THE COURT: Well, Ms. O'Connor had indicated that she's open to taking additional suggestions regarding more search terms.

MS. INTERLICCHIO: I think that the most fundamental thing also is that we need to ensure that the individuals whose

files are being searched are the correct individuals. Right now, plaintiffs still lack the very basic information about --

THE COURT: You mean individual A-Files?

MS. INTERLICCHIO: No, Your Honor. The individual custodians at the agency --

THE COURT: Oh, custodians. Okay.

MS. INTERLICCHIO: -- who are searching their emails.

Right now we do not know who made this determination, when they made this determination, why they made this determination, or how. There are privilege claims that are based around the time period at issue and when the determination happened, but we have no insight into when the determination happened.

THE COURT: Well, based on the last certification, it seemed like the two gentlemen who were identified were kind of the main points of contact within USCIS. So doesn't -- if the question is -- you know, if you're looking for materials that impacted the decision regarding the interpretation of the presidential proclamations, wouldn't -- don't you just need it from the primary decision makers? I mean, if they didn't consider it, does it really matter?

MS. INTERLICCHIO: Those individuals, assuming they were the primary decision makers, it's my understanding --

THE COURT: That's what I took from the -- that's what I took from the -- from the certification. Is that right,

Ms. O'Connor? Certainly with respect to DHS.

MS. O'CONNOR: Yes, Your Honor. With respect to USCIS, that's correct.

And, again, I apologize for the delay on this, but I think these questions will be answered when we produce the log of the DHS OGC emails, because that shows that really there were communications within the parent agency, the State Department, and the White House. So you will see those threads logged as well, and I think that will add a little bit of clarity here.

THE COURT: And when will you provide that?

MS. O'CONNOR: So we're in the process of finishing up that -- finishing that up now, excuse me, so we can get that to you as early next week as possible. Again, we're trying to make sure that we don't have to go back again. And as Your Honor indicated, we want to be as thorough as we can. But of course if you order a specific date, we will comply with that.

But I do think -- I think that will answer a lot of these questions.

MS. INTERLICCHIO: What the government's proposing does sound pretty reasonable to us. With that said, I think we also need to know when the determination happened. We think that's crucial to understanding the discovery issues and the case itself, and we don't have that right now.

THE COURT: Well, I think that makes sense, when and

who. When it was made and by whom.

MS. O'CONNOR: Yes, Your Honor. So there are two aspects of this. The one document that we did release in full -- other than the PII redactions -- this week shows DHS's sign-off on State's implementation of this program. But in terms of the underlying decision to apply the proclamations to these follow-to-join asylees, those will be logged in the DHS log that is forthcoming.

Again, as we've indicated, these are still all lawyer-to-lawyer discussions and determinations, and so we would still be asserting privilege over those. But I -- I guess I'll just leave it at that.

THE COURT: All right.

MS. INTERLICCHIO: May I respond to that, Your Honor?

The document that was released that the government's referring to, we reviewed that, and I don't see how that has anything to do with the determination at issue here, which is about follow-to-join asylees. So I don't -- I don't get from A to B on that document and how that represents what the government is representing that it does.

And then I would also add that the -- what we do have about how the -- how the determination was made and when and as to particular plaintiffs, we think that we've been able to rebut that with our -- with the information we've received from plaintiffs. So we've had documents referred to as

predecisional deliberative documents when we have documentation predating that applying the ban to our clients.

THE COURT: All right. So here's what I would like to do today, and this is a proposal. I'm happy to hear from both sides as to whether you have a better plan or you have any fundamental problems with this. And I will tell you, some of this is -- some of the fault lies with me, because I was not working under the assumption that the matter before Judge Trenga had at least a good chance, if not a really good chance, of being completely dispositive.

But why don't we do this. I'm going to ask the -- and this is really designed to put us in a good position that if there is a claim that is alive and has to be further adjudicated after Judge Trenga's decision, that we're in a position to do that quickly.

I'll ask plaintiffs to provide Ms. O'Connor with -- or Ms. Spavins with additional search terms that you think are necessary in order to ensure that the CAR is fully complete.

Ms. O'Connor, I'll ask your client to run those search terms, but you don't have to -- and be prepared, but you don't have to disclose anything until we hear from Judge Trenga and we know what the next steps are.

I'll ask the government to continue to provide a more fulsome privilege log.

MS. O'CONNOR: Sorry to interrupt.

THE COURT: Sure.

MS. O'CONNOR: Are you referring to the new batch of OGC documents that haven't been logged yet or the current log that you already have?

THE COURT: The new batch.

MS. O'CONNOR: The new batch.

THE COURT: I find it hard to believe that a privilege log wouldn't -- or that there would be a reason that there would be a privilege associated with a to/from, but I'm not going to get to that now. I have a hard time believing that there would be a privilege associated -- I mean, we'll hear it, we'll deal with it as it comes up.

I'm not going to resolve any privilege issues until Judge Trenga has ruled and we know whether or not there are still any issues to resolve, because that will obviously impact the scope of what we have to address and the scope of any potential privilege and anything else. I just want you to be ready --

MS. O'CONNOR: I understand.

THE COURT: -- if there is anything else to do that we don't look up and we have to wait another month or two.

MS. O'CONNOR: I understand.

And just to be clear about the timeline here, would you like us to produce the DHS OGC privilege log to plaintiffs next week, or are we holding that until Judge Trenga rules?

THE COURT: I'd like you to produce that to him.

MS. O'CONNOR: Okay.

THE COURT: Just the log, obviously.

MS. O'CONNOR: Okay.

THE COURT: I would like you to give him the log, and then you can review it, you can determine what, if any, objections you have. But what I would like to do is once Judge Trenga rules, I want us to have a status conference the following Friday.

MS. O'CONNOR: Okay.

THE COURT: At that point -- and if you need a little more time to review his ruling and decide what exactly, you know, the parties' positions are going forward, let me know. But once Judge Trenga rules, I would like us to have a status conference either the next Friday or very quickly after that. Okay.

MS. O'CONNOR: Understood.

THE COURT: And then the parties can represent to me where you are, if there's a disagreement as to whether or not there is a path forward and any remaining claims. That's obviously a different issue that would be resolved by Judge Trenga, but it will determine what we have to do next in terms of the CAR and any privilege issues.

MS. O'CONNOR: Understood. And just to be clear, is there -- are you imposing a deadline on us producing the next

privilege log to plaintiffs?

THE COURT: How long do you think you'll need to do it?

MS. O'CONNOR: Can we make it for next Friday?

THE COURT: I think you could do it -- yes, that's fine.

MS. O'CONNOR: A week from today.

THE COURT: Yeah, that's fine.

MS. O'CONNOR: Okay. Thank you.

THE COURT: Does that work for you all?

MS. INTERLICCHIO: Yes.

THE COURT: Okay. I think that strikes a little bit of a balance between -- and I understand it means maybe doing a little bit of work that at the end of the day may not be necessary. You know, that doesn't go unnoticed or unappreciated. But if there is anything else to do after he rules, I just want us to be ready to do it.

MS. O'CONNOR: I completely understand. Thank you.

THE COURT: Okay. Does anybody have any other objections to that or any other concerns?

MS. INTERLICCHIO: No. Thank you, Your Honor.

MS. O'CONNOR: Thank you, Your Honor.

THE COURT: All right. Tell Ms. Spavins we missed her today.

MS. O'CONNOR: She's in a -- she's going to trial on

Monday, so she's getting ready for that.

THE COURT: Oh, is she? Okay. So probably the one place she would rather be than here at this point, I think.

MS. O'CONNOR: Thank you, Your Honor.

THE COURT: Thank you.

(Proceedings adjourned at 11:12 a.m.)

-----------------------------------

I certify that the foregoing is a true and accurate, to the best of my ability, transcription of proceedings recorded by electronic sound recording (FTR system).

Stephanie Austin

Stephanie M. Austin, RPR, CRR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| AA, et al., Plaintiffs, | : | Civil Action No.: 1:25-cv-1819 |
| versus | : | Wednesday, June 3, 2026<br>Alexandria, Virginia |
| UNITED STATES DEPARTMENT OF STATE, Defendant. | : | Pages 1-11 |

The above-entitled motion to compel was heard before the Honorable William E. Fitzpatrick, United States Magistrate Judge.

A P P E A R A N C E S:

FOR THE PLAINTIFFS: RYAN SCARBOROUGH, ESQUIRE
LORI INTERLICCHIO, ESQUIRE
LINDSAY HANNIBAL, ESQUIRE
JULIAN KRITZ, ESQUIRE
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, D.C. 20024
(202) 434-5029

FOR THE DEFENDANT: ELIZABETH SPAVINS, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

TRANSCRIBER: STEPHANIE M. AUSTIN, RPR, CRR
Transcriber
United States District Court
401 Courthouse Square
Alexandria, Virginia 22314
S.AustinReporting@gmail.com

(TRANSCRIPT PROCEEDINGS RECORDED BY THE FTR SYSTEM)

P R O C E E D I N G S

THE DEPUTY CLERK: AA, et al. v. United States Department of State, et al., Case 1:25-cv-1819.

Counsel, please note your appearances for the record.

MS. SPAVENS: Good morning, Your Honor. Elizabeth Spavins on behalf of the -- Assistant United States Attorney on behalf of the defendants.

THE COURT: Good morning, Ms. Spavins. Or good afternoon.

MR. SCARBOROUGH: Good afternoon, Your Honor. Ryan Scarborough with Williams & Connolly on behalf of the plaintiffs, and with me is Lori Interlicchio, who will be addressing the Court, Lindsay Hannibal and Julian Kritz.

THE COURT: All right. Good afternoon, everyone.

So I had set this as a status conference, because last time it was represented that the motion to dismiss pending before Judge Trenga was going to likely be dispositive of the case on the merits. Judge Trenga has since ruled. As you all know, he's denied the government's 12(b) motion.

So with that, Ms. Spavins, where do we stand?

MS. SPAVENS: Yes, Your Honor. The merits have been determined, as was discussed at the last hearing. The Court has now ruled as a legal matter that the proclamations don't apply to these applications, so the next steps are either that the parties agree on next steps or we brief before Judge Trenga

what the proper remedy would be. But the question -- the legal question at issue has been determined.

So the only matter now is the agencies are deciding if they want to preserve their appellate rights and -- so convert the MTD decision into a final appealable order, which is pro forma, essentially. Not anything substantive.

THE COURT: Okay. The -- so regardless, the issue of the administrative record is moot?

MS. SPAVENS: That's right.

THE COURT: All right. Is that your position as well?

MS. INTERLICCHIO: Your Honor, we are -- we're a bit confused by the summary judgment exercise that the government has proposed. We believe that judgment should be entered based on the decision by Judge Trenga. Alternatively, we would ask the Court to order a settlement conference in which the parties appear with settlement authority, and we can quickly resolve how to get our clients to the next step.

THE COURT: What's currently pending before Judge Trenga?

MS. INTERLICCHIO: Right now there's nothing currently pending before Judge Trenga.

THE COURT: Ms. Spavins, I'm not -- on the one hand, I don't want to out run my role in this. If my role in this was to determine whether or not there was any additional

discovery that was necessary or whether or not the administrative record was properly compiled, was sufficient, was complete, I think the parties agree that that issue is no longer ripe for decision.

I am with the plaintiffs, I'm a little confused. And, again, at some point I -- you know, this is -- this is the issue for the District Judge, but given Judge Trenga's opinion, I'm not sure what the dispute about the remedy would be.

MS. SPAVENS: Right, Your Honor. So the dispute would only be, I suspect, a matter of timing -- processing time. So now that there's been this legal determination that the proclamations are not a bar anymore, it's not a matter of flipping a switch, it's a matter of the agencies have to take steps.

So, for example, two of the seven families have not had interviews yet for their application, so it's not like everyone is, you know, waiting at the door ready and has gone through all the other steps that they would need to. But it's -- it's a matter of the parties getting together and deciding what's reasonable, essentially, in terms of the regular bureaucratic processing that may now take place that couldn't take place before because of the legal impediment.

And as far as the procedural mechanism by which to get a final appealable order, that is a matter that is required by civil appellate, and it's not before --

THE COURT: I totally get that.

MS. SPAVENS: Yeah.

THE COURT: I totally get that. But it seems to me that there needs to be something to prompt -- to kind of frame the issue for the District Judge to decide.

MS. SPAVENS: That's correct, Your Honor. And so we've had other cases like this where -- and I sent the example from a prior case. It would just be a short motion to the Court from the defendants that says we understand that Your Honor has already ruled on this legal issue, to preserve our appellate rights, we move for summary judgment on the matter of the legal determination, which we fully expect the Court to deny. And then as to the remedy, we would set forth, you know, the following timeline for processing or something like that, if the parties can't agree.

If we can agree on what all the next steps are, which, again, it's not about the legal determination, it's about like kind of nuts and bolts of who's coming for an interview when, whether folks need to be reinterviewed, things like that.

We haven't really been able to trade proposals on that front because the agencies are still working that out on their end since they got the decision Thursday evening, but I'm in frequent communications with them.

THE COURT: All right. So I'm in --

All right. So how much time do you think you need for the executive branch agencies to make a determination?

MS. SPAVENS: To make a determination about a proposal for next -- for --

THE COURT: Yeah. In terms of -- well, I guess, Number 1, in terms of timing.

MS. SPAVENS: Uh-huh.

THE COURT: Number 2, to -- and I suppose just mechanically, and tell me if I'm wrong, if there's an agreement as to process, if there's an agreement as to timing, that would, in effect, be a settlement agreement, and then the plaintiffs would be comfortable, pursuant to that agreement, dismissing the case at that point. If there's not an agreement, then perhaps the government requests a motion to -- summary judgment, the Court will presumably, consistent with its prior order, dismiss the case on the merits, the government can either appeal or not appeal, and we'll kind of see what next steps are there; right? The -- but we don't want to leave this just hanging.

MS. SPAVENS: Absolutely, Your Honor. I would propose one more week I think for them to get their ducks in a row, and the proposal would be good both in terms of we could perhaps get our motion for summary judgment filed in that time which would -- because I think things will move even more quickly on the agencies once they have a final order.

THE COURT: Okay. All right. And with respect to a settlement agreement -- I'm sorry, a settlement conference, what I would tell the parties is this: If you need my help, I am more than happy to have a settlement conference. Right. It comes about one of two ways, either because the District Judge orders it or because the parties jointly request it. If either happens, we will do it immediately, right. But at this point, I'm not sure it's appropriate for me to order it.

If Judge Trenga thinks it's appropriate, if it's necessary, if it would be helpful, then -- and he requires the parties to contact me, we'll do it right away. If the parties think that I can play some helpful role in finding some common ground to these outstanding issues, I'm happy to do it right away.

But I think at this point, I think Ms. Spavins is right. Unless the government wants to do it or Judge Trenga orders it, we just sort of have to let this play out a little bit.

Does that make sense?

MS. INTERLICCHIO: Your Honor, could we get a schedule in place for any summary judgment briefing?

THE COURT: Well, what I would say is this, why don't we have another -- let's set a control date at least. Let's have another status conference before me. I'm happy to do it next week, or if you think you need another week, two weeks.

If -- during that period of time maybe you all can talk and you can come up with a process that everybody agrees to. If not, then at that point we will definitely have -- because it won't take long. I can tell you, any briefing on summary judgment will be very short because it seems like the parties just aren't going to have a whole lot of work to do beyond what's already been done. So at this point, maybe we just set another status conference.

And, again, if Ms. Spavins thinks you can get it done in a week and we can have a firm answer from the government in a week, let's just set it up in a week, and then give you that time to talk about timing and process, and if you can agree, then everything else, it seems to me, is moot.

MS. INTERLICCHIO: Okay. Thank you, Your Honor.

THE COURT: All right. But in the meantime, what I'll do is I'll dismiss as moot the plaintiffs' motions regarding the administrative record.

MS. SPAVENS: And just to be clear, Your Honor, so what I would propose is that within one week, so June the 10th, the government gives a proposal for adjudicative next steps to the plaintiff, and then could the status conference be a few days after that so they have time to let us know? You know, to horse trade essentially?

THE COURT: Sure. So why don't we do -- I don't have my calendar in front of me.

MS. SPAVENS: Today is the 3rd. So next Wednesday is the 10th. And then the -- we could do like --

THE COURT: How about Tuesday the 16th at 10.

MS. SPAVENS: Fine with us.

THE COURT: Does that work for you all?

MS. INTERLICCHIO: Yes, Your Honor. But we would ask that that proposal -- I think right now we already have the government's proposal on adjudicative next steps. What we don't have from the government is whether or not they are willing to engage in settlement discussions. And I think if they could also give us that position and a description of what next steps would look like in terms of processing our clients, that would be very helpful by that date.

THE COURT: Well, I think that's the purpose of this. But I think what I hear Ms. Spavins telling me is, you know, she still has clients she needs to consult with, and this is still a little bit fresh to them. But I -- so I understand that, but at the same time, this doesn't seem like a lot of hard issues to wrestle with, and they -- they need to get it done, and they needs to get it done quickly.

MS. SPAVENS: Absolutely, Your Honor. I will endeavor to go faster than this schedule, but just because I have multiple government agencies, they have to talk to each other, I just suspect it will take a little more time.

THE COURT: I think given the fact that the order

just came out last week giving them two weeks to figure out exactly what their next steps are, what the processes they think is fair, give them to you, you all can talk about them, maybe you could reach an agreement. If not, we'll see where we are from there.

But in terms of the settlement that you -- you're requesting or the settlement discussions, it's the same issue; right? You're just talking about, you know, what this means going forward for the families that are affected?

