**No. 26-2119**

# In the United States Court of Appeals for the Fourth Circuit

AA ET AL.,

Appellees,

*v.*

UNITED STATES DEPARTMENT OF STATE ET AL.,

Appellants.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA (NO. 1:25-CV-1819) (THE HONORABLE ANTHONY J. TRENGA)*

## BRIEF OF APPELLEES

Ghita Schwarz
Guadalupe Aguirre
Pedro Sepulveda
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Fl.
New York, NY 10004
Telephone: (516) 838-1655

Ryan T. Scarborough
William P. Ashworth
Danielle J. Barondess
Lindsay P. Hannibal
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000

# TABLE OF CONTENTS

INTRODUCTION ........ 1
STATEMENT OF THE CASE ........ 4
I. The Derivative Asylum Process ........ 4
II. Relevant Executive Actions and Agency Implementation ........ 5
III. Procedural History ........ 7
STANDARD OF REVIEW ........ 14
SUMMARY OF ARGUMENT ........ 15
ARGUMENT ........ 18
I. The District Court Correctly Held That the State Department's Policy Is Unlawful. ........ 18
A. Appellees' claims are reviewable and justiciable. ........ 18
1. The doctrine of consular non-reviewability does not bar review of Appellees' claims. ........ 19
2. The government's categorical application of the Proclamations to derivative asylees is reviewable under the APA. ........ 24
B. The Proclamations' asylum exemptions apply to derivative asylees. ........ 28
1. At minimum, I-730 beneficiaries located outside the United States are seeking asylum. ........ 28
2. I-730 beneficiaries accrue asylum status when USCIS approves an I-730 petition. ........ 36
C. The government's application of the Proclamations to derivative asylees violates due process. ........ 38
1. Appellees have established valid procedural due process violations. ........ 38
2. The Proclamations are unconstitutionally vague as applied. ........ 42
II. Vacatur Is the Well-Established and Appropriate Remedy ........ 44

A. The APA authorizes vacatur. .......... 44

1. Section 706(2)'s text clearly instructs courts to vacate unlawful agency action. .......... 46

2. The Supreme Court, lower courts, and Congress consistently treat vacatur as the ordinary APA remedy that extends beyond the parties. .......... 49

B. The government's approach would create the asymmetry and confusion that Congress sought to avoid. .......... 55

C. Vacatur is not subject to "traditional" equitable principles. .......... 57

CONCLUSION .......... 60

# TABLE OF AUTHORITIES

Page

## CASES

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ....................................53

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014)..................44

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
796 F. Supp. 3d 66 (D. Md. 2025)..........................................................52, 57

*Asylum Seeker Advoc. Project v. Exec. Off. for Immigr. Rev.*,
2026 WL 2833568 (D. Md. Sept. 22, 2026) ..............................................52

*Azarmanesh v. Bondi*, 2025 WL 965955 (N.D. Cal. Mar. 31, 2025) ...............34

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) ..................................................................................55

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)................................................50

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024)....................44, 51

*Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979) ................................................54

*Casa de Md. v. U.S. Dep't of Homeland Sec.*,
924 F.3d 684 (4th Cir. 2019)..................................................................16, 27

*Cela v. Garland*, 75 F.4th 355 (4th Cir. 2023)................................................34

*City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025).................52

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)..........43

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ............................................................................*passim*

*D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016) ..............................................42

Page

Cases—continued:

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) .......................................24

*Dep't of State v. Muñoz*, 602 U.S. 899 (2024) ........................................... *passim*

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ................................58

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ..............................42

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ..........................................59

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ...............................................................................60

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ...................................51

*Hart v. Sansom*, 110 U.S. 151 (1884) ...............................................................58

*Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282 (4th Cir. 2022) ...................16, 27

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) .................................................34

*Int'l Refugee Assistance Project v. Trump*,
883 F.3d 233 (4th Cir. 2018) ..........................................................20, 25

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
761 F.2d 798 (D.C. Cir. 1985) ..................................................................22

*Kerry v. Din*, 576 U.S. 86 (2015) ..................................................10, 40, 41

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016) ..................58

*Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) .........................................34

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs.*, 45 F.3d 469 (D.C. Cir. 1995) .............................25

Page

Cases—continued:

*Make the Rd. N.Y. v. Noem*,
2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ........................................47, 51

*Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339 (2026)..................57

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ....................................................41

*Monessen Sw. Ry. v. Morgan*, 486 U.S. 330 (1988) ........................................54

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .........................59

*Mulligan v. Schultz*, 848 F.2d 655 (5th Cir. 1988) ..........................................20

*Mullin v. Al Otro Lado*, 609 U.S. 258 (2026) ..........................................*passim*

*Mullin v. Doe*, 609 U.S. 324 (2026) ...........................................................16, 23

*Muth v. United States*, 1 F.3d 246 (4th Cir. 1993) ..........................................25

*Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*,
991 F.3d 577 (4th Cir. 2021)...........................................................................14

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
522 U.S. 479 (1998) ................................................................................*passim*

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .............................................................................50, 51

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) .................................................................49, 56

*Nken v. Holder*, 556 U.S. 418 (2009)...............................................................58

*O'Hara v. Nika Tech., Inc.*, 878 F.3d 470 (4th Cir. 2017) ...............................36

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019)...................................59, 60

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009)...........................................................................15

Page

Cases—continued:

*Olim v. Wakinekona*, 461 U.S. 238 (1983) ....................39

*Palmer v. Liberty Univ., Inc.*, 72 F.4th 52 (4th Cir. 2023) ....................38

*Patel v. Reno*, 134 F.3d 929 (9th Cir. 1997) ....................20

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
588 U.S. 1 (2019) ....................56

*Perkins Coie LLP v. U.S. Dep't of Just.*,
783 F. Supp. 3d 105 (D.D.C. 2025) ....................43

*Pietersen v. U.S. Dep't of State*, 138 F.4th 552 (D.C. Cir. 2025) ....................*passim*

*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985) ....................42

*Reyna v. Hott*, 2018 WL 3551558 (E.D. Va. Mar. 20, 2018) ....................41

*Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999) ....................26

*Sierra Club v. U.S. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018) ....................45, 52

*Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) ....................52

*Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021) ....................59

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) ....................52

*Thigpen v. Roberts*, 468 U.S. 27 (1984) ....................36

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ....................*passim*

*Trump v. Hawaii*, 585 U.S. 667 (2018) ....................3, 26

*United States v. Gomez*, 960 F.3d 173 (5th Cir. 2020) ....................49

*United States v. Texas*, 599 U.S. 670 (2023) ....................48, 51

*Virginia v. Browner*, 80 F.3d 869 (4th Cir. 1996) ....................29, 49

Page

Cases—continued:

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .......................................60

*Wilkinson v. Austin*, 545 U.S. 209 (2005) ....................................................38

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ....................................................40

*Yang v. INS*, 79 F.3d 932 (9th Cir. 1996) ....................................................34

## STATUTES, REGULATIONS, AND RULES

Administrative Procedure Act, 5 U.S.C.
§ 551 ........................................................................................46, 59
§ 701 ..............................................................................................26
§ 702 ..................................................................................13, 24, 53
§ 703 ........................................................................................*passim*
§ 705 ..............................................................................................47
§ 706 ........................................................................................*passim*

6 U.S.C. § 271 .....................................................................................36

Immigration and Nationality Act, 8 U.S.C.
§ 1157 ............................................................................................30
§ 1158 ......................................................................................*passim*
§ 1182 ......................................................................................*passim*
§ 1254a ..........................................................................................23

8 C.F.R.
§ 208.21 ...................................................................................*passim*
§ 208.24 ...................................................................................31, 40

Act of Oct. 21, 1976, Pub. L. No. 94-574, § 1, 90 Stat. 2721, 2721-22 .............53

Exec. Order No. 13780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) ........................5, 36

Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 27, 2017) .....................6, 35

Proclamation No. 10949, 90 Fed. Reg. 24,497 (June 10, 2025) ..............*passim*

Proclamation No. 10998, 90 Fed. Reg. 59,717 (Dec. 19, 2025)................*passim*

Fed. R. Civ. P. 2 .......................................................................................48

**OTHER AUTHORITIES**

*AA v. U.S. Dep't of State*, No. 1:25-cv-1819 (E.D. Va.) ..............................4, 5, 9

Brief for Professor Mila Sohoni as Amica Curiae in Support of Respondents, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) (Nos. 19-431, 19-454), 2020 WL 1877916.........................................................................*passim*

Docket, *U.S. Dep't of Health & Human Servs. v. Tex. Med. Ass'n*, No. 26-491, available at https://perma.cc/C3SD-4RY7 ................................45

H.R. Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653 ...........................................................................................25

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) ..................................................................58

Kathryn Kimball Mizelle, *To Vacate or Not to Vacate*, Harv. J.L. & Pub. Pol'y Per Curiam 1 (Fall 2023) ............................................................59

Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2304 (2024) .........................................................................48, 54

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020)..............................................................49

Pet. for Writ of Cert., *U.S. Dep't of Health & Human Servs. v. Tex. Med. Ass'n*, No. 26-491 (U.S. Oct. 14, 2026), available at https://perma.cc/DV7Y-ZL9F .......................................................................44

S. Rep. No. 79-752 (1945)..........................................................................53

"Set Aside", Black's Law Dictionary (12th ed. 2024) .......................................46

"Set Aside", Black's Law Dictionary 1537 (4th ed. 1951) .................................46

"Set Aside", Black's Law Dictionary 1612 (3d ed. 1933)..................................46

"Set Aside", Bouvier's Law Dictionary 1103 (W. Baldwin ed. 1926) .............47

USCIS Glossary, "Asylee",
available at https://perma.cc/7BYE-XHUE ............................................33

USCIS Policy Manual, Vol. 4, Part C, available at
https://perma.cc/W946-8CUC (last visited Nov. 12, 2026) ......................4, 37

U.S. Department of State Foreign Affairs Manual, 9 FAM
202.2 ........................................................................................................35
203.2 ........................................................................................................33
203.5 ..................................................................................................*passim*

## INTRODUCTION

When the President issued proclamations banning entry of nationals from certain countries into the United States, he expressly exempted asylees and individuals seeking asylum. Yet for a year and a half, federal agencies have implemented a policy that separates U.S.-based asylum holders from their spouses and children, who seek and are granted that same asylum status under statute. The plain language of the exemption to the entry ban forecloses that result, and this Court should reject the government's contrary reading.