MS. INTERLICCHIO: Yes, Your Honor, that's correct. I think that the government made representations that we want to enter our -- thank you.

THE COURT: I get it. That's completely fair. But I think at this point, let's see what the government can come up with, and we'll see if there's any additional intervention that's necessary at that point. But let's give them two weeks. If it works for you all, let's set it for Tuesday the 16th at 10 a.m. And if you guys need to move that up because things have moved a little more quickly than you think, that's fine, you just let me know and we'll come up with a date and a time. Or, in a perfect world, if you agree on the outcome, just let us know; all right?

MS. SPAVENS: Thank you, Your Honor.

THE COURT: All right. Thank you all. Have a nice day.

(Proceedings adjourned at 1:48 p.m.)

----------------------------------

I certify that the foregoing is a true and accurate, to the best of my ability, transcription of proceedings recorded by electronic sound recording (FTR system).

Stephanie Austin

Stephanie M. Austin, RPR, CRR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| AA, *et al.*, Plaintiffs, v. UNITED STATES DEPARTMENT OF STATE, *et al.*, Defendants. | Case 1:25-cv-1819<br>Alexandria, Virginia<br>July 29, 2026<br>11:24 a.m.<br>Pages 1 - 20 |

TRANSCRIPT OF CROSS-MOTIONS FOR SUMMARY JUDGMENT

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

APPEARANCES:

FOR THE PLAINTIFFS:

LINDSAY P. HANNIBAL, ESQUIRE
RYAN T. SCARBOROUGH, ESQUIRE
WILLIAM P. ASHWORTH, ESQUIRE, *PRO HAC VICE*
DANIELLE J. BARONDESS, ESQUIRE, *PRO HAC VICE*
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
(202) 434-5000

GUADALUPE V. AGUIRRE, ESQUIRE, *PRO HAC VICE*
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004

FOR THE DEFENDANTS:

CHRISTIAN J. COOPER, ESQUIRE
ELIZABETH A. SPAVINS, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

P R O C E E D I N G S

THE COURTROOM DEPUTY: Civil Action No. 1:25-cv-1819, *AA, et al. v. United States Department of State, et al*.

Counsel, will you please note your appearances for the record.

MS. HANNIBAL: Good morning. My name is Lindsay Hannibal from the law firm Williams & Connolly. With me today are my colleagues, Ryan Scarborough, William Ashworth, Danielle Barondess, and Kelly Edwards, as well as cocounsel from the International Refugee Assistance Project, Guadalupe Aguirre. And in attendance are several of the plaintiffs in this case and their American supporters.

THE COURT: All right. Welcome to everyone.

MR. COOPER: Good morning, Your Honor. Christian Cooper, Special Assistant United States Attorney. With me at counsel's table is Assistant United States Attorney Elizabeth Spavins on behalf of the government.

THE COURT: Okay. Welcome. You seem a little outnumbered this morning.

We're here on cross-motions for summary judgment. I've reviewed the pleadings and would be pleased to hear further from counsel.

I think the fundamental issue has been basically resolved. Even the government recognizes that based on my ruling on the motion to dismiss. I think we're down to remedy at this point.

MS. HANNIBAL: Yes, Your Honor, that's correct. The government has conceded that the Court's opinion on the motion to dismiss has decided the merits of this case --

THE COURT: Right.

MS. HANNIBAL: -- and all that's left to do is decide the remedy.

The plaintiffs are requesting a threefold remedy in their motion for summary judgment:

The first is for the five plaintiff families that were interviewed a year ago and were deemed eligible to travel, we ask that they be issued boarding foils immediately;

Second is for the two families that have yet to be interviewed, that they receive expedited processing; and

Third is simply that the Court grant the ordinary APA remedy and vacate the government's unlawful policy.

I'll start by addressing the relief that the individual plaintiffs who brought this case are seeking

because they're the ones that are facing ongoing harm and for whom time is of the essence. As I mentioned, five of these families already completed processing a year ago. The process is extensive and takes a long time and resources to be completed.

Once they got interview appointments, they had to then obtain visas to travel to a third country, which are always expensive, not always easy for Afghan nationals to get.

They then made the dangerous trip out of Afghanistan. They spent significant money to live in that other country for weeks or months while they were undergoing processing.

They completed their medical exams. They attended full days of meetings at the U.S. embassies where they had their fingerprints and other biometrics taken, and then they sat for interviews with consular officers.

After all of that, the government deemed them eligible to travel to the United States except for the fact that the government unlawfully applied the proclamations at issue in this case to these plaintiffs.

The government agrees in the undisputed facts that these plaintiffs who were already interviewed

would have received their boarding foils on the day of their interview had the government not unlawfully applied the proclamation to them.

Now, the government has conceded that the merits have been decided in favor of plaintiffs here, but they want the plaintiffs to repeat all of these steps, which are not easy to complete and can take both a long time and money to do.

And they want these plaintiffs to do so even though it is the government's fault that they're in this position. That's simply not supported by the agency's own regulations and policies.

Setting aside just for a second the medical exam issue, which I can discuss further later on, our understanding is the government has full authority to defer those exams until after the arrival of the plaintiffs in the United States.

The government hasn't cited a single regulation or legal precedent that actually backs up their claim that these steps need to be repeated by someone who has already cleared them.

In particular, if I can direct the Court to the provisions of the Foreign Affairs Manual and the case *Kerry v. Din* that the government cites on page 7 of its motion for summary judgment, Your Honor will

see, if you investigate those sources, that none of them back up the government's claim that these steps, once cleared, need to be repeated simply because the government inflicted a harm on the plaintiffs by unlawfully applying the proclamation to them.

These families have already been rigorously vetted. They should have been in the United States a year ago, and a court order that they receive their boarding foils immediately is the best way to remedy the harm that the government inflicted on them.

For the other two families that have yet to be interviewed, plaintiffs ask that the Court order the government to expedite their processing. Both of these families have been waiting at least over a year to attend their interviews. One family has been waiting over two years, and the timing is completely in the government's control as to when these interviews and further processing take place.

These two families can't do anything in terms of next steps until the government schedules their appointment. And as soon as that happens, they are prepared to go through all of the steps that I listed earlier of securing a visa, attending a medical appointment, attending an interview. But none of that can happen until the Court orders the government to

give them appointments.

Your Honor, these plaintiffs would not be skipping any sort of line if the Court were to order expedited processing for them. In fact, there really is no line as the government portrays it. As we noted in our response brief, the Foreign Affairs Manual requires that the appointment scheduling system be flexible, and it explicitly contemplates that there are certain cases that will be expedited.

In fact, this exact procedure was applied for Plaintiff Family CC, who was interviewed on an expedited basis. So this is not some unusual, unprecedented relief that plaintiffs are asking for.

And just, lastly, on this topic of injunctive relief that plaintiffs are requesting, I want to address the Court's authority to grant the orders that plaintiffs are seeking. The reality is that courts order the government to take certain actions within specified time frames all the time in the immigration context.

Plaintiffs included multiple examples in their response brief at Docket 125, page 4, including the case *Grace v. Whitaker* out of the District of Columbia District Court. And in that case, the court ordered the government to return plaintiffs, who had

been improperly removed from the United States, back into the country within seven days.

In this case here, the government has a nondiscretionary responsibility to, first, make the travel eligibility determinations for I-730 beneficiaries. And after making that determination, if they are found eligible, the government must issue them boarding foils.

These are the rules that the executive set for itself, and the Court is well within its authority to direct that the government follow them. Such an order would not encroach on executive discretion.

Finally, I would like to very briefly touch on the relief of *vacatur* that we are requesting here. And I'll note that the government agrees with us, at the very least, that the policy applying the proclamations to plaintiffs in this case should be vacated. So that is not in dispute here.

From the beginning, this case has always been an APA challenge pursuant to Section 706(2). The law says that the appropriate remedy for violation of that section is vacating the policy in general for all affected persons, and defendants agree that *vacatur* is routinely ordered by courts. And they don't cite a single legal precedent for why the Court would have

reason to decline to order that typical remedy here.

For those reasons, we ask today that the Court enter a final judgment in plaintiffs' favor and also order that the already-interviewed plaintiffs receive their boarding foils within seven days, that the not yet interviewed plaintiffs complete their processing and are given a final decision on boarding foils within 14 days, and that the government's policy applying Proclamations 10949 and 10998 to derivative asylees be vacated.

I am happy to answer the Court's questions or sit down.

THE COURT: All right. Thank you.

Mr. Cooper.

MR. COOPER: Thank you, Your Honor. May it please the Court.

I'll be brief and just address the points that my opponents have made here.

THE COURT: Yes.

MR. COOPER: The defendants recognize and want to make clear to the Court that there's still no constitutional or statutory right to enter the country. That is explicit through the Constitution and through the Immigration and Nationality Act.

Going to talking about the deferred medical

exams that plaintiffs cited hereinto, we said in our briefs that there was an ability to defer these medical appointments in the past. That was pursuant to an appropriations bill that has now lapsed. So, yes, there is precedent for doing so, but that is only because Congress did so. Congress has not renewed that medical deferment, nor have they made any indication that a medical appointment should be waived in this circumstance.

Secondly, the government contends that although they recognize that the attempts were to go through the adjudication process again do seem burdensome, but it still has been a year since those decisions have been made. And things can change in the matter of the year. There's still initiation of renewed security checks and whatnot that need to be addressed before plaintiffs can be allowed the ability to enter the United States.

And lastly, involving the two plaintiffs that have not been scheduled for an interview, like you said, the merits of this case have already been decided in that the proclamations should not be applied to the named plaintiffs in this case.

But specifically, the two plaintiffs that had not gotten an interview in this case, the complaint

does not bring any claim under the Mandamus Act or an unreasonable delay/unlawful withholding claim to be able for the Court to compel the State Department and a consular officer to schedule these plaintiffs for an interview or adjudicate these plaintiffs' applications for boarding foils.

And if the Court has no questions, I yield my time.

THE COURT: Is there anything preventing the government from conducting follow-up considerations or assessments after they have been issued their boarding foils and they've arrived in the United States either by way of additional medical screening or other screenings?

MR. COOPER: So to my understanding, no, Your Honor. The next step for security processes would be if they decide to continue to search for another immigration benefit that would come, and the next step after a person gains asylee status is that they can apply for adjustment of status. In that instance is where the --

THE COURT: They receive another review?

MR. COOPER: Yes, there will be another review. And like I said, the plaintiffs don't have to apply for adjustment of status. They can stay asylees

for the rest of their lives if they want to.

THE COURT: Right. What's the objection, with respect to the two that haven't gone through the process yet, simply to require that they be processed through the normal procedures?

MR. COOPER: I think the defendants would rest on the arguments that there was nothing in the complaint specifically compelling those people to go through the normal process. So I think to the -- there's the two groups distinguished from the plaintiffs that were deemed to be qualified but for the proclamations and the two families that had not received any interview or anything -- or any determination as such.

If this Court were to order anything, it should be that the proclamation should not be applied to those two families but that there shouldn't be any timeline for adjudication or for there to be a boarding foil issued within a certain time period.

Defendants would like to offer the solution on how they believe this could be resolved in that the agencies -- you know, once the Court enters a final judgment -- presumably in favor of the plaintiffs and against the defendants -- that the agencies will look to the boarding foil applications to see if there is

any need for the new medical exams or subsequent security checks and then the likelihood that the agencies will reschedule plaintiffs for interviews on the boarding foil application, so that they can be possibly issued and to resolve this.

I'm assuming the Court is going to want updates on these issues. The government is willing to provide status reports every 60 days to update the Court on the process of whether or not these plaintiffs are issued boarding foils.

THE COURT: All right. Thank you.

MR. COOPER: Thank you, Your Honor.

THE COURT: Counsel, anything further?

MS. HANNIBAL: Just very briefly, Your Honor.

I'll note that this case has never been about requiring any order that the executive admit people into the country. This case has always been about requiring that the executive follow the rules that it has set for itself, and that is true as well for the remedy. There are policies and procedures that the State Department has established, and it should be required to follow those.

The government has still provided no citation or further information about what in their policies or regulations would require repeat processing, and they

don't contest that it is well within their control under the Individual Humanitarian Parole Program for them to temporarily admit plaintiffs to the United States subject to conditions that the government itself can set.

So to the extent there are security checks or medical exams that the government feels need to be done, as Your Honor inquired, those can all be done here. The government has the authority to do that. It's not dependent on the congressional Afghan SIV medical waiver that the government referenced in their presentation.

There's a separate authority that the government has that it can admit anyone into the country temporarily on humanitarian parole. So nothing that we're asking the Court to order here is something that the Court would not have full authority to order the government to do and that the government wouldn't have full authority to execute.

With respect to the two plaintiff families who have yet to be interviewed, first, the complaint has always contemplated that plaintiffs would be seeking injunctive relief here. We sought specific injunctive relief for the plaintiffs who had yet to be interviewed, and we also asked that the Court order any

relief that it found just and proper.

So it's been part of this case from the beginning, that plaintiffs have asked the Court to order whatever remedies would be needed and however those would be specifically executed in order to right the wrongs that the government has inflicted on these plaintiffs.  And the Court has full authority to do so if it finds that that is what's needed to remedy what's been done to them.

And just because they have yet to be interviewed doesn't mean that they should be left out of the remedy here.  Your Honor already held in the motion to dismiss phase that these plaintiffs, who had yet to be interviewed, had standing to stay in the case and to bring the case against the government.

It's a foregone conclusion that they would be denied boarding foils due to defendants' policy, and the government has provided no response to the multiple cases that plaintiffs have introduced showing that courts order the government to take certain actions in the immigration context on a certain time frame routinely.

Defendants are still unable to provide any sort of time frame for when this additional processing for the five already interviewed families would have to

take place even though they have not shown any regulation or policy that would make such repeat processing necessary.

At the end of the day here, these are people who continue to live in mortal continuing danger in Afghanistan. Just recently, Your Honor --

If I can pass up an article, and I have copies for everybody here.

-- individuals who were previously affiliated with the United States have been assassinated in Afghanistan. So the threat is still very real, and it's why time is of the essence here. Because every day that these people, who should have been in the United States a year ago -- at least for the five interviewed families -- are in Afghanistan, they remain in danger.

So we're open to working with the government on what the reasonable particulars look like for progress and forward movement here, but the suggestion from the government that we should wait for a status update every two months without any understanding of how long the process is going to take for these plaintiffs is just not reasonable.

I'm happy to take any questions that Your Honor may have; otherwise, I'll rest.

THE COURT: All right. Thank you.

I've reviewed the merits of both motions for summary judgment.

As an initial matter, the Court will grant the plaintiffs' motion for summary judgment with respect to the liability issue based on the Court's already-issued decision with respect to the motion to dismiss.

As far as remedy, the Court will apply the standard APA remedy with respect to the two presidential proclamations, 10949 and 10998. The Court will vacate those as to all followed or joined asylees.

With respect to the remedy as to these specific plaintiffs, the Court will require the government to afford Plaintiffs AA, BB, CC, and DD, and EE, those five, to have their boarding foils issued immediately but no later than within 15 days without prejudice to the government's ability, after they've been admitted, to continue its review and impose any requirements with respect to their continued presence.

With respect to the remaining two plaintiffs, FF and GG --

Let me also say that the reason for the Court's order with respect to those five is based on the record in this case, that the boarding foils as to

those five were determined to be ready to be issued except for the application of the now vacated presidential proclamations.

With respect to Plaintiffs FF and GG, the Court will order that those plaintiffs be processed according to the government's normal procedures, but I think that an expedited processing is in order, given the overall equities of the case, and will require that their applications be processed within 30 days.

The Court is going to retain jurisdiction to review any issues until after the derivative plaintiffs have received their requested travel authorizations or the process as to the other two have been completed. The Court would like status reports every 14 days at this point.

All right. The Court is going to issue a written order memorializing these rulings.

All right. Yes. Mr. Cooper, did you have an issue?

MR. COOPER: Do you want those status reports to be joint?

THE COURT: I'm sorry?

MR. COOPER: Do you want those status reports to be joint?

THE COURT: Yes, if you could.

MR. COOPER: Joint. Okay.

THE COURT: All right. Anything further?

MS. HANNIBAL: Nothing further. Thank you, Your Honor.

THE COURT: All right. Thank you.

----------------------------------
Time: 11:48 a.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

Rhonda F. Montgomery, CCR, RPR

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| A.A., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>*Defendants*. | ) | Case No. 1:25-cv-1819 (AJT/WEF) |

## NOTICE OF APPEAL

Pursuant to Federal Rule of Appellate Procedure 3, the Defendants, in their official capacities, hereby appeal to the United States Court of Appeals for the Fourth Circuit the final judgment and order entered in this action on July 29, 2026 (Doc. No. 128, 129), granting Plaintiff's motion for summary judgment (Doc. No. 110) and denying Defendants' motion for summary judgment (Doc. No. 120).

//

//

Dated: August 12, 2026

Respectfully submitted,

TODD BLANCHE
ATTORNEY GENERAL

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED
STATES ATTORNEY

*By*: /s/

CHRISTIAN J. COOPER
Special Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3831
Fax: (703) 299-3983
Email: christian.cooper@usdoj.gov
*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| A.A., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>Defendants. | ) | Case No. 1:25-cv-01819-AJT-WEF |

**JOINT STATUS REPORT**

The Parties, by and through undersigned counsel, respectfully file this Joint Status Report pursuant to the Court's Order dated July 29, 2026 (Dkt. No. 128).

**Joint Statement on Plaintiff Families**

As of September 9, 2026, Plaintiff Families AA, BB, CC, DD, and EE have been admitted into the United States.