Proclamations 10949 and 10998 state that they "shall not apply to an individual who has been granted asylum by the United States" and shall not "be construed to limit the ability of an individual to seek asylum." Proclamation No. 10949 § 6(d), 90 Fed. Reg. 24,497, 24,504 (June 10, 2025); Proclamation No. 10998 § 8(d), 90 Fed. Reg. 59,717, 59,728 (Dec. 19, 2025). Appellees do not challenge the President's power to suspend the entry of foreign nationals from certain countries under Section 212(f) of the Immigration and Nationality Act, and the judgment below leaves that power intact. They ask only that the State Department honor the Proclamations' plain terms.

Congress created the "follow to join" pathway so that an asylee's spouse and children may "be granted the same status" and reunite with their family in the United States. 8 U.S.C. § 1158(b)(3)(A). Appellees are seven Afghan asylees who worked alongside U.S. forces in Afghanistan and fled after the Taliban seized power ("Principal Appellees"), and their wives and children ("Derivative Appellees"). JA96–108. USCIS approved each family's I-730 petition, and five families[1] then made dangerous, expensive journeys to U.S. embassies abroad for consular processing and to obtain the necessary travel documents to reunite with their spouses and fathers in the United States. Consular officers found every one of them "otherwise eligible" to travel yet refused them for one reason: the State Department's policy treating the Proclamations as barring derivative asylees from entry. JA121–124, JA126. The district court held this policy unlawful under the Administrative Procedure Act, ordered individualized relief tailored to each family's point in the process, and vacated the policy.

The federal agencies' application of the Proclamations also violates the Constitution. A directive that exempts asylees on its face, yet is enforced to

[1] The other two Appellee families were still waiting for their interviews with a U.S. embassy to be scheduled when Appellees commenced this case.

exclude family members of asylees who seek or are granted the same status, fails to give fair notice of what it prohibits and invites arbitrary enforcement, which are the hallmarks of a rule void for vagueness. And withholding a congressionally conferred path to family reunification based on an unannounced, atextual agency interpretation denies these families the fair process that due process requires.

On appeal, the government again recasts this case as an assault on executive power, invoking *Trump v. Hawaii*, 585 U.S. 667 (2018), and warning that the district court's judgment "essentially forc[es]" admissions into the United States "despite the President's determination." Appellants' Br. 1 [hereinafter "App. Br."]. Not so. The judgment does not second-guess any presidential finding, override any national-security judgment, or require the admission of anyone. It requires only that the State Department apply the Proclamations as the President wrote them, and it leaves the government "free to conduct lawful screening and apply other grounds of ineligibility as it has always done." Dkt. 20 at 8 (Agee, J., concurring). Far from limiting the President's authority, the district court judgment gives effect to his words by ensuring that federal agencies act in a manner consistent with the plain text of the Proclamations. The judgment should be affirmed.

## STATEMENT OF THE CASE

### I. The Derivative Asylum Process

Congress created the "follow to join" derivative asylum pathway in Section 208 of the Immigration and Nationality Act ("INA"), which provides that the "spouse or child" of an asylum-holder, or "principal asylee," may "be granted the same status" if "following to join" that family member in the United States. 8 U.S.C. § 1158(b)(3)(A). Family members seek "derivative" asylum status through an I-730 petition filed with USCIS, which has sole discretion to approve it. 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.21(d); 9 FAM 203.5-3(a).

Once USCIS approves the petition, its action on the matter is "complete." JA111.[2] If the derivative asylee is in a country where USCIS has no field office, USCIS forwards the petition to a State Department embassy or consulate for a "travel eligibility determination." USCIS Policy Manual, Vol. 4, Part C, Ch. 5; *see* JA111. In making that determination, the State Department has no authority or discretion to decide derivative asylum status or to reject an approved I-730 petition. *See* 9 FAM 203.5-3(a), 203.5-10;

[2] The government adopted in full the facts stated in Appellees' Complaint and Motion for Summary Judgment. Defs.' Mot. Summ. J. at 2, *AA v. U.S. Dep't of State*, No. 1:25-cv-1819 (E.D. Va.), Dkt. No. 121.

JA115. The State Department's role is limited to an individualized determination of the derivative asylee's eligibility to travel to the United States based on identity, the qualifying relationship with the principal asylee, and any statutory bars or grounds of inadmissibility (in other words, criteria that make an individual ineligible for admission into the United States notwithstanding an approved visa or petition). 9 FAM 203.5-7; JA113. The State Department is required to issue the relevant travel documents for entry into the United States—i.e., boarding foils—to any I-730 beneficiary who establishes identity and relationship to the principal asylee and who is not subject to any bar or inadmissibility. JA115; Pls.' Mot. Summ. J. at 3, *AA v. U.S. Dep't of State*, No. 1:25-cv-1819 (E.D. Va.), Dkt. No. 111.

## II. Relevant Executive Actions and Agency Implementation

During his first term, President Trump issued a series of entry bans for certain foreign nationals pursuant to his authority under INA Section 212(f), 8 U.S.C. § 1182(f). Each specifically exempted asylees and individuals seeking asylum, stating that it did not apply "to any foreign national who has been granted asylum" and "shall not be construed to limit the ability of an individual to seek asylum." Exec. Order No. 13780 §§ 3(b)(vi), 12(e), 82 Fed. Reg. 13,209, 13,214, 13,218 (Mar. 9, 2017); Proclamation No. 9645 §§ 3(b)(vi), 6(e), 82 Fed. Reg. 45,161, 45,171 (Sept. 27, 2017); JA116–117. Contrary to its

current position, the government interpreted each to permit derivative asylees to enter the United States. JA116–117.

Four months into his second term, President Trump issued another entry ban, Proclamation 10949, which fully restricted entry into the United States by nationals of twelve countries, including Afghanistan. Proclamation No. 10949 §§ 1(f), 2(a), 90 Fed. Reg. at 24,499; JA117. Like the first-term entry bans, and using identical language, Proclamation 10949 exempted asylees and individuals seeking asylum, stating that it would not apply to "an individual who has been granted asylum by the United States" and that it shall not "be construed to limit the ability of an individual to seek asylum." Proclamation No. 10949 § 6(d), 90 Fed. Reg. at 24,504; JA118.

On June 6, 2025, two days after the President issued Proclamation 10949, the State Department sent guidance to all embassies and consulates on processing affected applications. JA284. Consular officers were directed to "first determine whether the applicant is otherwise eligible for a visa under the INA, without regard to" the Proclamation. JA288. If an applicant was "otherwise eligible" but subject to the Proclamation, consular officers were informed that they "must" refuse the applicant under INA Section 212(f). JA289. Despite the Proclamation's express exemption for asylees and those

seeking asylum, the government began refusing boarding foils to "otherwise eligible" derivative asylees based solely on the Proclamation. *See* JA116–117, JA354–355.

On December 16, 2025, President Trump issued a second entry ban, Proclamation 10998, which continued and modified the restrictions imposed by Proclamation 10949, including the complete suspension of entry by nationals of certain countries, including Afghanistan. Proclamation 10998 § 2(a), 90 Fed. Reg. at 59,722. Proclamation 10998 contains an identical exemption for asylees and individuals seeking asylum and remains in effect as of this filing. *Id.* § 8(d), 90 Fed. Reg. at 59,728.

## III. Procedural History

Appellees are individual members of seven Afghan families. JA90; JA91. The Principal Appellee in each family was granted asylum in the United States after having supported U.S. forces in Afghanistan and entering the United States through a grant of humanitarian parole when the Taliban seized Afghanistan in 2021. JA91–92. Principal Appellees were forced to leave behind Derivative Appellees after fleeing Afghanistan. JA96–108. USCIS approved each Principal Appellee's I-730 petition for each Derivative Appellee. *Id.*

The Derivative Appellees of the U.S.-based Principal Appellees AA, BB, CC, DD, and EE attended consular interviews in June 2025 or later, after making dangerous and expensive trips to third countries with a U.S. embassy presence. JA98, JA100, JA102, JA104–105, JA121–125. After the interviews, these Derivative Appellees were all deemed "eligible" to travel to the United States but refused boarding foils under the State Department's erroneous application of Proclamation 10949 to derivative asylees. JA121–124, JA126; Pls.' Mot. Summ. J. at 6–7. These were not individualized decisions. Derivative Appellees received boilerplate form notices stating that they had been found ineligible under Section 212(f) of the INA and that a national interest exception "will not be granted." JA120–124, JA126. One refusal letter was dated three days before its interview. JA123. Another had "no date, no addressee, no case number, and no signature from a consular officer." JA122.

Those five families, along with Families FF and GG, whose derivative members were then awaiting interviews with a consular officer, filed this lawsuit on October 21, 2025. JA4; JA90. They asserted four claims: (1) the refusal of boarding foils was arbitrary and capricious under the Administrative Procedure Act ("APA") because the derivatives are "asylees";

(2) applying Proclamation 10949 to derivative asylees violated the State Department's own rules and procedures, contrary to the *Accardi* doctrine and the APA; (3) the blanket denial of admission to approved derivative asylees, without individualized determinations, violated Appellees' procedural due process rights; and (4) Proclamation 10949, as applied to derivative asylees, is unconstitutionally vague. JA7, JA129–134.