Plaintiff Families FF and GG continue to wait for their third-country visas to be approved so that they can travel to complete their processing as soon as possible. Plaintiffs expect to have an update on timing for those visa approvals by early next week, at which point they will request that Defendants schedule interviews for the families.

**Defendants' Statement on Implementation of Vacatur**

As of the date of this filing, the Defendants have been working towards fully implementing this Court's Order. The Defendants inform the Court that the implementation of the new guidance is in final stages. Once finalized and transmitted, the Defendants will be able to provide specifics as to implementation at Consular Posts and Embassy.

**<u>Plaintiffs' Statement on Implementation of Vacatur</u>**

Plaintiffs appreciate government counsel's assistance in coordinating with various agencies to facilitate the recent admission of the five families and trust that cooperation will continue until Families FF and GG have completed their processing. However, in the month and a half since the Court vacated Defendants' unlawful policy applying Proclamations 10949 and 10998 to derivative asylees, Defendants have failed to demonstrate any meaningful steps toward compliance with the vacatur portion of the judgment. As of the filing of this Joint Status Report, the State Department has yet to issue final implementation guidance to posts and has failed to provide an anticipated timeline for doing so. Nor has any Defendant publicly acknowledged—on their official websites or elsewhere—that the unlawful policy is no longer in effect,[1] despite Defendants' representation that USCIS issued an implementation announcement two weeks ago. *See* Joint Status Report (Aug. 26, 2026), Dkt. No. 145. Meanwhile, counsel for Plaintiffs are aware that impacted derivative asylees outside of this litigation continue to (a) be confused about how to proceed with their cases, and (b) experience irreparable harm as a result of their ongoing separation from their family members.

Perhaps Defendants intend to delay implementation in the hopes that they will never have to comply, based on their forthcoming motion for an immediate stay that they have represented will be filed in the Fourth Circuit shortly. But unless and until that motion is decided in Defendants' favor, they must comply with this Court's Order, which had the "*immediate* effect" of vacating Defendants' unlawful policy as of July 29. *Dorcas Int'l Inst. of Rhode Island v. United States*

[1] *See, e.g.*, "Follow-to-Join Refugees and Asylees," U.S. Department of State, https://travel.state.gov/content/travel/en/us-visas/immigrate/follow-to-join-refugees-and-asylees.html (containing no acknowledgement of this Court's judgment); "U.S. Visas News," U.S. Department of State, https://travel.state.gov/content/travel/en/News/visas-news.html (same, yet issuing news alerts about other subsequent court orders); "Alerts," USCIS, https://www.uscis.gov/newsroom/alerts (same).

*Citizenship & Immigr. Servs.*, 2026 WL 1695954, at *2 (D.R.I. June 11, 2026) (emphasis in original).

Because of Defendants' apparent failure to comply with the Court's Order concerning vacatur, and because they have not provided any meaningful status updates in advance of this Joint Status Report, Plaintiffs respectfully request that the Court require Defendants to file an additional status report by September 15, 2026, that explains in detail the specific steps they have taken to implement the Court's Order, identifies a concrete deadline by which vacatur will be fully implemented, and provides copies of any guidance and instructions circulated to Defendants' personnel on how to comply with the vacatur, including USCIS's implementation announcement referenced in the prior Status Report (Dkt. No. 145). *See, e.g.,* Defendants' Status Report, *Cath. Legal Immigr. Network, Inc. v. Rubio*, No. 26-CV-00858 (JAV) (S.D.N.Y. Sept. 8, 2026), Dkt. No. 96.

Dated: September 9, 2026

/s/___________

Ryan T. Scarborough (VSB No. 43170)
William P. Ashworth (*pro hac vice*)
Edward John Bennett (VSB No. 40118)
Adam Daniel Harber (*pro hac vice*)
Danielle J. Barondess (*pro hac vice*)
Julian Yigal Kritz (*pro hac vice*)
Lindsay P. Hannibal (VSB No. 97008)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
rscarborough@wc.com
washworth@wc.com
ebennett@wc.com

Respectfully submitted,

TODD W. BLANCHE
ATTORNEY GENERAL

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED STATES ATTORNEY

/s/_________________
ELIZABETH A. SPAVINS
Assistant United States Attorney
CHRISTIAN J. COOPER
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue

aharber@wc.com
dbarondess@wc.com
jkritz@wc.com
lhannibal@wc.com

Ghita Schwarz (*pro hac vice*)
Guadalupe Aguirre (*pro hac vice*)
Pedro Sepulveda (*pro hac vice*)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, NY 10004
Telephone: (516) 838-1655
gschwarz@refugeerights.org
laguirre@refugeerights.org
psepulveda@refugeerights.org

*Counsel for Plaintiffs*

Alexandria, Virginia 22314
Tel: (703) 299-3785
Fax: (703) 299-3983
Email: lizzie.spavins@usdoj.gov
*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| A.A., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-01819-AJT-WEF |

**JOINT STATUS REPORT**

The Parties, by and through undersigned counsel, respectfully file this Joint Status Report pursuant to the Court's Order dated July 29, 2026 (Dkt. No. 128).

**Defendants' Statement**

Because FF and GG continue to wait for their third-country visas, Defendants plan to ask the Court for an extension of their upcoming September 25, 2026 deadline to October 2, 2026. *See* Dkt. 161. Plaintiffs have consented to this request.

**Plaintiffs' Statement**

Plaintiff Families FF and GG continue to wait for their third-country visas to be issued so that they can travel to complete their processing in a country with a U.S. diplomatic presence.

With respect to vacatur, since last week's Status Report (Dkt. No. 159), Plaintiffs remain unaware of any derivative asylee case that has been scheduled for an interview with a consular officer. Defendants still have not provided public guidance explaining how derivative asylees who received unlawful denials over the past year can obtain relief, or whether the timeline for beneficiary interviews will revert to pre-policy levels. Additionally, Defendants have not

responded to Plaintiffs' request—raised in the September 9 Status Report (Dkt. No. 156) and reiterated in the September 16 Status Report (Dkt. No. 159)—that Defendants provide the text of the guidance disseminated to USCIS and State Department personnel.

Dated: September 23, 2026

s/ *Lindsay P. Hannibal*

Ryan T. Scarborough (VSB No. 43170)
William P. Ashworth (*pro hac vice*)
Edward John Bennett (VSB No. 40118)
Adam Daniel Harber (*pro hac vice*)
Danielle J. Barondess (*pro hac vice*)
Lindsay P. Hannibal (VSB No. 97008)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
rscarborough@wc.com
washworth@wc.com
ebennett@wc.com
aharber@wc.com
dbarondess@wc.com
lhannibal@wc.com

Ghita Schwarz (*pro hac vice*)
Guadalupe Aguirre (*pro hac vice*)
Pedro Sepulveda (*pro hac vice*)
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, NY 10004
Telephone: (516) 838-1655
gschwarz@refugeerights.org
laguirre@refugeerights.org
psepulveda@refugeerights.org

*Counsel for Plaintiffs*

Respectfully submitted,

TODD W. BLANCHE
ATTORNEY GENERAL

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED STATES ATTORNEY

/s/ *Elizabeth A. Spavins*
ELIZABETH A. SPAVINS
Assistant United States Attorney
CHRISTIAN J. COOPER
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3785
Fax: (703) 299-3983
Email: lizzie.spavins@usdoj.gov
*Counsel for Defendants*

**UNCLASSIFIED**

SBU

| | |
|---|---|
| **MRN:** | 25 STATE 55146 |
| **Date/DTG:** | Jun 06, 2025 / 060011Z JUN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CMGT, CVIS |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 STATE 5914 |
| **Subject:** | Action Request: Suspension of the Entry to the United States of Aliens from Designated Countries Pursuant to Section 212(f) of the INA (8 U.S.C. 1182(f)) |

1. (U) This is an action request. **See paragraphs 4-13**.

2. (SBU) **SUMMARY**: Presidential Proclamation (PP) "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats" (hereafter referred to as "the PP") issued on June 4, 2025, fully or partially suspends the entry of and visa issuance to aliens from 19 countries to the United States, pursuant to section 212(f) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f)). This cable details the restrictions and limitations imposed on nationals of countries covered by the PP and provides implementation guidance for processing nonimmigrant visa (NIV) and immigrant visa (IV) applications prior to, and following, its effective date on June 9, 2025, at 12:01 a.m. Eastern Daylight Time (EDT). Once in effect, any visa applicant subject to the PP must be refused under the PP, unless the applicant qualifies for one of the narrowly defined exceptions detailed below. Further guidance regarding National Interest Exceptions (NIEs) to the PP will come via septel. The suspension on entry applies

ONLY to nationals who are outside the United States AND do not hold a valid visa on the effective date. The PP does not direct the revocation of valid visa holders issued before the effective date. **END SUMMARY.**

**ACTION REQUEST/IMPLEMENTATION GUIDANCE**

**Prior to June 9, 2025, at 12:01 a.m. EDT**

3. (SBU) From the release of this ALDAC until June 9, 2025, at 12:00 a.m. EDT, GSS vendors, NVC, and posts should continue scheduling NIV and IV applicants from affected countries, and posts should continue normal visa processing, including approving eligible applicants, printing visas, and returning passports with issued visas. Posts should deny any requests for expedited appointments or expedited visa processing for affected applicants received after the announcement of the PP on June 4, 2025, if the request was received on or after June 5, 2025. Posts should not cancel appointments for individuals affected by the suspension.

**After June 9, 2025, at 12:01 a.m. EDT**

4. (SBU) After June 9, 2025, at 12:01 a.m. EDT, GSS vendors, the National Visa Center (NVC), and posts should continue scheduling NIV and IV applicants from affected countries, and posts should continue adjudicating all applications, applying the detailed guidance below. The Department will not provide refunds for MRV receipts purchased by a national of an affected country as these applicants are still permitted to proceed with their application, including an interview appointment. Posts should resume reviewing and approving, as appropriate, expedite requests for IV applicants from PP affected countries. Posts should consider any expedite requests for non-excepted

applicants in accordance with standard guidance on expediting appointments, even if the applicant is affected by the PP.

5. (SBU) The suspension and restrictions of the PP apply only to nationals of the designated countries who are outside the United States on the effective date and who do not have a valid visa on the effective date. Lawful permanent residents of the United States are also generally excepted.

**Full Suspension of Entry**

6. (SBU) Full suspension of entry under INA 212(f) applies to nationals of the following 12 countries: **Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen**. Effective June 9, 2025, at 12:01 a.m. EDT, you must refuse under INA 212(f) any NIV or IV applicant from any of these countries, with limited exceptions detailed below. (See paragraph 7 for detailed guidance on refusing applicants subject to the PP using the refusal code F251).

| Refuse | Except |
|---|---|
| **All NIVs** | • Any dual national of a country designated under the PP when the individual is applying on a passport issued by a non-designated country;<br>• Applicants for a visa in the A-1 and A-2 classifications<br>• Applicants for a visa in G-1, G-2, G-3, G-4 NATO-1, NATO-2, NATO-3, NATO-4, NATO-5, NATO-6 or C-2, C-3 classifications<br>• Approved National Interest Exceptions and certain athletes and athletic team members (further guidance forthcoming via septel) |

| | |
|---|---|
| **All IVs** | Any dual national of a country designated under the PP when the individual is applying on a passport issued by a non-designated country<br>• Immediate Family Immigrant Visas (IR-1/CR-1, IR-2/CR-2, IR-5) with clear and convincing evidence of identity and family relationship, e.g. DNA and other reliable documents - see para 10 below.<br>• Adoptions: IR-3, IR-4, IH-3, IH-4<br>• Afghan Special Immigrant Visas<br>• Special Immigrant Visas for USG Employees<br>• Immigrant visas for ethnic and religious minorities facing persecution in Iran<br>• Approved National Interest Exceptions (further guidance forthcoming via septel) |

**Partial Suspension of Entry**

7. (SBU) Partial suspension of entry under INA 212(f) applies to the following 7 countries: **Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela**. Effective June 9, 2025, at 12:01 a.m. EDT, you must refuse under INA 212(f) any NIV or IV applicant from any of these countries, with limited exceptions detailed below. (See paragraph 7 for detailed guidance on refusing applicants subject to the PP using the refusal code F251).

| Refuse | Except |
|---|---|
| **B1, B2, B1/B2** | • Approved National Interest Exceptions and certain athletes and athletic team members (further guidance forthcoming via septel) |
| **F, M, or J** | • Approved National Interest Exceptions (further guidance forthcoming via septel) |

| | |
|---|---|
| **All Other NIVs** | • Reduced validity to the extent permitted by law (Further guidance regarding reduced or limited visa validity will come via septel) |
| **All IVs** | • Immediate Family Immigrant Visas (IR-1/CR-1, IR-2/CR-2, IR-5) with clear and convincing evidence of identity and family relationship, e.g. DNA - see para 10 below.<br>• Adoptions: IR-3, IR-4, IH-3, IH-4<br>• Special Immigrant Visas for USG Employees<br>• Immigrant visas for ethnic and religious minorities facing persecution in Iran (further guidance forthcoming via septel)<br>• Approved National Interest Exceptions (further guidance forthcoming via septel) |

**Refuse Applicants Subject to the PP if No Exceptions Apply**

8. (SBU) Beginning 12:01 a.m. EST June 9, 2025, adjudicators must first determine whether the applicant is otherwise eligible for a visa under the INA, without regard to the PP. Adjudicators are reminded that all visa decisions are national security decisions and posts must maintain extra vigilance in our work and comprehensively review and screen every visa applicant for potential security- and non-security-related ineligibilities, including to assess whether the applicant poses a threat to U.S. national security (Ref A). This includes all required steps that would normally be taken as part of the visa application process for an adjudicator to determine eligibility.

    a. Adjudicators should first determine if an applicant subject to the PP overcomes 214(b) if applicable to the visa class. Adjudicators should make this determination independent from the PP.
    b. If the applicant is determined to not be eligible for the visa for any reason, independent of the PP, refuse the applicant and enter the appropriate refusal code [redacted] This

includes applicants who otherwise would require [redacted] or have independent grounds of ineligibilities [redacted]

c. If the applicant is subject to the PP and no exceptions apply, regardless of whether the applicant is determined to be ineligible on another basis, the officer must:
    i. Refuse the applicant 212(f) using refusal code "F251". **You should refuse applicants "F251" even if they have another refusal code already entered.** For example, if an applicant is subject to the PP and has been found 214(b), the adjudicator should enter both refusal codes into CLASS.
    ii. Inform the applicant in writing of the refusal by providing the applicant a copy of the 212(f) refusal letter in addition to refusal letters for any other relevant ineligibilities. Refusal letter templates are available on CA Web (link). [Note: if refusing an applicant "F251" after previously refusing 221(g), the 212(f)-refusal letter can be sent to the refused applicant via email. Applicants not previously refused 221(g) will need to be called to inform him or her of their refusal orally AND emailed the 212(f) refusal letter. End Note.]
    iii. Enter a case note stating, "Applicant was refused under INA 212(f) as per Presidential Proclamation 'Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats. '"
    iv. Refuse under INA 221(g) derivative applicants who are not directly affected by the PP because they are not from an affected country, but whose principal applicant is refused under INA 212(f).
    v. Do not [redacted] for applicants who will not be eligible for an exception and will be refused under the PP.
    vi. See below for guidance on handling cases already issued to applicants from suspended countries.

vii. VO/SAC will continue to provide responses to all currently-pending [redacted], including for applicants from countries affected by the PP. Do not request [redacted] for applicants from countries covered by the PP based solely on the PP. Consult with your VO/SAC analyst on questions about [redacted] for non-PP related issues.

**Adjudicating Excepted Immediate Relative IV Applicants**

9. (SBU) Immediate Relatives of U.S. citizens may be excepted in certain immigrant visa classifications (IR-1/CR-1, IR-2/CR-2, IR-5) if the consular officer finds that there is clear and convincing evidence of the identity of the applicant and the qualifying relationship between the applicant and the petitioner. Hospital records, school records, birth affidavits, identity documents, photos over the lifespan of the relationship, and other documents that corroborate the applicant's identity and relationship with the petitioner may be used to make this determination. If an applicant cannot establish clear and convincing evidence of identity and family relationship through documentary evidence, post may accept DNA testing consistent with 9 FAM 601.11. Applicants unable to provide clear and convincing evidence of identity and family relationship should be refused 221(g). Please contact the VO/F visa analyst who covers IRs if you have any questions.

10. (SBU) For any IV applicant from a 212(f) affected country who does not fall under one of the exceptions and who communicates to the officer that he is a member of an ethnic or religious minority facing persecution in Iran, post should 221(g) the case and contact the VO/F analyst who covers Iran for additional guidance.

**Issuing Excepted Applicants from Suspended Countries**

11. (SBU) Applicants who are excepted from the PP, as detailed in paragraphs 5 and 6 above, should not be refused under INA 212(f). If otherwise issuable, posts should add an annotation on the visa stating: "Excepted from PP Restricting Entry." Posts should also add a case note in IVO or NIV stating: "#XF251 applicant excepted from PP restricting entry of foreign nationals". If an F251 refusal is erroneously applied for an applicant who benefits from an exception, an officer must both delete the refusal from NIV or IVO and submit a CLOK deletion request.