The government moved to dismiss. *AA v. U.S. Dep't of State*, No. 1:25-cv-1819 (E.D. Va.), Dkt. No. 39. On May 28, 2026, the district court denied the motion in its entirety. JA4–23. The court held that both Principal Appellees and Derivative Appellees had standing, JA9–12, and that their claims were not committed to agency discretion because "the State Department's own guidelines 'acknowledge the limited discretion consular officers have in approving boarding foils and provide meaningful standards for judicial review,'" JA15. On the merits, the court concluded that the Derivative Appellees were, at the very least, "clearly 'seek[ing] asylum'" and thus excepted from the Proclamations. JA17. It rejected the government's consular non-reviewability defense because Appellees challenged not the "discretionary decisions of the consular and embassy staff," but the "blanket application of the Presidential Proclamations to [Derivative Appellees]

without any regard to their individualized circumstances." JA18. It held that the Principal Appellees "have their own entitlement and a 'strong expectation' under the statutory and regulatory scheme to have the asylum claims of their family members fairly adjudicated." JA20 (citing *Kerry v. Din*, 576 U.S. 86, 98 (2015)). And it let the vagueness claim proceed because Proclamation 10949 "does not provide any guidance with respect to its application to following-to-join asylees," particularly given the government's 2017 position that identical language did not apply to them. JA21.

Because the government conceded that no facts were disputed and that the district court's opinion denying the motion to dismiss decided the case, the suit proceeded directly to summary judgment. JA26; JA259 at 4:5–8. On July 29, 2026, the district court granted summary judgment to the families, relying on its reasoning in denying the motion to dismiss. JA1; JA273 at 18:4–8. The district court granted the "standard APA remedy" of vacating the State Department's policy of applying the Proclamations to derivative asylees. JA273 at 18:9–12. For Appellees, the court tailored the remedy for each family according to whether it had already been interviewed. For Families AA, BB, CC, DD, and EE, the court ordered that boarding foils be issued, because those families had already been deemed "otherwise eligible"

to enter the United States but for the Proclamation. JA273–274 at 18:13–19:3. Those five families have since been reunited in the United States. For Families FF and GG, each of which had waited more than a year for an interview, the court ordered only that their cases be processed under the State Department's normal procedures, on an expedited basis, without regard to the Proclamations. JA274 at 19:4–9. The GG Family was reunited in the United States in October 2026, and the FF Family derivatives are awaiting visas to a third country with a U.S. embassy presence so that they can interview with a consular officer.

The government noticed this appeal on August 12, 2026, and moved the district court to stay its judgment pending appeal or, alternatively, to stay the vacatur as to non-parties. JA2, JA276. The district court denied the motion on August 28, 2026, explaining that *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) "decided only whether 'a federal court's equitable authority under the Judiciary Act' permits universal injunctions—nothing more," and that the government had "failed to make the required 'strong showing'" of likely success, irreparable injury, or favorable equities. JA26–27. On September 9, 2026, the government filed an emergency motion for a stay in this Court. Dkt. 14.

This Court denied the government's motion on October 1, 2026. Dkt. 20. In a concurring opinion joined by Judge Niemeyer, Judge Agee concluded that the government "ha[d] not made a strong showing that it is likely to succeed on the merits of the appeal." *Id.* at 3 (Agee, J., concurring). Responding to the government's invocation of the consular non-reviewability doctrine, the concurrence observed that there was nothing to stay with respect to Families AA, BB, CC, DD, and EE because they had already been reunited. *Id.* at 5–6. As to Families FF and GG, who had not yet been interviewed, the concurrence found it "at best debatable whether the" doctrine "applies to them," because "it is well settled that when plaintiffs pursue forward-looking challenges to the lawfulness of regulations or policies governing consular decisions, courts may review them to assure that the executive departments abide by the legislatively mandated procedures." *Id.* at 6 (quoting *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025)) (cleaned up).

On reviewability, the concurrence found Appellees' claims likely reviewable under the APA because "[c]onsular non-reviewability does not categorically bar review under the APA." *Id.* at 6. It suggested that the district court's reasoning on agency discretion may be sound. *Id.* And it found

the government's argument that Appellees were not "aggrieved" under 5 U.S.C. § 702 "likely waived" because it was "apparently unpreserved." *Id.*

On the Proclamations' asylum exemption, the concurrence concluded that the government's argument that derivatives are not "seek[ing] asylum" because they were outside the United States "seems unlikely to carry the day." *Id.* at 7. It explained that the government's reliance on *Mullin v. Al Otro Lado*, 609 U.S. 258 (2026), "is misplaced," because that case construed the statutory pathway for principal asylees (8 U.S.C. § 1158(a)(1)), which derivative asylees do not use. Dkt. 20 at 7 (Agee, J., concurring). The concurrence reasoned it therefore "makes sense that § 1158(b)(3)(A) doesn't expressly require that an individual 'arrive[] in the United States,'" and that the text at issue here "differs meaningfully from that at issue in" *Al Otro Lado*. *Id.*

Regarding the remedy, the concurrence found it "at best unclear whether *Trump v. CASA* prohibited the district court's APA vacatur," because *CASA* "expressly reserved for decision 'whether the [APA] authorizes federal courts to vacate federal agency action' for another day." *Id.* (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 847 & n.10 (2025)). "For now," it concluded, "5 U.S.C. § 706(2)'s direction that courts 'set aside'

unlawful agency action provides a sufficient basis for concluding that the government has not made a strong showing of likely success." *Id.* at 7–8. For Appellees, the concurrence noted that the judgment "only requires individualized adjudication" for Families FF and GG, "not approval," and leaves "the Government free to conduct lawful screening and apply other grounds of ineligibility as it has always done." *Id.* at 8.

## STANDARD OF REVIEW

This Court reviews "the district court's summary judgment de novo, applying the same standard as that court was required to apply." *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021). Where, as here, a claim challenges agency action under the APA, that standard requires the Court to set aside any action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). Although deferential, this review is no mere formality: it does not "reduce judicial review to a 'rubber-stamp' of agency action," but instead demands that the Court's evaluation of the agency's actions be "searching and careful." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

## SUMMARY OF ARGUMENT

The President's entry ban expressly exempts asylees and preserves "the ability of an individual to seek asylum." Proclamation 10998 § 8(d), 90 Fed. Reg. at 59,728. A common-sense reading of that exemption encompasses derivative asylees: the spouses and children of U.S.-based asylum holders who are granted the same status by statute. It was the State Department, not the President, that applied the Proclamations to bar derivative asylees, in a departure from its prior practice and in violation of statutory and regulatory law and constitutional standards. The government's contrary premise, that the President decided to exclude derivative asylees and the district court impermissibly overrode that decision, finds no support in the record, logic, or the law. And no authority precludes the district court from reviewing the lawfulness of the State Department's policy and vacating it as an unlawful agency action.

*First*, Appellees' claims are reviewable. The consular non-reviewability doctrine protects a consular officer's exercise of discretion within the scope of his authority, and it does not apply here for three reasons. The Proclamations never authorized the State Department to deny boarding foils to derivative asylees. Even if they had, the State Department's policy eliminated consular discretion altogether when it mandated that officers determine eligibility

"without regard to" the Proclamations and then refuse every "otherwise eligible" applicant under them. JA288–289. And courts may review "forward-looking challenges to the lawfulness of regulations or policies governing consular decisions," *Pietersen*, 138 F.4th at 560, a principle that neither *Mullin v. Doe*, 609 U.S. 324 (2026), which turned on an express statutory bar to judicial review, nor *Dep't of State v. Muñoz*, 602 U.S. 899, 905 (2024), which addressed a single individualized consular decision, disturbed. The APA also permits review: whether the Proclamations reach derivative asylees is a pure legal question, and detailed statutory and regulatory standards govern the travel-eligibility determination. *Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 699 (4th Cir. 2019); *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 290 (4th Cir. 2022).

*Second*, the Proclamations' asylum exemptions cover derivative asylees. Congress created a specific path by which the spouse and children of an asylee abroad may "be granted the same status." 8 U.S.C. § 1158(b)(3)(A). Those beneficiaries received asylum status when USCIS approved their I-730 petitions. *Infra* Part I.B.2. In any event, I-730 beneficiaries are, at the very least, "seeking asylum." *Infra* Part I.B.1. The government's contrary reading imports a physical-presence requirement

from a different subsection of the asylum statute, misreads *Al Otro Lado*, and contradicts the State Department's own prior interpretation of identical language. *Id.*

*Third*, though this Court need not reach the constitutional questions to affirm, the State Department's application of the Proclamations also violates due process. *Infra* Part I.C.1. The derivative asylum statute and its regulations give principal asylees and their families a protected expectation of an individualized travel-eligibility determination, and the Department's blanket policy eliminated that process. *Id.* The State Department's reading also renders the Proclamations unconstitutionally vague as applied: nothing in their text gave notice that they reach derivative asylees, and the State Department's unexplained reversal of its 2017 position shows how arbitrarily it has enforced them. *Infra* Part I.C.2.

*Fourth*, vacatur was the proper remedy for the government's unlawful policy. Section 706(2) of the APA directs that a reviewing court "shall … hold unlawful and set aside agency action," and for nearly eighty years courts, including this Court and district courts in this circuit, have read that command to authorize vacatur. 5 U.S.C. § 706(2); *see infra* Part II. *CASA* explicitly declined to address the scope of vacatur. 606 U.S. at 847 n.10. What

the district court set aside here was the State Department's policy, not any presidential action. As is routine when an agency action is set aside, vacating that policy simply restores the Proclamations to the scope the President gave them.

## ARGUMENT

### I. The District Court Correctly Held That the State Department's Policy Is Unlawful.

This Court should affirm the district court's grant of summary judgment because Appellees' claims are reviewable, the plain language of the Proclamations encompasses derivative asylees, and the government's application of the Proclamations to derivative asylees violates Appellees' procedural due process rights and renders the Proclamations unconstitutionally vague.