**Handling Cases Already Adjudicated or Issued to Applicants from Suspended Countries prior to June 9, 2025.**

12. (SBU) For any applicant ineligible under INA 212(f) as a result of the PP, for whom no exception applies and for whom post has approved or printed but not yet passed back the visa as of 12:01 a.m. EDT on June 9, 2025, post must:

    d. Immediately stop the pass back of a printed visa for the now-ineligible applicant, physically cancel the visa without prejudice, and spoil for re-entry in the system. Refuse the applicant using refusal code "F251."
    e. Approved visas not yet printed should be reopened and refused using refusal code "F251."
    f. Enter a case note in NIV or IVO stating, "Visa was canceled, and applicant was refused under INA 212(f) as per Presidential Proclamation 'Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats.'"
    g. Call the applicant to inform him or her of their refusal orally AND email them the 212(f) refusal letter. Adjudicators should

document the refusal in case notes. The applicant does not need to be called back and refused in person if they have been refused orally and in writing.

h. No action should be taken for issued visas which have already left the consular section. No visas issued prior to the effective date should be revoked pursuant to this proclamation.

13. (SBU) For any applicant excepted from INA 212(f) as detailed above, and for whom post has already printed but not yet passed back the visa, post must:

   i. Physically cancel the visa, spoil for re-entry in the system, and reprint the visa with the annotation, "Excepted from PP Restricting Entry".
   j. Enter a case note stating, "*#XF251 applicant excepted from PP restricting entry of foreign nationals.*"

**Dual Nationals**

14. (SBU) Dual nationals applying with a valid passport of a nationality not subject to an INA 212(f) suspension are excepted from a suspension of entry. For individuals who are dual nationals of countries designated as state sponsors of terrorism (Cuba, Iran, North Korea, and Syria) under Section 306 of the Enhanced Border Security and Visa Entry Reform Act of 2002, adjudicators should assess whether a "no threat" determination is appropriate per 9 FAM 302.6-4, unless they determine that the applicant is a nominal national. A nominal national determination is not a factor to whether an applicant is subject to the PP.

15. (U) **Additional Guidance**: CA/VO will provide additional guidance via septel and will schedule webinars in the coming days to provide information to the field and answer additional questions. If you are

aware of an applicant who has a need for immediate emergency travel whose entry would serve the U.S. national interest, please contact your VO/F analyst.

16. (U) **Mission Website:** CA/P will coordinate with GPA to publish a notice at the top of the visa page on Mission websites for countries with full or partial suspensions. CA/EX will work with the GSS vendors to provide vendors cleared language to post on their websites. Posts should not/not ask their local GSS contacts to put alternative language on post-specific GSS websites.

17. (U) **Inquiries**: Post must refer any U.S. media inquiries regarding E.O.s to CA-Press@state.gov and congressional inquiries regarding E.O.s to ConsularOnTheHill@state.gov. Posts may continue to reply to routine case-specific constituent inquiries about cases subject to the PP. Posts may respond to requests from international media regarding E.O.s using CA's cleared press guidance located on CA Web, copying CA-Press@state.gov.

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

**UNCLASSIFIED**

SBU

| | |
|---|---|
| **MRN:** | 25 STATE 55754 |
| **Date/DTG:** | Jun 09, 2025 / 091521Z JUN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT |
| **Captions:** | SENSITIVE |
| **Subject:** | National Interest Exceptions (NIEs) for the Suspension of the Entry to the United States of Aliens from Designated Countries Pursuant to Section 212(f) of the Immigration and Nationality Act (8 U.S.C. 1182(f)) |

1. (SBU) **SUMMARY**: Presidential Proclamation (PP) "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats" (hereinafter "the PP") issued on June 4, 2025, fully or partially suspends the entry to the United States of and U.S. visa issuance to aliens from 19 countries, pursuant to section 212(f) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f)). This cable details the process by which applicants can be approved on a case-by-case basis for an NIE. NIEs are approved through an action memo (AM) to the Consular Affairs (CA) assistant secretary or senior bureau official (SBO) from a Chief of Mission (COM). NIEs should be used rarely and the relationship of the travel to U.S. national interests should be exceptional in nature.

## (U) National Interest Exceptions

2. (SBU) A COM may consider an NIE request if the applicant is able to demonstrate his or her travel to the United States would serve a U.S. national interest, consistent with Executive Order 14150 "America First

Policy Directive to the Secretary of State," which directs the Secretary of State to always put America and American citizens first.

3. (SBU) Given the nature of the PP's findings - that vetting and screening information for nationals of countries covered by the PP is so deficient as to warrant a full or partial suspension of admission - NIEs should be used rarely and the relationship of the travel to U.S. national interests should be exceptional in nature. COMs should make NIE requests only after carefully considering, from an America First perspective, why and how the applicant's travel would serve a U.S. national interest. [redacted]

**(U) Procedures to Approve an NIE**

4. (U) The PP states:

> *"(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee."*

5. (SBU) The Secretary of State has delegated the authority to approve NIEs on a case-by-case basis to the CA assistant secretary or SBO.

6. (SBU) For an applicant to qualify for an NIE, the applicant must first meet the requirements for the visa class and be issuable independent of any

suspension of entry or issuance under 212(f). This includes any screening and vetting otherwise necessary for visa issuance. An applicant who would be subject to a refusal under 212(f) can qualify for an NIE through an approved AM from a COM. Example template memos for NIEs are available on CAWeb at (Link). A single AM may be used for a group of applicants traveling as part of the same party for the same purpose (e.g., a family). By requesting the NIE, the COM is personally attesting that the visa applicant's identity is not in question, and that the applicant does not represent a threat to U.S. national security or public safety. While a Priority Appointment Request (PAR) or referrals are still permitted for nationals subject to 212(f), qualifying for a PAR or referral does NOT in and of itself indicate the applicant meets the bar for national interest necessary for an NIE.

7. (SBU) If the applicant is qualified for the visa and is under consideration for an NIE, adjudicators should refuse the applicant under 212(f) using the refusal code [redacted]. The AM should be cleared by the consular chief in the section where the applicant applied and approved personally by the requesting COM. Memos should be sent to [redacted] and the VO/F analyst who covers that post for routing to the CA SBO or assistant secretary for approval. Memos should not be sent to VO/F before an applicant has been found otherwise qualified for the visa and refused under 212(f) as part of his or her visa application. As part of the interview process, adjudicators should take detailed case notes [redacted].

8. (SBU) If the AM is approved, an electronic copy will be sent to post, and consular sections must scan a copy of the memo into the case. Adjudicators must enter a case note regarding the approved NIE, request a [redacted] and annotate the visa "NIE to PP on

Travel." The visa should not be issued until the [redacted] hit has been removed from [redacted].

9. (SBU) Some examples of travel that could potentially qualify for an NIE include, but are not limited to:

- The applicant is traveling for or on behalf of the U.S. government, including training for U.S. government employees;
- The applicant is traveling to the United States at the request of a U.S. government department or agency for legitimate law enforcement, foreign policy, or national security purposes;
- The applicant is traveling to participate in an international sports competition at the professional level (guidance for World Cup and Olympic Games participants is forthcoming);
- The applicant is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C 288 et seq., traveling for purposes of conducting meetings or business with the U.S. government, or traveling to conduct business on behalf of an international organization not designated under the IOIA;
- Other travel in support of a critical mission, Department, or U.S. government priority endorsed by a Chief of Mission;
- The applicant and any medically necessary escorts are traveling for urgent, non-routine humanitarian medical treatment not possible outside the United States or are traveling to continue previous medical treatment.

10. (SBU) A connection to a U.S. citizen or a U.S. citizen requesting assistance from a relative who needs to travel on a visa is, by itself, not sufficient grounds for an NIE. Examples of travel that would likely NOT qualify for an NIE absent other factors include:

- The applicant is traveling to visit or attend events involving family members who are U.S. citizens, LPRs, or lawfully admitted aliens;

- The applicant is traveling for education, work, or training in the United States. This includes continuing students or resuming employment;
- Travel that, if denied, would cause the applicant financial hardship, personal hardship (including but not limited to emotional distress), educational hardship, or non-critical harm to an applicant's health and well-being;
- The applicant is traveling to provide assistance to a U.S. citizen family member;
- The applicant is traveling for routine commercial or business purposes.

11. (U) **Inquiries:** Posts must refer any U.S. media inquiries regarding NIEs to CA-Press@state.gov and congressional inquiries regarding NIEs to ConsularOnTheHill@state.gov. Posts may continue to reply to routine case-specific constituent inquiries about cases subject to the PP.

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

| | |
|---|---|
| **From:** | The-Visa-Office |
| **To:** | The-Visa-Office |
| **Subject:** | Message to Posts: Implementation FAQs for PP 10949 on Suspension on the Entry to the United States of Aliens from Designated Countries Pursuant to Section 212(f) of the INA |
| **Date:** | Tuesday, June 10, 2025 12:46:34 PM |

Dear Colleagues,

Please see below for answers to the frequently asked questions from posts regarding implementation of guidance related to PP 10949 "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats" provided in 25 STATE 55146 on June 6, 2025.

**Q**: Where can I find the latest public messaging and resources regarding the PP? Can my post create its own guidance?

- Posts should use the latest public messaging found on TSG, CA Web and via CA/P's Visa Suspension Outreach Tool Kit. These points will be updated, so please continue to check back frequently. Posts **should not** provide additional uncleared guidance or warnings to applicants. GSS websites also include PP-specific language and posts should not request any changes to that language without first coordinating with the GSS Program Team.

**Q:** Where can posts find additional guidance on National Interest Exemptions (NIEs)?

- Guidance on NIEs can be found in 25 STATE 55754. Please consult your VO/F analyst with any additional questions.

**Q:** Do the restrictions under the PP apply to DV and K Visa applicants for individuals from those affected countries?

- DVs are **not excepted** under the PP and should, if otherwise eligible for the visa, be refused under 212(f).
- K visas are nonimmigrant visas under the INA. The PP suspends K visas for nationals of the 12 countries covered in Section 2, *i.e.*, Afghanistan, Burma, Chad, the Republic of Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan and Yemen. The PP **does not** suspend K visas for nationals of countries covered under the partial suspension of Section 3.

**Q**: Does the dual national exception apply to all countries (full and partial suspension)?

- Yes, the dual national exception applies to all 19 countries covered in the PP (full and partial restrictions).

**Q**: For any dual nationals (if applying on a passport issued by a non-designated country) should post include an annotation to indicate the applicant is excepted from the PP?

- When issuing the above-mentioned dual nationals, posts **should annotate** the visa as per the ALDAC with "Excepted from PP Restricting Entry".

**Q:** If a foreign national of a designated country was in the United States and/or held a valid visa at the time of the PP's implementation (12:01 EDT on June 9, 2025), is he or she excepted from the PP going forward?

- Valid visas will not be revoked pursuant to the PP and will remain valid until their expiration

dates, notwithstanding other potential ineligibilities. However, if an individual from an affected country makes an application for a new visa (including a renewal either before or after visa expiration), the case will be assessed in accordance with the PP. Per 9 FAM 403.9-2(C), an applicant is not permitted to possess more than one valid visa of the same classification in the same type of passport (i.e., tourist, official, or diplomatic) at the same time. You should physically cancel such visas whenever you encounter them.

**Q:** Under what circumstances should posts send [redacted] for nationals of the affected countries that are subject to 212(f)? If the applicant is ultimately going to be refused under 212(f), is post required to still send an [redacted] if normally required under the FAM (i.e. [redacted] etc.)?

- [redacted] Per 25 STATE 55754, if post will submit a National Interest Exception (NIE), [redacted]
- However, in limited circumstances, when the applicant has [redacted] posts should still send an [redacted], stating in the body of the [redacted] that the applicant will also be refused under the PP.

**Q:** If an applicant from an affected country is found ineligible under 214(b) or another ineligibility, should posts also refuse under the PP?

- Yes, if an applicant is subject to 214(b) or another ineligibility, consular officers should refuse under that ineligibility and 212(f) using the **refusal code F251**. If an applicant overcomes 214(b) and has no other ineligibilities, posts should only refuse them under the PP.
- When refusing an applicant under 212(f), posts should use the latest cleared 212(f) refusal letter.

**Q:** The PP mentions reducing validity for NIV categories (other than B and F/M/J) from countries subject to partial suspension. What should we do in those cases?

- [redacted]. In the interim, VO strongly recommends that consular officers consider, using their discretion, if warranted in an individual case, to **limit reciprocity to a single entry valid for three months**.

**Q:** Should post CWOP valid visas when applicants subject to the PP make a new application?

- Consistent with current guidance, if an applicant makes a new application and holds a valid visa in the same visa class as his or her current application, post should CWOP the valid visa at the time of application.

**Q:** How should post process IWs for nationals impacted by the proclamation?

- Posts with in-country visa processing for nationals impacted by the proclamation should discontinue IW processing for these nationals. CA is working with GSS to discontinue IW processing for impacted nationals worldwide.

**Q:** How should post continue to process V92/V93 cases for nationals of countries affected by the PP?

- Posts should refuse all V92/V93 cases under 221(g) and contact your VO/F analyst.

Continue to schedule and interview V92/V93 cases. Further guidance is forthcoming.

**Q**: How should post continue to process PARCIS cases for nationals of countries affected by the PP?

- Posts should refuse all PARCIS cases under 221(g) and contact your VO/F analyst. Continue to schedule and interview PARCIS cases. Further guidance is forthcoming.

**Q**: Are nationals from countries affected by the PP with valid PARCIS boarding foils allowed to enter the United States?

- Posts should refer inquiries to DHS.

**Q:** For individuals who are nationals of the affected countries, but applying for visas on travel documents issued by a third country (e.g., refugee travel documents), are they subject to the PP? What about stateless individuals?

- For purposes of the PP, visa applicants who are nationals of an affected country are subject to the restrictions of the PP, even if traveling on travel documents issued by a third country, unless they are also nationals of the third country. For cases involving stateless individuals, please reach out to L/CA and VO/F for further guidance.

**Q:** Are SB-1 visas for returning residents excepted from the PP?

- SB-1s are considered excepted from the proclamation as they are returning residents.

Q: Post currently has passports of IV or NIV applicants now affected by the PP, either refused 221(g) or otherwise issued/printed before the implementation of the PP. How do we refuse those cases? What should we do with those passports?

- Posts should take all appropriate steps to refuse applicants orally (including via telephone) and in writing per 9 FAM 403.10-3(A)(1), follow the guidance found in paragraph 8 of 25 STATE 55146, and immediately return all passports. As a reminder, posts **should not** hold onto passports for any reason.

**Q:** Should post alter any procedures or processing steps for visa applicants subject to 212(f)?

- Posts should continue all routine processing for nationals subject to the PP, including applicants for those visa classifications that are not excepted. Normal processing includes: pre-screening (virtual or in person) and contact about items missing from IV applications.

**Q:** If an application is incomplete, should post refuse the application 221(g) and F251?

- Post should process any visa application to completion. As 25 State 55146 notes, adjudicators must first determine whether the applicant is otherwise eligible for a visa under the INA, without regard to the PP. If a visa application is pending additional documentation or steps to determine eligibility, post should refuse only under 221(g). When an application is otherwise complete and subject to the PP, it should be refused F251.
- For IV cases, posts should request any/all missing documents necessary to show the applicant is qualified - but time-limited documents like police clearances and medicals are not necessary for a 212(f) refusal and posts may refuse an application F251 if the applicant declines to provide them. Posts should request all documentation necessary to resolve potential ineligibilities and enter appropriate 221(g) refusals for the missing documentation.

**Q:** Applicants at our post pay when they arrive for their interview. Can we share information about the PP and its implication before they proceed to payment and interview?

- Post should not counsel applicants or advise them in advance of the interview that they are subject to the PP – this could be seen as pre-adjudication. Information on the PP is widely available on post websites, and travel.state.gov. Posts can make available or post publicly available information in the waiting room (see below).
- **Public messaging resources:**

  TSG Visa Newsroom article
  Social media toolkit
  Cleared press points

This email was sent to MCCAs, RCOs, Consular Section Chiefs, Deputy Consular Section Chiefs, and NIV + IV Chiefs listed in the CCD (as of 6/10/25).

*Sent by VO/F [redacted])*

SBU - DELIBERATIVE PROCESS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

----------------------------------------------------------------x

**AA et al,**

Plaintiff,

v.

United States Department of State, *et al*.,

Defendants.

----------------------------------------------------------------x

Civil Action No. 1:25-cv-1819-AJT-WEF

**DECLARATION OF MICHAEL THOMAN**

I, Michael Thoman, hereby declare under penalty of perjury:

*1.* I am employed by the U.S. Department of State as Immigrant Visa Chief at the U.S. Embassy in Islamabad. In my official capacity, I am authorized to search the electronic Consular Consolidated Database (CCD) of the U.S. Department of State (Department), Bureau of Consular Affairs. The CCD contains electronic records if, inter alia, follow to join asylee (FTJ-A) travel eligibility determination cases at U.S. Embassies and consulates. The following declaration is based on records maintained in the CCD of beneficiaries of the respective Forms I-730 Refugee/Aylee Relative Petitions that have been filed by the petitioner and who are the subjects of the complaint *AA et al v. United States Department of State*, 1:25-cv-1819-AJT-WEF.

*2.* I have also reviewed the letter provided to DOJ by plaintiffs that is dated July 7, 2025, and issued by post. The format used in that letter appears to have been a standard template used in other types of cases. I can confirm that what accurately reflects the refusal dates and grounds of refusal for these I-730 beneficiaries is the information contained in the CCD.

*3.* The CCD identifies the parties as their names appear in the CCD.

**BENEFICIARIES OF PETITIONER [redacted]**

4. Beneficiary [redacted]. The CCD reflects that on July 7, 2025, the beneficiary appeared before a consular officer for a follow to join asylee interview. The CCD further reflects that the consular officer refused the beneficiary on that same date under 8 U.S.C. § 1201(g). The CCD further reflects that on August 15, 2025, the beneficiary was refused under INA 212(f).