#### A. Appellees' claims are reviewable and justiciable.

The government's threshold objections fail. Consular non-reviewability does not shield a policy that the Proclamations never authorized, that displaces a consular officer's individualized judgment, or that Appellees challenge on a forward-looking basis. Nor is the State Department's policy "committed to agency discretion" outside of APA review, as meaningful

statutory and regulatory standards govern these travel-eligibility determinations.

**1. The doctrine of consular non-reviewability does not bar review of Appellees' claims.**

The consular non-reviewability doctrine does not bar review here for three reasons. First, the doctrine does not shield consular action that the Proclamations did not authorize, and the Proclamations did not authorize the State Department to deny boarding foils to derivative asylees. Second, even if the Proclamations did authorize such denials, the State Department's policy eliminated consular discretion entirely. Third, Appellees' forward-looking challenge to the policy is permitted by the forty years of precedent articulated in *Pietersen*, 138 F.4th at 560, which remains good law.

*First*, the doctrine does not protect consular action that the Proclamations did not authorize in the first place. The government invokes consular non-reviewability to argue that the district court lacked jurisdiction to review a policy of refusing boarding foils, attempting to fit this policy challenge into a doctrine that precludes review of individual, discretionary decisions. App. Br. 2, 28–29. But "when the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, jurisdiction exists." *Patel v. Reno*, 134 F.3d 929, 931–

32 (9th Cir. 1997); *accord Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988); *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 288 (4th Cir. 2018) (en banc) (Gregory, C.J., concurring) (citing *Patel*, 134 F.3d at 931–32), *vacated on other grounds*, 585 U.S. 1028 (2018). That is precisely what the district court held: the plain language of the Proclamations does not authorize consular officers to apply them to I-730 beneficiaries. JA17–18; *see infra* Part I.B. Appellees have argued only that the Proclamations give consular officers no authority to deny boarding foils to derivative asylees.

*Second*, even if the Proclamations authorized the State Department to apply their entry restrictions to derivative asylees, the policy would still be reviewable because it deprives consular officers of the opportunity to exercise any discretion at all. No consular officer exercised discretion when refusing Derivative Appellees' boarding foils. The State Department directed consular officers *first* to "determine whether [each] applicant [was] otherwise eligible for a visa under the INA, without regard to the" Proclamations. JA288. Only after that determination was complete did State Department policy *require* the officers to refuse the foils on the basis of the Proclamations, regardless of the eligibility determination. JA288–289. The directives left no

room for judgment: if an applicant was subject to the Proclamations, the officer "*must* … refuse the applicant." JA289 (emphasis added).

Consular officers heeded those mandates for the Derivative Appellees who had already interviewed. The officers first determined that each was eligible to receive boarding foils, only to turn them away based solely on the State Department's policy ignoring the asylum exception in the Proclamations and applying the travel bans to derivative asylees. *See* Pls.' Mot. Summ. J. at 6–7; JA121–124, JA126. Each family received a pre-typed refusal letter. One bore no date, addressee, case number, or signature (JA122), and one was dated three days before the family's interview (JA123). No officer's individualized judgment produced these refusals, and none could have saved them.

The government therefore mischaracterizes the district court's order; it did not "forc[e]" anyone's admission. App. Br. 1, 20. For the five interviewed families, the court simply gave effect to the judgment consular officers had already made: those families were eligible for boarding foils *but for* the application of the Proclamations' entry bans to their cases. For the Derivative Appellees who had yet to interview when they filed this case, the court mandated no outcome at all, instead issuing prospective relief that does

not impinge on lawful consular decision-making. And the status reports ordered by the district court that the government critiques (at 29) imposed no substantive standard; they tracked only whether the State Department was processing the cases without regard to the Proclamations. Consular officers remain free to exercise their discretion under State Department guidelines, so long as they do not unlawfully apply the Proclamations' travel bans to derivative asylees who are explicitly excepted. The Executive's authority to exclude noncitizens under its own guidelines is fully intact.

*Third*, the consular non-reviewability doctrine does not preclude Appellees' forward-looking challenge to the State Department's policy. The D.C. Circuit, the jurisdiction that decides the most APA claims, has long held that the doctrine does not bar "forward-looking challenges to the lawfulness of regulations or policies governing consular decisions." *Pietersen*, 138 F.4th at 560. Review of such challenges is necessary "to assure that the executive departments abide by the legislatively mandated procedures." *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985) (holding that the doctrine did not bar review of a challenge to government policy for visa issuance to foreign workers). That is precisely the relief Appellees sought here. As the concurrence denying the government's

application for a stay acknowledged, the Derivative Appellee members of Families FF and GG had received no consular decision at the time of the district court's judgment, and the relief the court ordered for them was entirely prospective: individualized adjudication under lawful standards. *See* Dkt. 20 at 6 (Agee, J., concurring).

The government argues (at 31–32) that *Pietersen* does not survive *Mullin* or *Muñoz*. Not so. *Mullin* held, in the particular context of an express judicial-review bar[3] in the statute governing Temporary Protected Status, that a federal court cannot review subsidiary agency determinations if the final agency action is unreviewable. 609 U.S. at 344. Unlike in *Mullin*, no statutory language bars judicial review of the final agency action here: a policy of refusing to issue boarding foils to I-730 beneficiaries in excess of the authority conferred by the Proclamations' plain text. *Id.* Nor is *Pietersen* undermined by the Supreme Court's decision one year earlier in *Muñoz*, which analyzed an individual consular decision, not an unauthorized agency policy. 602 U.S. at 905.

[3] The review bar reads: "There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

### 2. The government's categorical application of the Proclamations to derivative asylees is reviewable under the APA.

Appellees' claims are also reviewable under the APA. The APA establishes a "basic presumption of judicial review," which yields only when a statute supplies no meaningful standard against which to judge the agency's exercise of discretion. *Dep't of Commerce v. New York*, 588 U.S. 752, 771 (2019). The government's three arguments to the contrary each fail.

*First*, the government contends (at 34) that the APA does not displace the limits imposed by consular non-reviewability. But the doctrine does not apply here because a consular officer's discretion was not the basis for the boarding foil denials. *Supra* Part I.A.1. And even if the doctrine did apply, it would not reach derivative asylees who have yet to be interviewed, as to whom no consular decision exists. *See id.*

*Second*, the government argues (at 34) that Appellees are not "aggrieved" within the meaning of 5 U.S.C. § 702 because they have no entitlement to enter the United States. The government never made that argument to the district court, raising it for the first time in its motion seeking a stay here. Dkt. 14 at 16. Because the government failed to preserve this argument, it is waived. *See* Dkt. 20 at 6 (Agee, J., concurring); *Muth v. United*

*States*, 1 F.3d 246, 250 (4th Cir. 1993). Even if this argument were properly before the Court, it misstates the governing standard. Section 702 imposes only a prudential, "not especially demanding" requirement that "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute … in question." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 488 (1998) (citation omitted). Appellees easily clear that bar. Their interests in the adjudication of their I-730 petitions, and in reunification with family members, lie at the core of the statutory scheme governing derivative asylum. *See* 8 U.S.C. § 1158(b)(3)(A); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs.*, 45 F.3d 469, 472 (D.C. Cir. 1995) ("In originally enacting the INA, Congress 'implement[ed] the underlying intention of our immigration laws regarding the preservation of the family unit.'") (citing H.R. Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1680); *Int'l Refugee Assistance Project*, 883 F.3d at 286 (Gregory, C.J., concurring) ("The INA manifests a clear

interest in preserving the family unit … ."), *vacated on other grounds*, 585 U.S. 1028 (2018).

Neither of the government's authorities suggests otherwise. *Trump v. Hawaii* held that "foreign nationals seeking admission have no constitutional right to entry." 585 U.S. at 703. It did not construe Section 702 or apply the zone-of-interests test, and whether a foreign national has a constitutional right to enter says nothing about whether Appellees' interests fall within the zone the INA protects. And in *Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999), the D.C. Circuit held that U.S. sponsors who had petitioned to classify their noncitizen employee as "managerial" for work-visa purposes were no longer aggrieved once the petition was granted, because their interest had been satisfied. *Id.* at 1164. That holding turned on the grant of the relief sought. Appellees have received no such relief: they seek to vacate the application of the Proclamations to derivative asylees and to obtain adjudication of their eligibility to travel to the United States.

*Third*, the government asserts that the grant of a boarding foil is "committed to agency discretion by law." App. Br. 34 (quoting 5 U.S.C. § 701(a)(2)). In evaluating that contention, this Court asks (1) whether the action has "traditionally been 'committed to agency discretion'" and (2)

whether the statute "intentionally limits agency discretion by setting guidelines … ." *Holbrook*, 48 F.4th at 290. Both inquiries favor reviewability.

As to the first inquiry, discretion played no role here. Appellees were denied boarding foils under a "broad or general" policy based on the State Department's "legal interpretation" of the Proclamations. *Casa De Md.*, 924 F.3d at 699. Challenges to such policies are "subject to review." *Id.*

As to the second, detailed statutory and regulatory guidelines govern the processing of derivative asylees. The Department of Homeland Security ("DHS") has exclusive authority to adjudicate and process "following-to-join derivatives of asylees" via the I-730 petition, and the State Department's own policies confine consular officers to a narrow set of tasks: verifying identity, confirming the family relationship, and determining whether any inadmissibility bar applies. 9 FAM 203.5-3(a)(1), (a)(5), 203.5-7(a)(1). If those factors are established, then an I-730 beneficiary is "approved to travel" and "should have boarding foils and travel packets prepared on their behalf." 9 FAM 203.5-15(c). The district court therefore correctly held that a consular officer's decision to issue a boarding foil is subject to meaningful standards for judicial review. JA15.

### B. The Proclamations' asylum exemptions apply to derivative asylees.

The government's position rests on two premises: that I-730 beneficiaries are not the ones "seeking asylum," and that asylum can be sought only by a person physically located in the United States. App. Br. 35–42. Neither premise survives the statutory text.