5. Beneficiary [redacted]. The CCD reflects that on July 7, 2025, the beneficiary appeared before a consular officer for a follow to join asylee interview. The CCD further reflects that the consular officer refused the beneficiary on that same date under 8 U.S.C. § 1201(g). The CCD further reflects that on August 15, 2025, the beneficiary was refused under INA 212(f).

6. Beneficiary [redacted]. The CCD reflects that on July 7, 2025, the beneficiary appeared before a consular officer for a follow to join asylee interview. The CCD further reflects that the consular officer refused the beneficiary on that same date under 8 U.S.C. § 1201(g). The CCD further reflects that on August 15, 2025, the beneficiary was refused under INA 212(f).

7. Beneficiary [redacted]. The CCD reflects that on July 7, 2025, the beneficiary appeared before a consular officer for a follow to join asylee interview. The CCD further reflects that the consular officer refused the beneficiary on that same date under 8 U.S.C. § 1201(g). The CCD further reflects that on August 15, 2025, the beneficiary was refused under INA 212(f).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed May 13, 2026.

Michael Thoman
Immigrant Visa Chief
U.S. Embassy Islamabad
United States Department of State.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

January 1, 2026 PM-602-0194

# Policy Memorandum

**SUBJECT:** Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries[1]

## Purpose

Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

1. Place a hold[2] on all pending benefit applications, for aliens[3] listed[4] in Presidential Proclamation (PP) 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*,[5] pending a comprehensive review, regardless of entry date;[6]
2. Conduct a comprehensive review of all policies, procedures, and screening and vetting processes for benefit requests for aliens from countries listed in PP 10998; and
3. Conduct a comprehensive re-review of approved benefit requests implicated in PP 10998 that were approved on or after January 20, 2021.

---

[1] On December 16, 2025, the President issued Presidential Proclamation (PP) 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*. Exercising authority under INA 212(f), the proclamation continues the full restrictions and entry limitations of nationals from the original high-risk countries established under PP 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats* (June 4, 2025), and imposes restrictions, limitations, and exceptions on additional high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests.

[2] A "hold" allows a case to proceed through processing, up to final adjudication. A "final adjudication" refers to the issuance of a final decision on a case, such as an approval, denial, or dismissal.

[3] The term "alien" means any person not a citizen or national of the United States. See INA 101(a)(3) and 8 U.S.C. 1101(a)(3).

[4] This refers to aliens with a nationality, country of birth, or aliens who have acquired Citizenship by Investment (CBI) listed in PP 10998. "As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country." Further, this includes aliens with varying nationalities but are traveling on a Palestinian-Authority-issued document.

[5] This applies to aliens who list one of the high-risk countries as their Country of Birth or Country of Citizenship.

[6] Immigrant visas for family members of individuals in the United States will no longer be automatically or broadly exempt from PP 10949 and PP 10998 restrictions or requirements. Family-based immigrant visa applications are now subject to the same review, restrictions, or additional scrutiny as other benefit requests.

This memorandum specifies which cases are subject to the adjudicative hold, identifies exemptions, and outlines the factors to consider when assessing benefit eligibility during the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

This memorandum does not supersede the guidance in Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* on December 1, 2025[7] except as specified under the "Exceptions to the Adjudication Hold" outlined in this memorandum.

**Background**

On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats*. This order aimed to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Accordingly, through PP 10949 and PP 10998, the President restricted the entry of foreign nationals from countries lacking adequate screening and vetting information to safeguard the national security and public safety of the United States and its citizens. The proclamations also instructed the United States Government to promptly engage with the countries identified, outlining the necessary steps to meet U.S. screening, vetting, immigration, and security standards. However, despite those efforts, most of the countries named in PP 10949 and PP 10998 – and others – continue to demonstrate significant deficiencies in screening, vetting, and information sharing. In addition to PP 10949, PP 10998 emphasizes that "it is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes."

Following the continued review since the issuance of PP 10949, as well as the responses of foreign countries to that proclamation, the United States Government has identified additional countries that are unable to meet basic criteria for identifying their nationals and residents who may pose national security and public safety risks, or for sharing necessary information with the United States. It is paramount that the United States Government ensure aliens in the United States do not intend to threaten its citizens or undermine or destabilize its culture, government, institutions, or

[7] USCIS issued a public-facing version on December 2, 2025. See Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries,* December 2, 2025 (PM-602-0192).

founding principles. Entry will not be granted to aliens who advocate for, aid, or support designated foreign terrorists or other threats to our national security or public safety.

As a result of these reviews and considerations, the President has determined to maintain and adjust the restrictions outlined in sections 2 and 3 of PP 10949 regarding the entry of certain classes of foreign nationals into the United States. Additionally, further limitations have been imposed on the entry of aliens from additional high-risk countries in PP 10998.

Considering identified concerns and the threat to the American people, USCIS has determined a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021, is necessary.[8]

USCIS remains dedicated to ensuring aliens from high-risk countries of concern who have entered the United States do not pose risks to national security or public safety. To faithfully uphold United States immigration law, the flow of aliens from countries with high overstay rates, significant fraud, or both must stop. To address potential vulnerabilities, USCIS will place an adjudicative hold on all pending benefit requests submitted by or for aliens from the high-risk countries identified in PP 10998, allowing for a thorough case-by-case review. This hold will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum or memorandum attachment. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.

**Guidance**

USCIS has determined the operational necessity to ensure all aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures USCIS exercises its full authority to investigate immigration benefit requests filed by or for aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist under Tier 1 or Tier 2 classifications or is included in Tier 3 of the TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).

[8] Additionally, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

4. The alien is unable to establish their identity as outlined in PP 10949 and PP 10998.[9]

Many of these restricted high-risk countries experience widespread corruption, unreliable or fraudulent civil documents and criminal records, and lack effective birth registration systems, which systematically hinder accurate vetting and identity verification. Officers must consider these country-specific factors when conducting security and background checks, and when reviewing civil documents such as passports, marriage and divorce certificates, and birth certificates, as well as criminal history information. Officers must follow established policies to ensure proper screening and vetting procedures are conducted, and that any derogatory information is thoroughly evaluated and appropriately resolved.

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that aliens are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined the burden of processing delays which will fall on some aliens is necessary and appropriate, when weighed against the agency's obligation to protect and preserve our national security.

*Exceptions to the Adjudication Hold*[10]

Exceptions to the adjudication hold for cases with identified national security, public safety, or fraud-related derogatory information still require the adjudicative directorate or program office to coordinate with U.S. Immigration and Customs Enforcement (ICE) in accordance with current policies and procedures before final adjudication. The following are exceptions to the adjudication hold:

1. Form I-90, Application to Replace Permanent Resident Card (Green Card);[11]
2. Form N-565, Application for Replacement Naturalization/Citizenship Document;
3. Form N-600, Application for Certificate of Citizenship;[12]

[9] See USCIS Policy Manual, Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].
[10] Any request for an exemption to the adjudicative hold must be coordinated with the USCIS Office of Policy and Strategy (OP&S). OP&S will track and record all the hold lifts. OP&S will issue additional guidance within 7 days of issuing this memorandum.
[11] Lawful permanent residents are entitled to evidence of status in the United States. Lawful permanent residents are eligible for replacement of their Permanent Resident Card if they meet certain requirements. See USCIS Policy Manual, Volume 11, Travel and Identity Documents, Part B, Permanent Resident Cards, Chapter 2, Replacement of Permanent Resident Card [11 USCIS-PM B.2].
[12] Except Yemen and Somalia. Yemen and Somalia are not included in this particular exception due to security and documentary concerns specific to those countries as documented on the Department of State Visa Reciprocity Schedules for these countries.

4. Form I-765, Application for Employment Authorization filed under the (c)(8),[13] limited (c)(11),[14] and limited (c)(14)[15] categories;
5. Form I-910, Application for Civil Surgeon Designation (only for physicians that are citizens or nationals of the United States);
6. Benefit requests filed by any alien who is an athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives for the purpose of participating in the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;
7. Benefit requests that are a priority for law enforcement and where ICE has requested USCIS take adjudicative action to uphold public safety or national security;
8. Benefit requests filed by aliens whose entry would serve a United States national interest;[16]
9. Benefit requests, as well as the associated underlying benefits, for any programs that are terminated or discontinued as a result of an Executive Order, Proclamation, Federal Register Notice, or Directive issued by the President, the Secretary of Homeland Security, or the USCIS Director; and
10. Automatic termination decisions for ancillary or related benefit requests when an alien is granted Legal Permanent Resident status or becomes a naturalized citizen.[17]

Within 90 days of this memorandum issuance, and in consultation with OP&S and the Fraud Detection and National Security Directorate, USCIS will prioritize a list for review, interview, and re-interview, and issue operational guidance.

**Use**

This policy memorandum is intended solely for the guidance of USCIS personnel in the performance of their official duties, but it does not remove their discretion in making adjudicatory decisions. It may not be relied upon to create any right or benefit, substantive or procedural, enforceable under law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

---

[13] See 8 CFR 274a.12(c)(8). Only applies to *initial* (c)(8) filings. *Asylumworks v. Mayorkas* requires USCIS to process all initial Form I-765 filed under the (c)(8) category within 30 days.
[14] See 8 CFR 274a.12(c)(11). Form I-765 filed under the (c)(11) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.
[15] See 8 CFR 274a.12(c)(14). Form I-765 filed under the (c)(14) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.
[16] For example, a benefit request filed by an alien whose entry into the United States would provide significant benefit to the United States may include, but is not limited to, a scientist or medical researcher working on a critical public health project, an engineer with specialized skills needed for a key infrastructure initiative, or someone with unique expertise supporting U.S. national security or economic interests. This is a case-by-case determination and requires approval from the headquarters of the adjudicative directorate or program office.
[17] For example, when USCIS approves an individual's Form I-485, any associated or underlying applications, such as Form I-765, will be automatically terminated, as the benefit provided by the ancillary form is no longer necessary.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

December 2, 2025 PM-602-0192

# Policy Memorandum

**SUBJECT:** Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries[1]

## Purpose

Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

1. Place a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review;
2. Place a hold on pending benefit requests[2] for aliens from countries listed in *Presidential Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*,[3] pending a comprehensive review, regardless of entry date[4]; and
3. Conduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021.[5]

This memorandum mandates that all aliens meeting these criteria undergo a thorough re-review process, including a potential interview[6] and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility.[7] An individualized, case-by-case review and assessment will be done of all relevant information and facts. USCIS will also conduct a comprehensive review of all relevant policies,

---

[1] On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats.* Exercising authority under section 212(f) of the Immigration and Nationality Act (INA), the proclamation imposes restrictions, limitations, and exceptions on the entry of aliens from 19 high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests. See 90 FR 24497 (PDF) (June 4, 2025).
[2] The term "benefit request" in this memorandum does not include USCIS screening activities, including credible fear, reasonable fear, safe third country, third country removal, and threshold screenings under the Asylum Cooperative Agreements.
[3] This applies to aliens who list one of the 19 high-risk countries as their Country of Birth or Country of Citizenship.
[4] Including Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to Replace Permanent Resident Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization Purposes), Form I-751, (Petition to Remove Conditions on Residence), and Form I-131 (Application for Travel Documents, Parole Documents, and Arrival/Departure Records).
[5] Entered may include admitted, inspected, paroled, or entered without inspection.
[6] Interviews for this population shall not be waived under any circumstance. For benefit requests where an interview is not required, the case review and evaluation will determine if the alien needs to appear at a USCIS office.
[7] See INA 212(a)(3)(A), (B), and (F) and 237(a)(4)(A) and (B).

procedures, and operational guidance for compliance, accuracy, and needed improvements during this time.

This guidance outlines the adjudicative hold, procedural requirements, and processes for the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with all applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

**Background**

On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aims to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Recently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people. An Afghan national, Nasir Ahmad Tawhedi, planned a terrorist attack in the United States on Election Day 2024. Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS).[8] In another instance, an Afghan national, Rahmanullah Lakanwal, is suspected of planning and executing a terrorist attack in Washington, DC against two National Guard members,[9] one who was killed and another who remains critically injured. USCIS plays an instrumental role in preventing terrorists from seeking safe haven in the United States and ensuring that USCIS' screening and vetting and adjudications prioritize the safety of the American people and uphold all U.S. laws.

In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary. Lastly, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

USCIS remains committed to ensuring that all aliens from high-risk countries of concern that entered the United States do not present threats to national security or public safety. To address vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949. This hold will remain

[8] See *Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States*, U.S. Department of Justice, June 13, 2025.
[9] See *Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program*, U.S. Department of Homeland Security Press Release, November 26, 2025.

in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.[10]

**Guidance**

USCIS has determined the operational necessity to ensure that all asylum applicants and aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist (KST) under Tier 1 or Tier 2 classifications or is included in Tier 3 or Tier 4 of the TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).
4. The alien is unable to establish their identity as outlined in PP 10949.[11]

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve national security.

Within 90 days of issuance of this memorandum, USCIS will prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and, in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance.

**Use**

[10] Any request for an exemption to the adjudicative hold must be coordinated with the Office of Policy and Strategy.
[11] See USCIS Policy Manual, Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

This policy memorandum is intended solely for the guidance of USCIS personnel in the performance of their official duties, but it does not remove their discretion in making adjudicatory decisions. It may not be relied upon to create any right or benefit, substantive or procedural, enforceable under law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Proclamation 10998 of December 16, 2025**

## Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of certain foreign nationals into the United States to prevent national security and public safety threats from reaching our borders. The Supreme Court upheld these restrictions. I reinstated these successful policies in Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), and Proclamation 10949 of June 4, 2025 (Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats).

It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes.

The United States must exercise extreme vigilance during the visa-issuance and immigration processes to identify, prior to their admission or entry into the United States, foreign nationals who intend to harm Americans or our national interests. The United States Government must ensure that admitted aliens do not intend to threaten its citizens; undermine or destabilize its culture, government, institutions, or founding principles; or advocate for, aid, or support designated foreign terrorists or other threats to our national security.

In order to protect our Nation, as directed in Executive Order 14161, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, identified countries throughout the world for which screening and vetting information was so deficient as to warrant a full or partial suspension of the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). Accordingly, in Proclamation 10949, I restricted the entry of foreign nationals into the United States from countries with deficient screening and vetting information to protect the national security and public safety of the United States and its people. The proclamation also directed the United States Government to immediately engage countries identified in the proclamation on measures that must be taken to comply with the screening, vetting, immigration, and security requirements of the United States.

Despite those engagements, most of the countries identified in Proclamation 10949, as well as others, continue to exhibit woeful inadequacies in screening, vetting, and provision of information. At least one country lacks mechanisms in hospitals to ensure births are reported, and widespread corruption, combined with a general lack of vetting and poor recordkeeping, result in any non-citizen being able to obtain any civil document from that country, particularly if that person is willing to pay a fee or engage an individual that specializes in assisting in such fraud. In that same country, law enforcement records are not maintained with the accuracy or consistency necessary to provide representations of individuals' criminal histories to the United

States Government. In another country, civil documents like marriage licenses and birth certificates are handwritten and stamped on regular paper, making them highly susceptible to alteration, and there is a fraudulent document market that produces all types of falsified records, making written corroboration of any visa application practically impossible. In yet another country, criminal records are widely unreliable and inaccessible. And in another, United States visas are used as a tool for illicit transborder movement of assets by corrupt government officials and organized criminal groups. Corruption in another country even extends to the national school system, which has provided falsified diplomas and grade information in the past to fraudsters who have tried to obtain student visas and eligibility for large athletic scholarships. The government of another country refuses to provide passport exemplars, undermining the United States Government's ability to detect fraudulent documents. In another country, the population, for the most part, does not formally document life events. This makes effective verification of basic biographical data such as birthdates, marriages, and parentage exceedingly difficult, if not impossible. Such countries warrant continued or new travel restrictions.

Further, after continuing their review, and in light of the experience gained since the issuance of Proclamation 10949 and the reaction of foreign countries to the issuance of that proclamation, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence have identified additional countries that cannot meet basic criteria for identifying their nationals and residents who pose national security and public safety threats and for sharing information with the United States. For example, only 40 percent of one country's territory is under complete government control, and officials there have noted that their ability to securely process, house, or monitor non citizens is constrained. In another country, corruption in various forms is pervasive. Other countries have been subject to successful efforts to overthrow or undermine their governments, with the result that radical terrorist groups operate with minimal, if any, interference from law enforcement, engaging in forced labor, sex trafficking, illegal drug manufacturing and distribution, and other activities that destabilize such countries. And, because of the poor documentation practices and corrupt governments in these countries, there can be little assurance that the foreign nationals from these countries who seek to come to America on immigrant or nonimmigrant visas are not bringing these criminal enterprises with them to the United States.

According to United States law enforcement reporting, foreign nationals from countries named in this proclamation have been involved with crimes that include murder, terrorism, embezzling public funds, human smuggling, human trafficking, and other criminal activity. Many of these countries are ranked in the top third of countries for criminality, and widely unreliable foreign civil documents and lack of authoritative criminal information make it extremely difficult for United States screening and vetting authorities to assess prior criminal activity and other grounds of inadmissibility.

Finally, some of these countries have offered Citizenship by Investment (CBI) without residency, which poses challenges for screening and vetting purposes. As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country. Additionally, United States law enforcement and the Department of State have found that, historically, CBI programs have been susceptible to several risks. These risks include allowing an individual to conceal his or her identity and assets to circumvent travel restrictions or financial or banking restrictions.