#### 1. At minimum, I-730 beneficiaries located outside the United States are seeking asylum.

The government's argument (at 36, 41–42) that I-730 beneficiaries can never "seek asylum," least of all while overseas, fails for three reasons: it ignores the statutory path Congress created for these beneficiaries; it contradicts the agencies' own regulations and procedures, which presuppose that beneficiaries are abroad; and it cannot be reconciled with the Proclamations' text and history.

*First*, the INA expressly permits the spouse and children of a principal asylee who remain abroad to obtain asylum status through the principal's existing grant. 8 U.S.C. § 1158(b)(3)(A). None of the other provisions the government cites says otherwise.

The government's reliance (at 41–42) on the distinction between Sections 1158(a) and 1158(b)(3) only confirms that the statute imposes no geographic restriction. Subsection (a) governs who may apply for asylum in

their own right. Subsection (b) sets out the "conditions for granting asylum." And subsection (b)(3), titled "Treatment of spouse and children," creates a separate and distinct path by which a spouse or child may "be granted the same status" as the principal even if not "otherwise eligible for asylum." 8 U.S.C. § 1158(b)(3)(A). That derivatives seek asylum through subsection (b)(3) rather than subsection (a) does not mean they are not "seeking asylum" at all; it means they are using the route Congress built specifically for them to do so. Indeed, subsection (b)(3) by its terms reaches family members "following to join" the principal, that is, family members who are not yet in the United States. *Id.* Importing subsection (a)'s physical-presence requirement into subsection (b)(3) would erase the "follow to join" benefit, because a family member who had to be present in the United States first could never be "following to join" anyone, and courts should not "construe a statute in a manner that reduces some of its terms to mere surplusage." *Virginia v. Browner*, 80 F.3d 869, 877 (4th Cir. 1996).

*Al Otro Lado*, the government's principal authority (at 36), is inapposite for the same reason. That case asked whether a person in Mexico has "*arrive[d]* in the United States" and may therefore apply for asylum under subsection (a) of Section 1158. 609 U.S. at 268 (emphasis added); *see* 8 U.S.C.

§ 1158(a)(1). Its holding turned on the meaning of the word "arrive," not the phrase "seek asylum." 609 U.S. at 268. Derivative asylees, by contrast, are not applying under subsection (a), but instead seek status under subsection (b), which extends the principal's grant to a spouse or child *even if* not independently "*eligible for asylum under this section*" and explicitly contemplates that those derivatives will be "following to join" from overseas. 8 U.S.C. § 1158(b)(3)(A) (emphasis added). As the stay concurrence recognized, that text "differs meaningfully from that at issue in" *Al Otro Lado*. Dkt. 20 at 7 (Agee, J., concurring). The government's geographic reading would nullify the statutory "follow to join" pathway, whose entire premise is that one family member is here and the other is abroad.

The other INA provisions the government invokes (at 37–39) do not support its reading either. Section 1157, which the government cites (at 37) without further specificity, governs refugees, who follow an entirely different pathway from asylum. *See* 8 U.S.C. § 1157. The government next contends (at 38–39) that Section 1158(c)(2)(D), which permits termination of asylum if the asylee returns to the country he originally fled, necessitates a geographic restriction, because otherwise USCIS "could terminate [Derivative Appellees'] status immediately" while they are still overseas. But that

provision says nothing about *when* asylum status attaches; it addresses only how that status may be lost. 8 U.S.C. § 1158(c)(2)(D). And a family member who has never left cannot have "voluntarily avail[ed]" himself of a return. *Id.* In any event, a derivative's status may be terminated only on a determination by the Attorney General under Section 1158(c)(2), or if the principal's status is terminated, 8 C.F.R. § 208.24(d), and no such determination has been made as to any Appellee.

The government's next argument (at 39) says that, under the President's entry-ban authority, 8 U.S.C. § 1182(f), an asylee's grounds for inadmissibility "apply until admission." And because asylum cannot be granted until the government confirms that "the identity of the applicant has been checked … to determine any grounds on which the alien may be inadmissible to or deportable from the United States," 8 U.S.C. § 1158(d)(5)(A)(i), the government reasons that derivatives cannot satisfy that requirement until they are physically admitted. But Section 1182(f) says nothing of the kind, and Section 1158(d)(5)(A)(i) imposes no geographic requirement. It requires only that certain checks be completed first. That is precisely the review that USCIS and the State Department conduct before a boarding foil is issued. None of the bars that apply to derivative beneficiaries

prevent them from seeking that status from abroad. *See* 9 FAM 203.5-9(b); 8 U.S.C. § 1158(b)(2)(A).

*Second*, USCIS's own regulations reinforce that derivative asylum status can be sought by beneficiaries abroad. 8 C.F.R. § 208.21(d) provides that an I-730 petition "cease[s] to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee." The government suggests (at 39) that this language imposes a geographic requirement, but it does no such thing. It provides only that the benefits cease after admission, not that they activate only upon presentation at a port of entry. Indeed, the regulation undermines the government's position: it sets out the procedure by which a spouse or child "outside the United States" obtains approval to travel here as a beneficiary, and it contemplates that approval will occur while the beneficiary is still abroad. 8 C.F.R. § 208.21(d). That regulatory framework is irreconcilable with the government's claim (at 36) that Derivative Appellees "could not have been 'seeking asylum' because they were outside the United States when their I-730 petitions were approved."

The State Department's own guidance confirms the point. The FAM describes I-730 beneficiaries as eligible "to travel to the U.S. as a family

member of an individual granted asylee status," 9 FAM 203.5-2(a), and none of the eligibility criteria it lists requires physical presence, *id.* The rest of the process assumes the beneficiary is abroad. Consular officers are told to interview derivative "family members together if they are in the same country," 9 FAM 203.5-6(b)(2), and not to approve travel for a beneficiary who is "already in the United States," 9 FAM 203.5-17. The agencies cannot run an overseas process built for beneficiaries abroad and then tell this Court that those same beneficiaries cannot be seeking the very status the process exists to confer.

The government's reliance on agency definitions fares no better. App. Br. 37–38. The USCIS and FAM definitions of "asylee" as a person "who cannot return to their home country due to persecution" describe principal asylees, not their derivatives. USCIS Glossary, "Asylee"[4]; 9 FAM 203.2-2. By relying on them, the government conflates principal asylees with derivatives and ignores the FAM provisions that actually govern derivative asylees, which draw a clear distinction between the two and provide that derivatives "are not required to establish" the criteria that principals must meet. *See* 9 FAM 203.5; 9 FAM 203.5-2(b), (c). Indeed, the FAM provisions

---

[4] Available at https://perma.cc/7BYE-XHUE (last visited Nov. 12, 2026).

provide that derivatives "may reside in their country of nationality or any other country." 9 FAM 203.5-2(d).

The legislative history and case law are likewise inapposite, because neither addresses derivative asylum. Although Congress enacted Section 1158 to give persons physically present in the United States a means to claim refugee status, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 435–36 & n.17 (1987), it chose to extend that status to a principal's overseas derivatives through subsection (b)(3). The cases cited by the government (at 38) that mention derivatives address the requirement of physical presence in the United States only in the context of *principal* asylees. *See Cela v. Garland*, 75 F.4th 355, 361 (4th Cir. 2023); *Azarmanesh v. Bondi*, 2025 WL 965955, at *11 (N.D. Cal. Mar. 31, 2025). The rest of the government's cases (at 38) make no mention of derivatives at all. *See generally Cardoza-Fonseca*, 480 U.S. 421; *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009); *Yang v. INS*, 79 F.3d 932 (9th Cir. 1996).

*Third*, the Proclamations' text and history confirm that the exemption covers derivative asylees. The government reads the "seek asylum" provision (at 40) narrowly, as a removal-protection safeguard for noncitizens already in the United States, pointing to the provision's parallel references to

withholding of removal and the Convention Against Torture. That reading is contrary to the Proclamations' own terms: "Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum … consistent with the laws of the United States." Proclamation 10949 § 6(d), 90 Fed. Reg. at 24,504. Derivative Appellees are seeking asylum "consistent with the laws of the United States" in precisely the manner those laws prescribe: through an I-730 petition that USCIS approved.

The government relies twice on Proclamation 9645 (at 36–37, 41 n.5) for its explicit boarding foil exemption, which Proclamations 10949 and 10998 lack. Proclamation 9645 § 3(b)(iii), 82 Fed. Reg. at 45,167. But that exemption was not a targeted carve-out for derivative asylees. It reached "any foreign national who has a document other than a visa—such as a transportation letter, an appropriate boarding foil, or an advance parole document— … that permits him or her to travel to the United States and seek entry or admission." *Id.* Some of those categories, such as advance parole, have nothing to do with derivative asylum. Even "boarding foils" cover more than I-730 beneficiaries; they are routinely issued to lawful permanent residents who lose their green cards. *See* 9 FAM 202.2-5. Language that broad cannot be read as a deliberate decision to exclude "follow to join" beneficiaries from

those "seeking asylum." And an earlier entry ban contained the same asylum exemption, said nothing about boarding foils, and was still read by the government to exempt derivative asylees. Exec. Order No. 13780 § 12(e), 82 Fed. Reg. at 13,218; JA116. The absence of any boarding foil reference in Proclamations 10949 and 10998 cannot bear the weight the government places on it now.

### 2. I-730 beneficiaries accrue asylum status when USCIS approves an I-730 petition.

The Court can also affirm on a separate ground that the district court did not need to reach:[5] Derivative Appellees were "granted asylum by the United States" when USCIS approved their I-730 petitions. As a matter of law, authority to adjudicate and process affirmative asylum applications, including petitions for derivative asylees, "rests exclusively with" DHS, of which USCIS is a component. 9 FAM 203.5-3(a)(1) (citing INA §§ 207, 208 and 6 U.S.C. § 271); *see also* 8 C.F.R. § 208.21(d). It is USCIS's policy that, for a beneficiary overseas in a country without a USCIS international field office presence, it first approves an I-730 petition before forwarding it to the

[5] The district court did not decide whether Derivative Appellees already had asylum status, JA17, but this Court may affirm on any ground the record supports. *Thigpen v. Roberts*, 468 U.S. 27, 30 (1984); *O'Hara v. Nika Tech., Inc.*, 878 F.3d 470, 474 (4th Cir. 2017).