Foreign nationals from the countries described above have also exploited the historic generosity of the United States and violated our Nation's immigration laws by not adhering to the terms of their nonimmigrant or immigrant visas. As cited in the Department of Homeland Security (DHS) Entry/Exit Overstay Report, foreign nationals from many countries have high nonimmigrant visa overstay rates. These visa overstays and other abuses flagrantly violate United States immigration laws, despite generous incentives offered by my Administration—for example, the ability to self-deport using the CBP Home app. To faithfully uphold United States immigration law, the flow of foreigners from countries with high overstay rates or significant fraud must stop.

In addition, the implementation of Proclamation 10949 counsels narrowing the categorical exceptions described in that proclamation to prevent exploitation by foreign nationals. For example, immigrant visas for family members of individuals in the United States will no longer be a broad categorical exception. As described above, the countries to which this proclamation applies have persistent, chronic vetting deficiencies that impede conclusive admissibility determinations and that are readily exploitable to threaten United States national security and public safety. These deficiencies include poor civil documentation and recordkeeping practices, widespread corruption and fraud, unreliable or inaccessible criminal records, and unreliable government travel documents. These pervasive risks concerning nationals from the covered countries apply with at least equal force to family-based visa applications—which comprise most of the immigrant visa applications from such countries—and potentially with even greater force. Familial ties can serve—and, in the past, have in fact served, based on concrete information provided by United States law enforcement and the Department of State—as unique vectors for fraudulent, criminal, or even terrorist activity through means such as the domestic or international financing of such activity. Broadly excepting most immigrant visa applicants from the countries whose risks and deficiencies most gravely threaten America is inconsistent with protecting our national security and with the purpose of driving greater cooperation and vetting improvements by these specific countries. This is particularly true in light of the large numbers of individuals granted United States immigration status during the prior administration without sufficient documentation and vetting mechanisms in place, whose family members might take advantage of such an exception, just as criminals have taken advantage of family-based visas in the past. Accordingly, I have determined that the risks from the classes of aliens covered by this proclamation cannot be satisfactorily mitigated absent resolution of the predominating country-specific concerns, and any extraordinary cases can be appropriately addressed through the national-interest exceptions provided for in this proclamation and Proclamation 10949.

As a result of these reviews and considerations, I have decided—as described in sections 2 and 3 of this proclamation—to continue to impose and modify the limitations set forth in sections 2 and 3 of Proclamation 10949 on the entry into the United States by certain classes of foreign nationals. Also, I have decided—as described in sections 4 and 5 of this proclamation—to impose the limitations set forth below on the entry into the United States by certain other classes of foreign nationals.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2, 3, 4, and 5 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security and public safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols and procedures enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such foreign nationals from entering the United States.

(b) Identity-management and information-sharing standards and practices of foreign governments impact the effectiveness of the screening and vetting protocols and procedures of the United States. Foreign governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals and residents to other governments, including information about known and suspected terrorists and criminals.

It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their identity-management and information-sharing protocols and procedures and to regularly share their identity and threat information with the screening and vetting systems of the United States.

(c) Proclamation 10949 directed the United States Government to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. The proclamation directed the United States Government to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. Additionally, the proclamation directed the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to immediately engage each of the countries identified in the proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(d) Proclamation 10949 directed the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by the proclamation should be continued, terminated, modified, or supplemented.

(e) The Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (d) of this section, recommending that entry restrictions and limitations continue to apply to foreign nationals of several countries. The report also identified additional countries for which vetting and screening information is so deficient as to warrant a full or partial suspension of admission. These recommendations follow the engagement with foreign countries that I directed in Proclamation 10949.

(f) In evaluating the recommendations from the Secretary of State and determining whether and to what extent to impose, or continue to impose, restrictions for each country, I consulted with the Secretary of State, the Secretary of War, the Attorney General, the Secretary of Homeland Security, the Director of National Intelligence, appropriate Assistants to the President, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. I further considered various factors, including each country's screening and vetting capabilities, information-sharing policies, and country-specific risk factors, including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals. Each of these factors, including visa-overstay rates, was just one of the factors considered in making the determinations in this proclamation, and the determinations in this proclamation are based on the totality of

the circumstances with respect to each country after a review of all relevant factors.

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas are, or can become, lawful permanent residents of the United States. Such persons admitted on immigrant visas may present national security or public safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security or public safety concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security or public safety of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the relevant countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary: to garner cooperation from foreign governments, including as to reducing overstay rates of their nationals; enforce our immigration laws; and advance other important foreign policy, national security, and counterterrorism objectives. Under the current circumstances, without the restrictions and limitations imposed in this proclamation, the entry or admission of such foreign nationals is detrimental to the national interest.

(g) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to continue to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of 7 additional countries: Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, and Syria. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants. I have also determined to fully restrict and limit the entry of individuals using travel documents issued or endorsed by the Palestinian Authority (PA).

(i) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to continue to partially restrict and limit the entry of nationals of the following 4 countries: Burundi, Cuba, Togo, and Venezuela. I have also decided to modify the partial restriction and limitation on the entry of nationals of Turkmenistan. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(j) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to partially restrict and limit the entry of nationals of the following 15 countries: Angola, Antigua and Barbuda, Benin, Cote d 'Ivoire, Dominica, Gabon, The Gambia,

Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(k) Sections 4 and 5 of this proclamation describe some of the identity-management and information-sharing inadequacies that led me to impose, or continue to impose, the restrictions described in this proclamation. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Continued Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries continues to be suspended and limited as set forth in Proclamation 10949 and herein, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Afghanistan;

(b) Burma;

(c) Chad;

(d) Republic of the Congo;

(e) Equatorial Guinea;

(f) Eritrea;

(g) Haiti;

(h) Iran;

(i) Libya;

(j) Somalia;

(k) Sudan; and

(l) Yemen.

**Sec. 3**. *Continued Partial Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries continues to be suspended and limited as set forth in Proclamation 10949 and herein, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Burundi;

(b) Cuba;

(c) Togo; and

(d) Venezuela.

**Sec. 4**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Burkina Faso

(i) According to the Department of State, terrorist organizations continue to plan and conduct terrorist activities throughout Burkina Faso. According to the Fiscal Year 2024, Department of Homeland Security (DHS) Entry/Exit Overstay Report (''Overstay Report''), Burkina Faso had a B–1/B–2 visa overstay rate of 9.16 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 22.95 percent. Additionally, Burkina Faso has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Burkina Faso as immigrants and as nonimmigrants is hereby fully suspended.

(b) Laos

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 28.34 percent and an F, M, and J visa overstay rate of 11.41 percent. According to the Fiscal Year 2023, Department of Homeland Security (DHS) Entry/Exit Overstay Report (''2023 Overstay Report''), Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Additionally, Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants and as nonimmigrants is hereby fully suspended.

(c) Mali

(i) According to the Department of State, armed conflict between the Malian government and armed groups is common throughout the country. Terrorist organizations operate freely in certain areas of Mali.

(ii) The entry into the United States of nationals of Mali as immigrants and as nonimmigrants is hereby fully suspended.

(d) Niger

(i) According to the Department of State, terrorists and their supporters are active in planning kidnappings in Niger, and they may attack anywhere in the country. According to the Overstay Report, Niger had a B–1/B–2 visa overstay rate of 13.41 percent and an F, M, and J visa overstay rate of 16.46 percent.

(ii) The entry into the United States of nationals of Niger as immigrants and as nonimmigrants is hereby fully suspended.

(e) Sierra Leone

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 16.48 percent and an F, M, and J visa overstay rate of 35.83 percent. According to the 2023 Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Additionally, Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants and as nonimmigrants is hereby fully suspended.

(f) South Sudan

(i) According to the Overstay Report, South Sudan had a B–1/B–2 visa overstay rate of 6.99 percent and an F, M, and J visa overstay rate of 26.09 percent. Additionally, South Sudan has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of South Sudan as immigrants and as nonimmigrants is hereby fully suspended.

(g) Syria

(i) Syria is emerging from a protracted period of civil unrest and internal strife. While the country is working to address its security challenges in close coordination with the United States, Syria still lacks an adequate central authority for issuing passports or civil documents and does not have appropriate screening and vetting measures. According to the Overstay Report, Syria had a B–1/B–2 visa overstay rate of 7.09 percent and a F, M, and J visa overstay rate of 9.34 percent.

(ii) The entry into the United States of nationals of Syria as immigrants and nonimmigrants is hereby fully suspended.

(h) Palestinian Authority Documents

(i) Several United States-designated terrorist groups operate actively in the West Bank or Gaza Strip and have murdered American citizens. Also, the recent war in these areas likely resulted in compromised vetting and screening abilities. In light of these factors, and considering the weak or nonexistent control exercised over these areas by the PA, individuals attempting to travel on PA-issued or endorsed travel documents cannot currently be properly vetted and approved for entry into the United States.

(ii) The entry into the United States of foreign nationals who seek to travel on any travel documents issued or endorsed by the PA, as immigrants and nonimmigrants, is hereby fully suspended.

**Sec. 5**. *Partial Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Angola

(i) According to the Overstay Report, Angola had a B–1/B–2 visa overstay rate of 14.43 percent and an F, M, and J visa overstay rate of 21.92 percent.

(ii) The entry into the United States of nationals of Angola as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Angola to the extent permitted by law.

(b) Antigua and Barbuda

(i) Antigua and Barbuda has historically had CBI without residency.

(ii) The entry into the United States of nationals of Antigua and Barbuda as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Antigua and Barbuda to the extent permitted by law.

(c) Benin

(i) According to the Overstay Report, Benin had a B–1/B–2 overstay rate of 12.34 percent and an F, M, and J visa overstay rate of 36.77 percent.

(ii) The entry into the United States of nationals of Benin as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Benin to the extent permitted by law.

(d) Cote d 'Ivoire

(i) According to the Overstay Report, Cote d'Ivoire had a B–1/B–2 visa overstay rate of 8.47 percent and an F, M, and J visa overstay rate of 19.09 percent.

(ii) The entry into the United States of nationals of Cote d 'Ivoire as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cote d 'Ivoire to the extent permitted by law.

(e) Dominica

(i) Dominica has historically had CBI without residency.

(ii) The entry into the United States of nationals of Dominica as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Dominica to the extent permitted by law.

(f) Gabon

(i) According to the Overstay Report, Gabon had a B–1/B–2 visa overstay rate of 13.72 percent and an F, M, and J visa overstay rate of 17.77 percent.

(ii) The entry into the United States of nationals of Gabon as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Gabon to the extent permitted by law.

(g) The Gambia

(i) According to the Overstay Report, The Gambia had a B–1/B–2 visa overstay rate of 12.70 percent and an F, M, and J visa overstay rate of 38.79 percent. Additionally, The Gambia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of The Gambia as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of The Gambia to the extent permitted by law.

(h) Malawi

(i) According to the Overstay Report, Malawi had a B–1/B–2 visa overstay rate of 22.45 percent and an F, M, and J visa overstay rate of 31.99 percent.

(ii) The entry into the United States of nationals of Malawi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Malawi to the extent permitted by law.

(i) Mauritania

(i) According to the Overstay Report, Mauritania had a B–1/B–2 visa overstay rate of 9.49 percent. According to the Department of State, the Government of Mauritania has little presence in certain parts of the country, which creates substantial screening and vetting difficulties.

(ii) The entry into the United States of nationals of Mauritania as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Mauritania to the extent permitted by law.

(j) Nigeria

(i) Radical Islamic terrorist groups such as Boko Haram and the Islamic State operate freely in certain parts of Nigeria, which creates substantial screening and vetting difficulties. According to the Overstay Report, Nigeria had a B–1/B–2 visa overstay rate of 5.56 percent and an F, M, and J visa overstay rate of 11.90 percent.

(ii) The entry into the United States of nationals of Nigeria as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Nigeria to the extent permitted by law.

(k) Senegal

(i) According to the Overstay Report, Senegal had a B–1/B–2 visa overstay rate of 4.30 percent and an F, M, and J visa overstay rate of 13.07 percent.

(ii) The entry into the United States of nationals of Senegal as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Senegal to the extent permitted by law.

(l) Tanzania

(i) According to the Overstay Report, Tanzania had a B–1/B–2 visa overstay rate of 8.30 percent and an F, M, and J visa overstay rate of 13.97 percent.

(ii) The entry into the United States of nationals of Tanzania as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Tanzania to the extent permitted by law.

(m) Tonga

(i) According to the Overstay Report, Tonga had a B–1/B–2 visa overstay rate of 6.45 percent and an F, M, and J visa overstay rate of 14.44 percent.

(ii) The entry into the United States of nationals of Tonga as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Tonga to the extent permitted by law.

(n) Turkmenistan

(i) Since the issuance of Proclamation 10949, Turkmenistan has engaged productively with the United States and demonstrated significant progress in improving its identity-management and information-sharing procedures. As a result, the restrictions imposed on Turkmenistan in this proclamation modify and supersede those set forth in section 3(f) of Proclamation 10949.

(ii) The suspension of entry into the United States of nationals of Turkmenistan as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is lifted. Because some concerns remain, the entry into the United States of nationals of Turkmenistan as immigrants remains suspended.

(o) Zambia

(i) According to the Overstay Report, Zambia had a B–1/B–2 visa overstay rate of 10.73 percent and an F, M, and J visa overstay rate of 21.02 percent.

(ii) The entry into the United States of nationals of Zambia as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Zambia to the extent permitted by law.

(p) Zimbabwe

(i) According to the Overstay Report, Zimbabwe had a B–1/B–2 visa overstay rate of 7.89 percent and an F, M, and J visa overstay rate of 15.15 percent.

(ii) The entry into the United States of nationals of Zimbabwe as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Zimbabwe to the extent permitted by law.

**Sec. 6**. *Scope and Implementation of Suspensions and Limitations.* (a) Scope. Subject to the exceptions set forth in subsection (b) of this section and any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2, 3, 4, and 5 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) Exceptions. The suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2, 3, 4, or 5 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) Special Immigrant Visas for United States Government employees under 8 U.S.C. 1101(a)(27)(D); and

(vi) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) The exceptions in subsection (b) of this section amend and supersede the exceptions set forth in section 4(b) of Proclamation 10949 with respect to any countries listed in section 2 or 3 of Proclamation 10949 from and after the date of this proclamation.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(e) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

(f) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Secretary of Homeland Security finds, in her discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of Homeland Security or her designee, in coordination with the Secretary of State or his designee.

**Sec. 7**. *Adjustments to and Removal of Suspensions and Limitations.* (a) Within 180 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, recommending whether any suspensions and limitations imposed by sections 2, 3, 4, and 5 of this proclamation should be continued, terminated, modified, or supplemented.

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall continue to engage each of the countries identified in sections 2 and 3 of this proclamation—and shall immediately engage each of the countries identified in sections 4 and 5 of this proclamation—on measures that must be taken to comply with screening, vetting, immigration, and security requirements of the United States.

**Sec. 8**. *Enforcement.* (a) The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States or to a refugee who has already been admitted to the United States. Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 9**. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch official shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 10**. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern standard time on January 1, 2026.

**Sec. 11**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this proclamation shall be borne by the Department of State.

IN WITNESS WHEREOF, I have hereunto set my hand this sixteenth day of December, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

[FR Doc. 2025–23570
Filed 12–18–25; 11:15 am]
Billing code 4710–05–P

| | |
|---|---|
| **From:** | Caudill-Mirillo, Ashley B |
| **To:** | Baxter, Mark P; Parker, Kristian |
| **Cc:** | Johnson, Bobbie L; Loizeaux, Andrew B (Drew); Hussain, Haris; Schoener, Sarah L |
| **Subject:** | EO Restricting the Entry of Foreign Nationals to Protect the United States from Terrorists and Other National Security and Public Safety Threats |
| **Date:** | Thursday, June 5, 2025 10:11:23 AM |

**FOR INTERNAL USE ONLY**

Good morning,

As you likely are aware, the President issued an Executive Order yesterday that may implicate our workloads. See link: https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/.

IRAD is meeting with OCC later today to get additional information. In the interim, please temporarily pause any final approvals for listed countries in the EO. You may proceed with denials as appropriate. If you become aware of any cases that require urgent attention such as mandamuses or other sensitive adjudications that cannot be temporarily paused, please alert this group ASAP.

Note, this instruction should not be read to allow for any decisions to move forward that would be in contravention of any other executive orders or litigation such as USRAP denials, etc.

Thanks,
Ashley

**Ashley B. Caudill-Mirillo**
Acting Chief, International and Refugee Affairs Division
Refugee, Asylum, and International Operations Directorate
U.S. Citizenship and Immigration Services
Department of Homeland Security
Phone: 718-501-7192

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Proclamation 10949 of June 4, 2025**

## Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of foreign nationals into the United States, which successfully prevented national security threats from reaching our borders and which the Supreme Court upheld. In Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), I stated that it is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

I also stated that the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify such aliens before their admission or entry into the United States. The United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security.

I directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to identify countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). After completing that process, the Secretary of State determined that a number of countries remain deficient with regards to screening and vetting. Many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals.

As President, I must act to protect the national security and national interest of the United States and its people. I remain committed to engaging with those countries willing to cooperate to improve information-sharing and identity-management procedures, and to address both terrorism-related and public-safety risks. Nationals of some countries also pose significant risks of overstaying their visas in the United States, which increases burdens on immigration and law enforcement components of the United States, and often exacerbates other risks related to national security and public safety.

Some of the countries with inadequacies face significant challenges to reform efforts. Others have made important improvements to their protocols and procedures, and I commend them for these efforts. But until countries with identified inadequacies address them, members of my Cabinet have recommended certain conditional restrictions and limitations. I have considered and largely accepted those recommendations and impose the limitations

set forth below on the entry into the United States by the classes of foreign nationals identified in sections 2 and 3 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2 and 3 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security or public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share their identity and threat information with the immigration screening and vetting systems of the United States.