State Department for the travel eligibility determination. JA112 (citing USCIS Policy Manual, Vol. 4, Part C, Ch. 5). That approval is the critical point. Because DHS alone may adjudicate I-730 petitions, 9 FAM 203.5-3(a)(1), USCIS's approval is the United States' decision on derivative asylum status, and USCIS's notice of approval to the principal asylee accordingly states that its action on the petition is "complete." JA111.

USCIS's own guidance confirms that its approval renders derivatives asylees. It calls the approval a "grant," and it describes the State Department's role after approval not as deciding status but, at most, as "initiating a consular return, as appropriate, to ask USCIS to reconsider the grant." USCIS Policy Manual, Vol. 4, Part C, Ch. 5 & n.1.[6] An agency cannot be asked to reconsider a grant it has not yet made. The State Department's own manual confirms that consular officers have no authority to re-adjudicate an approved I-730 petition or to deny derivative asylum and may only ask USCIS to reconsider or to exercise its discretion to deny. *See* 9 FAM 203.5-3(a), 203.5-9(b)(12)(b); JA115. What remains for the State Department is a travel-eligibility determination confined to identity, relationship, and statutory bars. 9 FAM 203.5-7(a)(1); JA113. Because USCIS approved each

[6] Available at https://perma.cc/W946-8CUC (last visited Nov. 12, 2026).

Derivative Appellee's I-730 petition, *see* JA111, each was "granted asylum by the United States," and the Proclamations do not apply to them. Proclamation 10949 § 6(d), 90 Fed. Reg. at 24,504; Proclamation 10998 § 8(d), 90 Fed. Reg. at 59,728.

### C. The government's application of the Proclamations to derivative asylees violates due process.

Because Appellees prevail on their APA claims, this Court need not reach the constitutional questions. *See Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 68 (4th Cir. 2023). But if it does, it should affirm: the government's application of the Proclamations denies Appellees due process, and the Proclamations are unconstitutionally vague as applied.

#### 1. Appellees have established valid procedural due process violations.

Procedural due process applies when a statute or regulation creates "an expectation" that a person will not suffer deprivation of a liberty interest without fair procedures. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (explaining that a liberty interest "may arise from an expectation or interest created by state laws or policies"). The INA and its implementing regulations create exactly that expectation. USCIS's decision to approve an I-730 petition may be discretionary, 8 U.S.C. § 1158(b)(3)(A), but the State Department's duty to adjudicate travel eligibility under a narrow set of criteria is not. The

State Department's own rules say that an I-730 beneficiary is "approved to travel" if a consular officer finds that the beneficiary has established identity and a qualifying relationship to the principal asylee, that "[t]hey are not subject to any mandatory bars or relevant inadmissibility grounds," and that they were "not previously granted asylum or refugee status by the United States." 9 FAM 203.5-15(a). Beneficiaries "approved to travel" then "should have boarding foils and travel packets prepared on their behalf." 9 FAM 203.5-15(c).

The procedural defect Appellees identified, and that the district court accepted, is that the government treated the Proclamations as "bars" for derivative asylees who are "otherwise eligible" for boarding foils, even though the Proclamations do not authorize the government to apply them to asylees or those seeking asylum. *See* JA19–20; JA288–289. That is not the procedure principal asylees and their beneficiaries are entitled to expect.

That expectation protects a real interest, not process for its own sake. *Contra Olim v. Wakinekona*, 461 U.S. 238, 249–50 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest of an individual; it cannot be the right to demand needless formality."). USCIS's regulations make clear that an I-730 petition confers "immigration benefits"

on a beneficiary once the petition is "approved" by USCIS. 8 C.F.R. § 208.21(d). Asylum status, including for derivatives, may be terminated only "if the Attorney General determines" that one of five enumerated conditions exists, 8 U.S.C. § 1158(c)(2); the only other way a derivative's asylum may terminate is if the principal's asylum status terminates. 8 C.F.R. § 208.24(d). A scheme that "specifies that [a benefit] is to be forfeited only" on specified conditions creates a protected interest. *See Din*, 576 U.S. at 98–99 (plurality opinion) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)).

None of those conditions apply here, yet the State Department's policy effectively stripped that benefit from an entire group of derivative asylees, without any individualized process or any exercise of discretion. The government therefore cannot claim (at 46) that Appellees challenge only the result. Appellees challenge the denial of a specific procedure: the individualized travel-eligibility determination that the State Department's own rules require for I-730 beneficiaries. 9 FAM 203.5-15.

The government's reliance on *Muñoz* is misplaced. *Muñoz* asked whether a U.S. citizen has a *fundamental liberty interest* in her spouse's visa application, not whether a statutory scheme creates a procedural due process right. *Muñoz*, 602 U.S. at 911–16. Appellees have never claimed that foreign

nationals have a constitutional right to enter the United States. Rather, because "procedural due process rights attach to rights … that are … created by nonconstitutional law, such as a statute," *Din*, 576 U.S. at 97, Appellees claim a *procedural* due process right to have the derivative asylum rules fairly followed. That difference decides the issue, and the district court correctly rejected the government's *Muñoz* argument. JA19–20.

Nor must Appellees first establish a substantive due process right before pressing a procedural one. The two inquiries are distinct, and liberty or property interests are not synonymous with fundamental rights. Procedural due process is implicated whenever government decisions "deprive individuals of 'liberty' or 'property' interests." *Reyna v. Hott*, 2018 WL 3551558, at *5 (E.D. Va. Mar. 20, 2018) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)), *aff'd sub nom. Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204 (4th Cir. 2019). A substantive due process claim, by contrast, requires government conduct that "shock[s] the conscience or interfere[s] with rights implicit to the concept of ordered liberty." *Id.* at *4. And the Supreme Court has distinguished "really fundamental rights, which cannot be taken away at all absent a compelling state interest," from "not-so-fundamental rights, which can be taken away so long as procedural due process is observed." *Din*,

576 U.S. at 99. Moreover, unlike substantive due process rights, which "are created only by the constitution," the interests that procedural due process protects may be derived from positive law. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring). This Court has accordingly allowed a procedural due process claim to proceed even while affirming dismissal of a substantive due process claim. *D.B. v. Cardall*, 826 F.3d 721, 743 (4th Cir. 2016).

**2. The Proclamations are unconstitutionally vague as applied.**

Finally, the district court correctly concluded that the Proclamations are unconstitutionally vague as the government has applied them. JA20–21. A law is unconstitutionally vague if it fails to make clear to regulated parties what is required or lacks the precision necessary to avoid arbitrary enforcement. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The government is wrong (at 47) that the Proclamations "do not proscribe any conduct for which [Appellees] must have fair notice." Read alongside their exemption for asylees and those seeking asylum, the Proclamations give no fair notice that they reach derivative asylees, who, with their principals, have a due process interest in a proper travel-eligibility determination. Yet the government has used the Proclamations to bar consular officers from issuing

travel documents to these derivative asylees. And the government's abandonment of its 2017 position that executive orders and proclamations with identical language did *not* apply to derivative asylees, *see* JA116–117, demonstrates the arbitrariness of its enforcement. JA21.

The Proclamations say nothing about derivative asylees or boarding foils. They expressly exempt anyone "who has been granted asylum by the United States" and say they should not be "construed to limit" the ability to seek asylum. Proclamation 10949 § 6(d); Proclamation 10998 § 8(d). The State Department's public guidance on implementing them does not mention derivative asylees or boarding foils either. JA119. Courts regularly apply the vagueness doctrine to executive orders. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 174–77 (D.D.C. 2025); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534–36 (N.D. Cal. 2017). The government's claim (at 49) that the denial letters gave notice misses the point, because the question is whether the Proclamations themselves gave fair notice. JA21. And the letters did not give notice anyway: they told Derivative Appellees they were "ineligible for an immigrant visa," a document entirely distinct from a boarding foil. JA123.

## II. Vacatur Is the Well-Established and Appropriate Remedy.

### A. The APA authorizes vacatur.

"[T]he APA authorizes vacatur." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When an agency's action is unlawful, 'vacatur is the normal remedy.'" *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)); *accord* Brief for Professor Mila Sohoni as Amica Curiae in Support of Respondents at 2, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) (Nos. 19-431, 19-454), 2020 WL 1877916 [hereinafter "Sohoni Amicus Br."].

With barely a mention of *Corner Post Inc. v. Board of Governors*, 603 U.S. 799 (2024), and no analysis of multiple recent appellate and Supreme Court cases confirming that Section 706 authorizes vacatur, the government seeks to upend nearly eighty years of settled practice and foundational APA principles, incredibly arguing (at 50) that the APA does not authorize vacatur at all.[7] In the government's view, Section 706(2)'s command to "hold unlawful

[7] On October 14, 2026, the government filed a petition for a writ of certiorari, asking the Supreme Court to consider "[w]hether the Administrative Procedure Act, 5 U.S.C. 701 et seq., authorizes courts, in Section 706(2), to

and set aside agency action" tells a court only to "disregard that unlawful action" in the case before it "in the same way a court would set aside and disregard an unconstitutional statute." App. Br. 53.