(c) Section 2(b) of Executive Order 14161 directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, within 60 days of the date of that order, to jointly submit to the President, through the Assistant to the President for Homeland Security, a report identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the entry or admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)).

(d) On April 9, 2025, the Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (c) of this section, recommending that entry restrictions and limitations be placed on foreign nationals of several countries. The report identified countries for which vetting and screening information is so deficient as to warrant a full suspension of admissions and countries that warrant a partial suspension of admission.

(e) In evaluating the recommendations from the Secretary of State and in determining what restrictions to impose for each country, I consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. And I further considered various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals.

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the subject countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives.

(f) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(g) I have determined to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) Sections 2 and 3 of this proclamation describe some of the identity-management or information-sharing inadequacies that led me to impose restrictions. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 5 of this proclamation:

(a) *Afghanistan*

(i) The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exit Overstay Report (''Overstay Report''), Afghanistan had a business/tourist (B–1/B–2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

(ii) The entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants is hereby fully suspended.

(b) *Burma*

(i) According to the Overstay Report, Burma had a B–1/B–2 visa overstay rate of 27.07 percent and an F, M, and J visa overstay rate of 42.17 percent. Additionally, Burma has historically not cooperated with the United States to accept back their removable nationals.

(ii) The entry into the United States of nationals of Burma as immigrants and nonimmigrants is hereby fully suspended.

(c) *Chad*

(i) According to the Overstay Report, Chad had a B–1/B–2 visa overstay rate of 49.54 percent and an F, M, and J visa overstay rate of 55.64 percent. According to the Fiscal Year 2022 Overstay Report, Chad had a B–1/B–2 visa overstay rate of 37.12 percent. The high visa overstay rate for 2022 and 2023 is unacceptable and indicates a blatant disregard for United States immigration laws.

(ii) The entry into the United States of nationals of Chad as immigrants and nonimmigrants is hereby fully suspended.

(d) *Republic of the Congo*

(i) According to the Overstay Report, the Republic of the Congo had a B–1/B–2 visa overstay rate of 29.63 percent and an F, M, and J visa overstay rate of 35.14 percent.

(ii) The entry into the United States of nationals of the Republic of the Congo as immigrants and nonimmigrants is hereby fully suspended.

(e) *Equatorial Guinea*

(i) According to the Overstay Report, Equatorial Guinea had a B–1/B–2 visa overstay rate of 21.98 percent and an F, M, and J visa overstay rate of 70.18 percent.

(ii) The entry into the United States of nationals of Equatorial Guinea as immigrants and nonimmigrants is hereby fully suspended.

(f) *Eritrea*

(i) The United States questions the competence of the central authority for issuance of passports or civil documents in Eritrea. Criminal records are not available to the United States for Eritrean nationals. Eritrea has historically refused to accept back its removable nationals. According to the Overstay Report, Eritrea had a B–1/B–2 visa overstay rate of 20.09 percent and an F, M, and J visa overstay rate of 55.43 percent.

(ii) The entry into the United States of nationals of Eritrea as immigrants and nonimmigrants is hereby fully suspended.

(g) *Haiti*

(i) According to the Overstay Report, Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent. Additionally, hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration. This influx harms American communities by creating acute risks of increased overstay rates, establishment of criminal networks, and other national security threats. As is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States.

(ii) The entry into the United States of nationals of Haiti as immigrants and nonimmigrants is hereby fully suspended.

(h) *Iran*

(i) Iran is a state sponsor of terrorism. Iran regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorism around the world, and has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Iran as immigrants and nonimmigrants is hereby suspended.

(i) *Libya*

(i) There is no competent or cooperative central authority for issuing passports or civil documents in Libya. The historical terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya as immigrants and nonimmigrants is hereby fully suspended.

(j) *Somalia*

(i) Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Terrorists use regions of Somalia as safe havens from which they plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The Government of Somalia struggles to provide governance needed to limit terrorists' freedom of movement. Additionally, Somalia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Somalia as immigrants and nonimmigrants is hereby fully suspended.

(k) *Sudan*

(i) Sudan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Overstay Report, Sudan had a B–1/B–2 visa overstay rate of 26.30 percent and an F, M, and J visa overstay rate of 28.40 percent.

(ii) The entry into the United States of nationals of Sudan as immigrants and nonimmigrants is hereby fully suspended.

(l) *Yemen*

(i) Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. The government does not have physical control over its own territory. Since January 20, 2025, Yemen has been the site of active United States military operations.

(ii) The entry into the United States of nationals of Yemen as immigrants and nonimmigrants is hereby fully suspended.

**Sec. 3.** *Partial Suspension of Entry for Nationals of Countries of Identified Concern.*

(a) *Burundi*

(i) According to the Overstay Report, Burundi had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 17.52 percent.

(ii) The entry into the United States of nationals of Burundi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Burundi to the extent permitted by law.

(b) *Cuba*

(i) Cuba is a state sponsor of terrorism. The Government of Cuba does not cooperate or share sufficient law enforcement information with the United States. Cuba has historically refused to accept back its removable nationals. According to the Overstay Report, Cuba had a B–1/B–2 visa overstay rate of 7.69 percent and an F, M, and J visa overstay rate of 18.75 percent.

(ii) The entry into the United States of nationals of Cuba as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cuba to the extent permitted by law.

(c) *Laos*

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Laos to the extent permitted by law.

(d) *Sierra Leone*

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Sierra Leone to the extent permitted by law.

(e) *Togo*

(i) According to the Overstay Report, Togo had a B–1/B–2 visa overstay rate of 19.03 percent and an F, M, and J visa overstay rate of 35.05 percent.

(ii) The entry into the United States of nationals of Togo as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Togo to the extent permitted by law.

(f) *Turkmenistan*

(i) According to the Overstay Report, Turkmenistan had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 21.74 percent.

(ii) The entry into the United States of nationals of Turkmenistan as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Turkmenistan to the extent permitted by law.

(g) *Venezuela*

(i) Venezuela lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Venezuela has historically refused to accept back its removable nationals. According to the Overstay Report, Venezuela had a B–1/B–2 visa overstay rate of 9.83 percent.

(ii) The entry into the United States of nationals of Venezuela as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Venezuela to the extent permitted by law.

**Sec. 4**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and

any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2 and 3 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) *Exceptions.* The suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2 and 3 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) immediate family immigrant visas (IR–1/CR–1, IR–2/CR–2, IR–5) with clear and convincing evidence of identity and family relationship (*e.g.,* DNA);

(vi) adoptions (IR–3, IR–4, IH–3, IH–4);

(vii) Afghan Special Immigrant Visas;

(viii) Special Immigrant Visas for United States Government employees; and

(ix) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made for certain individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**Sec. 5**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of State shall, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director for National Intelligence, devise a process to assess whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented. Within 90 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented.

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall immediately engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(c) Additionally, and in light of recent events, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall provide me an update to the review of the practices and procedures of Egypt to confirm the adequacy of its current screening and vetting capabilities.

**Sec. 6**. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT). Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States.

**Sec. 7**. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 8**. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern daylight time on June 9, 2025.

**Sec. 9**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of June, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.



[FR Doc. 2025–10669
Filed 6–9–25; 11:15 am]
Billing code 3395–F4–P

Federal Register
Vol. 90, No. 19
Thursday, January 30, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14161 of January 20, 2025

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose*. (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Proclamation 9645 of September 24, 2017**

## Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats

**By the President of the United States of America**

**A Proclamation**

In Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), on the recommendations of the Secretary of Homeland Security and the Attorney General, I ordered a worldwide review of whether, and if so what, additional information would be needed from each foreign country to assess adequately whether their nationals seeking to enter the United States pose a security or safety threat. This was the first such review of its kind in United States history. As part of the review, the Secretary of Homeland Security established global requirements for information sharing in support of immigration screening and vetting. The Secretary of Homeland Security developed a comprehensive set of criteria and applied it to the information-sharing practices, policies, and capabilities of foreign governments. The Secretary of State thereafter engaged with the countries reviewed in an effort to address deficiencies and achieve improvements. In many instances, those efforts produced positive results. By obtaining additional information and formal commitments from foreign governments, the United States Government has improved its capacity and ability to assess whether foreign nationals attempting to enter the United States pose a security or safety threat. Our Nation is safer as a result of this work.

Despite those efforts, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, has determined that a small number of countries—out of nearly 200 evaluated—remain deficient at this time with respect to their identity-management and information-sharing capabilities, protocols, and practices. In some cases, these countries also have a significant terrorist presence within their territory.

As President, I must act to protect the security and interests of the United States and its people. I am committed to our ongoing efforts to engage those countries willing to cooperate, improve information-sharing and identity-management protocols and procedures, and address both terrorism-related and public-safety risks. Some of the countries with remaining inadequacies face significant challenges. Others have made strides to improve their protocols and procedures, and I commend them for these efforts. But until they satisfactorily address the identified inadequacies, I have determined, on the basis of recommendations from the Secretary of Homeland Security and other members of my Cabinet, to impose certain conditional restrictions and limitations, as set forth more fully below, on entry into the United States of nationals of the countries identified in section 2 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in section 2 of this proclamation would be detrimental to the

interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. They enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share identity and threat information with our immigration screening and vetting systems.

(c) Section 2(a) of Executive Order 13780 directed a ''worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat.'' That review culminated in a report submitted to the President by the Secretary of Homeland Security on July 9, 2017. In that review, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States as immigrants and nonimmigrants, as well as individuals applying for any other benefit under the immigration laws, and to assess whether they are a security or public-safety threat. That baseline incorporates three categories of criteria:

(i) *Identity-management information.* The United States expects foreign governments to provide the information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be. The identity-management information category focuses on the integrity of documents required for travel to the United States. The criteria assessed in this category include whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports.

(ii) *National security and public-safety information.* The United States expects foreign governments to provide information about whether persons who seek entry to this country pose national security or public-safety risks. The criteria assessed in this category include whether the country makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States.

(iii) *National security and public-safety risk assessment.* The national security and public-safety risk assessment category focuses on national security risk indicators. The criteria assessed in this category include whether the country is a known or potential terrorist safe haven, whether it is

a participant in the Visa Waiver Program established under section 217 of the INA, 8 U.S.C. 1187, that meets all of its requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States.

(d) The Department of Homeland Security, in coordination with the Department of State, collected data on the performance of all foreign governments and assessed each country against the baseline described in subsection (c) of this section. The assessment focused, in particular, on identity management, security and public-safety threats, and national security risks. Through this assessment, the agencies measured each country's performance with respect to issuing reliable travel documents and implementing adequate identity-management and information-sharing protocols and procedures, and evaluated terrorism-related and public-safety risks associated with foreign nationals seeking entry into the United States from each country.

(e) The Department of Homeland Security evaluated each country against the baseline described in subsection (c) of this section. The Secretary of Homeland Security identified 16 countries as being ''inadequate'' based on an analysis of their identity-management protocols, information-sharing practices, and risk factors. Thirty-one additional countries were classified ''at risk'' of becoming ''inadequate'' based on those criteria.

(f) As required by section 2(d) of Executive Order 13780, the Department of State conducted a 50-day engagement period to encourage all foreign governments, not just the 47 identified as either ''inadequate'' or ''at risk,'' to improve their performance with respect to the baseline described in subsection (c) of this section. Those engagements yielded significant improvements in many countries. Twenty-nine countries, for example, provided travel document exemplars for use by Department of Homeland Security officials to combat fraud. Eleven countries agreed to share information on known or suspected terrorists.

(g) The Secretary of Homeland Security assesses that the following countries continue to have ''inadequate'' identity-management protocols, information-sharing practices, and risk factors, with respect to the baseline described in subsection (c) of this section, such that entry restrictions and limitations are recommended: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. The Secretary of Homeland Security also assesses that Iraq did not meet the baseline, but that entry restrictions and limitations under a Presidential proclamation are not warranted. The Secretary of Homeland Security recommends, however, that nationals of Iraq who seek to enter the United States be subject to additional scrutiny to determine if they pose risks to the national security or public safety of the United States. In reaching these conclusions, the Secretary of Homeland Security considered the close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS).

(h) Section 2(e) of Executive Order 13780 directed the Secretary of Homeland Security to ''submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means.'' On September 15, 2017, the Secretary of Homeland Security submitted a report to me recommending entry restrictions and limitations on certain nationals of 7 countries determined to be ''inadequate'' in providing such information and in light of other factors discussed in the report. According to the report, the recommended restrictions would help address the threats that the countries' identity-management protocols, information-sharing inadequacies, and other risk factors pose to the security and welfare of the United

States. The restrictions also encourage the countries to work with the United States to address those inadequacies and risks so that the restrictions and limitations imposed by this proclamation may be relaxed or removed as soon as possible.

(i) In evaluating the recommendations of the Secretary of Homeland Security and in determining what restrictions to impose for each country, I consulted with appropriate Assistants to the President and members of the Cabinet, including the Secretaries of State, Defense, and Homeland Security, and the Attorney General. I considered several factors, including each country's capacity, ability, and willingness to cooperate with our identity-management and information-sharing policies and each country's risk factors, such as whether it has a significant terrorist presence within its territory. I also considered foreign policy, national security, and counterterrorism goals. I reviewed these factors and assessed these goals, with a particular focus on crafting those country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. These restrictions and limitations are also needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments; and to advance foreign policy, national security, and counterterrorism objectives.

(ii) After reviewing the Secretary of Homeland Security's report of September 15, 2017, and accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to restrict and limit the entry of nationals of 7 countries found to be ''inadequate'' with respect to the baseline described in subsection (c) of this section: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. These restrictions distinguish between the entry of immigrants and nonimmigrants. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants even after national security concerns arise, which heightens the costs and dangers of errors associated with admitting such individuals. And although immigrants generally receive more extensive vetting than nonimmigrants, such vetting is less reliable when the country from which someone seeks to emigrate exhibits significant gaps in its identity-management or information-sharing policies, or presents risks to the national security of the United States. For all but one of those 7 countries, therefore, I am restricting the entry of all immigrants.

(iii) I am adopting a more tailored approach with respect to nonimmigrants, in accordance with the recommendations of the Secretary of Homeland Security. For some countries found to be ''inadequate'' with respect to the baseline described in subsection (c) of this section, I am restricting the entry of all nonimmigrants. For countries with certain mitigating factors, such as a willingness to cooperate or play a substantial role in combatting terrorism, I am restricting the entry only of certain categories of nonimmigrants, which will mitigate the security threats presented by their entry into the United States. In those cases in which future cooperation seems reasonably likely, and accounting for foreign policy, national security, and counterterrorism objectives, I have tailored the restrictions to encourage such improvements.

(i) Section 2(e) of Executive Order 13780 also provided that the ''Secretary of State, the Attorney General, or the Secretary of Homeland Security may also submit to the President the names of additional countries for which

any of them recommends other lawful restrictions or limitations deemed necessary for the security or welfare of the United States.'' The Secretary of Homeland Security determined that Somalia generally satisfies the information-sharing requirements of the baseline described in subsection (c) of this section, but its government's inability to effectively and consistently cooperate, combined with the terrorist threat that emanates from its territory, present special circumstances that warrant restrictions and limitations on the entry of its nationals into the United States. Somalia's identity-management deficiencies and the significant terrorist presence within its territory make it a source of particular risks to the national security and public safety of the United States. Based on the considerations mentioned above, and as described further in section 2(h) of this proclamation, I have determined that entry restrictions, limitations, and other measures designed to ensure proper screening and vetting for nationals of Somalia are necessary for the security and welfare of the United States.

(j) Section 2 of this proclamation describes some of the inadequacies that led me to impose restrictions on the specified countries. Describing all of those reasons publicly, however, would cause serious damage to the national security of the United States, and many such descriptions are classified.

**Sec. 2**. *Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to categorical exceptions and case-by-case waivers, as described in sections 3 and 6 of this proclamation:

(a) *Chad.*

(i) The government of Chad is an important and valuable counterterrorism partner of the United States, and the United States Government looks forward to expanding that cooperation, including in the areas of immigration and border management. Chad has shown a clear willingness to improve in these areas. Nonetheless, Chad does not adequately share public-safety and terrorism-related information and fails to satisfy at least one key risk criterion. Additionally, several terrorist groups are active within Chad or in the surrounding region, including elements of Boko Haram, ISIS-West Africa, and al-Qa'ida in the Islamic Maghreb. At this time, additional information sharing to identify those foreign nationals applying for visas or seeking entry into the United States who represent national security and public-safety threats is necessary given the significant terrorism-related risk from this country.

(ii) The entry into the United States of nationals of Chad, as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(b) *Iran.*

(i) Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals subject to final orders of removal from the United States. The Department of State has also designated Iran as a state sponsor of terrorism.

(ii) The entry into the United States of nationals of Iran as immigrants and as nonimmigrants is hereby suspended, except that entry by such nationals under valid student (F and M) and exchange visitor (J) visas is not suspended, although such individuals should be subject to enhanced screening and vetting requirements.

(c) *Libya.*

(i) The government of Libya is an important and valuable counterterrorism partner of the United States, and the United States Government looks forward to expanding on that cooperation, including in the areas of immigration and border management. Libya, nonetheless, faces significant challenges in sharing several types of information, including public-safety

and terrorism-related information necessary for the protection of the national security and public safety of the United States. Libya also has significant inadequacies in its identity-management protocols. Further, Libya fails to satisfy at least one key risk criterion and has been assessed to be not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States. The substantial terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya, as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(d) *North Korea.*

(i) North Korea does not cooperate with the United States Government in any respect and fails to satisfy all information-sharing requirements.

(ii) The entry into the United States of nationals of North Korea as immigrants and nonimmigrants is hereby suspended.