This radical argument openly disregards the Supreme Court's recent admonitions distinguishing vacatur under Section 706 from injunctive relief. *See CASA*, 606 U.S. at 847 n.10; *Corner Post*, 603 U.S. at 831–32 (Kavanaugh, J., concurring). The government may wish (at 54) that APA remedies against agencies "*should* function the same way" as injunctive relief for "unconstitutional enactment[s]" or as declaratory or habeas relief under Section 703. App. Br. 54 (emphasis added). But vacatur under Section 706 is not an injunction, and the government's wish cannot overcome decades of copious precedent finding that courts have authority to "set aside" agency rules and return the agency's guidance and practices to the status quo. Consistent with controlling precedent in this circuit that plainly authorizes

enter universal vacatur of agency rules that courts have held unlawful and, if so, in what circumstances." Pet. for Writ of Cert. at I, *U.S. Dep't of Health & Human Servs. v. Tex. Med. Ass'n*, No. 26-491 (U.S. Oct. 14, 2026), available at https://perma.cc/DV7Y-ZL9F. The respondents have until December 14, 2026 to file a response. Docket, *U.S. Dep't of Health & Human Servs. v. Tex. Med. Ass'n*, No. 26-491, available at https://perma.cc/C3SD-4RY7 (last visited Nov. 12, 2026).

vacatur as an APA remedy,[8] *see Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018), this Court should reject the government's baseless attempt to strip courts of power to remedy unlawful agency action.

**1. Section 706(2)'s text clearly instructs courts to vacate unlawful agency action.**

Section 706(2)'s text mandates that courts vacate unlawful agency action. Section 706(2) says the "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions" that are arbitrary and capricious, contrary to law, or otherwise defective. 5 U.S.C. § 706(2). The APA defines "agency action" to include "the whole or a part of an agency rule." 5 U.S.C. § 551(13). Read together, those provisions let the reviewing court set aside "the whole … of an agency rule" that it holds "unlawful." Vacatur does just that: it rescinds the rule and restores the status quo to before the agency acted unlawfully. Sohoni Amicus Br. 2.

This is consistent with the contemporary definition of "set aside": "to annul or *vacate*," Black's Law Dictionary (12th ed. 2024) (emphasis added); and its definition when Congress passed the APA in 1946: "to cancel, annul,

[8] Rather than contend with *Sierra Club*'s holding and this Court's precedential remedial practices, the government's brief dismisses *Sierra Club* as unpersuasive merely on the ground that it did not discuss the argument about Section 703 that the government now advances. App. Br. 53.

or revoke." *Corner Post*, 603 U.S. at 829 (Kavanaugh, J., concurring) (citing Black's Law Dictionary 1612 (3d ed. 1933)); *see also id.* (citing Black's Law Dictionary 1537 (4th ed. 1951) (defining "set aside" in the same way); Bouvier's Law Dictionary 1103 (W. Baldwin ed. 1926) ("To annul; to make void; as, to set aside an award")). A judgment that has been set aside does not survive for anyone. Neither does agency action that the court must "set aside." *See* 5 U.S.C. § 706(2) (using "shall" to command unlawful agency action be set aside); Sohoni Amicus Br. 14. And that makes practical sense. Vacatur ensures consistent application (or non-application) of a policy and ensures that an unlawful agency policy does not, *de facto*, remain intact. *See infra* Parts II.A.2, II.B.

Section 706(2)'s mandate to "set aside" "agency action, findings, and conclusions" thus does not merely shield the individual plaintiff from unlawful agency action.[9] The government's main contrary argument is that Section

[9] Notably, Section 705 of the APA lets a court "postpone the effective date of an agency action" while review is pending. 5 U.S.C. § 705. That interim relief operates on the agency action itself and keeps it from taking effect anywhere, *see Make the Rd. N.Y. v. Noem*, 2025 WL 3563313, at *35–36 (D.C. Cir. Nov. 22, 2025), and final relief under Section 706(2) is its permanent counterpart. It would make little sense for the APA to allow universal interim relief but only party-specific final relief. Yet that is the odd result the government's reading would produce. Sohoni Amicus Br. 9-–10.

706 "addresses 'the court's decisional process' leading up to its judgment, not 'the remedies the court may authorize,'" which are "governed by Section 703." App. Br. 53 (citing *United States v. Texas*, 599 U.S. 670, 696 (2023) (Gorsuch, J., concurring in the judgment)). But that reading is inconsistent with the statutory text and principles of statutory interpretation. Section 703 addresses the "[f]orm and venue of proceeding," that is, how a challenge is brought and where. 5 U.S.C. § 703. It does not purport to catalogue remedies. And even on the government's own premise (at 51), the absence of the word "vacatur" from Section 703 proves nothing, because the provision's list is illustrative, not exhaustive. It authorizes "any applicable form of legal action, *including* actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703 (emphasis added). A plaintiff may therefore proceed by "any applicable form of legal action," *id.*, including the "one form of action" the Federal Rules recognize: a "civil action." Fed. R. Civ. P. 2. What relief follows in such a suit is a question Section 703 leaves to other law, Section 706 included. *See* Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2304, 2337 (2024). As Justice Kavanaugh put it, the contrary argument "is weak." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring).

Nor does Section 706's title, "Scope of review," do what the government suggests (at 53). "[T]he heading of a section cannot limit the plain meaning of the text." *United States v. Gomez*, 960 F.3d 173, 178 (5th Cir. 2020). And the text mandates that a court not just "hold unlawful" agency action, but also "hold unlawful *and set aside*" that action. 5 U.S.C. § 706(2) (emphasis added). On the government's reading (at 53–54), the second command adds nothing to the first: a court that finds an action unlawful has already set it aside, so Congress said two things when one would have done. That reading makes "set aside" mere surplusage. *See Virginia*, 80 F.3d at 877. By contrast, Appellees' reading, which is consistent with nearly eighty years of federal court decisions, properly gives effect to both commands without treating Section 703 as silently eliminating the remedial language of Section 706.

**2. The Supreme Court, lower courts, and Congress consistently treat vacatur as the ordinary APA remedy that extends beyond the parties.**

Because Section 706 authorizes the vacatur of agency action, relief is not limited to the parties. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that rules are vacated – not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir.

1998) (citation omitted); *accord Corner Post*, 603 U.S. at 831 (Kavanaugh, J., concurring); *see also* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1173 (2020) ("The term 'set aside' means invalidation—and an invalid rule may not be applied to anyone."). Full vacatur of agency action is "complete relief." *Bowen v. Massachusetts*, 487 U.S. 879, 911 (1988) (finding error where appellate court did not affirm district court order granting full vacatur).

There is simply no basis to hold otherwise "in light of the text and history of the APA, the longstanding and settled precedent adhering to that text and history, and the radical consequences for administrative law and individual liberty that would ensue if vacatur were suddenly no longer available." *Corner Post*, 603 U.S. at 829 (Kavanaugh, J., concurring). A majority of the Supreme Court has confirmed that relief under Section 706 extends beyond the parties before the court to all those adversely affected by unlawful agency action. Since Justice Kavanaugh's concurrence in *Corner Post*, the majority in *Trump v. CASA* made clear that APA vacatur remains available even if universal injunctions do not. 606 U.S. at 847 n.10. And in *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), five Justices agreed that vacatur is relief that "has

prospective and generally applicable implications." 145 S. Ct. at 2663 (Roberts, C.J., joined by Sotomayor, Kagan, and Jackson, JJ., concurring in part and dissenting in part); *id.* at 2661 (Barrett, J., concurring).

Even Justice Gorsuch's concurrence in *United States v. Texas*, 599 U.S. 670, 701 (2023), on which the government stakes its entire argument (at 50), acknowledges that vacatur "has been the ordinary result" in challenges to agency action.[10] Yet in asking this Court to take the extraordinary step of finding no statutory authority for vacatur, the government makes no effort to evaluate the many cases in this circuit and others that treat unlawful agency action as invalid and therefore unenforceable against anyone. As the D.C. Circuit has repeatedly held, "[s]tays and vacatur are well-established remedies for unconstitutional and unlawful agency action." *Make the Rd. N.Y. v. Noem*, 2025 WL 3563313, at *17 (D.C. Cir. Nov. 22, 2025) (citing *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989), and *Bridgeport Hosp.*, 108 F.4th at 890). The government does not cite a single

---

[10] When the government put forth at oral argument in *Texas* its radical theory that the APA provided only for plaintiff-specific relief, "Chief Justice Roberts … not[ed] that the government's position would undermine 'what the D.C. Circuit and other courts of appeals have been doing all the time as a staple of their decision output[,]'" as well as multiple Supreme Court rulings upholding those decisions. *Make the Rd. N.Y.*, 2025 WL 3563313, at *36 n.10 (quoting Transcript of Oral Argument at 36, 38, *Texas*, 599 U.S. 670 (No. 22-58)).

appellate court analysis to the contrary. Even the Fifth Circuit opinion reversed in *Texas* states that "a vacatur does nothing but re-establish the status quo absent the unlawful agency action" and "neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022), *rev'd on other grounds*, 599 U.S. 670 (2023).

This Court has applied the same principles. *Sierra Club*, 909 F.3d at 655 ("Section 706(2)(A) requires federal courts to set aside federal agency action that is not in accordance with law") (internal citation and quotations omitted); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 295 (4th Cir. 2018) ("the APA's default rule ... empowers this Court to 'hold unlawful and set aside agency action.'"). And district courts in this circuit have affirmed the validity of vacatur in the wake of *Corner Post*, including in immigration cases. *See, e.g., Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 119–20 (D. Md. 2025), *appeal dismissed*, 2026 WL 3135309 (4th Cir. Jan. 22, 2026) ("Like every other court to consider this issue since *CASA*, this Court believes the APA has always expressly authorized vacatur, and *CASA* did not change that") (collecting cases); *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 176 (D. Md. 2025), *appeal dismissed*, 2026 WL 2057411 (4th Cir. June 23, 2026) ("the limiting principle on universal or national injunctions announced

in *CASA* does not apply to APA cases"); *Asylum Seeker Advoc. Project v. Exec. Off. for Immigr. Rev.*, 2026 WL 2833568, at *16 (D. Md. Sept. 22, 2026) ("vacating a rule means that it is void, null, and nonexistent; the government cannot continue to enforce it, implement it, or otherwise use it").