(e) *Syria.*

(i) Syria regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorist threats, and has been designated by the Department of State as a state sponsor of terrorism. Syria has significant inadequacies in identity-management protocols, fails to share public-safety and terrorism information, and fails to satisfy at least one key risk criterion.

(ii) The entry into the United States of nationals of Syria as immigrants and nonimmigrants is hereby suspended.

(f) *Venezuela.*

(i) Venezuela has adopted many of the baseline standards identified by the Secretary of Homeland Security and in section 1 of this proclamation, but its government is uncooperative in verifying whether its citizens pose national security or public-safety threats. Venezuela's government fails to share public-safety and terrorism-related information adequately, fails to satisfy at least one key risk criterion, and has been assessed to be not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States. There are, however, alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela. As a result, the restrictions imposed by this proclamation focus on government officials of Venezuela who are responsible for the identified inadequacies.

(ii) Notwithstanding section 3(b)(v) of this proclamation, the entry into the United States of officials of government agencies of Venezuela involved in screening and vetting procedures—including the Ministry of the Popular Power for Interior, Justice and Peace; the Administrative Service of Identification, Migration and Immigration; the Scientific, Penal and Criminal Investigation Service Corps; the Bolivarian National Intelligence Service; and the Ministry of the Popular Power for Foreign Relations—and their immediate family members, as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended. Further, nationals of Venezuela who are visa holders should be subject to appropriate additional measures to ensure traveler information remains current.

(g) *Yemen.*

(i) The government of Yemen is an important and valuable counterterrorism partner, and the United States Government looks forward to expanding that cooperation, including in the areas of immigration and border management. Yemen, nonetheless, faces significant identity-management challenges, which are amplified by the notable terrorist presence within its territory. The government of Yemen fails to satisfy critical identity-management requirements, does not share public-safety and terrorism-related information adequately, and fails to satisfy at least one key risk criterion.

(ii) The entry into the United States of nationals of Yemen as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(h) *Somalia.*

(i) The Secretary of Homeland Security's report of September 15, 2017, determined that Somalia satisfies the information-sharing requirements of the baseline described in section 1(c) of this proclamation. But several other considerations support imposing entry restrictions and limitations on Somalia. Somalia has significant identity-management deficiencies. For example, while Somalia issues an electronic passport, the United States and many other countries do not recognize it. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. Terrorists use under-governed areas in northern, central, and southern Somalia as safe havens from which to plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The State Department's 2016 Country Reports on Terrorism observed that Somalia has not sufficiently degraded the ability of terrorist groups to plan and mount attacks from its territory. Further, despite having made significant progress toward formally federating its member states, and its willingness to fight terrorism, Somalia continues to struggle to provide the governance needed to limit terrorists' freedom of movement, access to resources, and capacity to operate. The government of Somalia's lack of territorial control also compromises Somalia's ability, already limited because of poor record-keeping, to share information about its nationals who pose criminal or terrorist risks. As a result of these and other factors, Somalia presents special concerns that distinguish it from other countries.

(ii) The entry into the United States of nationals of Somalia as immigrants is hereby suspended. Additionally, visa adjudications for nationals of Somalia and decisions regarding their entry as nonimmigrants should be subject to additional scrutiny to determine if applicants are connected to terrorist organizations or otherwise pose a threat to the national security or public safety of the United States.

**Sec. 3**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and any waiver under subsection (c) of this section, the suspensions of and limitations on entry pursuant to section 2 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date under section 7 of this proclamation;

(ii) do not have a valid visa on the applicable effective date under section 7 of this proclamation; and

(iii) do not qualify for a visa or other valid travel document under section 6(d) of this proclamation.

(b) *Exceptions.* The suspension of entry pursuant to section 2 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any foreign national who is admitted to or paroled into the United States on or after the applicable effective date under section 7 of this proclamation;

(iii) any foreign national who has a document other than a visa—such as a transportation letter, an appropriate boarding foil, or an advance parole document—valid on the applicable effective date under section 7 of this proclamation or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission;

(iv) any dual national of a country designated under section 2 of this proclamation when the individual is traveling on a passport issued by a non-designated country;

(v) any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C–2 visa for travel to the United Nations, or G–1, G–2, G–3, or G–4 visa; or

(vi) any foreign national who has been granted asylum by the United States; any refugee who has already been admitted to the United States; or any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

(c) *Waivers.* Notwithstanding the suspensions of and limitations on entry set forth in section 2 of this proclamation, a consular officer, or the Commissioner, United States Customs and Border Protection (CBP), or the Commissioner's designee, as appropriate, may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate and consistent with subsections (i) through (iv) of this subsection. The Secretary of State and the Secretary of Homeland Security shall coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants.

(i) A waiver may be granted only if a foreign national demonstrates to the consular officer's or CBP official's satisfaction that:

(A) denying entry would cause the foreign national undue hardship;

(B) entry would not pose a threat to the national security or public safety of the United States; and

(C) entry would be in the national interest.

(ii) The guidance issued by the Secretary of State and the Secretary of Homeland Security under this subsection shall address the standards, policies, and procedures for:

(A) determining whether the entry of a foreign national would not pose a threat to the national security or public safety of the United States;

(B) determining whether the entry of a foreign national would be in the national interest;

(C) addressing and managing the risks of making such a determination in light of the inadequacies in information sharing, identity management, and other potential dangers posed by the nationals of individual countries subject to the restrictions and limitations imposed by this proclamation;

(D) assessing whether the United States has access, at the time of the waiver determination, to sufficient information about the foreign national to determine whether entry would satisfy the requirements of subsection (i) of this subsection; and

(E) determining the special circumstances that would justify granting a waiver under subsection (iv)(E) of this subsection.

(iii) Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa adjudication process will be effective both for the issuance of a visa and for any subsequent entry on that visa, but will leave unchanged all other requirements for admission or entry.

(iv) Case-by-case waivers may not be granted categorically, but may be appropriate, subject to the limitations, conditions, and requirements set forth under subsection (i) of this subsection and the guidance issued under subsection (ii) of this subsection, in individual circumstances such as the following:

(A) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the applicable effective date under section 7 of this proclamation, seeks to reenter the United States to resume that activity, and the denial of reentry would impair that activity;

(B) the foreign national has previously established significant contacts with the United States but is outside the United States on the applicable effective date under section 7 of this proclamation for work, study, or other lawful activity;

(C) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry would impair those obligations;

(D) the foreign national seeks to enter the United States to visit or reside with a close family member (*e.g.,* a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry would cause the foreign national undue hardship;

(E) the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

(F) the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee), and the foreign national can document that he or she has provided faithful and valuable service to the United States Government;

(G) the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. 288 *et seq.,* traveling for purposes of conducting meetings or business with the United States Government, or traveling to conduct business on behalf of an international organization not designated under the IOIA;

(H) the foreign national is a Canadian permanent resident who applies for a visa at a location within Canada;

(I) the foreign national is traveling as a United States Government–sponsored exchange visitor; or

(J) the foreign national is traveling to the United States, at the request of a United States Government department or agency, for legitimate law enforcement, foreign policy, or national security purposes.

**Sec. 4**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of Homeland Security shall, in consultation with the Secretary of State, devise a process to assess whether any suspensions and limitations imposed by section 2 of this proclamation should be continued, terminated, modified, or supplemented. The process shall account for whether countries have improved their identity-management and information-sharing protocols and procedures based on the criteria set forth in section 1 of this proclamation and the Secretary of Homeland Security's report of September 15, 2017. Within 180 days of the date of this proclamation, and every 180 days thereafter, the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Director of National Intelligence, and other appropriate heads of agencies, shall submit a report with recommendations to the President, through appropriate Assistants to the President, regarding the following:

(i) the interests of the United States, if any, that continue to require the suspension of, or limitations on, the entry on certain classes of nationals of countries identified in section 2 of this proclamation and whether the restrictions and limitations imposed by section 2 of this proclamation should be continued, modified, terminated, or supplemented; and

(ii) the interests of the United States, if any, that require the suspension of, or limitations on, the entry of certain classes of nationals of countries not identified in this proclamation.

(b) The Secretary of State, in consultation with the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, the Director of National Intelligence, and the head of any other executive department or agency (agency) that the Secretary of State deems appropriate, shall engage the countries listed in section 2 of this proclamation, and any other countries that have information-sharing, identity-management, or risk-factor deficiencies as practicable, appropriate, and consistent with the foreign policy, national security, and public-safety objectives of the United States.

(c) Notwithstanding the process described above, and consistent with the process described in section 2(f) of Executive Order 13780, if the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, and the Director of National Intelligence, determines, at any time, that a country meets the standards of the baseline described in section 1(c) of this proclamation, that a country has an adequate plan to provide such information, or that one or more of the restrictions or limitations imposed on the entry of a country's nationals are no longer necessary for the security or welfare of the United States, the Secretary of Homeland Security may recommend to the President the removal or modification of any or all such restrictions and limitations. The Secretary of Homeland Security, the Secretary of State, or the Attorney General may also, as provided for in Executive Order 13780, submit to the President the names of additional countries for which any of them recommends any lawful restrictions or limitations deemed necessary for the security or welfare of the United States.

**Sec. 5**. *Reports on Screening and Vetting Procedures.* (a) The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Director of National Intelligence, and other appropriate heads of agencies shall submit periodic reports to the President, through appropriate Assistants to the President, that:

(i) describe the steps the United States Government has taken to improve vetting for nationals of all foreign countries, including through improved collection of biometric and biographic data;

(ii) describe the scope and magnitude of fraud, errors, false information, and unverifiable claims, as determined by the Secretary of Homeland Security on the basis of a validation study, made in applications for immigration benefits under the immigration laws; and

(iii) evaluate the procedures related to screening and vetting established by the Department of State's Bureau of Consular Affairs in order to enhance the safety and security of the United States and to ensure sufficient review of applications for immigration benefits.

(b) The initial report required under subsection (a) of this section shall be submitted within 180 days of the date of this proclamation; the second report shall be submitted within 270 days of the first report; and reports shall be submitted annually thereafter.

(c) The agency heads identified in subsection (a) of this section shall coordinate any policy developments associated with the reports described in subsection (a) of this section through the appropriate Assistants to the President.

**Sec. 6**. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations, including those that provide an opportunity for individuals to enter the United States on the basis of a credible claim of fear of persecution or torture.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date under section 7 of this proclamation shall be revoked pursuant to this proclamation.

(d) Any individual whose visa was marked revoked or marked canceled as a result of Executive Order 13769 of January 27, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), shall be entitled to a travel document confirming that the individual is permitted to travel to the United States and seek entry under the terms and conditions of the visa marked revoked or marked canceled. Any prior cancellation or revocation of a visa that was solely pursuant to Executive Order 13769 shall not be the basis of inadmissibility for any future determination about entry or admissibility.

(e) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture. Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 7**. *Effective Dates.* Executive Order 13780 ordered a temporary pause on the entry of foreign nationals from certain foreign countries. In two cases, however, Federal courts have enjoined those restrictions. The Supreme Court has stayed those injunctions as to foreign nationals who lack a credible claim of a bona fide relationship with a person or entity in the United States, pending its review of the decisions of the lower courts.

(a) The restrictions and limitations established in section 2 of this proclamation are effective at 3:30 p.m. eastern daylight time on September 24, 2017, for foreign nationals who:

(i) were subject to entry restrictions under section 2 of Executive Order 13780, or would have been subject to the restrictions but for section 3 of that Executive Order, and

(ii) lack a credible claim of a bona fide relationship with a person or entity in the United States.

(b) The restrictions and limitations established in section 2 of this proclamation are effective at 12:01 a.m. eastern daylight time on October 18, 2017, for all other persons subject to this proclamation, including nationals of:

(i) Iran, Libya, Syria, Yemen, and Somalia who have a credible claim of a bona fide relationship with a person or entity in the United States; and

(ii) Chad, North Korea, and Venezuela.

**Sec. 8**. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 9**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-fourth day of September, in the year of our Lord two thousand seventeen, and of the Independence of the United States of America the two hundred and forty-second.



[FR Doc. 2017–20899
Filed 9–26–17; 11:15 am]
Billing code 3295–F7–P

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| A.A., *et al.*,<br>*Plaintiffs*,<br>v.<br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br>*Defendants.* | No. 1:25-cv-1819-AJT-WEF |

## INDEX FOR ADMINISTRATIVE RECORD


1. Cable, *Updated Guidance for Following-to-Join Asylee V92/YY Processing Related to the Suspension of Entry to the United States of Aliens from Countries Designated Under Presidential Proclamation 10949*, 25 STATE 73478……STATE00001

**UNCLASSIFIED**

SBU

| | |
|---|---|
| **MRN:** | 25 STATE 73478 |
| **Date/DTG:** | Jul 24, 2025 / 240104Z JUL 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, PREF |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 55146 |
| | B) 25 STATE 55754 |
| **Subject:** | Updated Guidance for Following-to-Join Asylee V92/YY Processing Related to the Suspension of Entry to the United States of Aliens from Countries Designated under Presidential Proclamation 10949 |

1. (SBU) This is an Action Request. Please see paragraph 3.

2. (SBU) **Summary:** Presidential Proclamation (PP) 10949 "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats" (hereafter referred to as "PP 10949") issued on June 4, 2025, and effective on June 9, 2025, fully or partially suspended entry to the United States of aliens from 19 countries, pursuant to section 212(f) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f)) (Ref A). DHS determined that Following-to-Join Asylee (FTJ-A) V92/YY beneficiaries from suspended countries are subject to PP 10949. As such, consular sections should follow previous guidance related to designated nationalities (Ref A) as well as the FTJ-A specific guidance outlined below. **End Summary**.

3. (SBU) **Action Request:** Posts should process all FTJ-A beneficiaries who are nationals of the countries designated under PP 10949 as per previous guidance for immigrant visa applicants (Ref A). For any such FTJ-A beneficiary whose case was ready to issue but an adjudicator refused under INA 221(g) solely pending further guidance from CA, the adjudicator should now overcome the INA 221(g) refusal and refuse the applicant under INA 212(f) using code F251 per prior guidance (Ref A). Posts should also follow previous guidance on National Interest Exceptions when processing these cases (Ref B).

4. (SBU) **Inquiries:** Posts must refer any U.S. media inquiries regarding E.O.s to CA-Press@state.gov, and congressional inquiries regarding the E.O. to ConsularOnTheHill@state.gov. Posts may respond to requests from international media regarding E.O.s using CA's cleared press guidance located on CA Web (linked here), copying CA-Press@state.gov.

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**

SBU

Outlook

## [External] [DHS Response] Consular Affairs/Visa Office Clearance Request by 3PM, Monday July 14, 2025: (SBU) CA/VO ALDAC - Updated FTJR Guidance

**From** [redacted]@hq.dhs.gov>

**Date** Tue 7/15/2025 8:47 AM

**To** [redacted]@state.gov>;[redacted]@hq.dhs.gov>

**Cc** [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@state.gov>;[redacted]@state.gov>

Good morning,

DHS clears without comment. Thank you for the opportunity to review.

DHS Exec Sec

---

**From:** [redacted]@state.gov>
**Sent:** Friday, July 11, 2025 6:12 PM
**To:** [redacted]@hq.dhs.gov>
**Cc:** [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@uscis.dhs.gov>; [redacted]@uscis.dhs.gov>; [redacted]@uscis.dhs.gov>; [redacted]@state.gov>
**Subject:** Re: Consular Affairs/Visa Office Clearance Request by 3PM, Monday July 14, 2025: (SBU) CA/VO ALDAC - Updated FTJR Guidance

This email is from an external US Government agency.

Also attaching hard copies in case links below do not open.

Thank you again!
[redacted]

Special Assistant to the Deputy Assistant Secretary for Visa Services
Office Phone: [redacted]

Consular Affairs – Visa Office
U.S. DEPARTMENT of STATE

SENSITIVE BUT UNCLASSIFIED

---

**From:** [redacted]@state.gov>
**Sent:** Friday, July 11, 2025 6:09 PM
**To:** [redacted]@hq.dhs.gov>
**Cc:** [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@state.gov>; [redacted]@uscis.dhs.gov> [redacted]@uscis.dhs.gov [redacted]@uscis.dhs.gov>; [redacted]@uscis.dhs.gov [redacted]@uscis.dhs.gov>; [redacted]@state.gov>
**Subject:** Consular Affairs/Visa Office Clearance Request by 3PM, Monday July 14, 2025: (SBU) CA/VO ALDAC - Updated FTJR Guidance

Good evening colleagues,

Consular Affairs Visa Office requests your review and clearance on the below ALDAC Cable to the field by 3PM on Monday, July 14. Please let us know if you have any questions. Thank you so much!

For clearance: (SBU) ALDAC - Updated FTJR Guidance (1).docx

Reference cables mentioned in the above ALDAC:

- Updated Guidance for Following-to-Join Refugees (FTJ-Rs) V93-ZZ Following Clarification from the United States Court of Appeals for the Ninth Circuit.pdf
- Suspension of the Entry to the United States of Aliens from Designated Countries Pursuant to Section 212(f) of the INA (8 U.S.C. 1182(f)).pdf
- National Interest Exceptions (NIEs) for the Suspension of the Entry to the United States of Aliens from Designated Countries Pursuant to Section 212(f) of the Immigration and Nationality Act (8 U.S.C. 1182(f)).pdf

PII [redacted]
CA/VO Special Assistant
PII [redacted]@state.gov

Special Assistant to the Deputy Assistant Secretary for Visa Services
Office Phone: PII [redacted]

Consular Affairs – Visa Office
U.S. DEPARTMENT of STATE

SENSITIVE BUT UNCLASSIFIED