Finally, Congress has long ratified this settled understanding. *See* Sohoni Amicus Br. 7–8. The APA's drafters intended for the statute's judicial review provisions "to ensure the complete coverage of every form of agency power, proceeding, action and in-action." *Id.* at 7 (quoting S. Rep. No. 79-752, at 197–98 (1945) (Senate Judiciary Committee Report)). Congress has since left the set-aside power untouched while courts invoked it, year after year, to invalidate unlawful rules. *Id.* By 1967, *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), had settled that the APA permitted facial, pre-enforcement challenges to regulations without any separate statutory authorization for such suits. Sohoni Amicus Br. 7 & n.8. Yet when Congress amended the APA's judicial review provisions in 1976, it left the remedial powers of the reviewing courts exactly where it found them. *Id.* (citing Act of Oct. 21, 1976, Pub. L. No. 94-574, § 1, 90 Stat. 2721, 2721-22 (amending 5 U.S.C. §§ 702, 703)). "Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that 'Congress at least acquiesces in, and

apparently affirms, that [interpretation].'" *Monessen Sw. Ry. v. Morgan*, 486 U.S. 330, 338 (1988) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 703 (1979)); *see also* Sohoni Amicus Br. 8. That principle carries special force where, as here, the courts have construed a statutory directive with "virtual unanimity over more than seven decades" and Congress has not acted; that "longstanding" interpretation should not be revised "in the face of such congressional inaction." Sohoni Amicus Br. 8 (quoting *Monessen Sw. Ry.*, 486 U.S. at 338–39).

Reading "set aside" in Section 706 to mean party-specific relief would likewise shrink the courts of appeals' power under parallel "set aside" statutes, because those courts apply the APA's standards on review. *See* Sohoni, *Past and Future*, 133 Yale L.J. at 2376–78. Since 1946, federal courts at every level have analyzed the APA's text, structure, history, and purpose to read the APA's command to "set aside" unlawful agency action as authorizing vacatur that extends relief beyond the parties before the court. The government offers no compelling reason for this Court to change course now.

### B. The government's approach would create the asymmetry and confusion that Congress sought to avoid.

Limiting relief to the parties would create a patchwork of unlawful enforcement, and any change to the settled rule is for Congress to make. "[H]owever one weighs the pros and cons" of such relief, "[i]t was Congress's job to weigh those consequences in enacting the APA," and Congress "elected to authorize that relief in the APA, authorized similar relief in subsequent statutes over the years, and has abided" the results ever since. Sohoni Amicus Br. 16. Caution is especially important because the APA supplies the default rules of federal administrative law. Its language is "borrowed and cross-referenced" throughout the U.S. Code, and it fills the gap whenever other statutes are silent about remedies. *Id.* at 19. Redefining its remedial provisions would therefore unsettle far more than this case. *See id.*

The government's alternative approach (at 57–59) would produce exactly the results the APA's remedy avoids. Party-specific relief would let the government keep enforcing a policy a court has held unlawful against everyone who did not sue. *See* Sohoni Amicus Br. 17. But the Supreme Court has said that when a provision is declared invalid, it "cannot be lawfully enforced" against the plaintiff or "against others." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 n.8 (2020) (plurality opinion). "Set aside"

has a fixed meaning in the APA, *supra* Part II.A.1, and that meaning "cannot reasonably depend on the specific party before the court." *Corner Post*, 603 U.S. at 842 (Kavanaugh, J., concurring). "Either the APA authorizes vacatur, or it does not." *Id.*

Here, the government's approach would mean consular officers applying the Proclamations to some derivative asylees but not others, based only on who happened to join the complaint. It would also multiply litigation. Limiting relief to the parties invites a "flood of duplicative litigation" against a policy already held unlawful, *Nat'l Mining Ass'n*, 145 F.3d at 1409, and it is "wholly impractical—and a huge waste of resources—to expect and require every potentially affected party to bring pre-enforcement [APA] challenges," *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 18 (2019) (Kavanaugh, J., concurring in the judgment); Sohoni Amicus Br. 17. That concern is acute for refugee families abroad, who have little practical ability to retain counsel to sue federal actors.

The government also repeats (at 58) its contention that Appellees asked only for party-specific relief because the complaint requested that the policy be set aside "as used to deny boarding foils to Derivative Plaintiffs." That misreads the complaint. Appellees asked that "the State Department's policy

applying Proclamation 10949 to follow-to-join asylees" be "set aside," JA134–135, and "set aside" is the APA's term for vacatur, *supra* Part II.A.1. The phrase "as used to deny boarding foils" identified the policy application being challenged by the plaintiffs; it did not limit who benefits from setting that policy aside. That this prayer sought vacatur is confirmed by the fact that Appellees requested individualized remedies for the plaintiffs, including invalidation of the boarding-foil denials issued to the interviewed families, in a separate section of the prayer for relief. JA135. No further elaboration was required, because "APA suits ultimately target the rule, and not necessarily the application of it to a particular person." *Am. Fed'n of Tchrs.*, 796 F. Supp. 3d at 120. Nor did the district court decide a question the parties never presented. *Cf. Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339, 343 (2026). The government asked the district court to limit vacatur to the named plaintiffs, and Appellees opposed that request and asked the court to vacate the policy. The scope of vacatur was squarely presented below, and the district court resolved it in Appellees' favor. JA273 at 18:9–12; JA27.

**C. Vacatur is not subject to "traditional" equitable principles.**

Last, the government contends that vacatur must yield to traditional equitable principles. That argument fails twice over. Vacatur is not

traditional equitable relief. And even if it were, Congress can depart from baseline equitable principles, and it did so here.

Three features distinguish vacatur from traditional equitable remedies. First, vacatur is mandatory, not discretionary. Equitable relief is discretionary, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006), but Section 706 provides that the reviewing court "shall" set aside unlawful agency action. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("the word 'shall' usually connotes a requirement").

Second, vacatur operates on the agency action, not on parties. An injunction is "a judicial process or mandate operating *in personam*" that "is directed at someone, and governs that party's conduct." *Nken v. Holder*, 556 U.S. 418, 428 (2009). That *in personam* character is why injunctions bind only the parties; courts of equity historically could not even annul a deed or establish title by force of their decree. *Hart v. Sansom*, 110 U.S. 151, 155 (1884). Vacatur, by contrast, operates on the agency action itself. It is self-executing, working "in the same way that an appellate court formally revokes an erroneous trial-court judgment." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018); *see also* Sohoni Amicus Br. 14.

The government argues (at 57) that because "agency action" includes "the whole or a part of an agency rule," 5 U.S.C. § 551(13), a court may vacate only the applications of a rule that affect the plaintiffs. But "a part of" a rule describes a severable piece of the rule's text, not a subset of the persons the rule governs. Rules are not composed of plaintiff parts and non-plaintiff parts. *See* Sohoni Amicus Br. 2, 4 n.5. And the government has identified no decision ordering the partial plaintiff-only vacatur it posits. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019); Kathryn Kimball Mizelle, *To Vacate or Not to Vacate*, Harv. J.L. & Pub. Pol'y Per Curiam 1, 18 (Fall 2023) (noting the government "never cited any case that has ever authorized partial vacatur").

Third, vacatur looks backward, not forward. Vacatur "undo[es] or expung[es] a past [agency] action," *Texas v. Biden*, 20 F.4th 928, 957 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022), while equitable remedies look forward, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). *Cf. Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (vacatur is a "less drastic remedy" than an injunction). These features also show why the government's alternative is unworkable. "[H]ow could th[e] Court vacate the Rule with respect to the ... plaintiffs in this case without vacating the Rule

writ large? What would it mean to 'vacate' a rule as to some but not other members of the public?" *O.A.*, 404 F. Supp. 3d at 153. Vacatur has one target: the challenged agency action. Once that action is set aside, there is nothing left to apply to anyone. A court cannot tailor a vacatur to reach only the winning plaintiffs. So the word "universal" in "universal vacatur" adds nothing.

Even if vacatur were like other forms of equitable relief, Congress overrode the default, as it is free to do. Congress may "guide or control the exercise of the courts' discretion" through "a clear and valid legislative command." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *see Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 329, 333 (1999) ("substantial expansion" of equitable practice is left to Congress); Sohoni Amicus Br. 21. Section 706 is that kind of command. It makes the set-aside mandatory and aims it at the agency action. The statute, not background equity practice, sets the remedy's scope.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court setting aside and vacating the State Department's policy of applying the entry ban to derivative asylees and allow asylum holders in the

United States to reunite with their spouses and children abroad, as permitted by U.S. asylum law and the express language in the Proclamations themselves.

Dated: November 12, 2026

Respectfully submitted,

*s/Lindsay Hannibal*

Ryan T. Scarborough
William P. Ashworth
Danielle J. Barondess
Lindsay P. Hannibal
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
rscarborough@wc.com
washworth@wc.com
dbarondess@wc.com
lhannibal@wc.com

Ghita Schwarz
Guadalupe Aguirre
Pedro Sepulveda
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Fl.
New York, NY 10004
Telephone: (516) 838-1655
gschwarz@refugeerights.org
laguirre@refugeerights.org
psepulveda@refugeerights.org

*Counsel for Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully submit that, given the complexity and importance of the statutory and constitutional issues presented, oral argument would be helpful to the disposition of this appeal. *See* Local Rule 34(a).

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(a) and 32(g), I certify that the text of this brief is double-spaced, proportionally spaced CenturyExpd BT type; the footnotes are single-spaced, proportionally spaced CenturyExpd BT type; and the brief contains 12,764 words, excluding the parts of the brief exempted by Rule 32(f), which does not exceed the 13,000-word limit of Rule 32(a)(7)(B).

Dated: November 12, 2026

*s/ Lindsay Hannibal*
Lindsay P. Hannibal
Attorney for Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated: November 12, 2026

*s/ Lindsay Hannibal*
Lindsay P. Hannibal
Attorney for Appellees